UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT, US DISTRICT JUDGE

- - -

UNITED STATES OF AMERICA,  )
                           )
        PLAINTIFF,         )
                           )
VS.                        )   NO. CR-18-50(B)-JAK
                           )
(1) YI-CHI SHIH, ET AL.,   )
                           )
        DEFENDANT.         )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL

DAY 4, VOLUME II

TUESDAY MAY 21, 2019

11:55 A.M.

LOS ANGELES, CALIFORNIA

SERENA WONG, CSR 10250, RPR, CCRR 200
COURT REPORTER PRO TEMPORE
350 W. 1ST STREET
LOS ANGELES, CALIIFORNIA 90012
SW10250@GMAIL.COM

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                           BY:  MELANIE SARTORIS
 3                             ASSISTANT US ATTORNEY
                               JAMES HUGHES,
 4                             ASSISTANT US ATTORNEY
                               WILLIAMS ROLLINS,
 5                             ASSISTANT US ATTORNEY
                               KHALDOUN SHOBAKI,
 6                             ASSISTANT US ATTORNEY
                           312 NORTH SPRING STREET
 7                         13TH FLOOR
                           LOS ANGELES, CALIFORNIA  90012
 8                         213-894-2434

 9

10

11

12   FOR DEFENDANT:        SPERTUS LANDES & UMHOFER
                           BY:  JOHN HANUSZ, ESQ.
13                             JAMES W. SPERTUS, ESQ.
                               CHRISTINA WASSERMAN, ESQ.
14                         1990 SOUTH BUNDY DRIVE
                           SUITE 705
15                         LOS ANGELES, CALIFORNIA  90025
                           310-826-4700
16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3   GOVERNMENT'S WITNESSES:                        PAGE

 4

 5   PETER LAWRENCE MATTIS

 6   DIRECT EXAMINATION BY MR. SHOBAKHI              10

 7

 8   JOSHUA LOUIS PASCOE

 9   DIRECT EXAMINATION BY MS. SARTORIS             20

10

11   MAUREEN MILLER

12   DIRECT EXAMINATION BY MS. SARTORIS             40

13

14

15

16   FURTHER PROCEEDINGS                            PAGE

17

18   DISCUSSION HELD OUTSIDE PRESENCE OF JURY        5

19   DISCUSSION HELD AT SIDEBAR                     17

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2   TRIAL EXHIBIT NUMBER              MARKED    ADMITTED

 3   700                                           53

 4   702                                           56

 5   703                                           56

 6   704                                           56

 7   705                                           59

 8   788                                           42

 9   789                                           50

10   790                                           54

11   791                                           59

12   792                                           60

13   1670                                          26

14   1671                                          26

15   1672                                          26

16   1673                                          26

17   1674                                          26

18   1676                                          25

19   1676-A                            24          39

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY MAY 21, 2019

 2                           --OOO--

 3

 4              (THE FOLLOWING WAS HELD OUTSIDE THE PRESENCE OF

 5         THE JURY.)

 6              THE CLERK:  PLEASE REMAIN SEATED AND COME TO

 7    ORDER.

 8              THE COURT:  WE'RE BACK ON THE RECORD IN THE

 9    UNITED STATES VERSUS YI-CHI SHIH.  NO JURORS ARE PRESENT.

10    ALL COUNSEL WHO WERE PREVIOUSLY HERE ARE PRESENT.  I

11    UNDERSTAND THE GOVERNMENT NOW WANTS TO GO FORWARD WITH THE

12    TESTIMONY.

13              MR. ROLLINS:  YES.  I APOLOGIZE, YOUR HONOR.  WE

14    CONFERRED DURING THE BREAK, AND THERE IS A CHANCE WE COULD

15    CONCLUDE OUR CASE IN CHIEF BEFORE MR. MATTIS IS AVAILABLE

16    ON JUNE 6.  AND FOR THAT REASON, WE THINK IT WOULD BE

17    HELPFUL TO HAVE VERY LIMITED TESTIMONY FROM HIM WHILE HE IS

18    AVAILABLE TODAY FOR THE DEFENSE TO CROSS AND THEN ELECT FOR

19    A RECALL AFTER -- OR AFTER THE DEFENSE CASE SO THAT WAY

20    WE'RE NOT UP AGAINST A JUNE 6 DEADLINE WITHOUT ANY

21    WITNESSES LEFT AND MR. MATTIS BEING UNAVAILABLE.

22              MR. SPERTUS:  YOUR HONOR, SEPARATING THE CROSS IN

23    THE MANNER THAT COUNSEL JUST DESCRIBED WILL REQUIRE US ON

24    CROSS TO ALWAYS REMIND THE JURY AGAIN ABOUT THE DIRECT.  TO

25    SEPARATE CROSS AND DIRECT IS A SEPARATE ERROR IN THIS CASE,
```

```
 1   AND WE WILL ABSOLUTELY BE GOING BEYOND --

 2           THE COURT:  NO, THAT IS NOT WHAT I HAVE IN MIND.

 3   EXCUSE ME.  WHAT I HAVE IN MIND IS THAT IF THE WITNESS IS

 4   PRESENTED TODAY, THE DEFENSE SHOULD CROSS-EXAMINATION HIM

 5   TODAY, BEST YOU CAN.  IF YOU LATER DETERMINE THAT YOU THINK

 6   FURTHER CROSS-EXAMINATION IS NECESSARY AND APPROPRIATE AND

 7   PERSUADE ME OF THAT, THEN HE WILL BE RECALLED, AND YOU CAN

 8   CONDUCT FURTHER CROSS-EXAMINATION.

 9           MR. SPERTUS:  SO THERE'S TWO ISSUES.  EVEN THE

10   CROSS-EXAMINATION THAT MR. HANUSZ DID IS LIKELY GOING TO

11   REQUIRE THE WITNESS TO COME BACK TOMORROW MORNING GIVEN

12   THAT IT IS NOW NOON.  AND SO IF THE GOVERNMENT IS GOING TO

13   SUGGEST ANY UNAVAILABILITY TOMORROW, THEN THAT PLAN WON'T

14   WORK.

15           THE COURT:  WE'LL SEE HOW IT GOES.

16           MR. SHOBAKHI:  YOUR HONOR, I UNDERSTAND HE HAS A

17   FLIGHT BACK TOMORROW, I THINK MIDDAY.

18           THE COURT:  AND WE MAY GO A LITTLE LATER TODAY,

19   SO WE CAN FINISH WHAT WE CAN DO TODAY.

20           MR. SPERTUS:  WE'RE GOING TO ADJUST ACCORDING TO

21   THE COURT'S RULINGS, OF COURSE.  OBVIOUSLY THIS IS

22   SOMETHING THAT WE FEEL VERY STRONGLY SHOULDN'T BE ALLOWED.

23           THE COURT:  I UNDERSTAND.  I RESPECT THAT.

24           IS MR. MATTIS NEARBY?

25           MR. ROLLINS:  YES, YOUR HONOR.
```

1              THE COURT:  WOULD YOU HAVE HIM COME IN, PLEASE.

2              PLEASE COME FORWARD, MR. MATTIS.  RIGHT THERE IS

3    FINE.  PLEASE BE SEATED.  AND WOULD YOU RESTATE YOUR NAME,

4    PLEASE.

5              THE WITNESS:  PETER LAWRENCE MATTIS.

6              THE COURT:  ALL RIGHT.  GOOD AFTERNOON,

7    MR. MATTIS.  MR. MATTIS, AS I THINK YOU'VE HEARD, WE'LL

8    BEGIN YOUR TESTIMONY TODAY.  WE MAY CONCLUDE IT TODAY OR WE

9    MAY NEED TO HAVE YOU COME BACK ANOTHER DAY.

10             DO YOU UNDERSTAND THAT?

11             THE WITNESS:  YES.

12             THE COURT:  WITH RESPECT TO YOUR TESTIMONY TODAY,

13   BASED ON RULINGS I'VE MADE IN RESPONSE TO QUESTIONS ABOUT

14   THESE ENTITIES AND THE OPINIONS YOU MAY HAVE ABOUT THEM, I

15   DON'T WANT YOU TO REFER TO THE CHINESE MILITARY OR WEAPON

16   SYSTEMS OR THAT SORT -- IN ANY WORDS THAT WOULD SUGGEST A

17   CONNECTION BETWEEN THESE ENTITIES AND THE CHINESE MILITARY.

18   CAN YOU FOLLOW THAT INSTRUCTION AND STILL PROVIDE YOUR

19   OPINIONS?

20             THE WITNESS:  I THINK -- IN SOME CASES, NO.  IN

21   SOME CASES, I THINK YES.

22             THE COURT:  ALL RIGHT.  WITH RESPECT TO -- TO BE

23   CLEAR, I'M DISTINGUISHING A REFERENCE TO THE CHINESE -- TO

24   THE MILITARY OF THE PEOPLE'S REPUBLIC OF CHINA AND THE

25   GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA, SO THAT AN

 1  ENTITY THAT IS RELATED TO THE GOVERNMENT IS SOMETHING THAT

 2  COULD BE STATED, AS OPPOSED TO IT'S RELATED TO THE MILITARY

 3  OF THE PEOPLE'S REPUBLIC OF CHINA.

 4           THE WITNESS:  ALL RIGHT.  I CAN SAY THAT THEY'RE

 5  STATE-OWNED ENTERPRISES.

 6           THE COURT:  YES.

 7           THE WITNESS:  AM I ALLOWED TO SAY THAT -- TO USE

 8  THE WORDS OF AT LEAST ONE OF THE ORGANIZATIONS THAT SAYS

 9  THAT IT REPORTS -- THAT IT TAKES DIRECTION FROM THE CENTRAL

10  MILITARY COMMISSION?

11           THE COURT:  NO.  I'D LIKE YOU TO OMIT THAT.

12           THE WITNESS:  I THINK, IN GENERAL, I CAN SAY THAT

13  THEY'RE GOVERNMENT LINKED.

14           THE COURT:  ALL RIGHT.  THANK YOU.  THEN WOULD

15  YOU PLEASE STEP DOWN SO WHEN THE JURY ENTERS YOU CAN BE

16  RECALLED.  THANK YOU.

17           MR. SHOBAKHI:  YOUR HONOR, ONE QUESTION OF

18  CLARIFICATION.  THE COURT SPECIFICALLY PREVIOUSLY SAID THAT

19  WITH RESPECT TO THE 607 INSTITUTE, THE WITNESS COULD

20  TESTIFY ABOUT MISSILES BUT NOT SAY THAT IT WAS RELATED TO

21  THE MILITARY.  DOES THAT STILL STAND?

22           THE COURT:  YES.

23           MR. SHOBAKHI:  THANK YOU, YOUR HONOR.

24           MR. HANUSZ:  I'D LIKE TO GET A PROFFER ON WHAT

25  TESTIMONY THE GOVERNMENT INTENDS TO ELICIT.

```
 1            THE COURT:  I'D RATHER -- GIVING ALL THE BRIEFING

 2   WE'VE HAD AND THE DISCUSSIONS WE'VE HAD, I THINK A LOT OF

 3   THAT SHOULD BE KNOWN, NOTWITHSTANDING OUR DISAGREEMENT ON

 4   DISCLOSURE.

 5            IS IT POSSIBLE TO LET ANDREA KNOW WE'RE READY?

 6            (JURY IN AT 12:02 P.M.)

 7            THE CLERK:  ALL RISE.

 8            THE COURT:  ALL OF OUR JURORS ARE BACK.  PLEASE

 9   BE SEATED.

10            LADIES AND GENTLEMEN, I DO WANT TO TELL YOU THAT

11   I TAKE FULL RESPONSIBILITY FOR KEEPING YOU WAITING.  IT'S

12   ON ME.  AS I SAID AT THE OUTSET, THERE ARE TIMES WHERE WE

13   NEED TO CONFER ABOUT THINGS.  WE DO OUR VERY BEST TO DO

14   THOSE WHEN YOU'RE NOT HERE, BUT SOMETIMES WE CAN'T AVOID

15   THAT.  SO I TAKE RESPONSIBILITY.  I APOLOGIZE TO YOU FOR

16   KEEPING YOU WAITING.

17            WOULD THE GOVERNMENT CALL THE NEXT WITNESS,

18   PLEASE.

19            MR. SHOBAKHI:  YES, YOUR HONOR.  THE UNITED

20   STATES CALLS PETER L. MATTIS.

21            THE COURT:  WOULD YOU COME FORWARD, PLEASE, SIR.

22            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

23            (WITNESS SWORN.)

24            THE CLERK:  PLEASE HAVE A SEAT.  CAN YOU STATE

25   YOUR FULL NAME AND SPELL IT FOR THE RECORD.
```

```
 1              THE WITNESS:  MY NAME IS PETER LAWRENCE MATTIS,

 2   P-E-T-E-R L-A-W-R-E-N-C-E M-A-T-T-I-S.

 3              THE COURT:  GOOD AFTERNOON, MR. MATTIS.

 4              PLEASE PROCEED, MR. SHOBAKHI.

 5                     PETER L. MATTIS,

 6              HAVING BEEN FIRST DULY SWORN,

 7         WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 8                   DIRECT EXAMINATION

 9   BY MR. SHOBAKHI:

10   Q    GOOD AFTERNOON, MR. MATTIS.  CAN YOU PLEASE TELL THE

11   JURY WHAT YOU DO FOR A LIVING?

12   A    I AM A RESEARCH FELLOW IN CHINA STUDIES AT THE VICTIMS

13   OF COMMUNISM MEMORIAL FOUNDATION AND A CONTRIBUTING EDITOR

14   TO THE ONLINE PUBLICATION "WAR ON THE ROCKS."  AND MY

15   PRIMARY FOCUS IS ON CHINA, ITS POLITICS, ITS SECURITY, AND

16   THE -- THE PARTY NETWORKS THAT STRETCH OUT FROM THE PARTY

17   CENTER.

18   Q    WHEN YOU SAY "PARTY NETWORKS," THAT REFERS TO THE

19   CHINESE GOVERNMENT?

20   A    YES.

21   Q    CAN YOU DESCRIBE YOUR EDUCATION?

22   A    I WAS EDUCATED AT THE UNIVERSITY OF WASHINGTON WITH

23   BACHELOR'S DEGREES IN POLITICAL SCIENCE AND ASIAN STUDIES,

24   WHICH MEANT CONTEMPORARY CHINESE AND JAPANESE HISTORY.  I

25   STUDIED AT TSINGHUA UNIVERSITY (PHONETIC) IN BEIJING.
```

1    WHILE I WAS AN ANALYST AT THE CENTRAL INTELLIGENCE AGENCY,

2    I WORKED ON MY MASTER'S DEGREE AT GEORGETOWN UNIVERSITY

3    WHERE I WROTE A THESIS ON CHINESE INTELLIGENCE OPERATIONS.

4    AND I STARTED AND ABORTED A PH.D. PROGRAM AT THE UNIVERSITY

5    OF CAMBRIDGE.

6    Q    YOU STARTED A PH.D. BUT YOU DIDN'T --

7    A    I DECIDED TO STOP THE PROGRAM.

8    Q    AND CAN YOU DESCRIBE YOUR WORK HISTORY AS IT RELATES

9    TO CHINA?

10   A    WELL, I WAS AN UNDERGRADUATE.  I WAS A RESEARCH

11   ASSOCIATE AT THE NATIONAL BUREAU OF ASIAN RESEARCH IN

12   SEATTLE.  WHEN I -- AFTER I GRADUATED AND WHILE I WAS

13   WAITING FOR SECURITY CLEARANCE, I CONTINUED WORKING THERE.

14        IN 2006 TO 2010, I WORKED AS A COUNTER-INTELLIGENCE AT

15   THE CENTRAL INTELLIGENCE AGENCY.  AND AFTER I LEFT, I

16   FINISHED MY MASTER'S DEGREE IN THE SPRING OF 2011 AND WENT

17   TO WORK AT THE JAMESTOWN FOUNDATION, WHERE I EDITED THE

18   CHINA BRIEF, A BIWEEKLY PUBLICATION ON CHINA, FROM 2011 TO

19   2013.  AND I REMAINED AS A NONRESIDENT FELLOW UNTIL THE

20   SPRING OF LAST YEAR, BEFORE I MOVED OVER TO THE VICTIM'S OF

21   COMMUNISM MEMORIAL FOUNDATION.

22   Q    IN THE COURSE OF YOUR WORK, DO YOU CONDUCT RESEARCH ON

23   CHINA?

24   A    YES.

25   Q    AND HOW DO YOU CONDUCT RESEARCH ON CHINA?

1    A    I USE SECONDARY LITERATURE FROM NONCHINESE ACADEMICS.

2    I USE INTERNET RESEARCH.  I RESEARCH USING CHINESE

3    PUBLICATIONS, BOTH FROM THE PEOPLE'S REPUBLIC OF CHINA AND

4    FROM THE REPUBLIC OF CHINA OR TAIWAN.  I SOMETIMES USE

5    RESEARCH DATABASES LIKE PROQUEST OR LEXUS NEXUS, AS WELL AS

6    THE CHINA NATIONAL KNOWLEDGE INFRASTRUCTURE, WHICH IS A

7    DATABASE IN THE PRC THAT CAN BE ACCESSED FROM ABROAD.

8    Q    WHEN YOU SAY "PRC," IS THAT PEOPLE'S REPUBLIC OF

9    CHINA?

10    A    PEOPLE'S REPUBLIC OF CHINA, YES.

11    Q    SO THAT'S A CHINESE DATABASE?

12    A    YES.  CHINESE PERIODCALS, MAGAZINES, JOURNALS.

13    Q    AND THROUGH YOUR WORK RESEARCHING CHINA, HAVE YOU

14    BECOME FAMILIAR WITH THE TYPES OF INFORMATION SOURCES

15    AVAILABLE ABOUT CHINA AND THE RELATIVE RELIABILITY OF THOSE

16    VARIOUS SOURCES?

17    A    I WOULD LIKE TO THINK SO.

18    Q    DOES YOUR EXPERIENCE AS A RESEARCHER INFORM YOUR

19    ABILITY TO EVALUATE SOURCES?

20    A    YES.

21    Q    HAVE YOU BEEN INVOLVED IN WRITING PUBLICATIONS BASED

22    ON YOUR WORK ABOUT CHINA?

23    A    YES.

24    Q    AND WHAT FORM OF PUBLICATIONS HAVE YOU BEEN INVOLVED

25    WITH?

1  A    I'VE WRITTEN QUITE A FEW SHORT ARTICLES.  I'VE WRITTEN

2  SEVERAL BOOK CHAPTERS, AND I WROTE A SHORT MONOGRAPH ON THE

3  CHINESE MILITARY, AND I HAVE A FORTHCOMING BOOK THAT I WAS

4  CO-AUTHORED ON ON THE ESPIONAGE ACTIVITY OF THE CHINESE

5  COMMUNIST PARTY FROM 1927 TO THE PRESENT.

6          MR. SPERTUS:  OBJECTION, YOUR HONOR.  THAT

7  VIOLATES THE COURT'S ORDER.

8          THE COURT:  LADIES AND GENTLEMEN, PLEASE

9  DISREGARD THE LAST TESTIMONY PLEASE.

10         NEXT QUESTION.

11 Q   BY MR. SHOBAKHI:  ARE YOU PART OF ANY PROFESSIONAL

12 ORGANIZATIONS?

13 A    I HAVE BEEN SOME PART OF THE NATIONAL STUDIES

14 ASSOCIATION AND THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

15 Q    WHAT ARE THOSE?

16 A    THEY'RE ACADEMIC ORGANIZATIONS THAT HOST ANNUAL OR

17 REGIONAL CONFERENCES.

18 Q    HAVE YOU ALSO BEEN AN INVESTIGATOR ON GRANTS RELATED

19 TO CHINA?

20 A    YES.

21 Q    AND WHAT ARE GRANTS?

22 A    YOU PROVIDE A -- IN THESE CASES, I PROVIDED A PROPOSAL

23 TO SEVERAL FOUNDATIONS.  AND THE SMITH RICHARDSON

24 FOUNDATION ACCEPTED BOTH FOR RUNNING THE JAMESTOWN

25 FOUNDATION'S CHINA BRIEF AND ALSO FOR -- AND ALSO FOR A

1    BOOK PROJECT.

2    Q    SO DID YOU WRITE PROPOSALS FOR THOSE?

3    A    YES, I DID.

4    Q    AND WERE THOSE FOR RESEARCH RELATED TO CHINA?

5    A    YES.

6    Q    AND YOU WERE GIVEN GRANTS TO CARRY ON THAT WORK?

7    A    YES.

8    Q    HAVE YOU ENGAGED IN SPEAKING ENGAGEMENTS RELATED TO

9    CHINA?

10   A    YES.

11   Q    CAN YOU JUST BRIEFLY DESCRIBE, KIND OF, THE NATURE OF

12   THAT?

13   A    I'VE BEEN INVITED TO SPEAK AT UNIVERSITIES TO

14   GOVERNMENT AUDIENCES, TO TESTIFY IN FRONT OF CONGRESS

15   RELATED TO THE SECURITY EFFORTS OF THE CHINESE GOVERNMENT.

16          MR. SHOBAKHI:  YOUR HONOR, AT THIS POINT, I'D

17   MOVE TO QUALIFY MR. MATTIS AS AN EXPERT ON RESEARCH ON

18   CHINA AND THE CHINESE GOVERNMENT.

19          MR. SPERTUS:  YOUR HONOR, WE OBJECT TO THE COURT

20   QUALIFYING MR. MATTIS AS AN EXPERT ON ANYTHING.  BUT WE

21   WON'T OBJECT TO OPINION QUESTIONS.

22          THE COURT:  ALL RIGHT.  I FIND HE'S SUFFICIENTLY

23   QUALIFIED TO PROVIDE THE OPINIONS THAT HAVE BEEN OFFERED

24   AND ADDRESSED IN THIS MATTER BY COUNSEL AND MYSELF.  AND

25   WITHOUT -- AND RECOGNIZING THE DISAGREEMENT AS TO CERTAIN

1    OF THOSE ISSUES.

2              GO AHEAD, PLEASE.

3    Q    BY MR. SHOBAKHI:  IN CONNECTION WITH THIS CASE, WERE

4    YOU ASKED TO RESEARCH AND PROVIDE OPINIONS AS TO THE NATURE

5    AND IDENTITY OF CERTAIN ENTITIES?

6    A    YES.

7    Q    OKAY.  NOW, WITH RESPECT TO THOSE ENTITIES, I'LL ASK

8    YOU A NAME AND THEN ASK YOU TO PROVIDE YOUR OPINION WITH

9    RESPECT TO THAT ENTITY, MINDFUL OF THE VARIOUS

10   ADMONISHMENTS, PLEASE.

11             FIRST, CHINA ELECTRONICS TECHNOLOGY GROUP

12   CORPORATION, 29 RESEARCH INSTITUTE, SET C-29, AKA CHINA

13   SOUTHWEST ELECTRONIC EQUIPMENT RESEARCH INSTITUTE, AKA 29

14   INSTITUTE, AKA CHENGDU SIWEI ELECTRONICS COMPANY, DID YOU

15   FORM AN OPINION BASED ON YOUR RESEARCH ABOUT THAT ENTITY?

16   A    YES.

17   Q    AND CAN YOU PLEASE SAY WHAT THAT OPINION IS.

18   A    THAT THE CHINA ELECTRONICS TECHNOLOGY GROUP

19   CORPORATIONS, 29TH RESEARCH INSTITUTE IS A STATE-OWNED

20   RESEARCH INSTITUTE THAT DOES RESEARCH ON ELECTRONIC

21   COMPONENTS THAT -- IN WHICH THE CHINESE GOVERNMENT HAS AN

22   INTEREST IN DEVELOPING.

23   Q    NOW, WITH RESPECT TO CHENGDU RML TECHNOLOGY COMPANY

24   LIMITED, IS THAT AN ENTITY ABOUT WHICH YOU'VE REACHED AN

25   OPINION BASED ON YOUR RESEARCH?

1    A    YES.

2    Q    CAN YOU PLEASE TELL THE JURY WHAT YOUR OPINION IS,

3    BASED ON YOUR RESEARCH?

4    A    IT APPEARS TO BE STAFFED BY -- OR AT LEAST ONE OR TWO

5    OF THE INDIVIDUALS THAT ARE ASSOCIATED WITH THAT COMPANY

6    APPEAR TO BE -- APPEAR TO BE RELATED TO THE CHINESE

7    GOVERNMENT, AND THEY APPEAR TO ACT AS FACILITATORS

8    CONNECTING PEOPLE OUTSIDE CHINA TO COMPANIES INSIDE CHINA

9    WITH AN INTEREST IN DEVELOPING COOPERATIVE AGREEMENTS.

10   Q    WITH RESPECT TO KING -- I'M SORRY ABOUT THE

11   PRONUNCIATION -- QING'AN INTERNATIONAL TRADING CO.

12   LIMITED, AKA QING'AN TRAINING GROUP OR QTC, DID YOU REACH

13   AN OPINION?

14   A    YES.

15   Q    CAN YOU PLEASE TELL THE JURY WHAT THAT IS.

16   A    THE QING'AN TRADING CORPORATION, AGAIN, APPEARS TO BE

17   LINKED TO THE CHINESE GOVERNMENT; AND IT APPEARS TO MAKE

18   CONNECTIONS BETWEEN FOREIGN ENTITIES AND RESEARCH

19   INSTITUTES INSIDE CHINA FOR THE PURPOSE OF DEVELOPING

20   COOPERATIVE AGREEMENTS THAT RELATE TO EXPERTISE OR

21   TECHNOLOGY THAT IS DESIRED INSIDE THE PEOPLE'S REPUBLIC OF

22   CHINA.

23   Q    WITH RESPECT TO CHINA AVIONICS SYSTEMS CO. LIMITED,

24   DID YOU REACH AN OPINION AS TO THAT ENTITY?

25   A    YES.  IT IS A STATE-OWNED ENTERPRISE THAT IS ACTIVE IN

1    ALL PARTS OF THE AEROSPACE INDUSTRY.

2    Q    NOW, WITH RESPECT TO THE NUMBER 607 INSTITUTE, DID YOU

3    REACH AN OPINION WITH RESPECT TO THAT ENTITY?

4    A    THE AVIC 607 INSTITUTE IS A SUBSIDIARY OF THE LARGER

5    BODY, AND IT SEEMS TO BE FOCUSED ON ELECTRONIC COMPONENTS

6    THAT MIGHT -- OR THAT COULD BE USED IN MISSILES OR MISSILE

7    GUIDANCE SYSTEMS.

8    Q    FINALLY, WITH RESPECT TO BEIJING -- AGAIN, I'M SORRY

9    THE PRONUNCIATION -- BEIJING TIAN HANG SONG BAI TECHNOLOGY

10   INVESTMENT CO. LIMITED, DID YOU REACH AN OPINION BASED ON

11   YOUR RESEARCH?

12   A    I WAS UNABLE TO FORM AN OPINION BASED ON MY RESEARCH.

13          MR. SHOBAKHI:  NO FURTHER QUESTIONS, YOUR HONOR.

14          THE COURT:  JUST A MINUTE.  BEFORE -- I JUST WANT

15   TO TALK YOU BRIEFLY AT THE SIDE.

16          (SIDEBAR DISCUSSION.)

17          THE COURT:  MR. HANUSZ, MY QUESTION IS THIS.  DO

18   YOU WANT ME TO TELL THE JURY THAT THERE'S -- EITHER PRIOR

19   TO OR AFTER YOUR EXAMINATION OR AFTER THE REDIRECT, THAT

20   THERE'S A POSSIBILITY THAT THIS WITNESS MAY AGAIN BE

21   CALLED?

22          MR. SPERTUS:  CAN I ADDRESS THIS POINT?  WE'VE

23   DISCUSSED THIS POINT, IT WILL BE LATER AT TRIAL.  THERE

24   WILL BE NO CROSS AT THIS TIME.

25          THE COURT:  IF THE GOVERNMENT RESTS, WHAT ARE WE

1    GOING TO DO?

2            MR. SPERTUS:  WE'RE NOT IN A POSITION TO CROSS.

3    WE WILL NEED TO RESEARCH IT.

4            THE COURT:  THAT'S FINE.  YOU CAN RESEARCH.

5    BE MINDFUL OF THE FOLLOWING.  AS I SAID, I ALREADY RULED ON

6    THIS AREA, WHICH I THINK YOU CAN PRESENTLY CROSS-EXAMINE.

7    THERE'S NO ASSURANCE -- NO ONE HAS GUARANTEED THAT THE

8    WITNESS WILL BE RECALLED, DEPENDING ON THE TIMING OF TRIAL

9    AND THE SCHEDULING.  SO IF HE -- I'LL DO MY BEST, BUT I

10   THINK THERE ARE AREAS IN WHICH YOU, AS YOU DID EARLIER, CAN

11   CROSS-EXAMINE THE WITNESS AT THIS TIME.  AND IF YOU ELECT

12   NOT TO DO THAT, I THINK THERE'S SOME POSSIBILITY THAT THE

13   WITNESS MAY NOT BE RECALLED.

14           MR. SPERTUS:  BRIEFLY, THE CROSS THAT HAPPENED AT

15   THE 702 HEARING WAS MINIMALLY RESEARCHED, AND WE DON'T

16   BELIEVE IT IS APPROPRIATE FOR US TO EVEN DO THAT CROSS

17   TODAY, BUT WE AREN'T ACCEPTING RISK.  RESPECTFULLY, THE

18   COURT MUST MAKE HIM AVAILABLE.

19           MR. SHOBAKHI:  YOU CAN AGREE TO DISAGREE.  YOU

20   CAN GO TO HIS ABILITIES AND ABILITY TO OPINE ON CHINESE

21   MATTERS.  THERE'S A POSSIBILITY THAT THIS MAY NOT HAPPEN.

22   I'M THE ONE WHO BROUGHT THIS UP.  I'M THE ONE WHO SUGGESTED

23   HAVING HIM COME BACK.  I'M NOT GETTING IN THE WAY OF

24   ANYTHING, BUT THERE'S ALWAYS THE POSSIBILITY THAT A WITNESS

25   SAYS I CAN'T DO IT.

```
 1            MR. SPERTUS:  WE ARE HOPEFUL THAT THE OBSTACLES

 2   CAN BE CIRCUMVENTED.  I DON'T WANT THE RECORD TO SAY WE'RE

 3   ACCEPTING THIS WITNESS.

 4            THE COURT:  I'M TELLING YOU ARE AT THAT RISK

 5   BECAUSE OF THE REASONS I'VE STATED.

 6            MR. SPERTUS:  I UNDERSTAND, YOUR HONOR.  THANK

 7   YOU, YOUR HONOR.

 8            THE COURT:  MR. HANUSZ.

 9            MR. HANUSZ:  WE RESERVE CROSS UNTIL LATER IN THE

10   TRIAL.

11            (SIDEBAR CONCLUDED.)

12            THE COURT:  THANK YOU, MR. MATTIS.  WE'RE GOING

13   TO STOP YOUR TESTIMONY AT THIS POINT, AND EXPECT THAT YOU

14   MAY BE RECALLED LATER IN THE TRIAL.  THANK YOU.

15            THE GOVERNMENT CAN CALL ITS NEXT WITNESS, PLEASE.

16            MS. SARTORIS:  YES, YOUR HONOR.  THE GOVERNMENT

17   CALLS JOSH PASCOE.

18            THE CLERK:  PLEASE STEP FORWARD.

19            (WITNESS SWORN.)

20            THE CLERK:  PLEASE HAVE A SEAT.  PLEASE STATE

21   YOUR FULL NAME AND SPELL IT FOR THE RECORD.

22            THE WITNESS:  JOSHUA LEWIS PASCOE, J-O-S-H-U-A

23   L-O-U-I-S P-A-S-C-O-E.

24            THE COURT:  GOOD AFTERNOON, MR. PASCOE.

25            PLEASE PROCEED.
```

```
 1              MS. SARTORIS:  THANK YOU, YOUR HONOR.

 2                    JOSHUA LOUIS PASCOE,

 3              HAVING BEEN FIRST DULY SWORN,

 4         WAS EXAMINED AND TESTIFIED AS FOLLOWS:

 5                    DIRECT EXAMINATION

 6  BY MS. SARTORIS:

 7  Q     GOOD AFTERNOON.

 8  A     HELLO.

 9  Q     WHO DO YOU WORK FOR?

10  A     I WORK FOR HONEYWELL.

11  Q     AND HOW LONG HAVE YOU DONE THAT?

12  A     I'VE WORKED FOR THEM SINCE THE YEAR 2000.

13  Q     WHAT IS YOUR TITLE?

14  A     I'M THE VICE PRESIDENT OF TOWN ACQUISITION FOR OUR

15  AEROSPACE BUSINESS.

16  Q     HOW LONG HAVE YOU DONE THAT?

17  A     I'VE BEEN IN THAT ROLE SINCE SEPTEMBER OF 2018.

18  Q     WHAT WAS YOUR POSITION PRIOR TO THAT?

19  A     PRIOR TO THAT, I WAS THE SENIOR DIRECTOR FOR HR DATA

20  AND ANALYTICS.

21  Q     WHAT DOES THAT MEAN?

22  A     IN MY ROLE, I OVERSAW OUR CORE HR DATA SYSTEM CALLED

23  PEOPLESOFT, SO KEPT ALL THE EMPLOYEE RECORDS.  I WAS ALSO

24  RESPONSIBLE FOR REPORTING IN ANALYTICS FOR THE HR FUNCTION.

25  Q     SO YOU WERE THE GO-TO PERSON IF SOMEBODY NEEDED
```

```
 1   INFORMATION OR DOCUMENTS ABOUT AN EMPLOYEE OF HONEYWELL?

 2   A    YES.  PEOPLE WOULD COME TO ME FOR INFORMATION ABOUT

 3   CURRENT OR FORMER EMPLOYEES.

 4   Q    IN THAT POSITION, DID THERE COME A TIME WHEN YOU WERE

 5   REQUESTED TO OBTAIN INFORMATION THAT HONEYWELL MAY HAVE

 6   ABOUT AN INDIVIDUAL NAMED YI-CHI SHIH?

 7   A    YES, I WAS REQUESTED TO PROVIDE INFORMATION ON HIM.

 8   Q    DID YOU GATHER INFORMATION?

 9   A    YES.  I LOOKED AT SOME OF THE BASIC EMPLOYEE DATA, AS

10   WELL AS THE LEARNING INFORMATION ON HIM.

11   Q    SO YI-CHI SHIH WAS A CURRENT OR FORMER EMPLOYEE OF

12   HONEYWELL?

13   A    HE WAS A FORMER EMPLOYEE WHEN I WAS REQUESTED TO GET

14   THE INFORMATION.

15   Q    DOES HONEYWELL OFFER TRAINING?

16   A    YES.  HONEYWELL OFFERS A LOT OF DIFFERENT TRAINING TO

17   EMPLOYEES.

18   Q    COULD YOU DESCRIBE THAT GENERALLY, HOW IT'S WORKED AND

19   HOW IT'S TRACKED BY HONEYWELL?

20   A    SURE.  WE HAVE WHAT'S CALLED A LEARNING MANAGEMENT

21   SYSTEM.  AND IN THAT SYSTEM, WE OFFER DIFFERENT TYPES OF

22   TRAINING FOR EMPLOYEES THAT THEY CAN EITHER SIGN UP FOR OR

23   THAT IS ASSIGNED TO THEM.  SOMETIMES THE TRAINING IS

24   DIRECTLY IN THE WEBSITE.  SO YOU SIGN INTO THE WEBSITE.

25   YOU PULL UP THE TRAINING MATERIAL AND TAKE THE COURSE
```

1  ONLINE.  OTHER TIMES, YOU MIGHT ATTEND A TRAINING IN

2  PERSON.  AND AFTERWARDS, THE COURSE OWNER OR THE INSTRUCTOR

3  WILL SUBMIT THOSE RECORDS, AND THEN WE UPDATE THE TRAINING

4  SYSTEM TO SHOW THAT THAT COURSE WAS COMPLETED.

5  Q    SO BACKING UP A LITTLE BIT, YOU MENTIONED TWO

6  DIFFERENT KINDS OF TRAINING.  ONE IS A WEBSITE, AND YOU

7  MENTIONED SIGNING IN.  COULD YOU DESCRIBE HOW THAT WORKS,

8  GENERALLY.

9  A    SURE.  ALL EMPLOYEES HAVE A SPECIFIC UNIQUE IDENTIFIER

10 OR WHAT WE CALL AN EID.  SO THE EMPLOYEE WILL TYPE IN THEIR

11 EID, AS WELL AS THEIR SPECIFIC PASSWORD AND IT WOULD LOG

12 THEM INTO A LEARNING SYSTEM.  AND ONCE THEY'RE IN THE

13 SYSTEM, THEY CAN TAKE THE TRAINING.  AND ONCE THEY COMPLETE

14 IT, THE RECORD WILL BE STORED AUTOMATICALLY IN THE SYSTEM.

15 Q    AND THEN COULD YOU DESCRIBE -- YOU DESCRIBED, ALSO,

16 LIVE TRAINING THAT SOMEONE MIGHT ATTEND.  HOW DOES

17 INFORMATION ABOUT WHO ATTENDED THAT TRAINING MAKE ITS WAY

18 INTO THE HONEYWELL SYSTEM?

19 A    SURE.  THE COURSE TRAINER WOULD HAVE SIGN-IN SHEET.

20 ALL THE PARTICIPANTS WOULD SIGN.  NORMALLY, IT WOULD

21 PRINTED OUT AND THEIR HAVE EID.  THEY WOULD SIGN THEIR NAME

22 NEXT TO IT.  AND AFTERWARDS THE TRAINER WOULD SUBMIT THAT

23 TO OUR LEARNING TEAM, WHO WOULD THEN UPDATE THE RECORDS IN

24 THE LEARNING SYSTEM TO SHOW THAT THE COURSE HAD BEEN

25 COMPLETED.

1    Q    THE HONEYWELL LEARNING SYSTEM WOULD TRACK THE

2    TRAININGS THAT INDIVIDUAL EMPLOYEES OF HONEYWELL HAD BASED

3    ON THOSE TWO WAYS YOU JUST DESCRIBED?

4    A    YES, WE TRACK IT BASED ON THOSE TWO WAYS.

5    Q    CAN I ASK YOU TO LOOK AT WHAT'S BEEN MARKED AS

6    GOVERNMENT'S EXHIBIT 1676?

7    A    SURE.  I HAVE THE EXHIBIT.

8    Q    YOU MENTIONED THAT YOU PULLED INFORMATION REGARDING

9    YI-CHI SHIH.  DID YOU OBTAIN YI-CHI SHIH'S TRAINING

10   RECORDS?

11   A    YES, I DID.  THAT'S WHAT THIS EXHIBIT IS.

12   Q    SO LOOKING AT EXHIBIT 1676, COULD YOU EXPLAIN

13   GENERALLY -- WE'LL GO THROUGH IT MORE SPECIFICALLY, BUT

14   COULD YOU JUST GENERALLY EXPLAIN WHAT THIS IS FOR THE JURY.

15   A    SURE.  THIS IS A SUMMARY OF THE TRAINING THAT HE WOULD

16   HAVE TAKEN WHILE AT HONEYWELL.  THE FIRST FOUR PAGES LIST

17   HIS NAME, AS WELL AS THE ENTITY TITLE, WHICH IS THE COURSE.

18   THE NEXT FOUR PAGES THEN ACTUALLY CORRESPOND TO THE

19   COMPLETION DATE OF THE TRAINING.  SO IT'S REALLY TWO PARTS.

20   IT'S, LIKE, AN EXTENDED SPREADSHEET.  THE FIRST PART LISTS

21   THE COURSE.  THE SECOND PART LISTS THE TRAINING DATES.

22   Q    SO I WOULD LIKE FOR US TO SPEND A LITTLE BIT OF TIME

23   WALKING THROUGH THIS EXHIBIT.

24           WITH THE COURT'S PERMISSION, I WOULD LIKE TO HAND

25   A COPY OF 1676 TO THE WITNESS SO THAT HE CAN WRITE ON SO HE

1    CAN CORRESPOND CERTAIN TRAININGS.  AND THAT WAY WE CAN MARK

2    IT AS AN EXHIBIT, AND IT CAN GO BACK TO THE JURY TO REVIEW

3    LATER SO THEY CAN BETTER UNDERSTAND THE EXHIBIT.

4           MR. HANUSZ:  WE WOULD OBJECT TO THE WITNESS

5    MAKING MARKINGS ON THE EXHIBIT AND SENDING THAT BACK TO THE

6    JURY.

7           MS. SARTORIS:  YOUR HONOR, I WOULD BE MAKING THIS

8    A NEW EXHIBIT, SO 1676 WOULD REMAIN PRISTINE.

9           THE COURT:  WHAT'S THE NEW EXHIBIT'S NUMBER, FOR

10   IDENTIFICATION?

11          MS. SARTORIS:  IT WOULD BE 1677.

12          THE COURT:  DO YOU UNDERSTAND -- OR 1676-A?

13          THE CLERK:  "A."

14          THE COURT:  CAN YOU MAKE IT 1676-A?

15          MS. SARTORIS:  SURE, YOUR HONOR, THAT WOULD BE

16   FINE.

17          THE COURT:  THE WITNESS MAY MARK 1676-A, BUT

18   THAT'S NOT A DETERMINATION AS TO ITS ADMISSIBILITY.

19          (EXHIBIT 1676-A WAS MARKED FOR IDENTIFICATION.)

20          MS. SARTORIS:  THANK YOU, YOUR HONOR.  AND I WILL

21   HAND THE WITNESS, THEN, A HIGHLIGHTER AND A PEN SO THAT HE

22   MAY DO THAT.

23          THE COURT:  MS. SARTORIS, YOU ALSO MAY BE AWARE,

24   BUT THE WITNESS CAN TOUCH THE SCREEN AND ANNOTATE EXHIBITS

25   THAT ARE PUBLISHED.

1          MS. SARTORIS:  YES, YOUR HONOR.  I JUST THINK IT

2    WOULD BE HELPFUL FOR THE JURY TO HAVE SOMETHING TO REFER TO

3    LATER.  AND I THOUGHT IF IT WAS DONE IN COURT, IT WOULD NOT

4    BE CONSIDERED HEARSAY.

5          THE COURT:  OKAY.  AGAIN, WE'LL RESERVE THOSE

6    ISSUES.  THANK YOU.

7          MS. SARTORIS:  THANK YOU.

8    Q    BY MS. SARTORIS:  SO, MR. PASCOE, IF YOU COULD TAKE A

9    MINUTE TO LOOK AT 1676-A AND JUST SATISFY FOR YOURSELF THAT

10   IT IS -- RESEMBLES 1676.  OR NOT JUST RESEMBLES, BUT IS

11   IDENTICAL.

12   A    YES, IT IS IDENTICAL.

13   Q    THANK YOU.

14         MS. SARTORIS:  YOUR HONOR, I WOULD MOVE 1676 INTO

15   EVIDENCE.

16         THE COURT:  ANY OBJECTION TO THE ADMISSION OF

17   1676, NOT 1676-A?

18         MR. HANUSZ:  NO OBJECTION AS TO 1676, YOUR HONOR.

19         THE COURT:  THANK YOU.  EXHIBIT 1676 IS

20   ADMITTED.

21         (EXHIBIT 1676 WAS ADMITTED.)

22   Q    BY MS. SARTORIS:  MR. PASCOE, LOOKING AT EXHIBIT 1676

23   -- I THINK YOU MENTIONED THAT THIS REFLECTS THE TRAINING

24   LOG THAT HONEYWELL MAINTAINED IN ITS LEARNING SYSTEMS FOR

25   YI-CHI SHIH?

1    A    YES, THAT IS CORRECT.

2    Q    AND CAN I ASK YOU TO LOOK NOW AT WHAT'S BEEN MARKED AS

3    GOVERNMENT'S EXHIBIT 1670.  ACTUALLY, LOOK AT 1670 THROUGH

4    1674.

5    A    (REVIEWING DOCUMENT.)  OKAY.

6    Q    THANK YOU.  DO YOU RECOGNIZE WHAT THOSE EXHIBITS ARE?

7    A    THESE ARE THE SPECIFIC TRAINING CONTENT THAT ARE

8    ALIGNED TO SOME OF THE COURSES ON 1676, SOME OF THE

9    SPECIFIC TRAINING THAT WOULD HAVE BEEN DONE.

10   Q    SO THOSE EXHIBITS DON'T REFLECT ALL OF THE TRAINING

11   THAT IS LISTED ON THIS EXHIBIT 1676, DO THEY?

12   A    NO.  JUST A SUBSECTION OF THE TRAININGS.

13   Q    AND HOW DO YOU KNOW THAT?

14   A    WHEN I --

15   Q    NOT SPECIFICALLY, BUT GENERALLY HOW DO YOU KNOW THAT?

16   DID YOU INDIVIDUALLY RESEARCH THIS?

17   A    YES.  I WAS REQUESTED TO PULL SOME SPECIFIC TRAININGS,

18   SO I WENT BACK AND PULLED THESE SPECIFIC ONES.

19         MS. SARTORIS:  YOUR HONOR, KEEPING IN MIND THE

20   DISCUSSION THAT WE HAD YESTERDAY, THE GOVERNMENT WOULD MOVE

21   GOVERNMENT'S EXHIBITS 1670 THROUGH 1674 INTO EVIDENCE.

22         MR. HANUSZ:  NO OBJECTION, YOUR HONOR.

23         THE COURT:  ALL RIGHT.  THOSE ARE ADMITTED.

24         (EXHIBITS 1670 THROUGH 1674 WERE ADMITTED.)

25   Q    BY MS. SARTORIS:  SO I'M NOT GOING TO ASK YOU TO GO

27

1    THROUGH THEM WITH THE JURY AT THIS TIME.  BUT WHAT WE WOULD

2    LIKE TO DO IS GO THROUGH THE TRAINING LOG SO THAT YOU CAN

3    HELP CORRESPOND THE DIFFERENT EXHIBIT NUMBERS TO THE LOG.

4             DOES THAT MAKE SENSE?

5    A    YES.

6    Q    AND IF YOU COULD, WHILE WE TALK ABOUT THIS, IF YOU

7    COULD HIGHLIGHT ON THE DOCUMENT THAT WAS IDENTIFIED AS

8    1676-A AND WRITE THE EXHIBIT NUMBER NEXT TO IT, WHILE AT

9    THE SAME TIME YOU COULD POINT TO IT ON THE SCREEN, AS THE

10   COURT HAD SUGGESTED WAS POSSIBLE, SO THAT THE JURY CAN SEE

11   IT.  OR NOT AT THE SAME TIME, BUT ROUGHLY THE SAME TIME.

12   A    OKAY.

13   Q    THANK YOU.

14            SO IF WE START BY LOOKING AT -- IF YOU LOOK AT

15   THE FIRST PAGE OF GOVERNMENT'S EXHIBIT 1676, AT THE BOTTOM

16   IT SAYS 22765, AND IF YOU LOOK ABOUT A THIRD TO A QUARTER

17   OF THE WAY UP THE PAGE AND YOU SEE AN ENTRY MARKED EXPORT

18   COMPLIANCE AWARENESS.

19            DO YOU SEE THAT?

20   A    YES, IT SHOWS UP TWICE, ACTUALLY, TOWARD THE BOTTOM.

21   Q    IT DOES SHOW UP TWICE.  CAN YOU EXPLAIN WHY THAT IS?

22   A    YES.  WHEN I LOOKED AT THE TRAINING RECORDS, THIS WAS

23   AN ONLINE COURSE.  THE FIRST TIME THERE WAS NO GRADE OR

24   SCORE FROM THE TEST THAT WAS RECORDED, SO IT LOOKS LIKE THE

25   TRAINING WAS DONE TWO DAYS LATER.

Q    AND DONE BY WHO?

A    YI-CHI SHIH IN OUR LEARNING MANAGEMENT SYSTEM.

Q    SO IF YOU TURN TO GOVERNMENT'S -- WELL, LOOKING AT THE

GOVERNMENTS' EXHIBITS THAT I ASKED YOU TO REVIEW, WHICH, IF

ANY OF THESE, REFER TO THAT TRAINING?

A    IT'S EXPORT COMPLIANCE AWARENESS.  IT WOULD BE EXHIBIT

1670.

Q    AND SO IF YOU COULD WRITE 1670 NEXT TO THE TRAINING ON

1676-A FOR BOTH OF THOSE.

        SO HOW DO YOU KNOW THAT THAT IS THE SAME -- THAT

GOVERNMENT'S EXHIBIT 1670 IS THE SAME TRAINING THAT WAS

IDENTIFIED ON THIS CHART?

A    WHEN I PULLED THE TRAINING, I WENT INTO THE DETAILS,

AND I WAS ABLE TO MATCH THE COURSE CONTENT ON THE FIRST

PAGE OF 1670.  IT SAYS LMS COURSE 8222.  I WAS ABLE TO

MATCH THAT SPECIFIC TO THE TRAINING RECORD AND THEN PULL

THE SPECIFIC TRAINING DEC.

Q    OKAY.  AND IS THAT TRAINING DEC WHAT IS MARKED AS

1670?

A    YES, IT IS.

Q    AND YOU MENTIONED PREVIOUSLY THAT THERE WAS -- WELL,

CAN YOU TELL FROM LOOKING AT THIS THAT THIS WAS A COMPUTER

PROGRAM OR A LIVE TRAINING?

    A    I CANNOT TELL FROM THIS SPECIFIC EXHIBIT.  BUT I

WENT INTO OUR TOOL AND WAS ABLE TO SEE THAT IT WAS

1   WEB-BASED TRAINING ONLINE.

2   Q    AND YOU MENTIONED, AS WELL, THAT THERE WAS A QUIZ AT

3   THE END?

4   A    YES.  IF YOU GO RIGHT NEAR THE END, THE -- ONE, TWO,

5   THREE --

6   Q    ARE YOU LOOKING --

7   A    1670, THIRD TO THE LAST PAGE, IT SAYS QUIZ QUESTION.

8   AND THAT'S WHAT SHOWS THERE WAS A QUIZ.  AND WHEN I LOOKED

9   AT OUR TRAINING RECORD, I COULD SEE THE FIRST TIME THERE

10  WAS NO SCORE FOR THE QUIZ, AND THE SECOND TIME THERE WAS A

11  SCORE.

12  Q    AND IN THE GOVERNMENT'S EXHIBIT, JUST FOR

13  CLARIFICATION, DOES THIS EXHIBIT REFLECT YI-CHI SHIH'S

14  ACTUAL EXAM ANSWERS ON THE ONLINE TEST?

15  A    NO, IT DOES NOT.

16  Q    WERE YOU ABLE TO DETERMINE THAT HE ANSWERED THE

17  QUESTIONS?

18  A    YES.  WHEN I WENT INTO DETAILS INTO THE SYSTEM, I SAW

19  THAT THE FIRST TIME THERE WAS NO SCORE.  BUT THEN THE

20  SECOND TIME, THERE WAS A SCORE FOR THE TEST RESULTS.

21  Q    OKAY.  SO YOU MENTIONED PREVIOUSLY THAT YOU -- THE

22  FIRST, I THINK, FOUR PAGES OF 1676 REFLECT THE TRAINING.

23  AND THEN FIVE -- THE NEXT FOUR CORRESPOND TO WHEN THE

24  TRAINING WAS TAKEN.

25  A    YES.  THAT IS CORRECT.

1    Q    SO WHEN YOU LOOK AT PAGE -- THE LAST FOUR PAGES ON THE

2    ONE THAT'S MARKED 22769, AT THE BOTTOM, DO YOU SEE THAT?

3    A    YES, I DO.

4    Q    WHERE ON THIS CHART, IF ANYWHERE, DOES IT SHOW WHEN

5    THESE TWO TRAININGS WERE TAKEN, THESE TWO EXPERT COMPLIANCE

6    AWARENESS TRAININGS?

7    A    SURE.  SO, ESSENTIALLY, IT'S JUST MATCHING THE ROWS.

8    SO THE FIRST EXPORT COMPLIANCE IS ONE, TWO, THREE, FOUR,

9    FIVE, SIX, SEVEN, EIGHT, NINE, TEN, IT'S TEN -- SO IT'S

10   RIGHT HERE, THE FIRST ONE, 10/16/2007.  SO IT CORRESPONDS

11   TO ESSENTIALLY WHERE THE FIRST ONE EXPORT COMPLIANCE

12   AWARENESS IS ON PAGE 1217.  AND THEN THE SECOND EXPORT

13   COMPLIANCE IS SEVEN FROM THE BOTTOM.  SO THEN YOU JUST GO

14   TO THE NEXT PAGE, AND YOU CAN COUNT SEVEN UP RIGHT THERE,

15   SEVEN, SO YOU CAN, SORT OF, CORRESPOND THE TRAINING TIMES.

16   Q    OKAY.  COULD YOU MARK A HIGHLIGHTER ON 1676-A WHERE

17   THOSE TWO TRAININGS ARE, AND THEN WRITE THE CORRESPONDING

18   EXHIBIT NUMBER NEXT TO THE TRAININGS, PLEASE.

19   A    THE TRAINING TIMES?  YES, I CAN.

20   Q    TRAINING TIMES, YES.

21   A    OKAY.

22   Q    NOW, LOOKING AT THE FIRST PAGE OF 1676 AGAIN, DO YOU

23   SEE A TRAINING CALLED "PROTECTING PROPRIETARY INFORMATION"?

24        DO YOU SEE THAT?

25   A    YES.  IT'S ABOUT EIGHT FROM THE BOTTOM.  IT'S EIGHT

1    FROM THE BOTTOM.

2    Q    OKAY.  COULD YOU LOOK THROUGH THE EXHIBITS THAT WERE

3    MARKED 1670 TO 1674, AND DETERMINE IF ANY OF THOSE TRAINING

4    MATERIALS ARE INCLUDED IN THE GOVERNMENT'S EXHIBITS?

5    A    YES.  PROTECTING PROPRIETARY INFORMATION IS EXHIBIT

6    1672.

7    Q    COULD YOU WRITE ON THE DOCUMENT 1676-A AND ON 1672?

8    A    YES.

9    Q    SO LOOKING AT THAT, HOW DO YOU KNOW THAT THE

10   GOVERNMENT'S EXHIBIT 1672 IS THE ACTUAL CONTENT OF THE

11   TRAINING THAT WAS OFFERED THAT YI-CHI SHIH TOOK THAT'S

12   REFLECTED ON THIS CHART ON 1676?

13   A    IT'S LINKED TO, SORT OF, THE NUMBER ON THE PAGE OF

14   1672.  IT SAYS WEB-BASED TRAINING MODULE 2963.  WHEN I WENT

15   INTO THE ACTUAL TRAINING RECORDS AND SAW THAT IT WAS

16   PROTECTING PROPRIETARY INFORMATION, I WAS ABLE TO SEE IT

17   WAS THE SAME TRAINING NUMBER.

18   Q    AND I THINK YOU SAID IT, BUT THIS APPEARS TO HAVE BEEN

19   WEB-BASED TRAINING BASED ON THE TITLE?

20   A    YEAH.  BASED ON THE TITLE OF THE COURSE, YES.

21   Q    BUT WERE YOU ALSO ABLE TO TELL THAT IN THIS OTHER

22   WAYS?

23   A    YES.  I WAS ABLE TO GO IN AND LOOK AT THE SCORE FOR

24   THE TRAINING AND TEST RESULTS AND SAW THAT IT WAS

25   WEB-BASED.

1  Q    AND WHAT SCORE ARE YOU TALKING ABOUT?

2  A    AT THE END OF THE TRAINING, THERE LISTS OUT TEN

3  QUESTIONS.  AND I SAW THAT THE SCORE FOR THE TRAINING WAS

4  100 PERCENT.  SO THE INDIVIDUAL HAD TAKEN THE TEST AT THE

5  END, AND WE CAPTURED THE SCORE IN OUR LEARNING SYSTEM.

6  Q    WHEN YOU SAY "THE INDIVIDUAL," YOU MEAN --

7  A    YI-CHI SHIH.

8  Q    OKAY.  SO WHEN YI-CHI SHIH WENT IN AND TOOK THESE

9  TRAININGS, HE HAD TO INPUT HIS PERSONAL IDENTIFICATION

10 NUMBER ISSUED BY HONEYWELL?

11 A    YES, TO LOG INTO THE SYSTEM, HE WOULD HAVE ENTERED HIS

12 EMPLOYEE IDENTIFICATION, NUMBER AS WELL AS A PASSWORD TO

13 GET INTO THE SYSTEM.  AND AFTER HE TOOK THE TEST, THE

14 SYSTEM STORED THE RESULTS.

15 Q    AND THAT'S TRUE WITH ALL THE WEB-BASED TRAININGS WE'RE

16 GOING TO BE TALKING ABOUT TODAY?

17 A    YES, THAT IS CORRECT.

18 Q    NOW, ARE YOU ABLE TO TELL IF THE QUIZ AT THE END OF

19 THIS TRAINING REFLECTS THE ACTUAL QUIZ THAT HE TOOK?  OR IS

20 THIS GENERALLY WHAT THE QUIZ OFFERED AT THAT TIME?

21 A    THE QUIZ QUESTIONS AT THE END REFLECT WHAT THE QUIZ

22 WAS AND HIGHLIGHTS WHAT THE CORRECT ANSWER IS.  I WAS ABLE

23 TO LOOK IN THE SYSTEM AND SEE THAT YI-CHI SHIH GOT 100

24 PERCENT ON THE TEST, SO HE WOULD HAVE THE SAME ANSWERS.

25 Q    SO NOW COULD YOU TELL US WHERE WE WOULD FIND IN

1    EXHIBIT 1676 INFORMATION ABOUT WHEN YI-CHI SHIH COMPLETED

2    THIS TRAINING?

3    A    SURE.  SO ON THE FIRST PAGE, 1217, PROTECTING

4    PROPRIETARY INFORMATION IS EIGHT FROM THE BOTTOM.  SO I

5    WOULD GO TO THE CORRESPONDING PAGE 1221 THAT LISTS OUT THE

6    TIMES AND JUST COUNT EIGHT FROM THE BOTTOM.  AND I WOULD

7    SEE THAT IT'S 10/16/2017, IS THE TIME.  SO IT'S THIS ONE

8    RIGHT HERE.

9    Q    COULD YOU HIGHLIGHT THAT ON 1676-B AND PUT THE

10   CORRESPONDING EXHIBIT NUMBER NEXT TO IT.

11   A    YES, I CAN DO THAT.

12   Q    THANK YOU.  SO IF I COULD ASK YOU TO TURN NOW TO THE

13   SECOND PAGE OF 1676, THE TRAINING LOG, IT SAYS 22766 AT THE

14   BOTTOM.

15        DO YOU SEE THAT?

16   A    YES, I DO.

17   Q    AND WHEN YOU LOOK BACK AT THE GOVERNMENT'S EXHIBITS

18   1660 TO 1664 THAT I PREVIOUSLY ASKED YOU TO LOOK AT, ARE

19   ANY OF THESE THE DOCUMENTS THAT CORRESPOND TO THAT TRAINING

20   THAT YI-CHI SHIH APPEARS TO HAVE TAKEN CALLED EXPORT

21   CLASSIFICATIONS AND EAA SECTION 17(C) IMPACT, WHICH IS NEAR

22   THE BOTTOM OF THE CHART?

23   A    I SEE IT'S SIX FROM THE BOTTOM, THE EXPORT

24   CLASSIFICATION.  I SEE THAT'S EXHIBIT 1673, EXPORT

25   CLASSIFICATION AND EAA SECTION 17(C) IMPACT.

1  Q    COULD YOU HIGHLIGHT THAT, PLEASE, AND PLACE THE

2  CORRESPONDING EXHIBIT NUMBER NEXT TO IT ON GOVERNMENT

3  EXHIBIT 1676-A?

4  A    YEAH.  THAT ONE CALLED OUT, YES.  IT'S THAT ONE.

5  Q    DID YOU MARK ON 1676?

6  A    YES, I DID.

7  Q    SO WHEN YOU LOOK AT 1673, HOW DO YOU KNOW THAT YI-CHI

8  SHIH TOOK THIS TRAINING?

9  A    WE HAVE IT IN OUR -- THIS TRAINING LOG HERE.  AND I

10  WAS ABLE TO MATCH THE COURSE NUMBER, THE 360222 -- THE 022.

11  EXCUSE ME.  AND THEN WHEN I WENT INTO YI-CHI SHIH'S ACTUAL

12  TRAINING RECORD, THAT WAS THE COURSE ASSIGNED TO THE EXPORT

13  CLASSIFICATION, SO I WAS ABLE TO MATCH THEM.

14  Q    COULD YOU TELL US WHERE WE WOULD LOOK IF WE WANTED TO

15  KNOW WHEN IT WAS THAT HE TOOK THAT TRAINING, TURNING BACK

16  TO EXHIBIT 1676?

17  A    SURE.  SO IT WOULD BE ON THE SECOND PAGE OF THE DATES,

18  WHICH IS 2270.  AND, AGAIN, THIS EXPORT CLASSIFICATION WAS

19  SIXTH FROM THE BOTTOM.  SO I JUST COUNT UP SIX FROM THE

20  BOTTOM, ONE, TWO, THREE, FOUR, FIVE, SIX.  SO IT'S -- WAIT

21  A SECOND.  SORRY.  THIS IS THE WRONG -- I NEED PAGE 22770.

22  SORRY.  I DON'T SEE IT ON MY SCREEN.  YEAH.  SORRY.  IT'S

23  PAGE 6 FROM THE BOTTOM.  ONE, TWO, THREE, FOUR, FIVE, SIX.

24  Q    I'M SORRY.  I KNOW YOU SAID THIS, BUT ARE YOU LOOKING

25  AT THE ONE THAT SAYS 22770 AT THE BOTTOM?

1    A    YES, I AM.    THAT'S SIXTH FROM THE BOTTOM TO CORRESPOND

2    TO PAGE 22766.

3    Q    AND DID YOU HIGHLIGHT THAT AND PUT THE EXHIBIT NUMBER

4    NEXT TO IT?

5    A    YES.  I PUT 1673 NEXT TO IT.

6    Q    NOW, I NOTE THAT WHAT YOU JUST HIGHLIGHTED SAYS

7    3/7/2009.  BUT IF YOU LOOK BACK AT 1673, IT HAS A DATE ON

8    IT THAT SAYS 5 FEBRUARY 2009.

9            CAN YOU EXPLAIN THAT?

10    A    SURE.  THE 5 FEBRUARY 2009 IN EXHIBIT 1673 REPRESENTS

11    WHEN THE COURSE OWNER CREATED THIS CONTENT OR UPLOADED THE

12    CONTENT.  THE 3/7/2009 REPRESENTS WHEN YI-CHI SHIH TOOK THE

13    TRAINING.

14    Q    NOW, IF YOU COULD TURN BACK TO PAGE 2 OF 1676, WHICH

15    SAYS 22766 AT THE BOTTOM --

16    A    YES.

17    Q    -- DO YOU SEE A TRAINING NEAR THE BOTTOM CALLED

18    "FOREIGN PERSON VISITOR REQUEST PROCESS"?

19    A    YES, I DO.  IT'S RIGHT HERE.

20    Q    WHEN YOU LOOK THROUGH THE EXHIBITS 1670 THROUGH 1674,

21    CAN YOU FIND THAT TRAINING AMONG THESE EXHIBITS?

22    A    SURE.  ONE SECOND.

23            IT'S EXHIBIT 1671, WHICH JUST SAYS "EXPERT

24    COMPLIANCE REVIEW FOR AEROSPACE EMPLOYEES, FOREIGN PERSON

25    FACILITY ACCESS."

1    Q    SO COULD YOU HIGHLIGHT THAT ON 1676-A AND NOTE NEXT TO

2    IT THE EXHIBIT NUMBER?

3    A    YES, I DID THAT.

4    Q    SO HOW DO YOU KNOW THAT THIS IS THE SAME TRAINING IN

5    1671 THAT IS REFLECTED ON PAGE 2 OF 1676?

6    A    I WENT INTO THE SPECIFIC TRAINING RECORDS AND MATCHED.

7    ON EXHIBIT 1671, IT SAYS AN LMS COURSE NUMBER 00036502.  I

8    WENT INTO OUR LEARNING SYSTEM AND MATCHED THIS SPECIFIC

9    TRAINING RECORD.

10    Q    COULD YOU HELP US UNDERSTAND, THEN, WHEN IT WAS THAT

11    YI-CHI SHIH COMPLETED THIS TRAINING?

12    A    SURE.  SO IT'S ON 1676, THE PAGE 22,770, IT'S THE ONE

13    ON THE SCREEN.  IT WOULD CORRESPOND TO THE FIFTH FROM THE

14    BOTTOM, SO RIGHT HERE.  SO IT ALIGNS WITH THE FOREIGN

15    PERSON REQUEST PROCESS ON 22,766, WHICH IS THE SIXTH FROM

16    THE BOTTOM.  WE THEN GO TO 22,770, IT'S THE FIFTH FROM THE

17    BOTTOM, SO IT'S MARCH 9, 2009.

18    Q    COULD YOU HIGHLIGHT THAT, PLEASE, AND PUT THE EXHIBIT

19    NUMBER NEXT TO IT ON 1676-A.

20    A    YES, ONE SECOND.  YES, I DID THAT.

21    Q    SO THIS EXAMPLE, IF YOU TURN BACK TO 1671, THIS IS

22    ANOTHER EXAMPLE OF A TRAINING THAT HAS A QUIZ AT THE END OR

23    SOME TEST QUESTIONS.

24         DO YOU SEE THAT, STARTING ON PAGE 22,042?

25    A    YES.

1    Q    AND DID YOU HAVE ANY INFORMATION ABOUT WHETHER OR NOT

2    YI-CHI SHIH COMPLETED THE TESTING THAT CORRESPONDS TO THIS

3    TRAINING?

4    A    I BELIEVE THIS COURSE WAS INSTRUCTOR LED, SO WE DID IT

5    IN A CLASSROOM, WHICH MEANS WE DID NOT CAPTURE ANY SCORES

6    FOR THIS TEST TO COMPLETE THE TRAINING.

7    Q    SO THIS IS ONE OF THE EXAMPLES OF AN INSTRUCTOR-LED

8    COURSE, NOT A COMPUTER?

9    A    YES.  IT WAS INSTRUCTOR-LED TRAINING, SO WE KNOW THAT

10   HE TOOK THE COURSE, BUT WE DO NOT HAVE A SCORE FOR THE

11   TEST.

12   Q    AND YOU KNOW THAT BECAUSE OF THE SIGN-IN SHEET THAT

13   WOULD HAVE BEEN SUBMITTED BY THE INSTRUCTOR?

14   A    YES.  AND THAT'S HOW WE CODED IT IN OUR LEARNING

15   SYSTEM, AS INSTRUCTOR-LED TRAINING.

16   Q    OKAY.  AND NOW IF YOU COULD TURN TO PAGE 3 OF 1676.

17   A    OKAY 22767.

18   Q    YES.  DO YOU SEE IN THE MIDDLE OF THE PAGE, THERE'S A

19   TRAINING CALLED "EXPORT COMPLIANCE FOR ENGINEERING AND

20   TECHNOLOGY"?

21   A    YES, I DO.

22   Q    LOOKING THROUGH THE EXHIBITS THAT YOU'VE BEEN LOOKING

23   AT, DO ANY OF THESE REFLECT THAT TRAINING?

24   A    EXHIBIT 1674, EXPORT COMPLIANCE FOR AEROSPACE

25   ENGINEERING AND TECHNOLOGY, IS THE SAME TRAINING.

1    Q    AND HOW DO YOU KNOW THAT?

2    A    THERE'S A COURSE CODE.  THE 36923 WOULD HAVE GONE INTO

3    LOOK AT -- BASED ON THE TRAINING RECORD AND VALIDATED THE

4    TRAINING RECORD THAT IT'S THE SAME COURSE.

5    Q    THAT'S WHAT YOU DID?

6    A    YES.

7    Q    AND CAN YOU TELL FROM LOOKING AT THIS IF THIS WAS A

8    WEB-BASED TRAINING OR A INSTRUCTOR LED TRAINING?

9    A    WHEN I LOOKED AT YI-CHI SHIH'S TRAINING RECORD, IT

10   LOOKED LIKE IT WAS A WEB-BASED TRAINING.

11   Q    AND COULD YOU TELL ON THIS ONE, DID THE SYSTEM GIVE

12   YOU INFORMATION ABOUT WHETHER OR NOT HE COMPLETED THE QUIZ

13   QUESTIONS THAT ARE AT THE END OF THE TRAINING IN 1674,

14   STARTING ON PAGE 22760?

15   A    I DID NOT LOOK TO SEE WHAT HIS QUIZ RESULTS WERE ON

16   THIS ONE.  I JUST SAW THAT HE COMPLETED THE COURSE.  I

17   DON'T KNOW THE RESULTS.

18   Q    AND COULD YOU HELP US SEE FROM -- IN EXHIBIT 1676, HOW

19   DO WE KNOW WHEN IT WAS HE TOOK THIS TRAINING?

20   A    SURE.  SO 22767 SHOWS THE EXPORT COMPLIANCE TRAINING

21   ABOUT HALF WAY.  SO IT'S KIND OF -- IT'S 18 FROM THE

22   BOTTOM.  AND THEN IF YOU THEN GO TO PAGE 22771, WHICH LISTS

23   ALL THE DATES, AND COUNT UP 18 FROM THE BOTTOM, IT MATCHES

24   THE -- MAKE SURE I COUNTED RIGHT.  IT MATCHES THE DATE THAT

25   SAYS 7/2/2010.

1    Q    SO THAT'S THE DATE THAT HE COMPLETED THAT TRAINING?

2    A    YES.

3    Q    WOULD YOU HIGHLIGHT THAT, PLEASE, AND THEN PUT THE

4    EXHIBIT NUMBER NEXT TO IT ON EXHIBIT 1676-A?

5    A    YES.  IT'S EXHIBIT 1674.  I'LL MARK IT NEXT TO THE

6    DATE.

7    Q    DID YOU HIGHLIGHT AND MARK THE TRAINING AND THE

8    EXHIBIT DATES FOR EACH OF THE EXHIBITS THAT YOU WERE ABLE

9    TO IDENTIFY THAT MATCHED THE TRAINING IN 1676 TO THE

10   GOVERNMENT'S EXHIBITS 1670 TO 1675?

11   A    YES, I MATCHED THE FIVE TRAININGS IN 1676.  I

12   HIGHLIGHTED THEM AND WROTE THE COURSE NUMBER NEXT TO THEM

13   IN 1676.

14   Q    THAT'S 1676-A?

15   A    1676-A, YES.

16          MS. SARTORIS:  YOUR HONOR, I WOULD MOVE

17   1676-A INTO EVIDENCE.

18          MR. HANUSZ:  NO OBJECTION, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  1676-A-IS ADMITTED.

20          (EXHIBIT 1676-A WAS ADMITTED.)

21          MS. SARTORIS:  THANK YOU, YOUR HONOR.  I HAVE NO

22   MORE QUESTIONS.

23          THE COURT:  CROSS-EXAMINATION, MR. HANUSZ?

24          MR. HANUSZ:  NO QUESTIONS FOR MR. PASCOE.

25          THE COURT:  MR. PASCOE, THANK YOU FOR YOUR

1    TESTIMONY.  YOU ARE EXCUSED.

2         CALL THE NEXT WITNESS, PLEASE.

3         MS. SARTORIS:  YES, YOUR HONOR.  GOVERNMENT CALLS

4    SPECIAL AGENT MAUREEN MILLER.

5         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

6         (WITNESS SWORN.)

7         THE CLERK:  PLEASE HAVE A SEAT.  PLEASE STATE

8    YOUR FULL NAME AND SPELL IT FOR THE RECORD.

9         THE WITNESS:  MY NAME IS MAUREEN, M-A-U-R-E-E-N,

10   MILLER, M-I-L-L-E-R.

11        THE COURT:  GOOD AFTERNOON, MS. MILLER.

12        THE WITNESS:  GOOD AFTERNOON.

13        THE COURT:  PLEASE PROCEED, MS. SARTORIS.

14        MS. SARTORIS:  THANK YOU, YOUR HONOR.

15                    MAUREEN MILLER,

16              HAVING BEEN FIRST DULY SWORN,

17         WAS EXAMINED AND TESTIFIED AS FOLLOWS:

18                  DIRECT EXAMINATION

19   BY MS. SARTORIS:

20   Q    SPECIAL AGENT MILLER, WHAT IS IT YOU DO?

21   A    I AM A SPECIAL AGENT FOR THE FEDERAL BUREAU OF

22   INVESTIGATION OUT OF THE LOS ANGELES OFFICE.

23   Q    HOW LONG HAVE YOU DONE THAT?

24   A    IT WILL BE THREE YEARS THIS AUGUST.

25   Q    AS A SPECIAL AGENT, DID YOU RECEIVE ANY TRAINING?

1   A    I DID.  I RECEIVED TRAINING BOTH IN THE CLASSROOM AND

2   IN THE FIELD IN ORDER TO LEARN HOW TO INVESTIGATE A VARIETY

3   OF VIOLATIONS OF FEDERAL LAW.

4   Q    ARE YOU FAMILIAR WITH THE LOCATION 3040 BECKMAN ROAD,

5   LOS ANGELES, CALIFORNIA?

6   A    YES.

7   Q    AND HOW ARE YOU FAMILIAR WITH THAT?

8   A    IT WAS A LOCATION THAT WE SERVED A SEARCH WARRANT AT.

9   Q    DRAWING YOUR ATTENTION TO AN EXHIBIT BINDER THAT SAYS

10  9(B) ON IT, EXHIBITS NEXT TO YOU, YOU'LL SEE EXHIBIT 788.

11       DO YOU SEE THAT?

12  A    YES.

13  Q    WHAT IS THAT?

14  A    THIS IS A AERIAL PHOTOGRAPH OF THE RESIDENCE AT 3040

15  BECKMAN ROAD.

16  Q    AND HOW DO YOU KNOW THAT?

17  A    THIS IS A PHOTOGRAPH THAT I OBTAINED THROUGH AN

18  INTERNET SEARCH, AND I RECOGNIZE IT AS THE LOCATION THAT WE

19  WERE PHYSICALLY AT DURING OUR SEARCH WARRANT.

20  Q    WHEN WAS THAT SEARCH WARRANT?

21  A    JANUARY 19 OF 2018.

22       MS. SARTORIS:  YOUR HONOR, I WOULD LIKE TO MOVE

23  EXHIBIT 788 INTO EVIDENCE.

24       THE COURT:  ANY OBJECTION?

25       MR. SPERTUS:  NO, YOUR HONOR.

```
 1            THE COURT:  788 IS ADMITTED.

 2            (EXHIBIT 788 WAS ADMITTED.)

 3   Q    BY MS. SARTORIS:  SO, SPECIAL AGENT MILLER, COULD YOU

 4   PROVIDE MORE INFORMATION ABOUT WHY YOU WERE THERE IN

 5   JANUARY OF 2018?

 6   A    WE WERE THERE TO EXECUTE A SEARCH WARRANT TO LOOK FOR

 7   EVIDENCE THAT THE DEFENDANT HAD COMMITTED A VARIETY OF

 8   CRIMES, INCLUDING UNLAWFUL EXPORT ACTIVITIES, MAIL FRAUD,

 9   WIRE FRAUD, MONEY LAUNDERING, THEFT OF TRADE SECRETS, AND

10   TRANSPORTATION OF STOLEN GOODS.

11   Q    SO YOU WERE EXECUTING A SEARCH WARRANT?

12   A    YES.

13   Q    AND LOOKING FOR SPECIFIC TYPES OF EVIDENCE?

14   A    CORRECT.

15   Q    AND WHEN YOU SAY "WE," WHO IS "WE"?

16   A    IT WAS A MULTIAGENCY SEARCH WARRANT.  SO THE FBI WAS

17   INVOLVED, THE IRS WAS INVOLVED, THE DEPARTMENT OF COMMERCE.

18   Q    DO YOU HAVE AN IDEA OF APPROXIMATELY HOW MANY AGENTS

19   WERE THERE AT THE SEARCH WARRANT THAT DAY?

20   A    WE HAD OVER 40 INDIVIDUALS AT THE LOCATION THAT DAY.

21   Q    AND YOU WERE THERE?

22   A    YES, CORRECT.

23   Q    SO WHAT WERE YOU DOING THERE?

24   A    MY ROLE WAS TEAM LEADER FOR THE EXECUTION OF THE

25   SEARCH WARRANT, AND I WAS ALSO THE SEIZING AGENT.
```

1  Q    WHAT DOES THAT MEAN?

2  A    SO AS TEAM LEADER, I WAS RESPONSIBLE FOR THE OVERALL

3  EXECUTION OF THE SEARCH WARRANT AND PROVIDING DIRECTION TO

4  THE TEAM MEMBERS.  AND AS SEIZING AGENT, THAT MEANT AT THE

5  CONCLUSION OF THE SEARCH, I WOULD BE RESPONSIBLE FOR TAKING

6  OWNERSHIP OR POSSESSION OF THE ITEMS THAT WE COLLECTED.

7  Q    ARE YOU FAMILIAR WITH YI-CHI SHIH?

8  A    YES.

9  Q    HOW ARE YOU FAMILIAR WITH HIM?

10 A    I BECAME FAMILIAR WITH HIM THROUGH INVESTIGATIVE

11 ACTIVITIES RELATED TO THIS CASE AND BY MEETING HIM IN

12 PERSON AT THE RESIDENCE DURING THE EXECUTION OF THE SEARCH

13 WARRANT.

14 Q    AND DO YOU SEE HIM HERE TODAY?

15 A    YES.

16 Q    COULD YOU DESCRIBE WHERE HE IS SITTING AND WHAT HE'S

17 WEARING?

18 A    HE IS SITTING ON MY RIGHT-HAND SIDE, THE FIRST CHAIR,

19 WEARING A GRAY JACKET AND BLUE TIE.

20        MS. SARTORIS:  YOUR HONOR, I'D LIKE THE RECORD TO

21 REFLECT SHE'S REFERRING TO THE DEFENDANT.

22        MR. SPERTUS:  NO OBJECTION.

23        THE COURT:  THE RECORD WILL SO REFLECT.

24 Q    BY MS. SARTORIS:  WERE THERE OTHER PEOPLE THERE ON THE

25 DAY OF THE SEARCH WARRANT?

1    A    YES.

2    Q    WHO WAS THAT?

3    A    THE DEFENDANT'S WIFE WAS THERE, HIS DAUGHTER, AND THE

4    DAUGHTER'S BOYFRIEND WERE ALSO THERE.

5    Q    COULD YOU DESCRIBE HOW THE SEARCH WAS EXECUTED

6    GENERALLY?

7    A    SO AT APPROXIMATELY 6:00 A.M. THAT MORNING, WE KNOCKED

8    ON THE FRONT DOOR OF THE RESIDENCE.  WE ANNOUNCED OUR

9    PRESENCE AS FBI AND OUR INTENT TO EXECUTE A SEARCH WARRANT

10   AT THE RESIDENCE.  ONCE THE OCCUPANTS HAD EXITED THE

11   RESIDENCE, WE ENTERED AND CLEARED THE RESIDENCE, WHICH

12   MEANS THAT WE JUST ENSURED IT WAS SAFE FOR OTHER PERSONNEL

13   TO ENTER.

14         WE THEN CONDUCTED A WALK-THROUGH OF THE RESIDENCE

15   TO BECOME FAMILIAR WITH THE GENERAL LAYOUT OF THE HOUSE.

16   WE THEN BEGAN TAKING PHOTOGRAPHS AND ASSIGNING ROOM LETTERS

17   SO THE LETTERS ARE -- JUST SO THAT WE HAVE AN EASIER TIME

18   IDENTIFYING ROOMS AS WE ARE COLLECTING EVIDENCE.  AS I

19   MENTIONED, WE BEGAN TAKING PHOTOGRAPHS.  WE ALWAYS DO THAT

20   TO MAKE SURE THE RESIDENCE IS DOCUMENTED HOW WE FOUND IT.

21   AND THEN WE BEGAN ASSIGNING SEARCH TEAMS TO LOOK INTO

22   INDIVIDUAL ROOMS.

23   Q    DID YOU, YOURSELF, GO INTO EACH OF THE ROOMS?

24   A    YES, I DID.

25   Q    AND DID YOU OBSERVE THE PHOTOGRAPHS BEING TAKEN AND

1  THE INDIVIDUALS SEARCHING?

2  A    YES.

3  Q    NOW, WHO IS GINGER?

4  A    GINGER IS A DOG, ACTUALLY, THAT IS TRAINED TO DETECT

5  ELECTRONIC ITEMS OR DEVICES.  AND SHE WAS PRESENT WITH US

6  DURING THE SEARCH WARRANT.

7  Q    SO IN ADDITION TO THE 40 -- ROUGHLY 40 PERSONS

8  EXECUTING A SEARCH WARRANT, GINGER ALSO ASSISTED IN THE

9  SEARCH WARRANT EXECUTION?

10  A    THAT'S CORRECT.

11  Q    WERE ITEMS SEIZED DURING THE SEARCH?

12  A    YES, THEY WERE.

13  Q    AND IF I COULD ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT

14  655 TO 787, THEY WOULD BE IN BINDER NUMBERS 8 AND 9.

15  A    OKAY.

16  Q    ARE YOU FAMILIAR WITH THESE EXHIBITS?

17  A    YES, I AM.

18  Q    WERE THE DOCUMENTS THAT YOU'VE -- THAT ARE MARKED AS

19  EXHIBITS, WERE THEY SEIZED FROM DEFENDANT'S RESIDENCE

20  DURING THE SEARCH THAT YOU JUST DESCRIBED?

21  A    YES, THEY WERE.

22  Q    DID THE FBI BOOK THEM INTO EVIDENCE AND MAINTAIN

23  CONTROL OF THE ORIGINAL OF THESE ITEMS?  THESE ARE

24  OBVIOUSLY COPIES.  BUT DID THE FBI BOOK THE ORIGINALS INTO

25  EVIDENCE AND MAINTAIN CONTROL OF THEM FROM THE DATE THEY

1   WERE SEIZED UNTIL THIS TRIAL?

2   A    YES.

3   Q    IN ADDITION TO THESE DOCUMENTS, DID THE FBI SEIZE

4   DIGITAL DEVICES?

5   A    WE DID.

6   Q    WHAT IS A DIGITAL DEVICE?

7   A    A DIGITAL DEVICE IS ANY ITEM THAT CAN STORE DATA.  SO

8   AN EXAMPLE WOULD BE A PHONE OR A COMPUTER THAT YOU USE.

9   Q    WOULD THAT INCLUDE THUMB DRIVES?

10  A    YES, IT WOULD INCLUDE THUMB DRIVES, HARD DRIVES, BOTH

11  INTERNAL AND EXTERNAL HARD DRIVES.

12  Q    AND AFTER REMOVING THE ADDITIONAL DEVICES FROM

13  DEFENDANT'S RESIDENCE, DID THE FBI TRANSPORT THEM TO THE

14  REGIONAL COMPUTER FORENSIC LABORATORY IN ORANGE COUNTY?

15  A    YES, WE DID.

16  Q    WERE THEY GIVEN A SECOND IDENTIFYING NUMBER SPECIFIC

17  TO THAT LAB?

18  A    YES.

19  Q    AND WAS THE PURPOSE SO THAT THE LAB COULD EXTRACT

20  INFORMATION FROM THE DEVICES IN ORDER FOR FEDERAL AGENTS TO

21  REVIEW THEM FOR EVIDENCE IN THE CASE?

22  A    YES.

23  Q    ARE YOU FAMILIAR WITH DETECTIVE JOSEPH JOON

24  (PHONETIC)?

25  A    YES, I AM.

47

```
1   Q    ARE YOU AWARE THAT HE TESTIFIED EARLIER IN THIS TRIAL
2   LAST THURSDAY AFTERNOON, MAY 16?
3              MR. HANUSZ:  YOUR HONOR, OBJECTION TO LEADING THE
4   WITNESS THROUGH THE TESTIMONY.
5              THE COURT:  SUSTAINED.
6   Q    BY MS. SARTORIS:  ARE YOU AWARE THAT HE TESTIFIED IN
7   THIS TRIAL?
8   A    YES, I AM AWARE.
9   Q    I'D LIKE TO BRING YOUR ATTENTION TO WHAT'S BEEN
10  ADMITTED INTO EVIDENCE AS EXHIBIT 645.  I BELIEVE IT'S IN
11  VOLUME 6 -- I MEAN, 7.  I APOLOGIZE.  1647 I MEANT TO
12  DIRECT YOU TO.
13  A    OKAY.
14  Q    DO YOU RECOGNIZE THIS DOCUMENT?
15  A    YES, I DO.
16             MR. HANUSZ:  YOUR HONOR, IT'S NOT IN THE EXHIBIT
17  BOOK.  I DO NOT HAVE IT.
18             THE COURT:  I'M SORRY.  I CAN'T HEAR YOU.
19             MR. HANUSZ:  I DO NOT HAVE THE EXHIBIT.  IT'S NOT
20  IN THE EXHIBIT BOOK.
21             THE COURT:  IT'S IN VOLUME 19, I BELIEVE.  DO YOU
22  HAVE VOLUME 19?
23             MR. HANUSZ:  I DO, WHICH ENDS AT 1644.
24             MS. SARTORIS:  YOUR HONOR, THIS PARTICULAR
25  EXHIBIT WAS ADMITTED INTO EVIDENCE ON THURSDAY.  IT MAY
```

1    HAVE BEEN PROVIDED SEPARATELY FROM THE EXHIBIT BOOK TO

2    DEFENSE COUNSEL.

3              MR. HANUSZ:  YOUR HONOR, MAY I HAVE THE

4    GOVERNMENT'S COPY?  DO YOU HAVE A COPY?

5              MS. SARTORIS:  LET'S SEE IF I HAVE ONE.

6              I'M HANDING A COPY TO DEFENSE COUNSEL.

7              THE COURT:  THANK YOU.

8    Q    BY MS. SARTORIS:  DO YOU SEE THE BOLD HEADING

9    DESCRIBING DIGITAL DEVICES ON THIS EXHIBIT 1645?

10   A    YES, I DO.

11   Q    WERE ALL OF THE DEVICES LISTED IN THE BOLD HEADINGS

12   INCLUDED IN 1645 SEIZED FROM DEFENDANT'S RESIDENCE?

13   A    YES, THEY WERE.

14   Q    SPECIFICALLY, WAS THE 03-A TOSHIBA LAPTOP ORCO-028239

15   SEIZED FROM DEFENDANT'S RESIDENCE?

16   A    YES.

17   Q    WHAT ABOUT O3-A1 FREE AGENT ORCO-28240?

18   A    YES.

19   Q    AND THE 03-A2 KINGSTON THUMB DRIVE ORCO-28241.

20   A    YES.

21   Q    AND 03-A3 GENERIC THUMB DRIVE ORCO-28242?

22   A    YES.

23   Q    AND THE 03-A6 SONY PCVRX 600 ORCO-28246?

24   A    YES.

25   Q    AND THE 03-A7 DELL INSPIRON TOWER ORCO-28247?

1    A    YEC.

2    Q    AND THE 03-A8 COMPACT TOWER ORCO-28248?

3    A    YES.

4    Q    AND THE 03-A10 ASUS ULTRA TOWER ORCO-28250?

5    A    YES.

6    Q    WHAT ABOUT THE 03-A11 IOMEGA HARD DRIVE ORCO-28251?

7    A    YES.

8    Q    DID FBI SPECIAL AGENTS REVIEW THE INFORMATION

9    CONTAINED ON THESE DEVICES AND IDENTIFY CERTAIN FILES TO BE

10   EVIDENCE IN THIS CASE?

11   A    WE DID.

12   Q    ARE THESE REFLECTED BY EXHIBIT NUMBER FILE AND PATH

13   NAME ON EXHIBIT 1645?

14   A    THEY ARE.

15   Q    NOW, COULD I ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT

16   789, WHICH IS IN 9(B).

17   A    OKAY.

18   Q    AND IF YOU TURN TO THE FIRST PAGE OF THIS EXHIBIT --

19   ACTUALLY, LOOKING AT THIS EXHIBIT, DO YOU RECOGNIZE WHAT

20   THIS EXHIBIT CONSISTS OF?

21   A    YES, I DO.

22   Q    AND WHAT IS IT?

23   A    THIS EXHIBIT CONTAINS A SERIES OF PHOTOGRAPHS WE TOOK

24   DURING THE EXECUTION OF THE SEARCH WARRANT.

25         MS. SARTORIS:  YOUR HONOR, I WOULD ASK PERMISSION

1    TO MOVE EXHIBIT 789 INTO EVIDENCE.

2              THE COURT:  ANY OBJECTION?

3              MR. SPERTUS:  NO, YOUR HONOR.

4              THE COURT:  EXHIBIT 789 IS ADMITTED.

5              (EXHIBIT 789 IS ADMITTED.)

6    Q    BY MS. SARTORIS:  JUST REAL BRIEFLY, COULD YOU LOOK AT

7    PAGES 1 THROUGH 4.  AND STARTING AT PAGE 1, JUST REALLY

8    BRIEFLY, WHAT IS THIS?

9    A    THIS IS A PHOTO OF THE EXTERIOR PART OF THE DRIVEWAY

10   BEFORE -- LEADING UP TO THE RESIDENCE.

11   Q    AND LOOKING AT PAGE 2, WHAT IS THAT?

12   A    THIS IS AN EXTERIOR PHOTO OF THE RESIDENCE.

13   Q    AND IS IT FAIR TO SAY THAT PAGES 3 THROUGH 6 REPRESENT

14   OTHER ROOMS -- SORRY -- 3 THROUGH 7 REPRESENT OTHER ROOMS

15   ON THE FIRST FLOOR OF THE RESIDENCE?

16   A    YES.

17   Q    OKAY.  SO COULD I ASK YOU TO TURN TO PAGE 8.

18   A    OKAY.

19   Q    CAN YOU DESCRIBE WHAT THIS IS?

20   A    THIS IS A PHOTOGRAPH TAKEN OF A ROOM ON THE FIRST

21   FLOOR OF THE RESIDENCE.

22   Q    WHAT IS THAT "F"?

23   A    THE "F" IS ONE OF THE ROOM LABELS THAT I DESCRIBED

24   EARLIER.  IT WAS THE ROOM LETTER THAT WAS ASSIGNED TO THIS

25   PARTICULAR ROOM ON THE FIRST FLOOR.

```
1   Q    AND IF YOU LOOK AT PAGE 9 OF THIS EXHIBIT, WHAT IS

2   THIS?

3   A    THIS IS AN OVERALL PHOTOGRAPH OF ROOM "F."

4   Q    AND PAGE 10, COULD YOU LOOK AT THAT?

5   A    PAGE 10 --

6   Q    JUST A MOMENT, YOUR HONOR.

7             THE COURT:  ONE MOMENT.

8             (OFF-THE-RECORD DISCUSSION.)

9             THE COURT:  PLEASE PROCEED.

10            MS. SARTORIS:  THANK YOU, YOUR HONOR.

11  Q    BY MS. SARTORIS:  IF YOU LOOK AT PAGE 10 --

12  A    OKAY.

13  Q    -- IS THERE ANY SIGNIFICANCE TO THE GREY FILE CABINET

14  NEXT TO THE DESK?

15  A    YES.  THIS IS A LOCATION THAT WE SEIZED EVIDENCE FROM.

16  Q    WE'RE ON EXHIBIT 789.  IF YOU LOOK AT THE NEXT PAGE

17  11 --

18  A    OKAY.

19  Q    -- WHAT IS THIS?

20  A    A CLOSE-UP PHOTO OF THE ITEMS THAT WE WERE GOING TO

21  SEIZE OUT OF THIS -- THE GREY FILING CABINET IN THIS ROOM.

22  Q    COULD YOU JUST BRIEFLY DESCRIBE THE SIGNIFICANCE OF

23  L -24 THAT WE SEE ON THIS?

24  A    SURE.  THE L-24 IS THE ITEM NUMBER THAT WE ASSIGNED TO

25  THIS PARTICULAR PIECE OF EVIDENCE WHEN WE COLLECTED IT.  SO
```

1    WHEN WE -- WHEN AGENTS IDENTIFY A PIECE OF EVIDENCE, IT

2    GETS ASSIGNED AN ITEM NUMBER BASED ON THE CONDITION IT WAS

3    FOUND IN AND THE LOCATION IT WAS FOUND IN.  AND THEN IT'S

4    PHOTOGRAPHED WITH THAT ITEM NUMBER SO THAT WE CAN IDENTIFY

5    IT ON OUR EVIDENCE LOGS.

6    Q    SO CAN I ASK YOU TO LOOK AT WHAT'S BEEN PREVIOUSLY

7    IDENTIFIED AS GOVERNMENT'S EXHIBIT 700, AND THAT WOULD BE

8    IN BOOK 9.

9         DO YOU HAVE THAT IN FRONT OF YOU?

10   A    YES.

11   Q    WAS THIS DOCUMENT FOUND -- SEIZED BY THE FBI IN THE

12   FILE CABINET THAT WE WERE JUST DISCUSSING WITH REFERENCE TO

13   EXHIBIT 789?

14   A    YES, IT WAS.

15        MS. SARTORIS:  YOUR HONOR, I'D LIKE TO MOVE

16   EXHIBIT 700 INTO EVIDENCE.

17        MR. SPERTUS:  NO OBJECTION, YOUR HONOR.

18        THE COURT:  EXCUSE ME.  700 IS TWO PAGES; IS THAT

19   CORRECT?

20        MS. SARTORIS:  THE FIRST PAGE IS THE EXHIBIT PAGE

21   WITH THE LABEL, THE YELLOW EXHIBIT TAB, AND THE SECOND PAGE

22   IS THE DOCUMENT.

23        THE COURT:  AND THAT BEARS BATES ENDING IN 5328?

24        MS. SARTORIS:  YES,

25        THE COURT:  THANK YOU.  IT'S ADMITTED.

```
 1              (EXHIBIT 700 WAS ADMITTED.)

 2    Q    BY MS. SARTORIS:  SPECIAL AGENT MILLER, WHAT IS THIS?

 3    A    THIS IS A DOCUMENT VERIFYING -- FOR EMPLOYMENT

 4    VERIFICATION FOR THE DEFENDANT YI-CHI SHIH FROM CHENGDU

 5    GASTONE TECHNOLOGY COMPANY.

 6    Q    AND --

 7    A    IT'S DATED JANUARY 21ST, 2013.  IT STATES THAT HE HAS

 8    BEEN EMPLOYED BY CHENGDU GASTONE TECHNOLOGY SINCE JULY 3 OF

 9    2011, AND ANNUAL SALARY $317,460, WHICH IS APPROXIMATELY 2

10    MILLION RENMINBI.

11    Q    AND HE WAS PRESIDENT OF GASTONE?

12    A    CORRECT.

13              MR. SPERTUS:  YOUR HONOR, OBJECTION.  FOUNDATION

14    AS TO THE LAST QUESTION AND ANSWER.  I'M SORRY.  I SEE IT

15    NOW.  I APOLOGIZE.  I WITHDRAW THE OBJECTION.

16              THE COURT:  THANK YOU.

17    Q    BY MS. SARTORIS:  COULD I ASK YOU TO LOOK AT

18    EXHIBIT 790, WHICH IS IN BOOK 9(B)?

19    A    OKAY.

20    Q    DO YOU RECOGNIZE THIS?

21    A    YES, I DO.  THIS IS A SERIES OF PHOTOGRAPHS TAKEN ON

22    THE SECOND FLOOR OF THE RESIDENCE IN ANOTHER ROOM.  IT WAS

23    WHAT WE DETERMINED TO BE AN OFFICE SPACE ON THE SECOND

24    FLOOR.

25              MS. SARTORIS:  YOUR HONOR, I'D LIKE TO MOVE
```

1  EXHIBIT 790 INTO EVIDENCE.

2           THE COURT:  ANY OBJECTION?

3           MR. SPERTUS:  IF I COULD JUST HAVE A MOMENT, YOUR

4  HONOR.

5           (REVIEWING DOCUMENT.)

6           MR. SPERTUS:  NO OBJECTION, YOUR HONOR.

7           THE COURT:  THANK YOU.  EXHIBIT 790 IS ADMITTED.

8           (EXHIBIT 790 IS ADMITTED.)

9  Q    BY MS. SARTORIS:  OKAY.  SO IF YOU COULD LOOK AT PAGE

10 -- LET'S START WITH PAGE 1 OF EXHIBIT SO THAT THE JURY CAN

11 SEE IT.

12          IS THAT THE ROOM YOU JUST DESCRIBED?

13 A    YES, IT IS.

14 Q    IF YOU TURN TO PAGE 2, WHAT DO YOU SEE HERE?

15 A    THIS IS A PHOTO OF A DESK THAT WAS IN THIS ROOM.

16 Q    AND WHAT DO YOU SEE ON THE DESK?

17 A    THERE'S A VARIETY OF DIGITAL DEVICES ON THE DESK.  IN

18 PARTICULAR, THERE'S A GREY OR SILVER LAPTOP WITH A THUMB

19 DRIVE AND A BLACK CORD ON -- PLUGGED IN ON THE LEFT SIDE OF

20 THE LAPTOP.

21 Q    AND IF YOU TURN TO PAGE 3?

22 A    PAGE 3 IS A PHOTOGRAPH TAKEN FROM THE FRONT VIEW OF

23 THIS DESK.  YOU'LL NOTICE THE SAME GREY AND SILVER LAPTOP

24 ON THE LEFT-HAND SIDE OF THE DESK.  IT'S GOT TWO THUMB

25 DRIVES PLUGGED IN, ONE ON EITHER SIDE, AND THEN A BLACK

1    CORD LEADING TO A HARD DRIVE THAT'S BEHIND THAT YELLOW

2    POST-IT.  ANOTHER ITEM TO NOTE IS IN THE BOTTOM RIGHT-HAND

3    CORNER UNDERNEATH THE DESK, IT'S A LITTLE BIT HARD TO SEE,

4    BUT THERE IS A BLACK COMPUTER.

5    Q    AND PAGE 4?

6    A    PAGE 4 IS GOING TO BE A PHOTOGRAPH IDENTIFYING THE

7    SILVER LAPTOP, THE THUMB DRIVES AND HARD DRIVES THAT WERE

8    ATTACHED TO IT, WITH THE U-10 AS AN ITEM THAT WAS

9    COLLECTED.

10   Q    AND PAGE 5?

11   A    PAGE 5 IS JUST A CLOSE-UP PHOTO OF THE ITEMS.

12   Q    AND WHAT ABOUT PAGE 6?

13   A    PAGE 6 IS A PHOTOGRAPH OF THE BLACK COMPUTER THAT WAS

14   UNDERNEATH THE DESK ON THE RIGHT-HAND SIDE -- UNDERNEATH

15   THE DESK ON THE RIGHT-HAND SIDE.  AND THEN BEHIND THE WHITE

16   ITEM NUMBER, YOU'LL SEE A BLACK BOX, WHICH IS A HARD DRIVE.

17   Q    AND ARE THESE SOME OF THE ITEMS THAT WE PREVIOUSLY

18   DISCUSSED ON GOVERNMENT'S EXHIBIT 1645?  IF YOU COULD TURN

19   TO THAT EXHIBIT, PLEASE.

20   A    OKAY.

21   Q    AND ARE THESE ON PAGES 1 THROUGH 4, 8, AND 13 OF THAT

22   EXHIBIT?

23   A    YES, THEY ARE.

24   Q    TURNING BACK TO THE PHOTO EXHIBIT 790, THE SECOND

25   FLOOR OFFICE THAT YOU WERE DISCUSSING, WERE THERE DOCUMENTS

1    OR OTHER PHYSICAL ITEMS IN ADDITION TO DIGITIAL DEVICES

2    SEIZED FROM THAT ROOM?

3    A    YES, THERE WAS.

4    Q    AND IF I ASK YOU TO LOOK AT EXHIBITS 702, 703, 704,

5    THAT WOULD BE IN BINDER 9 --

6    A    OKAY.

7    Q    -- WERE THESE ITEMS SEIZED FROM THIS OFFICE?

8    A    YES, THEY WERE.

9         MS. SARTORIS:  YOUR HONOR, I'D LIKE TO MOVE

10   EXHIBIT 702, 703, 704 INTO EVIDENCE.

11        THE COURT:  ANY OBJECTION?

12        MR. SPERTUS:  NO OBJECTION, YOUR HONOR.

13        THE COURT:  ALL RIGHT.  EXHIBIT 702, 703, 704 ARE

14   ADMITTED.

15        (EXHIBITS 702, 703, 704 WERE ADMITTED.)

16   Q    BY MS. SARTORIS:  SPECIAL AGENT MILLER, I'D LIKE TO

17   PUBLISH EXHIBIT 702.  COULD YOU LOOK AT EXHIBIT 702,

18   PLEASE, AND TELL US WHAT IT IS.

19   A    SO EXHIBIT 702 IS A SERIES OF BUSINESS CARDS FOR A

20   HONG KONG BRANCH OF COUTTS BANK.  THEY'RE DUAL-SIDED, SO

21   ONE SIDE IS IN MANDARIN AND THE OTHER SIDE IS IN ENGLISH.

22   Q    OKAY.  CAN YOU TURN TO PAGE 2 OF EXHIBIT 702.

23   A    OKAY.

24   Q    WHAT IS THAT?

25   A    SO THIS IS ONE OF THE BUSINESS CARDS FOR THE COUTTS'

1    HONG KONG BRANCH, AND IT IS A BUSINESS CARD FOR THE VICE

2    PRESIDENT OF WEALTH PLANNING.

3    Q    AND IF YOU TURN TO EXHIBIT -- PAGE 4 OF THAT EXHIBIT,

4    WHAT IS THAT?

5    A    THIS IS ANOTHER COUTTS BUSINESS CARD FOR THE HONG KONG

6    BRANCH FOR AN INDIVIDUAL UNDER THE SENIOR CLIENT PARTNER,

7    EXECUTIVE VICE PRESIDENT.

8    Q    AND PAGE 6?

9    A    THIS IS THE THIRD COUTTS BUSINESS CARD FOR THE HONG

10   KONG BRANCH FOR SOMEONE IN THE INVESTMENT CONSULTANT.

11   Q    IF WE LOOK AT EXHIBIT 703, WHAT IS THIS?

12   A    THIS IS A CHINESE VISA WITH THE DEFENDANT'S NAME AT

13   THE BOTTOM, YI-CHI SHIH.  AND THE DATE FOR THIS CHINESE

14   VISA IS FEBRUARY 22, 2010 TO FEBRUARY 22, 2012.

15   Q    AND EXHIBIT 704, WHAT IS THIS?

16   A    THIS IS A VISA APPLICATION FORM FOR THE PEOPLE'S

17   REPUBLIC OF CHINA WITH THE DEFENDANT'S NAME YI-CHI SHIH ON

18   IT.  IT ALSO HAS A CALIFORNIA DRIVER'S LICENSE NUMBER ON

19   THE FIRST PAGE.

20   Q    AND IF YOU LOOK AT PAGE 3 OF THAT EXHIBIT, WHAT DOES

21   IT SHOW IN THE ADDRESS PART, THE INTENDED STAY SECTION?

22   A    UNDER THE ADDRESS, IT LISTS CHENGDU, CHINA.

23   Q    AND WHAT DATE?

24   A    FOR AUGUST 7 OF 2016.

25   Q    AND IF YOU TURN TO PAGE 4 --

1           THE COURT:  ARE YOU PUBLISHING 65455?

2           MS. SARTORIS:  YES, YOUR HONOR.  THAT WAS 65455.

3           THE COURT:  THANK YOU.

4    Q    BY MS. SARTORIS:  AND IF WE MOVE TO THE NEXT PAGE

5    65456, WHAT DO YOU SEE AS THE E-MAIL ADDRESS?

6    A    THE E-MAIL ADDRESS IS LISTED AS YICHISHIH@GMAIL.COM.

7    Q    AND YOU SEE SOME FAMILY MEMBERS.  AND WHAT ARE THERE

8    ARE OCCUPATIONS?

9    A    THE FIRST NAME, SUE JANE L. SHIH, THE OCCUPATION IS

10   LISTED AS RETIRED, AND THE RELATIONSHIP IS SPOUSE.  THE

11   NEXT NAME IS APRIL Y. SHIH.  THE OCCUPATION IS

12   SCREENWRITER, AND THE RELATIONSHIP IS DAUGHTER.  AND THE

13   THIRD NAME IS ALICE J. SHIH.  THE OCCUPATION IS FASHION

14   DESIGNER, AND THE RELATIONSHIP IS DAUGHTER.

15   Q    AND SO LOOKING AT PAGE 6 OF THIS EXHIBIT, WHAT ELSE

16   WAS INCLUDED IN THESE DOCUMENTS?

17   A    THIS IS A PHOTOGRAPH OF THE DEFENDANT'S PASSPORT.  IT

18   HAS HIS NAME, YI-CHI SHIH, AND A PICTURE OF HIM ON IT.

19   Q    COULD I ASK YOU TO TURN YOUR ATTENTION TO WHAT'S BEEN

20   MARKED AS PHOTO EXHIBIT 791.  IT WOULD BE IN VOLUME 9(B).

21   A    OKAY.

22   Q    ARE YOU FAMILIAR WITH THIS?

23   A    YES.  THIS IS A PHOTOGRAPH THAT WAS TAKEN IN THE

24   RESIDENCE ON THE SECOND FLOOR, IN A BEDROOM ON THE SECOND

25   FLOOR.

1    Q     AND DID THE BEDROOM APPEAR TO BELONG TO A FEMALE?

2    A     YES.

3          MS. SARTORIS:  AND, YOUR HONOR, I WOULD LIKE TO

4    MOVE GOVERNMENT'S EXHIBIT 791 INTO EVIDENCE.

5          MR. SPERTUS:  NO OBJECTION.

6          THE COURT:  EXHIBIT 791 IS ADMITTED.

7          (EXHIBIT 791 WAS ADMITTED.)

8    Q   BY MS. SARTORIS:  TURNING TO THE SECOND PAGE OF THAT

9    EXHIBIT --

10   A     OKAY.

11   Q     -- WHAT IS THIS?

12   A     THIS IS A CLOSE PHOTO OF BUSINESS CARDS THAT WERE

13   SEIZED FROM THIS BEDROOM.

14   Q     COULD I ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT 705,

15   WHICH IS IN BINDER B.

16   A     OKAY.

17   Q     DO YOU RECOGNIZE THIS?

18   A     YES, THIS IS THE BUSINESS CARD THAT WAS SEIZED FROM

19   THE BEDROOM.

20         MS. SARTORIS:  YOUR HONOR, I'D LIKE TO MOVE

21   EXHIBIT 705 INTO EVIDENCE.

22         MR. SPERTUS:  NO OBJECTION.

23         THE COURT:  THANK YOU.  EXHIBIT 705 IS ADMITTED.

24         (EXHIBIT 705 WAS ADMITTED.)

25   Q   BY MS. SARTORIS:  SO REAL BRIEFLY, COULD YOU EXPLAIN

1    TO THE JURY WHAT THIS EXHIBIT REFLECTS?

2    A    THIS EXHIBIT IS A BUSINESS CARD FOR CHENGDU GASTONE

3    TECHNOLOGY.  IT HAS THE NAME YI-CHI SHIH ON IT, AS WELL AS

4    THE TITLE PRESIDENT.  AND YOU'LL NOTICE THE ADDRESS IS IN

5    CHENGDU CHINA, AND THE ADDRESS IS YICHISHIH@HOTMAIL.COM.

6    Q    NOW, DID YOU ALSO SEIZE ITEMS FROM DEFENDANT'S

7    BEDROOM?

8    A    YES, WE DID.

9    Q    COULD YOU TURN TO GOVERNMENT'S EXHIBIT 792.  IT'S A

10   PHOTO EXHIBIT IN BINDER 9(B).

11   A    OKAY.

12   Q    NOW, LOOKING AT THE -- DO YOU HAVE THAT EXHIBIT IN

13   FRONT OF YOU?

14   A    YES, I DO.

15   Q    DO YOU RECOGNIZE WHAT THIS IS?

16   A    YES.  THIS IS A SERIES OF PHOTOGRAPHS THAT WERE TAKEN

17   FROM THE MASTER BEDROOM ON THE SECOND FLOOR OF THE

18   RESIDENCE.

19          MS. SARTORIS:  YOUR HONOR, I'D ASK TO MOVE

20   GOVERNMENT'S EXHIBIT 792 INTO EVIDENCE.

21          MR. SPERTUS:  NO OBJECTION.

22          THE COURT:  THANK YOU.  EXHIBIT 792 IS ADMITTED.

23          (EXHIBIT 792 WAS ADMITTED.)

24          THE COURT:  MS. SARTORIS, YOU LET ME KNOW WHEN

25   YOU GET TO A CONVENIENT PLACE TO STOP.

```
 1              MS. SARTORIS:  YOUR HONOR, NOW WOULD BE FINE.

 2              THE COURT:  HOW MUCH MORE TIME DO YOU HAVE WITH

 3     THIS WITNESS?

 4              MS. SARTORIS:  I THINK ABOUT 45 MINUTES.

 5              THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR

 6     NEXT BREAK HERE.  I DON'T THINK WE'LL BE BREAKING AS LONG

 7     AS THE LAST TIME, BUT FOR ABOUT 15, 20 MINUTES.  WE NEED TO

 8     CHANGE REPORTERS AND DO A FEW OTHER THINGS.  SEE YOU IN

 9     ABOUT 20 MINUTES.  PLEASE DO NOT DISCUSS THE CASE DURING

10     THE BREAK.  THANK YOU.

11              THE CLERK:  ALL RISE.

12              (JURORS OUT AT 1:30 P.M.)

13              THE COURT:  MS. MILLER, YOU MAY STEP DOWN, AS

14     WELL.  ANY ISSUES YOU WANT TO DISCUSS BEFORE THE BREAK?

15              MS. SARTORIS:  NO, YOUR HONOR.

16              MR. SPERTUS:  NO YOUR HONOR.

17              THE COURT:  THANK YOU.

18              (PROCEEDINGS ADJOURNED AT 1:30 P.M.)

19

20

21

22

23

24

25
```

1    STATE OF CALIFORNIA  )
                         ) SS
2    COUNTY OF LOS ANGELES)

3

4                 CERTIFICATION OF REPORTER PRO TEMPORE

5

6          I, SERENA WONG, CERTIFIED SHORTHAND REPORTER PRO

7    TEMPORE, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

8    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

9    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THAT

10   THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

11   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

12   ABOVE-ENTITLED MATTER, AND THAT THE TRANSCRIPT PAGE FORMAT

13   IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

14   CONFERENCE OF THE UNITED STATES.

15

16   DATED:  JUNE 6, 2019.

17

18

19

20   _____

21          SERENA WONG, CSR 10250, RPR, CCRR 200

22          FEDERAL COURT REPORTER, PRO TEMPORE

23

24

25