UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -


USA,                                      )
                                          )
                    PLAINTIFF,            )
                                          )
VS.                                       ) CR18-00050-JAK
                                          )
SHIH, ET AL.,                            )
                    DEFENDANTS.           )
_____)



REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY 2, VOLUME 1 OF 2**

LOS ANGELES, CALIFORNIA

THURSDAY, MAY 16, 2019; 11:00 AM



_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFF:          MELANIE ANN HANSON SARTORIS
                             AUSA - OFFICE OF US ATTORNEY
3                            UNITED STATES DISTRICT COURTHOUSE
                             312 NORTH SPRING STREET
4                            12TH FLOOR
                             LOS ANGELES, CA 90012
5

6                            JUDITH A. HEINZ
                             AUSA - OFFICE OF US ATTORNEY
7                            CRIMINAL DIVISION - US COURTHOUSE
                             312 NORTH SPRING STREET
8                            15TH FLOOR
                             LOS ANGELES, CA 90012-4700
9

10                           KHALDOUN SHOBAKI
                             AUSA - OFFICE OF US ATTORNEY
11                           CYBER AND INTELLECTUAL
                             PROPERTY CRIMES SECTION
12                           312 NORTH SPRING STREET
                             SUITE 1500
13                           LOS ANGELES, CA 90012

14

15                           JAMES C. HUGHES
                             AUSA - OFFICE OF US ATTORNEY
                             TAX DIVISION
16                           300 NORTH LOS ANGELES STREET
                             ROOM 7211
17                           LOS ANGELES, CA 90012

18

19                           WILLIAM ROLLINS
                             AUSA - OFFICE OF US ATTORNEY
                             GENERAL CRIMES SECTION
20                           312 NORTH SPRING STREET
                             SUITE 1200
21                           LOS ANGELES, CA 90012

22

23

24

25

1      **APPEARANCES (CONTINUED)**

2

       FOR DEFENDANT SHIH:

3
                            JAMES W. SPERTUS
4                           SPERTUS LANDES AND UMHOFER LLP
                            1990 SOUTH BUNDY DRIVE
5                           SUITE 705
                            LOS ANGELES, CA 90025
6

7                           JOHN HANUSZ
                            SPERTUS LANDES AND UMHOFER LLP
8                           1990 SOUTH BUNDY DRIVE
                            SUITE 705
9                           LOS ANGELES, CA 90025

10
                            CHRISTA L. CULVER
11                          SPERTUS LANDES AND UMHOFER LLP
                            1990 SOUTH BUNDY DRIVE
12                          SUITE 705
                            LOS ANGELES, CA 90025
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 16, 2019

2

3                           11:00 AM

4                          -  -  -  -  -

5

6              (THE FOLLOWING PROCEEDINGS WERE HELD IN

7         OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)

8         THE COURT:  GOOD MORNING.

9              CR18-00050, USA VERSUS YI-CHI SHIH.

10             WOULD YOU STATE YOUR APPEARANCES, PLEASE,

11    STARTING WITH THE GOVERNMENT COUNSEL.

12             MS. HEINZ:  GOOD MORNING, YOUR HONOR.  JUDITH

13    HEINZ ON BEHALF OF THE UNITED STATES.

14             MR. ROLLINS:  GOOD MORNING, YOUR HONOR.  WILL

15    ROLLINS ON BEHALF OF THE UNITED STATES.

16             MR. SHOBAKI:  GOOD MORNING, YOUR HONOR.  KHAL

17    SHOBAKI ON BEHALF OF THE UNITED STATES.

18             MR. HUGHES:  GOOD MORNING, YOUR HONOR.  JAMES

19    HUGHES ON BEHALF OF THE UNITED STATES.

20             MS. SARTORIS:  GOOD MORNING, YOUR HONOR.

21    MELANIE SARTORIS FOR THE UNITED STATES.

22             MR. SPERTUS:  GOOD MORNING, YOUR HONOR.  JAMES

23    SPERTUS AND JOHN HANUSZ AND CHRISTA WASSERMAN ON BEHALF

24    OF DR. SHIH WHO IS PRESENT BEFORE THE COURT.

25             THE COURT:  GOOD MORNING TO ALL OF YOU.
```

```
 1                    WE DON'T HAVE ALL OF THE JURORS YET.  WE

 2      HOPE TO HAVE THEM SOON.

 3                    WAS THERE AN ISSUE THAT YOU WANTED TO

 4      ADDRESS?

 5              MR. SPERTUS:  YES, YOUR HONOR.

 6              MS. HEINZ:  YES, YOUR HONOR.

 7                    THE DEFENSE HAS STATED THAT I CANNOT USE

 8      THE WORDS "NATIONAL SECURITY" IN MY OPENING.

 9                    I PLAN TO USE THE WORDS "NATIONAL

10      SECURITY" ONE TIME IN MY OPENING.  AND THAT IS WHEN I

11      AM EXPLAINING TO THE JURY THE EVIDENCE REGARDING THE

12      ENTITY LIST.

13                    THE EVIDENCE, AS YOUR HONOR KNOWS, OF THE

14      ENTITY LIST IS THE FEDERAL REGISTER.  AND WE HAVE

15      REDACTED GREAT AMOUNTS OF THE FEDERAL REGISTER, BUT WE

16      HAVE LEFT IN THE WORDS "NATIONAL SECURITY AND "FOREIGN

17      POLICY INTERESTS OF THE UNITED STATES."

18                    I PLAN TO SAY THAT ONCE TO TELL THE JURY

19      WHY THE -- WHAT THE CRITERIA IS FOR THE ENTITY LIST.

20                    I BELIEVE THAT WE HAVE REALLY TALKED

21      ABOUT THIS A LOT, YOUR HONOR.  THAT IS THE LAW, AND

22      THAT IS THE EVIDENCE.  I DON'T PLAN TO GO ON AND ON

23      ABOUT "NATIONAL SECURITY."  I PLAN TO SAY IT ONCE.

24              THE COURT:  ALL RIGHT.  MR. SPERTUS?

25              MR. SPERTUS:  YOUR HONOR, THERE HAS BEEN A LOT
```

1    OF DISCUSSION ABOUT THIS.  AND I UNDERSTOOD THE COURT

2    TO BE SAYING "NATIONAL INTEREST" IS FINE.

3                   AND IF I MISUNDERSTOOD THE COURT, I WANT

4    TO THEN REMIND THE COURT THAT THE "WHY" AN ENTITY IS

5    PLACED ON AN ENTITY LIST IS IRRELEVANT TO THIS CASE.

6    WE HAVE ALL BRIEFED THAT AND AGREED TO THAT.

7                   SO THE "FOREIGN POLICY" IS FINE.  BUT WE

8    HAVE AN UNDERLYING 403 CURRENT THROUGHOUT THIS CASE.

9            THE COURT:  WHAT I'VE SAID IN THE PAST WAS,

10   THE WORDS "NATIONAL INTEREST" WOULD WORK.  I'VE ALSO

11   DIDN'T EXCLUDE "NATIONAL SECURITY."

12                   AND IF YOUR PLAN -- ARE YOU PLANNING TO

13   SAY ONLY "NATIONAL SECURITY" AND NOT "NATIONAL

14   INTEREST"?

15           MS. HEINZ:  I AM PLANNING TO SAY THE EXACT

16   WORDS THAT ARE IN THE FEDERAL REGISTER, WHICH IS

17   "NATIONAL SECURITY AND FOREIGN POLICY INTERESTS OF THE

18   UNITED STATES."  THAT IS THE EVIDENCE, AND THAT IS THE

19   EXACT LANGUAGE.

20           THE COURT:  I UNDERSTAND.

21                   YOU CAN SAY THAT IN YOUR OPENING.  I'LL

22   OVERRULE THE OBJECTION.

23                   BUT WHEN YOU SAID "ONCE," THAT SHOULD

24   BE THAT -- A, ADHERE TO THAT.

25                   AND, B, WITH RESPECT TO THE USE OF THAT

```
 1    WORD AGAIN DURING THE TRIAL, I'LL EVALUATE THAT,

 2    WHETHER IT'S NEEDED.

 3              AND HOW -- ARE YOU PLANNING TO USE IT

 4    AGAIN DURING THE TRIAL?

 5              MS. HEINZ:  YOUR HONOR --

 6              THE COURT:  IT'S A "YES" OR A "NO."

 7              MS. HEINZ:  THE ANSWER IS, "YES" BECAUSE THOSE

 8    WORDS ARE IN THE EVIDENCE.

 9              THE COURT:  OKAY.  WELL --

10              MS. HEINZ:  BUT, YOUR HONOR, WE'VE REALLY

11    TRIED.  WE ARE NOT GOING TO ASK AGENTS ON THE STAND

12    WHAT DIVISION THEY ARE IN OR TO BRING THAT OUT.  BUT

13    WHERE THE "NATIONAL SECURITY" WORDS ARE IN THE

14    EVIDENCE, THEN THEY HAVE TO BE USED.

15              THE COURT:  WORDS IN AN EXHIBIT ARE DIFFERENT

16    THAN WORDS ELICITED IN TESTIMONY.

17              MS. HEINZ:  UNDERSTOOD TOTALLY, YOUR HONOR.

18              THE COURT:  SO IS IT -- DO YOU KNOW WHETHER

19    YOU WILL BE SEEKING TO ELICIT TESTIMONY WITH THE WORDS

20    "NATIONAL SECURITY" AS OPPOSED TO "NATIONAL INTEREST"?

21              MS. HEINZ:  I DON'T BELIEVE TODAY, YOUR HONOR.

22    THAT'S DEFINITELY -- AND -- AND -- WE'LL -- IF THOSE

23    WORDS ARE GOING TO COME OUT IN TESTIMONY RATHER THAN AN

24    EXHIBIT, WE WILL FRONT THAT FOR THE COURT.

25              THE COURT:  THANK YOU.
```

```
1          AND I WILL, OF COURSE, BE TELLING THE

2    JURORS THAT, WHAT THE COUNSEL SAY IN OPENING STATEMENTS

3    ISN'T EVIDENCE BECAUSE IT ISN'T.

4          MR. SPERTUS:  THANK YOU, YOUR HONOR.

5          THE COURT:  THANK YOU.

6          ANY OTHER ISSUE WE HAVE TO ADDRESS -- AND

7    THANK YOU FOR GETTING TOGETHER ON THOSE EVIDENTIARY

8    ISSUES CONCERNING E-MAILS.  I APPRECIATE YOUR

9    COLLABORATION ON THAT.

10          SO I THINK, AT THIS POINT, WE'RE GOING TO

11    WAIT.

12          THE UPDATE -- THE LATEST THAT I HEARD

13    WAS, THERE WAS A JUROR WHO HAD -- WHOSE KEYS WERE

14    LOCKED INSIDE THE JUROR'S CAR, AND THE JUROR CALLED FOR

15    HELP AND HELP WAS EXPECTED TO BE THERE RIGHT AROUND

16    NOW.  AND THE CAR IS NEARBY.  SO THAT JUROR, I EXPECT

17    TO BE HERE SHORTLY.

18          THE OTHER PERSON -- THE OTHER JUROR OR

19    ALTERNATE CALLED WITH A LONGER TIME ESTIMATE.  BUT I'M

20    NOT SURE WHAT THE LATEST IS ON THAT.  WE'LL FIND OUT.

21    WE'LL SEE WHAT STEPS WE SHOULD TAKE.

22          MR. SPERTUS:  THANK YOU, YOUR HONOR.

23          MS. HEINZ:  THANK YOU, YOUR HONOR.

24          THE COURT:  BY THE WAY -- WE'LL DEAL WITH IT

25    LATER.  SO AS SOON AS WE HAVE THE JURORS, WE'LL
```

1    PROCEED.

2              YOUR TIME ESTIMATES REMAIN AT,

3    APPROXIMATELY, ONE HOUR EACH?

4              MR. SPERTUS:  MINE MAY BE AN HOUR AND 10

5    MINUTES OR SO.

6              MS. HEINZ:  I BELIEVE IT'S GOING TO BE AN

7    HOUR, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  OKAY.  THANK YOU.

9              (**RECESS**)

10             **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

11             **OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)**

12             THE COURT:  WE'RE BACK ON THE RECORD IN

13   CR18-00050, USA VERSUS YI-CHI SHIH.

14             ALL COUNSEL WHO WERE PREVIOUSLY HERE ARE

15   BACK, AS IS DR. SHIH.

16             WE HAVE -- HERE'S THE UPDATE:  JUROR FIVE

17   SHOULD BE HERE SOON.  I WOULD SAY THE CURRENT ESTIMATE

18   IS WITHIN ABOUT 10 TO 15 MINUTES.  WELL, LET'S SAY 10

19   MINUTES.

20             JUROR NUMBER -- JUROR NUMBER 16, FOURTH

21   ALTERNATE, CALLED AND STATED THAT THAT PERSON WAS

22   HAVING -- HAD AN AUTO VEHICLE PROBLEM.  ESTIMATED, AT

23   TIME OF THE CALL, WHICH WAS ABOUT 30 MINUTES OR SO

24   AGO -- I'M NOT EXACTLY SURE WHEN THE FIRST CALL WAS.

25   ESTIMATED IT WOULD BE A COUPLE OF HOURS BEFORE THAT

```
1    PERSON COULD BE HERE.

2                    WE'VE PLACED CALLS TO THAT JUROR, SEVERAL

3    OF THEM, NONE HAS BEEN RETURNED.

4                    SO AT THE MOMENT, I DON'T -- I DON'T KNOW

5    THE STATUS OF ALTERNATE NUMBER 4.  WE MAY KNOW MORE --

6    BY THE TIME JUROR NUMBER 5 ARRIVES, PERHAPS WE'LL HAVE

7    HEARD FROM JUROR NUMBER 16, ALTERNATE NUMBER 4.  BUT I

8    WANTED TO ALERT YOU TO THIS AND GET YOUR -- SO JUROR 5

9    IS NOW HERE.

10                   I'LL CONFIRM IF WE'VE NOT HEARD ANYTHING

11   NEW FROM JUROR NUMBER 16, ALTERNATE 4.

12                   WHAT'S THE GOVERNMENT'S VIEW IF WE DON'T

13   HEAR SOON FROM ALTERNATE 4?

14              MS. SARTORIS:  YOUR HONOR, IF WE MAY BE GIVEN

15   TIME TO CONSULT?

16                   THERE IS CONCERN ABOUT LOSING AN

17   ALTERNATE SO SOON IN THE TRIAL BECAUSE IT'S GOING TO BE

18   A VERY LONG TRIAL.  AND I DO KNOW THE ROADS TODAY WERE

19   PARTICULARLY BRUTAL FOR COMMUTERS.  SO IF WE COULD GIVE

20   IT JUST A LITTLE BIT MORE TIME.  AND THEN, HOPEFULLY,

21   WE'LL HEAR FROM ALTERNATE 4 AND HAVE A BETTER SENSE OF

22   TIMING.

23                   IN THE MEANTIME, WE CAN CONSULT WITH EACH

24   OTHER ON OUR POSITION.

25              THE COURT:  THAT'S FINE.  THANK YOU.
```

```
 1                      MR. SPERTUS?
 2                 MR. SPERTUS:  THE DEFENSE WON'T OBJECT TO
 3     EXCUSING THE FOURTH ALTERNATE AND PROCEEDING.  WE HAVE
 4     A LOT OF MATERIAL TO COVER.  WE HAVE FOUR ALTERNATES.
 5                 THE COURT:  LET'S SEE IF WE HEAR BACK FROM
 6     THIS PERSON.
 7                 MR. SPERTUS:  THANK YOU, YOUR HONOR.
 8                 THE COURT:  I'LL BE BACK SHORTLY.
 9                    (RECESS)
10                 (THE FOLLOWING PROCEEDINGS WERE HELD IN
11                 OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)
12                 THE COURT:  ALL RIGHT.  WE'RE BACK ON THE
13     RECORD IN CR18-00050, USA VERSUS YI-CHI SHIH.
14                      ALL COUNSEL WHO PREVIOUSLY APPEARED ARE
15     BACK, AS IS DR. SHIH.
16                      WE HAVE MADE ADDITIONAL CALLS TO
17     ALTERNATE 4.  THERE'S BEEN NO RESPONSE TO THE CALLS.
18                      SO, AT THIS POINT, I THINK -- WELL, MY
19     UNDERSTANDING IS, THAT COUNSEL HAVE AGREED THAT WE
20     SHOULD EXCUSE HIM OR PROCEED WITHOUT HIM?
21                 MS. SARTORIS:  THAT'S CORRECT, YOUR HONOR.
22                 MR. SPERTUS:  YES, YOUR HONOR.
23                 THE COURT:  IN THE UNLIKELY EVENT THAT HE WERE
24     TO APPEAR SOON INTO AN OPENING STATEMENT, WELL, THEN WE
25     CAN REVIEW THAT AND START -- HAVING THE OPENING
```

1    STATEMENTS START OVER.  BUT I THINK, AT THIS POINT, WE

2    NEED -- LET'S -- I THINK IT'S -- EFFICIENCY AND

3    FAIRNESS WARRANTS PROCEEDING.  WE HAVE THE 15 PEOPLE

4    HERE WAITING FOR US.

5                    **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

6                    **OPEN COURT IN THE PRESENCE OF THE JURY:)**

7              THE CLERK:  ALL RISE.

8              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

9                    ALL 15 JURORS AND ALTERNATES ARE PRESENT.

10                   ALTERNATE NUMBER 4, JUROR NUMBER 16 HAS

11   NOT APPEARED.  WE'RE GOING TO PROCEED WITHOUT HIM.

12                   THANK YOU FOR BEING BACK ON TIME, LADIES

13   AND GENTLEMEN.  THERE WERE SOME CHALLENGES TO GETTING

14   HERE, I UNDERSTAND.

15                   TWO THINGS.  FIRST, I'VE SAID THIS

16   GENERALLY; BUT I WANT TO SAY IT MORE SPECIFICALLY ABOUT

17   THOSE -- THE THREE OF YOU WHO ARE ALTERNATE JURORS.  AS

18   ALTERNATE JURORS, YOU'RE BOUND BY THE SAME RULES THAT

19   GOVERN THE CONDUCT OF JURORS WHO ARE SITTING ON THE

20   PANEL.  YOU'LL OBSERVE THE SAME TRIAL AND SHOULD PAY

21   ATTENTION TO ALL OF MY INSTRUCTIONS JUST AS IF YOU WERE

22   SEATED ON THE PANEL.

23                   SOMETIMES A JUROR NEEDS TO BE EXCUSED

24   DURING A TRIAL FOR ILLNESS OR SOME OTHER REASON.  IF

25   THAT HAPPENS, AN ALTERNATE WILL BE SELECTED TO TAKE

1   THAT JUROR'S PLACE.

2              SECOND, AS I HAVE SAID YESTERDAY, THE

3   NEXT STEP IN THE TRIAL WILL BE WHAT ARE CALLED "OPENING

4   STATEMENTS."  EACH SIDE WILL HAVE AN OPPORTUNITY TO

5   MAKE AN OPENING STATEMENT.

6              WHAT COUNSEL SAY IN THE OPENING

7   STATEMENTS IS NOT EVIDENCE.  IT IS INTENDED TO PROVIDE

8   TO YOU AN OUTLINE THAT WILL FACILITATE YOUR

9   CONSIDERATION OF THE EVIDENCE AS THE EVIDENCE IS

10  PRESENTED.

11             THE GOVERNMENT WILL SPEAK FIRST, FOLLOWED

12  BY THE DEFENSE.

13             SO, MS. HEINZ?

14        MS. HEINZ:  GOOD MORNING, LADIES AND GENTLEMEN

15  OF THE JURY.

16             THE EVIDENCE IN THIS CASE WILL SHOW,

17  INSIDE THIS PACKAGE ARE MMIC'S, MONOLITHIC MICROWAVE

18  INTEGRATED CIRCUITS.  THEY ARE VERY SMALL BLOCKS OF

19  ELECTRICAL CIRCUITS.  AND THEY ARE SO POWERFUL, THEY

20  CAN BE USED BY THE MILITARY.

21             THESE ARE THE FRUITS OF HARD-EARNED

22  AMERICAN INNOVATION.

23             DEFENDANT SHIH AND HIS CO-CONSPIRATORS

24  TOOK THESE POWERFUL BLOCKS OF ELECTRICAL CIRCUITS BY

25  FRAUD AND BY STEALTH FROM AN AMERICAN COMPANY.

1    DEFENDANT AND HIS CO-CONSPIRATORS

2    EXPORTED THESE MMIC'S, MMIC'S IDENTICAL TO THE ONES IN

3    MY HAND, FROM THE UNITED STATES TO THE PEOPLE'S

4    REPUBLIC OF CHINA.  AND HE DID SO UNLAWFULLY.

5    NOW, FOR THIS, DEFENDANT WAS PAID

6    MILLIONS BY HIS CHINA-BASED CO-CONSPIRATORS, MILLIONS

7    THAT THE DEFENDANT SECRETED IN HONG KONG BANK ACCOUNTS,

8    AND THAT DEFENDANT DELIBERATELY CONCEALED BOTH THE

9    MONEY AND THE BANK ACCOUNTS FROM THE INTERNAL REVENUE

10   SERVICE WHEN HE FILED HIS TAXES.

11   AND THEN DEFENDANT LIED TO THE FBI.  HE

12   LIED TO THE IRS, AND HE LIED TO THE DEPARTMENT OF

13   COMMERCE ABOUT WHAT HE HAD DONE.  AND THAT'S WHY WE'RE

14   HERE TODAY.

15   DURING THIS TRIAL, YOU WILL SEE DOCUMENTS

16   IN WHICH DEFENDANT AND HIS CO-CONSPIRATORS WRITE ABOUT

17   THEIR PLANS.  THEY WRITE ABOUT EVADING UNITED STATES

18   LAWS RESTRICTING EXPORTS TO CHINA.  THEY WRITE ABOUT

19   HOW THEY WANT TO BUILD A MMIC FACTORY THAT WILL

20   DOMINATE THE WORLD MARKET, AND BUILD THAT FACTORY IN

21   CHINA.

22   YOU WILL HEAR TESTIMONY THAT THE

23   DEFENDANT INSTRUCTED OTHERS TO LIE ABOUT THE CONTENT

24   AND THE VALUE OF THE SHIPMENTS FROM THE UNITED STATES

25   TO CHINA.

```
 1            YOU WILL SEE E-MAILS BETWEEN DEFENDANT
 2   AND HIS CO-CONSPIRATORS, E-MAILS ARRANGING TO HAND-OFF
 3   PACKAGES TO AIR CHINA PILOTS AT A LOS ANGELES HOTEL
 4   BEFORE THEIR FLIGHTS LEFT L.A.X. FOR BEIJING.
 5            YOU WILL SEE E-MAILS WHERE DEFENDANT AND
 6   HIS CO-CONSPIRATORS LIED TO THE AMERICAN MMIC
 7   MANUFACTURER.  AND YOU WILL SEE E-MAILS THAT THOSE LIES
 8   WERE TO ALLOW THE DEFENDANT AND HIS CO-CONSPIRATORS TO
 9   GET ACCESS TO THE COMPUTER PORTAL OF THAT AMERICAN
10   MANUFACTURER, TO USE THE AMERICAN MANUFACTURER'S MMIC
11   PROCESS, MMIC MANUFACTURING PROCESS WHILE, AT THE SAME
12   TIME, DEFENDANT AND HIS CO-CONSPIRATORS WERE
13   NEGOTIATING WITH THE CHINESE INSTITUTE THAT WAS THE
14   CUSTOMER FOR THOSE AMERICAN-MADE, AMERICAN-MANUFACTURED
15   MMIC'S.
16            THESE WERE MILITARY GRADE MMIC'S.  AND
17   THEY WERE RESTRICTED FOR EXPORT FROM THE UNITED STATES
18   TO CHINA.
19            AND THE AMERICAN MMIC MANUFACTURER WOULD
20   NEVER HAVE ALLOWED DEFENDANT AND HIS CO-CONSPIRATORS TO
21   HAVE ACCESS TO ITS COMPUTER PORTAL AND ITS DESIGN
22   SERVICES IF IT HAD KNOWN THAT THOSE MMIC'S WERE GOING
23   TO CHINA.
24            THE CONSPIRACY STARTS IN 2005.  IT
25   CONTINUED FOR OVER 10 YEARS.  NOW, THAT'S A LONG
```

13

```
1   CONSPIRACY, BUT IT INVOLVED ALWAYS THE SAME TWO PEOPLE,
2   AMONG OTHERS.  THROUGHOUT THE ENTIRE TIME, TWO
3   CO-CONSPIRATORS REMAINED CONSTANT, THE DEFENDANT AND
4   YAPING CHEN.  THEIR GOAL WAS GETTING POWERFUL MILITARY
5   GRADE MMIC'S INTO CHINA.
6                IN 2005, YAPING CHEN, WHO IS A CITIZEN
7   AND RESIDENT OF THE PEOPLE'S REPUBLIC OF CHINA, WAS
8   GENERAL MANAGER OF DINGTIAN.  DINGTIAN WAS A COMPANY IN
9   CHENGDU, CHINA.
10               IN 2005, DEFENDANT WAS PRESIDENT OF
11  MMCOMM.  MMCOMM WAS A SMALL COMPANY IN TORRANCE,
12  CALIFORNIA.  MMCOMM MADE MODULES.  MODULES ARE SMALL
13  METAL PACKAGES THAT CONTAIN MMIC AMPLIFIERS AND OTHER
14  ELECTRICAL PARTS.
15               IN ESSENCE, THEY'RE VERY SMALL, BUT VERY
16  POWERFUL, AND THEY MAKE THINGS WORK, THINGS THAT
17  REQUIRE ELECTRICITY.  THE CUSTOMERS FOR MMCOMM INCLUDED
18  THE U.S. MILITARY.
19               NOW, DEFENDANT AND YAPING CHEN AGREED.
20  THEY AGREED TO CREATE A MODULE.  AND THAT MODULE
21  CONTAINED TWO AMERICAN-MADE PARTS.  THE PART NUMBER WAS
22  TGA-4517.  THAT PART WAS MADE BY A COMPANY CALLED
23  "TRIQUINT."  TRIQUINT IS AN AMERICAN COMPANY BASED IN
24  TEXAS.
25               THE TGA-4517 IS WHAT MADE THAT MODULE
```

14

1    WORK.

2                    TGA-4517 IS A DUAL-USE COMMODITY.  THAT

3    MEANS IT HAS BOTH CIVILIAN AND MILITARY APPLICATIONS.

4                    FOR EXAMPLE, TGA-4517'S APPLICATIONS

5    INCLUDED POINT-TO-POINT RADIO AND MILITARY RADAR.

6                    NOW, U.S. LAW PLACES RESTRICTION CONTROLS

7    ON THE EXPORT OF CERTAIN ITEMS TO CHINA.  AND THESE

8    ITEMS INCLUDE DUAL-USE ITEMS, DUAL-USE COMMODITIES.

9                    "EXPORT CONTROLLED," THAT TERM MEANS THE

10   EXPORTER NEEDS TO GET A LICENSE BEFORE EXPORTING,

11   EXPORTING THIS THING, THIS COMMODITY, TO THE FOREIGN

12   COUNTRY, IN THIS CASE CHINA.

13                   AND EXPORT CONTROLS OF MMIC'S DEPEND ON

14   THE FREQUENCY RANGE THAT THE MMIC IS CAPABLE OF PUTTING

15   OUT AND THE POWER LEVEL THAT IT IS CAPABLE OF

16   GENERATING.

17                   YOU WILL SEE E-MAILS BETWEEN DEFENDANT

18   AND YAPING CHEN.  THEY SHOW THAT, IN AUGUST OF 2005,

19   YAPING CHEN HAD 10 OF THESE TGA-4517'S IN CHINA.

20                   ADDITIONAL EVIDENCE IN THIS CASE WILL

21   SHOW THAT THE DEFENDANT UNDERSTOOD UNITED STATES EXPORT

22   REGULATIONS VERY WELL.  THE DEFENDANT INSTRUCTED HIS

23   EMPLOYEES AT MMCOMM ABOUT THESE REGULATIONS.

24                   THE DEFENDANT RECEIVED TRAINING ON THESE

25   REGULATIONS AT HONEYWELL INTERNATIONAL.

1  AND DEFENDANT HAD COPIES OF THESE EXPORT

2  REGULATIONS, THESE RULES IN HIS HOUSE ON HIS COMPUTER

3  AND ATTACHED TO HIS E-MAILS.

4  MOVING FORWARD TO 2006.  THE DEFENDANT

5  PROVIDED MORE TRIQUINT PARTS TO YAPING CHEN IN CHINA.

6  I STUMBLED.  IN CHINA, THEY PUT THE LAST NAME FIRST AND

7  THE FIRST NAME LAST.  SO YOU MAY HEAR WITNESSES CALL

8  "YAPING CHEN," "CHEN YAPING."

9  THE DEFENDANT PROVIDED THESE PARTS TO

10  YAPING CHEN IN CHINA THROUGH A COMPANY IN SINGAPORE.

11  HE DIDN'T EXPORT THEM DIRECTLY.  HE CAUSED THEM TO BE

12  EXPORTED TO OGER INTERNATIONAL IN SINGAPORE.

13  YOU WILL SEE E-MAILS BETWEEN DEFENDANT

14  AND A THIRD CO-CONSPIRATOR, HIS NAME IS "MICHAEL YE."

15  MICHAEL YE IS A MAN OF MANY NAMES AND

16  MANY E-MAIL ADDRESSES.  ONE OF HIS NAMES IS "MICHAEL

17  YE," AND ONE OF HIS NAMES IS "FEI YE."  AND HE WORKED

18  AT DINGTIAN WITH YAPING CHEN.

19  YOU WILL SEE MICHAEL YE'S BUSINESS CARD.

20  IT WAS FOUND IN DEFENDANT'S RESIDENCE.  AND THAT

21  BUSINESS CARD SHOWS THAT HE WORKED AT DINGTIAN.

22  MICHAEL YE ASKED THE DEFENDANT TO GET THE

23  CO-CONSPIRATORS' EXPORT-CONTROLLED AMERICAN-MADE PARTS.

24  AND THE DEFENDANT AGREED.

25  ALSO, THE DEFENDANT PROVIDED YAPING CHEN

16

```
1    AND MICHAEL YE WITH A PLAN.  THE PLAN WAS TO BUILD, IN

2    CHINA, A FOUNDRY, A MMIC FOUNDRY.

3                 NOW, A FOUNDRY IS THE NAME OF THE PLANT

4    OR THE FACTORY WHERE THESE MMIC'S ARE MANUFACTURED.

5                 AND THIS PLAN, THIS BUSINESS PLAN

6    INCLUDED A WEALTH OF INFORMATION ABOUT AMERICAN MMIC

7    FOUNDRIES.

8                 MOVING TO JULY OF 2006.  DEFENDANT

9    ESTABLISHED A CORPORATION.  IT WAS CALLED "PULLMAN LANE

10   PRODUCTIONS."  IT DIDN'T HAVE A BUILDING, AND IT DIDN'T

11   HAVE EMPLOYEES.  IT WAS JUST DEFENDANT'S OWN

12   CORPORATION.

13                THE DEFENDANT OPENED BANK ACCOUNTS.

14   THESE BANK ACCOUNTS WERE IN THE NAME OF "PULLMAN LANE

15   PRODUCTIONS."  AND INTO THESE BANK ACCOUNTS, DEFENDANT

16   WOULD RECEIVE MONEY FROM HIS CO-CONSPIRATORS.

17                IN 2007, DEFENDANT SOLD MMCOMM TO

18   HONEYWELL INTERNATIONAL.  AND DEFENDANT BEGAN WORKING

19   THERE.

20                HONEYWELL INTERNATIONAL IS A DEFENSE

21   CONTRACTOR.  THAT MEANS IT HAS CONTRACTS WITH THE

22   DEPARTMENT OF DEFENSE TO MAKE THINGS.

23                IN ADDITION, YAPING CHEN STARTED RML IN

24   CHINA.  IT'S JUST THE INITIALS "R-M-L."  AND HE WAS THE

25   HEAD OF IT.  HE WAS THE GENERAL MANAGER THERE.
```

1        IN ADDITION, DEFENDANT'S BROTHER, ISHIANG

2    SHIH, ESTABLISHED JYS TECHNOLOGIES IN CANADA.  AND HE

3    WAS IN CHARGE THERE.

4        IN 2008, THE CONSPIRACY BROADENED.  THE

5    DEFENDANT BEGAN DIRECTING YAPING CHEN TO SEND MONEY

6    FROM CHINA TO JYS TECHNOLOGIES IN CANADA.  THE

7    CONSPIRATORS BECAME -- BEGAN OBTAINING MMIC'S FROM WIN

8    SEMICONDUCTOR.  THIS WAS A MMIC FOUNDRY IN TAIWAN.

9        NOW, WIN WOULD NOT SHIP MMIC'S TO CHINA

10    OR TO HONG KONG.

11        SO OVER THE NEXT FEW YEARS, THE

12    CONSPIRATORS DIRECTED WIN TO SHIP THE MMIC'S TO JYS

13    TECHNOLOGIES IN CANADA WHERE THE MMIC'S WERE DRIVEN

14    ACROSS THE U.S./CANADA BORDER TO A FREIGHT-FORWARDER IN

15    MAINE THAT SHIPPED THESE MMIC'S -- THESE WIN MMIC'S TO

16    A COMPANY IN SAN JOSE WHERE LILIE CHEN, YAPING CHEN'S

17    SON, SHIPPED THE MMIC'S TO HONG KONG AS DIRECTED BY

18    DEFENDANT AND YAPING CHEN.

19        YOU WILL HEAR TESTIMONY THAT, AS DIRECTED

20    BY DEFENDANT OR YAPING CHEN, LILIE CHEN LIED.  HE LIED

21    ABOUT THE MMIC'S ON THE SHIPPING DOCUMENTS.  HE

22    UNDERVALUED THEM.  HE PUT AN AMOUNT ON THOSE SHIPPING

23    DOCUMENTS THAT WAS NOWHERE NEAR THE VALUE OF THOSE

24    MMIC'S.  AND HE ALSO DESCRIBED THEM AS "STAINED GLASS."

25        IN 2009, DEFENDANT, AGAIN, DESIGNED

```
1   MODULES FOR HIS CO-CONSPIRATORS IN CHINA, AGAIN, USING

2   TRIQUINT PARTS.

3                   AT MICHAEL YE'S DIRECTION, DEFENDANT GAVE

4   THE TRIQUINT PARTS TO AIR CHINA PILOTS IN LOS ANGELES

5   HOTELS FOR DELIVERY TO YAPING CHEN AND MICHAEL YE IN

6   CHINA.

7                   ALSO, AT THIS TIME, DEFENDANT AND HIS

8   BROTHER ISHIANG SHIH PREPARED A BUSINESS PLAN TO

9   ESTABLISH A MMIC FOUNDRY IN CHINA THAT WOULD DOMINATE

10  THE WORLD MARKET.  AND DEFENDANT SENT THIS PLAN TO

11  YAPING CHEN.

12                  IN 2010 AND 2011, THIS CONSPIRACY

13  BROADENED FURTHER.  A WOMAN BY THE NAME OF "JIERU DENG"

14  JOINED THE CONSPIRACY.  SHE'S ALSO KNOWN AS "ANGEL

15  DENG."  SHE WAS THE GENERAL MANAGER AT QING'AN

16  INTERNATIONAL TRADING GROUP, ALSO KNOWN AS "QTC."

17                  QTC IS LOCATED IN BEIJING, CHINA.  AND

18  JIERU DENG WAS ALSO EMPLOYED AT TIAN HANG -- TIAN HANG

19  YANG PU TECHNOLOGY INVESTMENT COMPANY.

20                  JIERU DENG'S ROLE WAS TO TRANSFER MONEY.

21  SHE TRANSFERRED MONEY FROM CHINA TO BANK ACCOUNTS HELD

22  BY JYS TECHNOLOGIES IN CANADA AND PULLMAN LANE

23  PRODUCTIONS HERE IN LOS ANGELES, CALIFORNIA.

24                  IN LATE 2010, JIERU DENG TRANSFERRED $1

25  MILLION TO A PULLMAN LANE BANK ACCOUNT CONTROLLED BY
```

19

```
1    DEFENDANT.  YOU WILL SEE E-MAILS EXCHANGED BETWEEN

2    DEFENDANT ISHIANG SHIH, YAPING CHEN AND JIERU DENG

3    ABOUT GETTING EQUIPMENT FOR THE FOUNDRY IN CHINA, THE

4    FOUNDRY THAT WOULD DOMINATE THE WORLD MARKET.

5                    AND THE CO-CONSPIRATORS ALSO EXCHANGED

6    BUSINESS PLANS THAT FEATURED, PROMINENTLY, AMERICAN

7    FOUNDRIES, INCLUDING TRIQUINT AND A COMPANY CALLED

8    "CREE INCORPORATED," C-R-E-E.

9                    THESE AMERICAN COMPANIES, THESE

10   FOUNDRIES, THEY HELD THE INNOVATIVE EDGE.  AND THE

11   CONSPIRATORS WANTED THEIR FOUNDRY TO DOMINATE THE WORLD

12   MARKET.

13                   THE BUSINESS PLANS DISCUSSED THE MILITARY

14   USE OF MMIC'S THAT THIS FOUNDRY IN CHINA WOULD

15   MANUFACTURE AND THE U.S. EXPORT CONTROLS THAT THE

16   CONSPIRATORS WOULD EVADE.

17                   THE ENGLISH LANGUAGE NAME OF THE FOUNDRY

18   WAS "CHENGDU GASTONE TECHNOLOGY COMPANY."  ITS CHINESE

19   NAME IS "JIASHI."

20                   YOU WILL SEE EVIDENCE THAT THE

21   SHAREHOLDERS IN CHENGDU GASTONE, ALSO KNOWN AS

22   "JIASHI," INCLUDED QTC AND CHENGDU SIWEI ELECTRONICS

23   COMPANY, WHICH IS ALSO KNOWN AS "CETC 29."

24                   ALSO, AT THIS TIME, DEFENDANT BEGAN

25   MAKING ARRANGEMENTS WITH PROFESSORS AT UCLA FOR RML
```

```
1    EMPLOYEES -- YOU REMEMBER RML IS YAPING CHEN'S
2    COMPANY -- FOR THESE RML EMPLOYEES TO WORK IN THE
3    ELECTRICAL ENGINEERING LABS AT UCLA AS VISITING
4    SCHOLARS.  YOU WILL HEAR DEFENDANT ADMIT, IN HIS OWN
5    WORDS, THAT HIS PURPOSE IN MAKING THESE ARRANGEMENTS
6    WAS TO TRAIN FUTURE JIASHI EMPLOYEES.  AND YOU WILL SEE
7    THAT THE DEFENDANT DONATED MONEY SPECIFICALLY FOR THE
8    PROFESSORS WHO WERE IN CHARGE OF THESE LABS IN THE
9    ELECTRICAL ENGINEERING DEPARTMENT OF UCLA.  AND THE
10   MONEY FOR THESE DONATIONS CAME FROM THE $1 MILLION THAT
11   DENG JIERU HAD DEPOSITED INTO DEFENDANT'S PULLMAN LANE
12   ACCOUNTS.
13            ALSO, AT THIS TIME, DEFENDANT OPENED UP
14   AN ACCOUNT AT STANDARD CHARTERED BANK IN HONG KONG.  AT
15   DEFENDANT'S DIRECTION, THE COMPENSATION FOR HIS WORK IN
16   CHINA WAS DEPOSITED INTO THIS ACCOUNT.  NOT ALL OF HIS
17   COMPENSATION, BUT A SUBSTANTIAL AMOUNT OF IT.  AND
18   DEFENDANT CONCEALED THIS INCOME AND THE BANK ACCOUNT ON
19   HIS U.S. TAX RETURNS.
20            IN JUNE OF 2011, DEFENDANT RESIGNED FROM
21   HONEYWELL INTERNATIONAL.  AND IN JULY OF 2011,
22   DEFENDANT BECAME PRESIDENT OF CHENGDU GASTONE
23   TECHNOLOGY.
24            IN 2012, THE CONSPIRACY BROADENED AGAIN.
25   YE YUAN -- YE YUAN JOINED THE CONSPIRACY.  YE YUAN WAS
```

1    AN ELECTRICAL ENGINEER AT RML.

2              YOU WILL SEE DEFENDANT AND YE YUAN

3    EXCHANGE E-MAILS COMPARING THE PARTS FROM TRIQUINT AND

4    CREE.  TRIQUINT AND CREE INCORPORATED, BOTH AMERICAN

5    COMPANIES.  CREE MANUFACTURES MMIC'S, AS WELL AS

6    TRIQUINT.

7              AS A RESULT OF DEFENDANT'S ARRANGEMENTS,

8    AT THE END OF 2012, YE YUAN BEGAN WORK AS A VISITING

9    SCHOLAR IN THE ELECTRICAL ENGINEERING DEPARTMENT OF

10   UCLA.

11             ANOTHER CO-CONSPIRATOR, KIET MAI, KIET

12   MAI IS A LONG-TIME ASSOCIATE OF DEFENDANT.  HE WORKED

13   FOR DEFENDANT AT MMCOMM.  HE WAS SUPERVISED BY

14   DEFENDANT WHEN THEY BOTH WORKED AT HONEYWELL

15   INTERNATIONAL.

16             KIET MAI ESTABLISHED A COMPANY CALLED

17   "MICROEX ENGINEERING."  AGAIN, MICROEX DIDN'T HAVE ITS

18   OWN BUILDING.  IT WAS JUST -- THE ONLY EMPLOYEE, THE

19   ONLY PERSON AT MICROEX WAS KIET MAI.

20             YOU WILL HEAR THAT KIET MAI HAS PLED

21   GUILTY TO SMUGGLING IN CONNECTION WITH THIS CASE.

22   THAT'S BECAUSE KIET MAI, AT DEFENDANT'S DIRECTION,

23   SHIPPED CONNECTORS FOR INTEGRATED CIRCUITS FROM THE

24   UNITED STATES TO CHINA.  AND HE LIED ON THE SHIPPING

25   DOCUMENTS TO AVOID A REPORTING REQUIREMENT.  IF A

22

1    SHIPMENT IS WORTH MORE THAN $2,500, YOU HAVE TO FILE

2    CERTAIN PAPERWORK.  AND THAT PAPERWORK IS CALLED AN

3    "ELECTRONIC EXPORT INFORMATION."  IT WAS PREVIOUSLY

4    CALLED A "SHIPPER'S EXPORT DECLARATION."  KIET MAI

5    DELIBERATELY UNDERVALUED THAT SHIPMENT THAT HE KNEW WAS

6    GOING TO CHINA.  IT WAS ADDRESSED TO DEFENDANT'S

7    BROTHER IN ORDER TO AVOID THAT REPORTING REQUIREMENT.

8            KIET MAI WILL TESTIFY UNDER A COOPERATION

9    PLEA AGREEMENT WITH THE UNITED STATES GOVERNMENT.

10            NOW, THE EVIDENCE THAT I HAVE DESCRIBED

11   THUS FAR, AND MORE, SUPPORTS COUNT 1 OF THE INDICTMENT,

12   WHICH CHARGES DEFENDANT WITH CONSPIRING WITH OTHERS TO

13   EXPORT ITEMS FROM THE UNITED STATES TO CHINA AND TO

14   CHENGDU GASTONE TECHNOLOGY COMPANY WITHOUT HAVING FIRST

15   OBTAINED A LICENSE FROM THE DEPARTMENT OF COMMERCE AND

16   WITHOUT FILING AN ELECTRONIC INFORMATION -- AN

17   ELECTRONIC EXPORT INFORMATION.

18            MOVING TO 2013.  IN 2013, THE

19   CONSPIRATORS DECIDE THAT THEY ARE GOING TO GET MMIC'S

20   FROM CREE INCORPORATED.  YE YUAN, AT UCLA, AT

21   DEFENDANT'S DIRECTION, ATTEMPTS TO GET CREE MMIC'S

22   THROUGH UCLA.  HE IS UNSUCCESSFUL.  SO DEFENDANT ASKS

23   KIET MAI TO GET MMIC'S FROM CREE THROUGH MICROEX.

24   SPECIFICALLY, DEFENDANT WANTED ACCESS TO CREE'S FOUNDRY

25   SERVICES.

23

```
 1              NOW, CREE, AS I TOLD YOU, IS AN AMERICAN
 2    COMPANY.  IT'S LOCATED IN NORTH CAROLINA.  AND IT
 3    OFFERS FOUNDRY SERVICES TO COMPANIES WHO WANT TO CUSTOM
 4    DESIGN THESE MMIC'S, THESE ELECTRICAL CIRCUITS.  AND IT
 5    PROVIDES DESIGN ASSISTANCE.  AND IT ALSO MAKES THE
 6    MMIC'S THAT THE CUSTOMER HAS DESIGNED.
 7              MAI CONTRACTED WITH CREE FOR THESE
 8    FOUNDRY SERVICES.  HE LIED TO CREE.  HE TOLD CREE THAT
 9    MICROEX WOULD BE DOING THE DESIGN, TESTING AND USE OF
10    THE MMIC'S WHEN MAI KNEW, ABSOLUTELY, THAT IT WAS
11    DEFENDANT WHO WAS GOING TO BE DOING THE DESIGN, TESTING
12    AND USE OF THE MMIC'S.
13              DEFENDANT ALSO LIED TO CREE.  HE
14    COMPLETED AN EXPORT COMPLIANCE FORM.  AND HE LIED ABOUT
15    THE POWER OF THE MMIC'S HE WAS GOING TO DESIGN.  HE
16    LIED ABOUT WHETHER THE MMIC'S, THOSE MMIC'S THAT WOULD
17    BE MANUFACTURED, WOULD BE CONTROLLED FOR EXPORT FROM
18    THE UNITED STATES TO CHINA.
19              KIET MAI SIGNED AGREEMENTS WITH CREE,
20    AGREEMENTS THAT HE VIOLATED.  HE AGREED THAT NO ONE
21    OUTSIDE MICROEX WOULD USE CREE'S DESIGN KIT.  BUT HE
22    KNEW THAT DEFENDANT WAS GOING TO USE IT.  HE AGREED NOT
23    TO PROVIDE ACCESS TO CREE'S DESIGN PORTAL TO CREE'S
24    COMPUTER, BUT HE KNEW THAT -- HE AGREED NOT TO PROVIDE
25    THAT ACCESS TO PEOPLE OUTSIDE MICROEX.  AND HE KNEW
```

1    THAT THE DEFENDANT WAS GOING TO ACCESS THAT COMPUTER.

2    AND HE AGREED THAT THE MMIC'S THAT CREE WOULD

3    MANUFACTURE WOULD NOT BE EXPORTED CONTRARY TO U.S. LAW.

4    THE DEFENDANT KNEW THAT MAI WAS LYING TO CREE BECAUSE

5    MAI SENT TO DEFENDANT ALL OF THOSE AGREEMENTS THAT HE

6    HAD SIGNED.  AND WHILE MAI WAS LYING TO CREE, DEFENDANT

7    AND HIS CO-CONSPIRATORS WERE NEGOTIATING WITH THE

8    CHINA-BASED CUSTOMER FOR THOSE CUSTOM-DESIGNED CREE

9    MMIC'S.

10                YOU WILL SEE E-MAILS SHOWING THAT THE 607

11   INSTITUTE IN CHINA INSTRUCTED DEFENDANT AND HIS

12   CO-CONSPIRATORS THE EXACT PARAMETERS THAT IT WANTED IN

13   THOSE CREE MMIC'S, THE EXACT FREQUENCY RANGE THAT IT

14   DEMANDED AND THE POWER LEVEL THAT IT WANTED.

15                NOW, THE EXPORT OF MMIC'S TO CHINA IS

16   CONTROL BASED ON FREQUENCY AND POWER LEVEL BECAUSE WE

17   ARE NOT TALKING ABOUT THE KIND OF ELECTRICITY THAT IS

18   IN OUR CELL PHONES HERE.  WE ARE TALKING ABOUT VERY

19   POWERFUL ELECTRICITY.  THE KIND OF ELECTRICITY THAT IS

20   USED IN AVIATION AND OUTER SPACE.

21                YOU WILL HEAR TESTIMONY THAT CREE WOULD

22   NEVER HAVE PERMITTED DEFENDANT AND THE CONSPIRATORS

23   ACCESS TO THE CREE FOUNDRY SERVICE IF IT HAD KNOWN THAT

24   THOSE RESULTING MMIC'S WERE GOING TO CHINA AND IF IT

25   HAD KNOWN THAT SOMEONE OTHER THAN MICROEX WAS GOING TO

1   BE ACCESSING ITS COMPUTER PORTAL.

2              YOU WILL SEE E-MAILS THAT CREE PROVIDED A

3   USER NAME AND A PASSWORD FOR THAT CREE COMPUTER PORTAL.

4              YOU WILL SEE E-MAILS THAT MAI IMMEDIATELY

5   PROVIDED THAT INFORMATION TO DEFENDANT.

6              YOU WILL SEE E-MAILS SHOWING THAT MAI

7   PROVIDED ALL OF HIS COMMUNICATIONS WITH CREE TO THE

8   DEFENDANT, AND THEN MAI WAITED.  HE WAITED TO HEAR THE

9   RESPONSE FROM DEFENDANT.  AND THEN HE TOOK THAT

10  RESPONSE AND CUT AND PASTED IT INTO AN E-MAIL AND SENT

11  IT BACK TO CREE.

12             MAI AND DEFENDANT INTENTIONALLY HID

13  DEFENDANT'S INVOLVEMENT FROM CREE.

14             DEFENDANT USED ONE E-MAIL TO COMMUNICATE

15  WITH MAI AND ANOTHER E-MAIL TO COMMUNICATE WITH HIS

16  CHINA-BASED CO-CONSPIRATORS ABOUT THE DESIGN OF THESE

17  MMIC'S.

18             YOU WILL SEE E-MAILS THAT SHOW THAT

19  DEFENDANT AND HIS CHINA-BASED CO-CONSPIRATORS DESIGNED

20  THE MMIC'S TO BE MANUFACTURED BY CREE.  THEY CONDUCTED

21  SIMULATIONS.  SIMULATIONS ALLOWED THE DESIGNER TO

22  PREDICT THE ACCURATE -- WITH FAIR ACCURACY THE

23  FREQUENCY RANGE AND THE POWER LEVELS OF THE MMIC'S THAT

24  THEY ARE DESIGNING.

25             MAI, USING MICROEX, MADE PAYMENTS TO CREE

1    FOR THE MANUFACTURE OF THE MMIC'S.  THE PAYMENTS

2    TOTALED $130,000.  AND MAI INVOICED DEFENDANT AT

3    PULLMAN LANE FOR WHAT MAI PAID CREE FOR THE MMIC'S,

4    PLUS A 15-PERCENT COMMISSION.

5                    THE CREE MMIC PURCHASE WAS CODE NAMED IN

6    CHINA "Z-5."  YOU WILL SEE E-MAILS IN WHICH DEFENDANT

7    DIRECTED HIS CHINA-BASED CO-CONSPIRATORS TO TRANSFER

8    MONEY FOR THE Z-5 PROJECT TO DEFENDANT'S PULLMAN LANE

9    BANK ACCOUNT.

10                    AND DEFENDANT THEN USED THIS MONEY TO PAY

11   MAI THROUGH THE PULLMAN LANE BANK ACCOUNT THAT HAD

12   RECEIVED THE MONEY FROM CHINA.

13                    IN DECEMBER OF 2013, USING THE DESIGNS

14   THAT WERE PREPARED BY DEFENDANT AND HIS CHINA-BASED

15   CO-CONSPIRATORS, CREE MANUFACTURED FOUR IDENTICAL

16   WAFERS THAT CONTAINED IDENTICAL MMIC'S, EACH OF WHICH

17   CONTAINED MULTIPLE MMIC'S, MMIC'S OF VARYING FREQUENCY,

18   RANGES AND POWER LEVELS.

19                    CREE ASSIGNED A UNIQUE IDENTIFICATION

20   NUMBER TO EACH ONE OF THESE WAFERS.  IT'S ATTACHED TO

21   EACH WAFER.  AND IT'S ALSO LISTED ON THE PACKING SLIP.

22                    THIS, WHAT'S BEEN MARKED AS THE

23   GOVERNMENT'S EXHIBIT NUMBER 1, IS ONE OF THOSE FOUR

24   WAFERS.

25                    CREE SHIPPED THE FOUR WAFERS TO MAI.  AND

1    MAI GAVE THE FOUR WAFERS TO DEFENDANT.  DEFENDANT GAVE

2    ONE OF THE CREE WAFERS TO UCLA FOR TESTING.  DEFENDANT

3    SHIPPED THE REMAINING THREE WAFERS -- THE CREE WAFERS

4    TO ERIC LIN.  ERIC LIN WAS A FRIEND OF LILIE CHEN.

5    LILIE CHEN IS YAPING CHEN'S SON.  HE SHIPPED IT TO ERIC

6    LIN AT ERIC LIN'S AUTOMOTIVE REPAIR SHOP UP IN NORTHERN

7    CALIFORNIA.

8                DEFENDANT LIED ON THE SHIPPING DOCUMENTS.

9    HE UNDERVALUED THE THREE CREE WAFERS.

10               YOU WILL HEAR TESTIMONY THAT DEFENDANT

11   HAD A LONG-STANDING ARRANGEMENT WITH LILIE CHEN.  LILIE

12   CHEN WOULD SHIP MMIC'S TO HONG KONG KNOWING THAT THEY

13   WERE GOING TO CHINA FOR THE DEFENDANT.

14               ERIC LIN, AT LILIE CHEN'S DIRECTION,

15   SHIPPED THE THREE CREE WAFERS TO THE PRE-ARRANGED HONG

16   KONG ADDRESS.  LILIE CHEN HAD DIRECTED ERIC LIN, HAVING

17   RECEIVED INSTRUCTION FROM DEFENDANT, TO CALL THIS

18   "GLASS SAMPLE" -- THE SHIPMENT "GLASS SAMPLE" AND TO

19   VALUE IT AT A HUNDRED DOLLARS.

20               YOU WILL SEE E-MAILS THAT THE DEFENDANT

21   PROVIDED THE SHIPPING TRACKING NUMBER, THE TRACKING

22   NUMBER OF THAT SHIPMENT, THE SHIPMENT SENT BY ERIC LIN

23   TO HIS CHINA-BASED CO-CONSPIRATORS, INCLUDING YE YUAN.

24   YE YUAN E-MAILED DEFENDANT THEN THAT THEY HAD RECEIVED

25   THE SHIPMENT.  YE YUAN WAS THEN IN CHINA WHEN HE SENT

1   THAT E-MAIL.  HE SAID THEY HAD RECEIVED THE SHIPMENT,

2   AND THEY HAD BEGUN TESTING THE MMIC'S.

3                YOU WILL SEE PHOTOGRAPHS FOUND ON

4   DEFENDANT'S COMPUTERS OF SOME OF THESE CREE MMIC'S THAT

5   WERE SHIPPED TO CHINA.  YOU WILL HEAR TESTIMONY THAT

6   THE CREE WAFER THAT DEFENDANT GAVE TO UCLA WAS PROVIDED

7   TO THE FBI.

8                YOU WILL HEAR EVIDENCE AND HEAR TESTIMONY

9   ABOUT THE TESTING OF THE MMIC'S ON THAT WAFER.

10                THAT TESTING WAS CONDUCTED AT THE SANDIA

11   NATIONAL LAB.  IT WAS CONDUCTED BY DR. CHRISTOPHER

12   NORDQUIST.  YOU WILL HEAR FROM DR. NORDQUIST.  THAT

13   TESTING SHOWED THAT SOME OF THE MMIC'S ON THIS WAFER

14   PERFORMED AT FREQUENCY LEVELS, FREQUENCY RANGES AND

15   POWER LEVELS THAT MAKE THOSE MMIC'S CONTROLLED FOR

16   EXPORT FROM THE UNITED STATES TO CHINA.

17                YOU WILL HEAR TESTIMONY THAT AN EXPORTER

18   OF SUCH A MMIC WOULD NEED TO OBTAIN A LICENSE FROM THE

19   DEPARTMENT OF COMMERCE BEFORE EXPORTING IT TO CHINA

20   FROM THE UNITED STATES.

21                NEITHER DEFENDANT, NOR ANY OF HIS

22   CO-CONSPIRATORS, NOR ANY OF THEIR ASSOCIATED COMPANIES

23   EVER GOT SUCH A LICENSE.

24                THE EVIDENCE THAT I HAVE DESCRIBED TO YOU

25   THUS FAR, AND MORE, SUPPORTS THE FOLLOWING CHARGES

```
 1    AGAINST THE DEFENDANT:
 2                COUNT 2, CAUSING TO BE EXPORTED, FROM THE
 3    UNITED STATES TO CHINA, MMIC'S, WITHOUT HAVING FIRST
 4    OBTAINED THE REQUIRED LICENSE FROM THE DEPARTMENT OF
 5    COMMERCE.
 6                COUNTS 3 THROUGH 8, KNOWINGLY, AND WITH
 7    INTENT TO DEFRAUD, EXECUTING A SCHEME TO DEFRAUD CREE
 8    AS TO MATERIAL MATTERS AND TO OBTAIN MONEY AND PROPERTY
 9    FROM IT BY MEANS OF MATERIAL FALSE REPRESENTATIONS,
10    USING BOTH THE U.S. MAIL AND INTERSTATE WIRES.
11                AND COUNT 9, CONSPIRING WITH OTHERS TO
12    INTENTIONALLY ACCESS, WITHOUT AUTHORIZATION, A
13    PROTECTED COMPUTER AND, THEREBY, OBTAIN INFORMATION FOR
14    PURPOSES OF COMMERCIAL ADVANTAGE AND PRIVATE GAIN IN
15    FURTHERANCE OF A CRIMINAL ACT IN VIOLATION OF
16    UNITED STATES LAW.
17                ON AUGUST 1ST, 2014, SOMETHING
18    SIGNIFICANT HAPPENED.  THE DEPARTMENT OF COMMERCE
19    PLACED FOUR COMPANIES ON ITS ENTITY LIST.  YOU MAY
20    RECOGNIZE THEIR NAMES.  THE FOUR COMPANIES WERE CHENGDU
21    GASTONE, QTC, CETC 29 AND TIAN HANG YANG PU TECHNOLOGY
22    INVESTMENT LIMITED COMPANY.  THEY WERE PLACED ON THE
23    ENTITY PLACE DUE TO THEIR INVOLVEMENT AND ACTIVITIES
24    CONTRARY TO NATIONAL SECURITY AND THE FOREIGN POLICY
25    INTERESTS OF THE UNITED STATES.
```

30

1    AND AS A RESULT, AN EXPORTER NEEDED TO

2    OBTAIN A LICENSE TO SEND ANY ITEM THAT WAS SUBJECT TO

3    THE EXPORT ADMINISTRATION REGULATIONS TO ANY OF THESE

4    FOUR COMPANIES.

5    AND, IN ADDITION, THERE WAS A PRESUMPTION

6    AGAINST SUCH A LICENSE.  IN OTHER WORDS, IT WAS HIGHLY

7    UNLIKELY THAT THE DEPARTMENT OF COMMERCE WAS GOING TO

8    GRANT SUCH A LICENSE.

9    YOU WILL HEAR THE DEFENDANT SAY, IN HIS

10   OWN WORDS, THAT, IN 2014, HE KNEW, HE KNEW IN 2014,

11   THAT GASTONE HAD BEEN PLACED ON THE ENTITY LIST.

12   IN 2014 AND 2015, THE CONSPIRATORS AND

13   DEFENDANT REPEATED THE SAME PROCESS TO GET ANOTHER

14   BATCH OF FOUR CREE MMIC'S.

15   AS BEFORE, THEY DID THEIR CUSTOM DESIGNS

16   FOR THE MMIC'S.  AND IN DECEMBER OF 2014, MAI SENT CREE

17   THE MICROEX PURCHASE ORDER.  THE PRICE FOR THE SECOND

18   BATCH WAS $117,000.

19   ON DECEMBER 12TH OF 2014, AT DEFENDANT'S

20   DIRECTION, CO-CONSPIRATORS ISHIANG SHIH CAUSED $120,000

21   TO BE WIRE TRANSFERRED FROM A BANK ACCOUNT IN CANADA TO

22   KIET MAI'S BANK ACCOUNT IN SOUTHERN CALIFORNIA TO PAY

23   FOR THE SECOND BATCH OF CREE WAFERS.

24   AND ON DECEMBER 17TH OF 2014, MAI PAID

25   CREE $117,000 FOR THE SECOND BATCH OF CREE WAFERS.

1   AGAIN, MAI WAS ACTING AT DEFENDANT'S DIRECTION.  AGAIN,

2   MAI AND DEFENDANT HID DEFENDANT'S INVOLVEMENT FROM

3   CREE.

4          AND ON MARCH 23RD OF 2015, MAI RECEIVED

5   THE SHIPMENT OF THE FOUR CREE WAFERS.  AND AT

6   DEFENDANT'S DIRECTION, ONE OF THESE FOUR WAFERS WAS

7   SHIPPED TO CANADA TO ISHIANG SHIH.

8          YOU WILL ALSO SEE A REPORT THAT IS

9   E-MAILED TO DEFENDANT AND YE YUAN IN JUNE, JUNE 2015,

10  AFTER GASTONE, QTC AND CETC 29 HAD BEEN PLACED ON THE

11  ENTITY LIST.  THAT REPORT SHOWS THAT SOME OF THESE CREE

12  MMIC'S FROM THE SECOND BATCH WERE EXPORTED TO CHINA.

13  THE EVIDENCE THAT I HAVE DESCRIBED SUPPORTS COUNT 10 OF

14  THE INDICTMENT.  AND THAT CHARGES THAT THE DEFENDANT

15  KNOWINGLY AIDED ANOTHER PERSON TO TRANSFER FUNDS FROM

16  OUTSIDE OF THE U.S. TO A PLACE INSIDE THE U.S.  AND,

17  SPECIFICALLY, WE'RE TALKING ABOUT THE TRANSFER I'VE

18  JUST DESCRIBED FROM CANADA TO LOS ANGELES WITH INTENT

19  TO PROMOTE THE CARRYING ON OF A SPECIFIED UNLAWFUL

20  ACTIVITY.

21          IN THE SPRING OF 2014, THERE WAS A

22  REORGANIZATION AT CHENGDU GASTONE.  DEFENDANT'S

23  POSITION AS PRESIDENT WAS CHANGED, AND HE BECAME A

24  TECHNICAL CONSULTANT.  HOWEVER, HE REMAINED INVOLVED

25  WITH GASTONE.  AND YOU WILL SEE AN E-MAIL SENT BY

DEFENDANT IN DECEMBER OF 2014 IN WHICH THE DEFENDANT STATES THAT HE REMAINS COMMITTED TO MAKING CHENGDU GASTONE A STRONG FOUNDRY LIKE TRIQUINT.

ON JANUARY 14TH OF 2018, THE DEFENDANT WAS ARRESTED ON THE CHARGES IN THIS CASE.

HE WAS INTERVIEWED BY AGENTS OF THE FBI, THE IRS AND THE DEPARTMENT OF COMMERCE.  THE INTERVIEW WAS RECORDED.  DEFENDANT WAS GIVEN HIS MIRANDA WARNINGS.  DEFENDANT WAS ALSO WARNED THAT LYING TO THE FBI IS A CRIME.  YOU WILL HEAR DEFENDANT, IN HIS OWN WORDS, TELL THE FBI THAT NO CREE WAFERS WENT TO CHINA, AND OTHER FALSE STATEMENTS.

THE EVIDENCE IN THIS CASE SUPPORTS COUNT 11 OF THE INDICTMENT, WHICH CHARGES DEFENDANT WITH KNOWINGLY AND WILLFULLY MAKING A MATERIAL FALSE STATEMENT TO THE FBI.

AND THESE WERE NOT THE ONLY LIES TOLD BY DEFENDANT TO THE UNITED STATES GOVERNMENT.  DEFENDANT ALSO LIED TO THE IRS, AND HE LIED TO HIS OWN TAX ACCOUNTANT.  DEFENDANT, AS PRESIDENT OF GASTONE, RECEIVED A SALARY.  IT WAS PAID INTO A BANK ACCOUNT AT CHINA CIVIC BANK IN CHINA.  DEFENDANT CORRECTLY REPORTED THIS INCOME.  HE REPORTED IT ON HIS FEDERAL INCOME TAXES.  AND DEFENDANT DISCLOSED HIS BANK ACCOUNTS AT CHINA CIVIC IN CHINA TO THE UNITED STATES

33

1   TREASURY ON FBAR FORMS.  FBAR FORMS ARE FORMS THAT

2   PEOPLE WHO HAVE FOREIGN BANK ACCOUNTS NEED TO FILL OUT

3   EVERY YEAR IF THE AMOUNT IN -- IF THE TOTAL ASSETS IN

4   THEIR ACCOUNTS ARE MORE THAN $10,000.

5                    HOWEVER, THAT SALARY THE DEFENDANT WAS

6   PAID AS PRESIDENT OF CHENGDU GASTONE WAS ONLY PART OF

7   THE MONEY THAT HE RECEIVED FROM HIS CO-CONSPIRATORS.

8                    YOU WILL HEAR AND YOU WILL SEE EVIDENCE

9   THAT, IN ADDITION TO HIS SALARY AS PRESIDENT OF CHENGDU

10  GASTONE, THE DEFENDANT RECEIVED ADDITIONAL MONEY,

11  ADDITIONAL PAYMENTS FROM THE CO-CONSPIRATORS.  AND

12  THESE PAYMENTS WERE MADE BY AN ACCOUNT HELD BY MYSTICAL

13  OPTIMISM INCORPORATED.  THAT WAS A COMPANY REGISTERED

14  IN THE BRITISH VIRGIN ISLANDS.  THESE PAYMENTS WERE

15  TRANSFERRED FROM MYSTICAL OPTIMISM INCORPORATED TO

16  DEFENDANT'S ACCOUNTS AT STANDARD CHARTERED BANK IN

17  HONG KONG.

18                   YOU WILL SEE DOCUMENTS SHOWING THAT

19  DEFENDANT OPENED HIS STANDARD CHARTERED BANK ACCOUNT IN

20  HONG KONG SHORTLY BEFORE HE BEGAN RECEIVING THOSE

21  PAYMENTS FROM MYSTICAL OPTIMISM.  YOU WILL SEE THAT

22  DEFENDANT OPENED THAT BANK ACCOUNT AT STANDARD

23  CHARTERED BANK IN HONG KONG USING HIS TAIWANESE

24  PASSPORT AND HIS TAIWANESE ADDRESS IN TAIWAN.

25                   AND YOU WILL SEE THAT, WHEN HE OPENED

```
1    THAT ACCOUNT, HE FILLED OUT A CLIENT PROFILE IN WHICH

2    HE DENIED HE WAS A UNITED STATES CITIZEN.

3              YOU WILL HEAR THAT, BETWEEN JUNE 2011 AND

4    DECEMBER 2013, DEFENDANT RECEIVED CLOSE TO 1.7 MILLION

5    IN PAYMENTS INTO THAT STANDARD CHARTERED BANK IN

6    HONG KONG, AND THAT DEFENDANT DISCLOSED NONE OF THOSE

7    PAYMENTS ON HIS FEDERAL INCOME TAX RETURNS FOR 2011 AND

8    2012, AND THAT DEFENDANT INTENTIONALLY AND COMPLETELY

9    OMITTED HIS STANDARD CHARTERED BANK ACCOUNTS ON THE

10   FBAR'S THAT HE FILED WHEN HE REPORTED HIS FOREIGN BANK

11   ACCOUNTS IN 2011 AND 2012.

12             YOU WILL ALSO SEE AND HEAR THAT THE

13   DEFENDANT CONTINUED THIS PATTERN OF OMITTING HIS

14   FOREIGN INCOME AND ASSETS IN SUBSEQUENT TAXABLE YEARS.

15             YOU WILL SEE THAT DEFENDANT REPORTED HIS

16   STANDARD CHARTERED BANK ACCOUNT.  YOU WILL SEE THAT

17   DEFENDANT'S HOLDINGS IN HIS STANDARD CHARTERED BANK

18   ACCOUNT GENERATED SUBSTANTIAL DIVIDENDS.  YOU WILL SEE

19   BANK STATEMENTS AND YOU WILL SEE E-MAILS SHOWING THAT,

20   THROUGH JULY OF 2013, DEFENDANT WIRED ROUGHLY $1

21   MILLION INTO A NEWLY-CREATED ACCOUNT AT COUTTS BANK IN

22   HONG KONG.

23             WHEN DEFENDANT FILED HIS 2013 FEDERAL

24   INCOME TAX RETURNS, HE DID NOT DISCLOSE THIS DIVIDEND

25   INCOME.  AND WHEN DEFENDANT FILED HIS FBAR FORMS FOR
```

35

1    2013 AND 2014 AND 2015 AND 2016, DEFENDANT OMITTED BOTH

2    OF HIS STANDARD CHARTERED BANK ACCOUNT AND HIS COUTTS

3    BANK ACCOUNT.

4                    YOU WILL HEAR DEFENDANT ADMIT, IN HIS OWN

5    WORDS, THAT WHEN DEFENDANT WAS INTERVIEWED BY THE

6    FEDERAL AGENTS, HE SAID, HE KNEW HE HAD AN OBLIGATION

7    TO REPORT HIS FOREIGN ASSETS.  AND HE ACKNOWLEDGED THAT

8    HE HAD BEEN INFORMED OF THIS OBLIGATION BY HIS TAX

9    ACCOUNTANT.

10                   YOU WILL HEAR FROM DEFENDANT'S FORMER TAX

11   ACCOUNTANT.  YOU WILL HEAR THAT, EVERY YEAR, DEFENDANT

12   WOULD E-MAIL BACK AND FORTH WITH HIS ACCOUNTANT, WOULD

13   PROVIDE SPREADSHEETS, WOULD ANSWER QUESTIONS.  AND

14   THESE SPREADSHEETS WOULD SUMMARIZE HIS INCOME,

15   INCLUDING SOME OF HIS FOREIGN INCOME, BUT NOT ALL OF

16   IT.  YOU WILL HEAR HIS ACCOUNTANT SAY THAT HE OMITTED

17   THE PAYMENTS FROM MYSTICAL OPTIMISM, AND THAT HE

18   OMITTED THE DIVIDENDS THAT HE EARNED IN THE STANDARD

19   CHARTERED BANK ACCOUNT.

20                    AND YOU WILL SEE THAT, IN SOME YEARS, THE

21   DEFENDANT SIMPLY LIED TO HIS ACCOUNTANT.  WHEN SHE

22   ASKED HIM IF HE HAD ANY FOREIGN BANK ACCOUNTS THAT HE

23   HAD NOT TOLD HER ABOUT, HE SAID, NO.

24                    SO THE EVIDENCE THAT I HAVE JUST

25   DESCRIBED SUPPORTS THE CHARGES IN COUNTS 12 THROUGH 18

1   OF THE INDICTMENT, WHICH CHARGE DEFENDANT WITH

2   SUBSCRIBING TO FALSE FEDERAL INCOME TAX RETURNS FOR

3   2011 AND 2012 AND 2013 TAXABLE YEARS BASED ON

4   UNDERSTATEMENT OF INCOME AND WILLFULLY CONCEALING

5   MATERIAL FACTS THAT THE DEFENDANT HAD A DUTY TO REPORT

6   ON HIS FBAR FORMS.

7            LADIES AND GENTLEMEN, BASED ON THE

8   EVIDENCE THAT I HAVE DESCRIBED, WHICH YOU WILL SEE AT

9   TRIAL, AND MORE EVIDENCE THAT YOU WILL SEE AT TRIAL,

10  THE GOVERNMENT WILL RETURN TO YOU AT THE CLOSE OF THIS

11  CASE AND ASK YOU TO RETURN VERDICTS OF GUILTY ON ALL OF

12  THE CHARGES AGAINST DEFENDANT.

13           THE COURT:  THANK YOU, MS. HEINZ.

14           MR. SPERTUS?

15           MR. SPERTUS:  YOUR HONOR, I NEED A TWO-MINUTE

16  BREAK.  I'M VERY SORRY, OR I CAN GO AND COME BACK?

17           THE COURT:  THAT'S FINE.

18           ANY OF THE JURORS NEED A BREAK?

19           JUST A MOMENT.

20           I'M GOING TO ASK ONE OF OUR CLERKS TO --

21  IF THERE'S ANY JUROR WHO WISHES TO TAKE -- HOW MANY OF

22  YOU -- WHY DON'T YOU -- THOSE -- ALL OF YOU, PLEASE GO.

23  AND AS SOON AS YOU'RE FINISHED, WE'LL RETURN.

24           THANK YOU.

25           PLEASE DO NOT DISCUSS THE CASE DURING THE

```
1    BREAK.
2                    (RECESS)
3                    (THE FOLLOWING PROCEEDINGS WERE HELD IN
4            OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)
5            THE COURT:  BACK ON THE RECORD.
6                    NO JURORS ARE PRESENT.
7                    MR. SPERTUS, ARE YOU READY TO PROCEED?
8            MR. SPERTUS:  YES, YOUR HONOR.
9            THE COURT:  WE TOOK A BREAK BECAUSE SOME OF
10   THE JURORS WANTED TO TAKE A BREAK AS WELL.
11           MR. SPERTUS:  I APOLOGIZE.
12           THE COURT:  DON'T APOLOGIZE.  YOU DIDN'T DO
13   ANYTHING WRONG.
14                    (THE FOLLOWING PROCEEDINGS WERE HELD IN
15           OPEN COURT IN THE PRESENCE OF THE JURY:)
16           THE CLERK:  ALL RISE.
17           THE COURT:  PLEASE BE SEATED.
18                    ALL JURORS AND ALTERNATES ARE PRESENT.
19                    MR. SPERTUS, PLEASE PROCEED.
20           MR. SPERTUS:  THE GOVERNMENT IS WRONG ABOUT
21   THE FACTS, THE SCIENCE AND THE LAW.
22                    WE'VE HEARD THE GOVERNMENT SPEND,
23   APPROXIMATELY, AN HOUR SUMMARIZING THE EVIDENCE THAT
24   THEY EXPECT TO INTRODUCE AT TRIAL.  WE'RE HOPEFUL THAT
25   THAT EVIDENCE COMES IN, AND WE WILL TRY TO
```

38

1    COMPARTMENTALIZE IT FOR YOU.

2              THERE ARE ACTUALLY GOING TO BE THREE

3    BUCKETS THAT THE EVIDENCE WILL FALL IN.  THERE ARE 18

4    COUNTS AS DESCRIBED BY THE GOVERNMENT.

5              THE FIRST BUCKET WILL BE THE EXPORT

6    VIOLATIONS BUCKET.  THERE ARE TWO COUNTS AND A THIRD

7    THAT'S RELATED THAT -- COUNTS 1, 2 AND 10 -- THAT

8    BASICALLY ASK THE QUESTION, DID DR. SHIH SHIP WAFERS

9    WITHOUT A REQUIRED LICENSE TO CHINA?

10             AND THE EVIDENCE WILL ESTABLISH THAT HE

11   DID NOT.

12             THE SECOND BUCKET THAT THE EVIDENCE WILL

13   FALL IN IS THIS CREE FRAUD THEORY THAT THE PROSECUTOR

14   DESCRIBED.  IT'S COUNTS 3 THROUGH 9 AND 10.

15             AND, BASICALLY, THE QUESTION IS, DID

16   DR. SHIH DEFRAUD CREE BY PURCHASING WAFERS FROM CREE?

17             DID HE USE THE CREE'S PDK DESIGN PORTAL

18   WITHOUT AUTHORIZATION?

19             AND, AGAIN, THE EVIDENCE WILL ESTABLISH

20   CONCLUSIVELY, THROUGH CREE WITNESSES, THAT HE DID NOT.

21             THE THIRD MINI-TRIAL OR SERIES OF FALSE

22   STATEMENT COUNTS, COUNTS 11 THROUGH 18 IN THE

23   INDICTMENT, DID DR. SHIH MAKE FALSE STATEMENTS TO THE

24   FBI AND IRS?

25             AND THE SHORT ANSWER, AFTER MUCH

1    DISCUSSION ON THE SUBJECT, WILL BE, NO.  I'M GOING TO

2    UNPACK THAT IN A MINUTE.

3                    FIRST, I WANT TO DIRECT YOUR ATTENTION TO

4    THE LICENSING COUNTS.  THE 18 COUNTS CHARGED IN THIS

5    INDICTMENT ARE -- CREATE A LOT OF COMPLEXITY.  SO I

6    WANT TO INTRODUCE YOU TO THE PEOPLE, THE COMPANIES AND

7    THE PLACES INVOLVED SO THAT YOU CAN BEGIN TO UNDERSTAND

8    WHERE THE EVIDENCE BELONGS AS YOU HEAR IT.

9                    SO, FIRST, I'M GOING TO INTRODUCE YOU TO

10   DR. SHIH HIMSELF.  HE'S THE DEFENDANT IN THIS CASE.

11   HE'S A UNITED STATES CITIZEN.  HE WAS BORN IN TAIWAN,

12   AND HE IS HIGHLY EDUCATED.  HE'S A CHIP DESIGNER.  HE'S

13   AN ENGINEER.

14                    HE OBTAINED A BACHELOR'S OF SCIENCE

15   DEGREE FROM THE NATIONAL TAIWAN UNIVERSITY IN 1976.  HE

16   OBTAINED A MASTER OF SCIENCE DEGREE FROM THE UNIVERSITY

17   OF OTTAWA, CANADA IN 1980.

18                    HE OBTAINED A PH.D. FROM THE UNIVERSITY

19   OF TEXAS AT AUSTIN IN 1982 AND AN MBA FROM UCLA.

20                    HE HAS A VERY DISTINGUISHED WORK HISTORY

21   THAT YOU WILL LEARN ABOUT IN THIS TRIAL.  FROM 1984 TO

22   1986, HE WAS AN ENGINEER, AN ELECTRONICS ENGINEER AT

23   HUGHES AIRCRAFT.

24                    HE THEN BECAME THE DIRECTOR OF RESEARCH

25   AND DEVELOPMENT AT MM WAVE TECHNOLOGY FROM 1986 TO '88.

```
 1                    AND THEN HE MOVED OVER TO HUGHES AIRCRAFT

 2      FROM 1988 TO 1997 AND WAS THE MANAGER OF RESEARCH AND

 3      DEVELOPMENT FOR SEVERAL PROJECTS AT HUGHES AIRCRAFT.

 4                    HE THEN FORMED HIS OWN COMPANY FROM 1997

 5      TO 2007.  FOR 10 YEARS, HE WAS THE PRESIDENT AND CEO OF

 6      HIS OWN CHIP DESIGN FIRM.  HE'S AN ELECTRICAL ENGINEER.

 7      HE HAD A GROUP OF PEOPLE HELPING HIM.  AND HE MADE CHIP

 8      DESIGNS, ALL PERFECTLY LAWFUL AND DISTINGUISHED.

 9                    FROM 2007 TO 2011, HE WENT BACK TO

10      HONEYWELL.  HONEYWELL PURCHASED HIS COMPANY.  SO

11      ALTHOUGH HE DID THE SAME THING, HE WAS NOW UNDER THE

12      HONEYWELL UMBRELLA.  AND HE CONTINUED AT HONEYWELL

13      UNTIL JUNE 2007 WHEN HE WAS OFFERED AN OPPORTUNITY TO

14      HELP BUILD A FOUNDRY IN CHINA.  IT'S PERFECTLY LAWFUL.

15      YOU WILL LEARN THE LAW FROM THE COURT AT THE CONCLUSION

16      OF THIS CASE.  AMERICAN SCIENTISTS COLLABORATE WITH

17      CHINESE COMPANIES ALL THE TIME.

18                    FROM JULY 2007 UNTIL JUNE 2014, DR. SHIH

19      WAS THE PRESIDENT OF CGTC.  CGTC WAS TRYING TO BUILD A

20      FOUNDRY.  AGAIN, A FOUNDRY IS A MANUFACTURING FACILITY

21      THAT MAKES COMPUTER CHIPS.  MOST ELECTRONICS HAVE

22      COMPUTER CHIPS IN THEM.  THEY ARE NOT CONTRABAND.

23      THERE ARE HUNDREDS AND HUNDREDS OF THOUSANDS OF

24      COMPUTER CHIPS IN TECHNOLOGY DEVICES ALL AROUND US.

25      AND THEY ARE A MAJOR PART OF THE ELECTRONIC BUSINESS.
```

| 1 | CHINA HAS SEVERAL FOUNDRIES.  THERE WERE |
| 2 | CHINESE INVESTORS WHO DECIDED THEY WANTED TO BUILD A |
| 3 | FOUNDRY IN CHINA.  AND THEY SOUGHT A PROMINENT ENGINEER |
| 4 | TO HELP THEM DESIGN WORK FLOW.  THERE'S NOTHING SECRET |
| 5 | ABOUT HOW A FOUNDRY IS DESIGNED AND BUILT.  ALL OF THE |
| 6 | INFORMATION ON HOW TO DO IT IS PUBLICLY AVAILABLE, |
| 7 | UNPROTECTED AND WIDELY KNOWN.  YOU JUST NEED AN |
| 8 | ENGINEERING DEGREE TO UNDERSTAND IT FOR MANY OF THE |
| 9 | DETAILS. |
| 10 | THEN THEY LET HIM GO IN JUNE 2004, AND HE |
| 11 | BECAME A RESEARCH CONSULTANT AND PROFESSOR. |
| 12 | HE'S INVOLVED -- DR. SHIH IS INVOLVED IN |
| 13 | DOZENS, MANY DOZENS OF PUBLISHED PAPERS THAT SET |
| 14 | STANDARDS FOR ENGINEERING DEVELOPMENTS WORLDWIDE.  HE |
| 15 | HAS 72 PATENTS WITH HIS BROTHER, APPROXIMATELY. |
| 16 | HE'S BEEN INVOLVED IN, APPROXIMATELY, 60 |
| 17 | SIGNIFICANT RESEARCH PAPERS ON ADVANCEMENTS IN |
| 18 | ELECTRICAL ENGINEERING, TECHNOLOGY AND WORK, PUBLISHED. |
| 19 | HE'S AN ACCLAIMED SCIENTIST AND |
| 20 | RESEARCHER.  HE'S BEEN A SENIOR MEMBER OF IEEE SINCE |
| 21 | 1979.  THAT IS THE ENGINEERING PROFESSIONAL SOCIETY |
| 22 | THAT SETS STANDARDS SO DIFFERENT PEOPLE'S WORK CAN |
| 23 | OPERATE TOGETHER AND PERFORM CERTAIN FUNCTIONS. |
| 24 | THERE ARE STANDARDS IN MOST ELECTRICAL |
| 25 | FIELDS.  IEEE DEVELOPS THOSE STANDARDS.  AND ITS SENIOR |

1    MEMBERS ARE ITS MOST EXPERIENCED AND HIGHLY TRAINED

2    MEMBERS.  THEY SET THE STANDARDS FOR PRODUCTS.

3                  FROM 1982 TO 1984, HE WAS AN ADJUNCT

4    PROFESSOR IN THE ELECTRICAL ENGINEERING DEPARTMENT AT

5    THE NAVY POST GRADUATE SCHOOL.

6                  FROM 2014 TO 2017, HE WAS AN ADJUNCT

7    PROFESSOR IN THE DEPARTMENT OF ELECTRICAL ENGINEERING

8    AT UCLA.

9                  DR. SHIH LIVES HERE IN LOS ANGELES.  HE

10   WAS A PROFESSOR AT UCLA, AND HE DID PIONEERING

11   ELECTRICAL ENGINEERING WORK AT UCLA.

12                 FROM 2017 TO '18, HE WAS AN ADJUNCT

13   PROFESSOR OF ELECTRICAL ENGINEERING AT THE NATIONAL

14   TAIWAN UNIVERSITY.  AGAIN, PERFECTLY LAWFUL RESEARCH

15   AND STUDY AND TRAINING AND TEACHING.

16                 NOW, I WANT TO INTRODUCE YOU TO

17   DR. SHIH'S BROTHER.  DR. ISHIANG SHIH LIVES IN CANADA.

18   HE TOO IS AN ELECTRICAL ENGINEER.  DR. ISHIANG AND

19   YI-CHI SHIH ARE BOTH PROMINENT RESEARCHERS IN THE FIELD

20   OF ELECTRICAL ENGINEERING.  AND THEY WORK ON PROJECTS

21   WORLDWIDE, ALL LAWFUL.

22                 DR. SHIH IS A PROMINENT CANADIAN

23   RESEARCHER.  HE'S A PROFESSOR AT MCGILL UNIVERSITY IN

24   MONTREAL, A VERY PRESTIGIOUS INSTITUTION, JUST LIKE

25   UCLA.  HE'S THE EQUIVALENT OF DR. SHIH AND --

1    DR. YI-CHI SHIH IN L.A. AND DR. ISHIANG SHIH IN MCGILL

2    IN MONTREAL WORK TOGETHER ALL THE TIME.

3                    DR. ISHIANG SHIH IS A CANADIAN CITIZEN

4    WHO RESIDES IN MONTREAL.  IT'S A SMALL LAB.  IT'S

5    CALLED "JYS ENTERPRISES."  HE DOES RESEARCH FOR A WIDE

6    VARIETY OF CUSTOMERS.  YOU'LL LEARN HE SUBMITTED A BID

7    TO THE CANADIAN SPACE AGENCY, WHICH I'LL EXPLAIN WHY

8    THAT'S IMPORTANT IN A MINUTE.  IT'S A VERY LEGITIMATE

9    ENGINEERING LAB IN MONTREAL, AND YOU'LL HEAR A LOT

10   ABOUT IT.

11                   DR. YI-CHI SHIH IS A TECHNICAL ADVISER TO

12   JYS.  IT HAS ITS OWN BUSINESS CARD.  IT'S ON HIS OWN

13   CV.  AND HE COLLABORATES WITH HIS BROTHER ON MANY, MANY

14   PROJECTS.

15                   THE BROTHERS HAVE COLLABORATED ON A LOT

16   OF ELECTRICAL ENGINEERING PROJECTS.  THEY HAVE OBTAINED

17   PATENTS.  AS I SAID, THERE HAVE BEEN APPROXIMATELY 60

18   PATENTS, WHICH MEANS ORIGINAL RESEARCH THAT IS

19   PATENTABLE.  IT DIDN'T EXIST BEFORE THEY COLLABORATED.

20   THEIR RESEARCH HAS BEEN WIDELY PUBLISHED.  STUDENTS

21   AROUND THE WORLD STUDY THEIR RESEARCH.  AND IT IS ALL

22   PERFECTLY LAWFUL.  THEY ARE PIONEERS IN THE FIELD OF

23   ELECTRICAL ENGINEERING.

24                   NOW, THERE'S A CITY OF CHENGDU LOCATED IN

25   CHINA.  THE EVIDENCE IS GOING TO DE-MYSTIFY THIS A

1   LITTLE BIT.  IT'S IN CHINA.  IT'S BASICALLY A REGIONAL

2   SILICON VALLEY IN THE AREA WHERE IT'S LOCATED.  THERE

3   ARE RESEARCH LABS LOCATED THERE.  THERE ARE TESTING

4   FACILITIES FOR VARIOUS THINGS LOCATED THERE, JUST LIKE

5   IN SILICON VALLEY HERE IN CALIFORNIA.  THERE ARE

6   ELECTRICAL ENGINEERING FIRMS IN THE CITY OF CHENGDU.

7   AND THERE ARE MANUFACTURING FACILITIES IN THE CITY OF

8   CHENGDU.

9              THERE ARE MANY, MANY AMERICAN COMPANIES

10  THAT HAVE LOCATIONS IN CHENGDU.  AND THE GOVERNMENT

11  EXPERTS WILL ADMIT THIS DURING THEIR TESTIMONY IN THIS

12  TRIAL.  IBM HAS FACILITIES IN CHENGDU.  INTEL HAS

13  FACILITIES IN CHENGDU.  MICROSOFT HAS FACILITIES IN

14  CHENGDU.

15             GLOBAL FOUNDRIES IS MAYBE A LESS COMMON

16  NAME, BUT THEY'RE BUILDING A $10 BILLION FOUNDRY IN

17  CHENGDU.

18             NOTHING UNLAWFUL ABOUT TRADE WITH CHINA,

19  WORKING WITH CHINA, COLLABORATING WITH CHINA.  IT

20  HAPPENS ALL THE TIME.

21             THERE'S ALSO CGTC.  CGTC, CHENGDU GASTONE

22  TECHNOLOGY, IS THE FOUNDRY THAT DR. SHIH WAS ADVISING.

23  HE BECAME THE PRESIDENT UP UNTIL JUNE 2014 WITH DESIGN

24  CONCEPTS.  HE BASICALLY WROTE BUSINESS PLANS.  NOTHING

25  SECRET.  THE CONTENTS OF THESE PLANS, BY THE WAY, ALL

1  COME FROM THE INTERNET, JUST PUBLIC SEARCHES.  THEY ARE

2  NOT SECRETS.

3          BUT IN ORDER TO BUILD A FOUNDRY IN

4  CHENGDU, CGTC WANTED AN ELECTRICAL ENGINEER AS

5  PRESIDENT TO HELP GUIDE THE PROCESSES.  IT WAS NEVER

6  OPERATIONAL WHILE DR. SHIH WAS PRESIDENT.  IN FACT, HIS

7  DILIGENCE PROBABLY CAUSED THEM TO REPLACE HIM BECAUSE

8  IT TAKES A LONG TIME TO PLAN APPROPRIATELY.

9          BUT THEY WERE BUILDING A GALLIUM ARSENIDE

10  FOUNDRY.  THIS IS VERY IMPORTANT.  I'M GOING TO GET

11  INTO THE SCIENCE A LITTLE BIT, BECAUSE GALLIUM ARSENIDE

12  IS A WAY TO MAKE WAFERS THAT IS COMPLETELY DIFFERENT,

13  UNRELATED TO OTHER PROCESSES IN ANY MANNER.

14          SO THE CREE WAFERS, FOR EXAMPLE, THAT THE

15  PROSECUTOR HELD UP TO YOU THAT DR. SHIH - I'LL GET INTO

16  A MINUTE - WAS TESTING SOME CONCEPTS AND WANTED SOME

17  CHIPS MADE SO THAT HIS DESIGNS CAN BE TESTED, THOSE

18  WERE GALLIUM NITRADE.  IT'S A DIFFERENT SUBSTANCE

19  ENTIRELY.  THEY ARE OIL AND WATER.  YOU CAN'T USE ANY

20  KNOWLEDGE OF PROCESSES RELATED TO GALLIUM NITRADE TO

21  BUILD A GALLIUM ARSENIDE FOUNDRY.

22          SO YOU WILL HAVE TO LEARN THE SCIENCE A

23  LITTLE BIT.  AND I SUBMIT THAT THE EVIDENCE WILL

24  ESTABLISH, THE GOVERNMENT HAS IT COMPLETELY WRONG.  AND

25  WE WILL CORRECT IT THROUGH GOVERNMENT WITNESSES.

1          NOW, THERE'S A KEY DATE MENTIONED BY THE

2     PROSECUTOR IN THE GOVERNMENT'S OPENING THAT IS CRITICAL

3     IN THIS CASE.  IT'S CRITICAL BECAUSE, YOU HAVE TO

4     RECALL, WE'RE TALKING ABOUT THE EXPORT LICENSING PART

5     OF THIS TRIAL RIGHT NOW.  AND DID DR. SHIH NEED A

6     LICENSE, YES OR NO, BEFORE HE SHIPPED A MMIC TO OUTSIDE

7     OF THE COUNTRY?  THE ANSWER I SUBMITTED WAS, NO.

8          THE KEY DATE TO KEEP IN MIND THROUGHOUT

9     THIS TRIAL IS AUGUST 1ST, 2014.  THAT'S THE DATE THAT

10    THE ENTITIES THAT THE GOVERNMENT JUST IDENTIFIED WERE

11    LISTED ON THIS ENTITY LIST.  YOU WILL LEARN ABOUT THIS

12    ENTITY LIST.  NO ONE REALLY KNOWS WHY COMPANIES MAY BE

13    LISTED, BUT THEY ARE.

14          AND IF A COMPANY IS LISTED ON THE ENTITY

15    LIST, THE LAW PROVIDES THAT CERTAIN TYPES OF EXPORTS --

16    WHICH YOU'LL LEARN DON'T EVEN APPLY HERE TO THIS CASE,

17    BUT CERTAIN TYPES OF EXPORTS WOULD REQUIRE A LICENSE.

18          AND YOU'LL LEARN THAT THE GOVERNMENT

19    WON'T GIVE A LICENSE FOR UNKNOWN REASONS.  IF YOU'RE

20    PLACED ON THE ENTITY LIST, YOU HAVE DIFFERENT LICENSING

21    HURDLES.

22          BUT CGTC WAS PLACED ON THE ENTITY LIST ON

23    AUGUST 1ST, 2014, AFTER DR. SHIH WAS REMOVED.  HE WAS

24    NOT PRESIDENT AT ANY MOMENT IN TIME WHEN CGTC WAS ON

25    ANY ENTITY LIST.

1          SAME WITH QTC, CETC 29, TIAN HANG, THESE

2     ARE ENTITIES THAT DR. SHIH WASN'T COLLABORATING WITH.

3     SO YOU'LL LEARN ABOUT WHAT THEY DO.

4          BUT, REMEMBER, DR. SHIH WAS GONE BY THE

5     TIME THESE ENTITIES WERE PLACED ON THE ENTITY LIST.

6          SO AFTER THIS DATE, A LICENSE WOULD THEN

7     BE REQUIRED FOR EXPORTS OF CONTROLLED ITEMS TO THOSE

8     ENTITIES.

9          NOW, "CONTROLLED ITEMS" IS A SPECIAL

10    TERM.  YOU'RE GOING TO LEARN A LOT, AND IT'S GOING TO

11    BE TEDIOUS.  AND IF YOU FOCUS, IT'S NOT -- IT'S NOT

12    HARD TO UNDERSTAND.

13         BUT THE CONTROLLED ITEMS INVOLVE CERTAIN

14    TYPES OF THINGS THAT WOULD TRIGGER AN EXPORT LICENSE.

15    99 PERCENT OF GOODS EXPORTED FROM THE UNITED STATES DO

16    NOT REQUIRE A LICENSE.  AND IT'S THE SUBSET, THE VERY

17    FEW ITEMS THAT ARE CALLED "CONTROLLED ITEMS" THAT

18    TRIGGER LICENSING ISSUES.

19         AND I'VE ALREADY SAID THAT DR. SHIH

20    WORKED AT CGTC BEFORE IT WAS EVEN PLACED ON THE ENTITY

21    LIST.

22         SO ON AUGUST 1ST, DR. SHIH WAS NOT

23    PRESIDENT OF CGTC.  NO CONTROLLED ITEMS WERE EVER

24    SHIPPED TO CGTC.  THIS IS GOING TO BECOME A REAL ANCHOR

25    POINT FOR YOU, THE JURY, TO EVALUATE THE GOVERNMENT'S

1    EVIDENCE ABOUT WHAT WAS SHIPPED TO CHINA.

2              THE PROSECUTOR DECLARED IT, BUT HER WORDS

3    AND MY WORDS ARE NOT EVIDENCE.  THERE ARE NO -- ZERO

4    FACTS TO SUPPORT THAT ANYTHING WAS SHIPPED TO CGTC

5    EITHER BEFORE OR AFTER AUGUST 2014.

6              AND DR. SHIH NEVER ONCE SHIPPED A

7    CONTROLLED ITEM AT ANY TIME.  THAT'S THE KEY.  YOU'RE

8    HERE TO DECIDE, DID DR. SHIH SHIP A CONTROLLED ITEM TO

9    CGTC?  AND AFTER ALL THE EVIDENCE COMES IN, I SUBMIT

10   YOU'LL HAVE TO CONCLUDE, NO.

11             NOW, THERE ARE -- DR. SHIH DOES HAVE

12   COLLEAGUES IN CHINA.  OF COURSE, HE'S A RESEARCHER OF

13   WORLD ACCLAIM.  SO HE HAS COLLEAGUES.  HE HAS

14   COLLABORATED, IN HIS LENGTHY AND PROMINENT CAREER, WITH

15   CHINESE SCIENTISTS.  THERE'S NOTHING ILLEGAL ABOUT IT

16   AT ALL.

17             AND YOU'RE GOING TO SEE SOME E-MAIL

18   COMMUNICATIONS THAT BASICALLY ARE NOT WHAT THE

19   GOVERNMENT REPRESENTS TO BE, BUT DO ESTABLISH THAT HE'S

20   COLLABORATING WITH SCIENTISTS IN CHINA.  YES, NO

21   DISPUTE THERE.  AND -- BUT THOSE ENTITIES ARE NOT ON

22   THE ENTITY LIST.

23             CRML IS AN ENTITY.  I DON'T KNOW EVEN

24   KNOW WHAT IT STANDS FOR.  IT'S A RESEARCH INSTITUTE

25   THAT'S NOT ON THE ENTITY LIST.  CHENGDU GANIDE IS A

1    RESEARCH INSTITUTE THAT'S NOT ON THE ENTITY LIST.

2                    SO WITHIN THIS FIRST EXPORT LICENSING

3    PHASE OF THE TRIAL, YOU'RE GOING TO HAVE TO FIRST GET

4    TO KNOW THE FACTS.

5                    NO CREE WAFERS EVER WENT TO CHINA.  THAT,

6    I SUBMIT AT THE END OF THIS TRIAL, YOU CAN CONCLUSIVELY

7    CONCLUDE THAT NO CREE WAFERS EVER WENT TO CHINA BASED

8    ON THE EVIDENCE THAT YOU WILL SEE AND HEAR DURING THIS

9    TRIAL.

10                    THAT'S AN ANCHOR POINT BECAUSE THE

11   GOVERNMENT ITSELF IS ON TRIAL DURING -- THE CREDIBILITY

12   OF THE GOVERNMENT AND THE QUALITY OF THEIR

13   INVESTIGATION IS AT ISSUE IN DR. SHIH'S TRIAL.

14                    I MISSPOKE EARLIER.  THE -- YOU ARE HERE

15   TO EVALUATE WHETHER THESE PROSECUTORS AND AGENTS KNOW

16   WHAT THEY'RE DOING.

17                    NOW, TRIAL ONE, STEP ONE, REQUIRES YOU TO

18   UNDERSTAND THESE PURCHASES FROM CREE.  CREE IS A

19   FOUNDRY HERE IN THE UNITED STATES.  CREE HAS A

20   WORLDWIDE PRESENCE.  THEY HAVE HALF THEIR WORKFORCE IN

21   CHINA.  THEY ADVERTISE IN CHINA.  THEY SELL THEIR CHIPS

22   IN CHINA.  THERE IS -- CREE HAS AS MUCH A PRESENCE IN

23   CHINA AS ANY COMPANY IN THE WORLD THAT MAKES CHIPS.

24   IT'S A HUGE MARKET.  AND CREE IS TRYING TO DOMINATE

25   THAT MARKET.  AND THEIR GOAL IS TO SELL AS MUCH TO

1   CHINA AS THEY POSSIBLY CAN.

2                   NOW, DR. SHIH WAS TESTING A CONCEPT FOR

3   AMPLIFIERS.  THIS WAS IN 2013 WHEN THE PROSECUTOR SAID

4   THAT HE WORKED WITH HIS FORMER LONG-TIME FRIEND AND

5   FORMER COLLEAGUE KIET MAI WHOSE COMPANY WAS MICROEX TO

6   ORDER WAFERS FROM CREE, A U.S. MANUFACTURER.  THOSE

7   WERE EXPERIMENTS.  THEY WERE TO TEST AMPLIFIERS.  SOME

8   OF THE FIRST WITNESSES THAT THE GOVERNMENT CALLS ARE

9   GOING TO CONFIRM THIS.  AND IT'S GOING TO BE CRITICALLY

10  IMPORTANT BECAUSE THE ERRORS IN THE GOVERNMENT'S STORY

11  WILL BECOME KNOWN WHEN WE COMPARE RUN ONE, WHICH TESTED

12  AMPLIFIERS, TO RUN TWO, WHICH TESTED TRANSISTORS, A

13  COMPLETELY DIFFERENT ELECTRONIC ITEM.

14                  AND YOU'LL SEE THAT -- YOU'LL BEGIN TO

15  CORRELATE E-MAIL TRAFFIC BASED ON, ARE THEY TALKING

16  ABOUT TRANSISTORS OR AMPLIFIERS TO DECIDE WHETHER

17  SOMETHING WENT TO CHINA AT A TIME THAT MATTERS?

18                  SO ONE OF THE FOUR WAFERS IN THE FIRST

19  RUN OF CREE WAFERS WENT TO UCLA FOR TESTING.  AGAIN,

20  DR. SHIH HAS NUMEROUS COLLEAGUES AT UCLA.  HE WAS AN

21  ADJUNCT PROFESSOR THERE FOR MANY, MANY YEARS.  HE WORKS

22  WITH THESE PEOPLE ALL THE TIME.  AND THEY WILL TESTIFY

23  IN THIS TRIAL.

24                  AND SO THE AMPLIFIER DESIGN WORK THAT

25  DR. SHIH WAS TRYING TO ACCOMPLISH, ONE WAFER WENT TO

1    UCLA FOR TESTING, ONE WAFER WENT TO CANADA FOR TESTING.

2    HE SENT IT TO HIS BROTHER.  HE WAS COLLABORATING TO

3    DEVELOP SOME PATENTS FOR HIMSELF AND HIS BROTHER.  HE

4    SENT A WAFER TO CANADA.  AND HE STORED TWO OF THEM AT

5    HIS HOUSE, WHATEVER.

6                   THE SECOND RUN OF WAFERS WAS IN MARCH

7    2015, AS THE PROSECUTOR SAID.  THESE WERE TESTING

8    TRANSISTORS, AS I SAID.  DR. SHIH AND HIS BROTHER PUT

9    IN A BID TO THE CANADIAN SPACE AGENCY.  THEY ULTIMATELY

10   DIDN'T GET FUNDED.  BUT THEIR RESEARCH WAS DESIGNED TO

11   BE PART OF A PROJECT WITH THE CANADIAN SPACE AGENCY.

12   AND THEY WERE TESTING TRANSISTORS.

13                   ONE WAFER, DR. SHIH JUST STORED IN HIS

14   HOME.  THREE WAFERS WENT TO CANADA.  TWO WERE STORED AT

15   DR. SHIH'S BROTHER'S HOME OFFICE IN CANADA, IN

16   MONTREAL.  AND THE OTHER WAS STORED AT JYS ENTERPRISES

17   IN CANADA, ALSO IN MONTREAL.

18                   NOW, YOU'RE GOING TO HAVE TO KNOW THE

19   SCIENCE TOO TO BE ABLE TO REACH A VERDICT IN THIS CASE.

20   THIS IS CRITICAL.  RESEARCH AND DESIGN FAILS FAR MORE

21   OFTEN THAN IT SUCCEEDS.  NO ONE KNOWS -- IF YOU HAVE A

22   DESIGN -- I'M GOING TO EXPAND ON THIS A LITTLE BIT.

23                   FOR EXAMPLE, IF YOU JUST THINK IF YOU PUT

24   A TRANSISTOR RIGHT ON TOP OF AN AMPLIFIER, MAYBE IT'LL

25   BE MORE EFFICIENT.  THAT'S AN IDEA.  THEN YOU DESIGN A

1    CHIP WITH A MMIC ON TOP OF AN AMPLIFIER AND SEE IF IT

2    WORKS.  NINE TIMES OUT OF TEN, IT DOESN'T.  YOU HAVE NO

3    IDEA WHETHER YOUR DESIGNS WILL WORK.

4                    IF YOU COULD BUILD CHIPS SIMPLY BY

5    WRITING IDEAS ON PAPER, IT WOULD CREATE A -- IT WOULD

6    ACCELERATE OUR RESEARCH BY DECADES.  BUT IT'S DESIGN

7    AND TESTING THAT CONFIRMS WHETHER YOUR IDEAS WORK.

8                    THESE CREE WAFERS WERE TEST DESIGNS.  YOU

9    WILL SEE, YOU'LL HEAR FROM CREE WITNESSES THEMSELVES.

10   I ANTICIPATE THAT THERE WILL BE ONE OR TWO OR THREE

11   WITNESSES FROM THIS FOUNDRY TESTIFYING DURING THIS

12   TRIAL.  AND THEY'RE GOING TO TELL YOU, YEAH, DR. SHIH

13   USED OUR FACILITY LIKE A MACHINE SHOP.  WE HAVE DESIGN

14   SERVICES.  WE COULD HELP PEOPLE DESIGN.  WE TRY TO SELL

15   THOSE SERVICES.  THE ELECTRICAL ENGINEERS THAT WE HAVE

16   IN-HOUSE ARE VERY GOOD.  BUT DR. SHIH DIDN'T WANT THEIR

17   DESIGN HELP.  HE WANTED THEM TO JUST FABRICATE HIS

18   DESIGNS.

19                   AND YOU'RE GOING TO LEARN THE DIFFERENCE

20   BETWEEN ENGINEERING RUNS AND PRODUCTION RUNS.

21   ENGINEERING RUNS ARE SMALL.  THEY CREATE WAFERS FOR

22   TESTING.  IF THE DESIGN WORKS, THEN YOU GO TRY TO FIND

23   CLIENTS TO BE INTERESTED IN THEIR CHIPS.  IF THEY BUY

24   THEM, THEN YOU GET THOSE CHIPS INTO PRODUCTION.

25                   AND PRODUCTION RUNS ARE LARGE VOLUME.

```
 1    THESE WERE ENGINEERING RUNS JUST TESTING DR. SHIH'S
 2    RESEARCH.
 3              NOW, THERE'S AN ACRONYM YOU'LL HEAR,
 4    "ECCN," ELECTRONIC COMMERCE CONTROL NUMBER.  IT'S
 5    BASICALLY A LIST OF THE FREQUENCY AND OUTPUTS FOR RATED
 6    WAFERS THAT REQUIRE A LICENSE.  AND THIS IS CODE.
 7    YOU'RE GOING TO SEE THE LAW.  IT'S ACTUALLY IN BLACK
 8    AND WHITE.  IT'LL BE ADMITTED AS EXHIBITS.  THE
 9    GOVERNMENT WILL LIKELY OFFER IT THROUGH THEIR EXPERTS.
10    AND IT SAYS RIGHT ON THE FACE, "MMIC'S RATED FOR
11    CERTAIN PERFORMANCE."  THEY'RE EXPRESSLY
12    CONTEMPLATING -- WE DON'T WANT TO CHILL RESEARCH AND
13    COLLABORATION.  EDUCATIONAL WORK, THAT'S FINE.  BUT IF
14    YOU'RE DOING PRODUCTION RUNS, THEN YOU'RE GOING TO NEED
15    A LICENSE IF THE CHIPS ARE RATED FOR CERTAIN
16    PERFORMANCE LEVELS.
17              SO YOU'LL LEARN THAT THE TERMS "RATED"
18    AND "UNRATED" WILL MAKE A BIG DIFFERENCE FOR THE
19    LICENSE EXPORT PORTION OF THIS TRIAL.
20              ALL THE WAFERS THAT DR. SHIH HAD
21    MANUFACTURED BY CREE WERE JUST SCIENCE EXPERIMENTS.
22    THAT'S -- THAT'S IT.  AND, IN FACT, YOU'RE GOING TO
23    LEARN THEY DIDN'T WORK.  THAT'S GOING TO BE KEY, AND
24    THAT WILL BE CONCLUSIVELY ESTABLISHED DURING THIS
25    TRIAL.
```

54

```
1              NOW, THE COURT WILL INSTRUCT YOU ABOUT
2    THE LAW, BUT SO WILL EARLY GOVERNMENT WITNESSES.
3    YOU'LL HEAR FROM CARLOS MONROY.  BUT THE POINT IS,
4    YOU'RE GOING TO -- HE'S A GOVERNMENT EXPERT WHO WILL
5    TESTIFY.
6              BUT THE LAW MATTERS BECAUSE, OBVIOUSLY,
7    THIS IS A VERY COMPLEX REGULATORY SCHEME, WHAT NEEDS
8    EXPORT, WHAT DOESN'T.
9              I'VE HEARD LIKE THE PROSECUTOR'S OPENING
10   SAY, THESE ARE MILITARY GRADE, OR TERMS LIKE THAT MIGHT
11   BE HEARD.
12             FIRST OF ALL, THE TERM YOU WILL MOST
13   LIKELY HEAR IS CALLED "DUAL USE."  IT MEANS THERE ARE
14   ITEMS THAT HAVE CIVILIAN AND MILITARY APPLICATION.
15             CREE HAS PICTURES OF TANKS AND SATELLITES
16   AND ROCKETS AND STUFF ON ITS WEBSITE BECAUSE IT
17   BASICALLY WANTS TO CATER TO THE WHOLE MARKET.  IF ANY
18   GOVERNMENT-AFFILIATED ENTITY WANTS TO BUY THEIR CHIPS,
19   THEY'RE HAPPY TO SELL THEM.  AND THEY ALSO HAVE CELL
20   PHONES AND 5G AND CARS THAT DRIVE THEMSELVES.  THESE
21   ALL REQUIRE CHIPS.  THEY ALL REQUIRE THE SAME FREQUENCY
22   AND WATTAGE.
23             SO THE NAME AND LABEL, YOU'LL LEARN FOR
24   SOMETHING THAT COULD BE SOLD FOR A COMMERCIAL PURPOSE
25   OR A MILITARY PURPOSE IS CALLED "DUAL USE."  YOU'LL
```

1    QUICKLY BE DESENSITIZED TO IT.

2              M&M'S WERE DEVELOPED BY THE ARMY, YOU'LL

3    LEARN.  COTTON T-SHIRTS ARE DUAL-USE ITEMS.  ARMY

4    RANGERS WEAR COTTON T-SHIRTS, AND SO DO SIX-YEAR-OLD

5    SOCCER PLAYERS.

6              SO TRIAL ONE, STEP ONE IS, YOU HAVE TO

7    UNDERSTAND THE LAW.  AND THERE WAS NO LICENSE REQUIRED

8    FOR ANY OF THE ITEMS THAT WERE PRESENTED HERE BECAUSE

9    THERE ARE LICENSING EXCEPTIONS TO MAKE SURE THAT WE

10   DON'T CHILL RESEARCH, DESIGN AND DEVELOPMENT.  SO

11   THERE'S NO LICENSE REQUIRED TO EXPORT ITEMS THAT ARE

12   FOR PUBLICATION OR INTENDED FOR PUBLICATION.  PATENTS,

13   ARTICLES, ACADEMIC LITERATURE, FOR EXAMPLE, FUNDAMENTAL

14   RESEARCH, EXCLUDED FROM THE LICENSING PARADIGM.

15             EDUCATIONAL PURPOSES, YOU CAN EXPORT

16   WITHOUT A LICENSE.

17             PATENT APPLICATIONS, YOU CAN EXPORT

18   WITHOUT A LICENSE.

19             FOR SHIPMENTS OF LIMITED VALUE, YOU CAN

20   EXPORT WITHOUT A LICENSE.

21             AND THIS IS WORTH JUST A QUICK MENTION

22   NOW BECAUSE THE EVIDENCE THAT THE GOVERNMENT REFERENCED

23   WAS THAT, TO GET A MMIC MANUFACTURED, FABRICATED, IF

24   YOU HAVE A DESIGN IDEA, AND YOU WANT TO TEST IT BY

25   HAVING IT MADE, IT COSTS A LOT OF MONEY.  IF YOU PUT

56

```
1    THAT SAME WAFER ON E-BAY, NO ONE WOULD BUY IT.  IT'S
2    VALUELESS.  IT HAS NO VALUE WHATSOEVER.  THE COST ISN'T
3    GETTING IT MADE, BUT IT DOESN'T HAVE ANY VALUE AFTER
4    IT'S MADE.
5                TEMPORARY EXPORTS DON'T REQUIRE LICENSES.
6                ADDITIONAL PERMISSIVE REEXPORTS DO NOT
7    REQUIRE LICENSES.
8                ITEMS THAT ARE SPECIALLY DESIGNED FOR
9    TELECOMMUNICATIONS DON'T REQUIRE EXPORT LICENSES.
10                SENT TO CANADA, YOU DON'T NEED A LICENSE
11    TO EXPORT ITEMS TO CANADA.
12                THERE'S ANOTHER KIND OF PAPERWORK PROCESS
13    THAT'S SEPARATE FROM THE LICENSING THAT THE PROSECUTOR
14    REFERRED TO CALLED "SUBMITTING ELECTRONIC EXPORT INFO."
15                FOR EXAMPLE, I THINK THE PROSECUTOR
16    MENTIONED THAT THERE'S GOING TO BE A WITNESS AT THIS
17    TRIAL, KIET MAI, DR. SHIH'S LONGTIME FRIEND WHO WAS
18    CHARGED AS A CO-CONSPIRATOR.  YOU'LL LEARN THE
19    GOVERNMENT DISMISSED ALL OF THE COUNTS, ALL OF THEM
20    AGAINST KIET MAI.  AND HE PLED GUILTY TO SMUGGLING,
21    WHICH INVOLVED LYING ABOUT SOMETHING.  AND WE'LL HEAR
22    FROM HIM WHAT THAT WAS.
23                BUT THAT HAD TO DO WITH AN OBLIGATION TO
24    DECLARE INFORMATION AND FILE INFORMATION
25    ELECTRONICALLY.  BUT YOU DON'T NEED TO FILE ELECTRONIC
```

1    EXPORT INFORMATION FILINGS FOR EXPORTS MADE IN

2    ELECTRONIC OR IN INTANGIBLE FORM.  WE'RE TALKING WAFERS

3    IN THIS CASE.

4                    EXPORTS SENT TO CANADA DON'T REQUIRE ANY

5    ELECTRONIC EXPORT INFORMATION FILING.

6                    SIMILARLY, TO THE LICENSING REGULATORY

7    SCHEME, YOU DON'T NEED TO FILE THOSE IF THE ITEMS ARE

8    FOR PUBLICATION OR INTENDED FOR PUBLICATION, FOR

9    FUNDAMENTAL RESEARCH, FOR EDUCATIONAL PURPOSES, FOR

10   PATENT APPLICATIONS AND FOR ITEMS VALUED AT LESS THAN

11   $2500.  I DON'T KNOW WHY THE VALUATION IS A LOWER

12   NUMBER FOR EXPORT -- ELECTRONIC EXPORT INFORMATION

13   FILINGS THAN IT IS FOR LICENSING, BUT IT IS.

14                    TEMPORARY EXPORTS DON'T REQUIRE ANY

15   FILINGS.

16                    AND THE KEY HERE IS THAT, DR. SHIH,

17   YOU'LL LEARN FROM THE EVIDENCE, HE'S TRYING TO KNOW THE

18   LAW.  THE GOVERNMENT SEIZED MATERIALS THAT WILL

19   CONCLUSIVELY PROVE DR. SHIH IS TRYING TO LEARN THE LAW.

20   THE PROSECUTOR REFERENCED TRAINING HE RECEIVED DURING

21   HIS MANY DIFFERENT PHASES OF PROFESSIONAL EXPERIENCE

22   WHERE HE KNOWS THAT THERE ARE EXPORT REGULATIONS FOR

23   CERTAIN THINGS.  AND YOU ARE GOING TO LEARN, DURING

24   THIS TRIAL, HE'S JUST TRYING TO MAKE SURE THAT HE IS

25   FOLLOWING THE LAW.  BUT THE RESEARCH DOESN'T REQUIRE

58

```
1    THOSE LICENSING STEPS THAT THE PROSECUTOR DESCRIBED.

2                AND THE GOVERNMENT WITNESSES THEMSELVES

3    ARE GOING TO REALLY EMPHASIZE BECAUSE THERE WAS A

4    SUGGESTION THAT IT IS SOMEHOW EVIL TO COLLABORATE WITH

5    CHINA, WHICH IS ABSOLUTELY NOT THE LAW.

6                IT'S NOT ILLEGAL TO WORK WITH CHINESE

7    COMPANIES.  THE UNITED STATES ENCOURAGES CROSS-COUNTRY

8    COLLABORATION.  THE U.S. HAS A FINANCIAL INTEREST IN

9    TRADE WITH CHINA.

10               IF THE U.S. HAD ITS WAY, CHINA WOULD

11   COLLABORATE WITH U.S. COMPANIES LIKE CREE AND MAKE ALL

12   OF ITS CHIPS HERE.  THE BUSINESS BETWEEN THE

13   UNITED STATES AND CHINA IS SO FUNDAMENTAL TO OUR

14   ECONOMY.  YOU'LL LEARN A LOT OF IT.  BUT IT'S NOT

15   CHINA, AN EVIL EMPIRE.  IT'S CHINA, BUSINESS PARTNER,

16   THAT THE LAW WANTS TO ENCOURAGE THAT TYPE OF

17   COLLABORATION.  THAT'S WHY MICROSOFT, INTEL, ALL THESE

18   U.S. COMPANIES HAVE FOOTPRINTS IN PLACES LIKE CHENGDU,

19   WHICH WILL FEATURE PROMINENTLY IN THIS CASE.

20               IT'S ONLY ILLEGAL TO SHIP ITEMS OR

21   TECHNOLOGIES -- "ITEMS" IS A BETTER TERM -- TO CHINA

22   WITHOUT A REQUIRED LICENSE.

23               IF YOU FIT INTO ONE OF THOSE ECCN

24   CATEGORIES THAT APPLY TO CHIPS RATED FOR CERTAIN

25   OUTPUTS, THEN YOU COULD, UNLESS IT'S FOR EDUCATIONAL
```

```
1    PURPOSES OR YOU INTEND TO PUBLISH THE OUTCOME OF YOUR
2    RESEARCH OR ANY OF THAT LONG LIST OF EXCEPTIONS JUST
3    PRESENTED TO YOU, UNLESS YOU FIT INTO AN EXCEPTION, AND
4    YOU FALL WITHIN AN ECCN, THEN YOU ARE REQUIRED TO GET A
5    LICENSE.
6                 AND IF YOU SHIP WITHOUT GETTING THAT
7    LICENSE, THAT'S A CRIME.  AND YOU'LL LEARN THAT
8    DR. SHIH IS NOT, I SUBMIT, BASED ON THE EVIDENCE,
9    GUILTY OF THAT CRIME IN THIS CASE.
10               SO I WANT TO CONCLUDE PHASE ONE BEFORE I
11   MOVE TO PHASES TWO AND THREE THAT I INITIALLY DEFINED
12   FOR YOU.
13               SO THE PHASE ONE, THE EXPORT LICENSING,
14   DID DR. SHIH NEED AN EXPORT LICENSE?  YES OR NO, WHICH
15   IS ALL YOU'RE HERE TO FIND, IS -- THE GOVERNMENT JUST
16   MISUNDERSTANDS THE E-MAILS THE PROSECUTOR DESCRIBES,
17   MISUNDERSTANDS THE SCIENCE, THE DIFFERENCE BETWEEN
18   GALLIUM ARSENIDE AND GALLIUM NITRADE AS MANUFACTURING
19   PROCESSES.  BECAUSE IF THEY UNDERSTOOD THAT, I SUBMIT,
20   GETTING A CREE WAFER DOES NOT EVEN HELP IN ANY REMOTE
21   MANNER WITH BUILDING A GALLIUM ARSENIDE FOUNDRY.
22               AND THEY MISUNDERSTAND THE LAW.  AS I
23   SAID, THERE'S NO LICENSE REQUIRED IN THIS CASE
24   REGARDLESS OF WHETHER THINGS SHIPPED.
25               BUT DR. SHIH DIDN'T SHIP ANYTHING.  AND
```

```
1    YOU'RE GOING TO VERY QUICKLY, I THINK, CONCLUDE THAT
2    THERE'S NO EVIDENCE THAT THESE WAFERS WERE SHIPPED TO
3    CHINA AT ALL.  IT JUST DOESN'T EXIST.
4                    AND EVEN IF HE SHIPPED A WAFER BECAUSE IT
5    WAS A SCIENCE EXPERIMENT, WHICH HE DIDN'T, BUT I WANT
6    TO SAY, IT'S A LITTLE BIT OF A RED HERRING BECAUSE,
7    EVEN IF HE DID, IT WAS LAWFUL.  HE HAD RESEARCH
8    COLLEAGUES IN CHINA.  THAT'S LAWFUL.
9                    DR. SHIH IS NOT GUILTY, I SUBMIT, THE
10   EVIDENCE WILL ESTABLISH OF THE COUNTS CHARGED IN COUNTS
11   1 AND 2.
12                    NOW I'M MOVING TO -- IT'S RELATED
13   DISTANTLY, BUT IT'S A SEPARATE BUCKET FOR YOU TO PUT
14   THE EVIDENCE THAT YOU HEAR AND RECEIVE DURING THIS
15   TRIAL.  IT'S CALLED -- I'LL CALL IT THE "CREE FRAUD
16   COUNTS."
17                    CREE IS A GIANT UNITED STATES CHIP
18   MANUFACTURER.  THEY MAKE THOUSANDS OF WAFERS A DAY.
19   HALF THEIR WORKFORCE IS IN CHINA.  AND THEY ARE BIG.
20   AND THEY PROVIDE LOTS OF DIFFERENT SERVICES.
21                    SO I WANT TO INTRODUCE YOU TO THE PEOPLE
22   AND THE COMPANIES AND THE PLACES THAT ARE GOING TO BE
23   INVOLVED IN THIS SECOND PHASE OF THE TRIAL.
24                    SO, ONE, IS CREE.  I JUST BEGAN TO
25   DESCRIBE CREE.  AND THERE WILL BE A LARGE NUMBER OF
```

```
1    CREE WITNESSES TESTIFYING IN THIS TRIAL.
2              JEFF BARNER IS THE CHIEF OF THE FOUNDRY.
3    HE'S GOING TO TESTIFY AS A GOVERNMENT WITNESS, BY THE
4    WAY.  HE'S MET SEVERAL TIMES WITH PROSECUTORS.  HE'S
5    DESCRIBED CREE'S BUSINESS WITH MICROEX AND HOW THE
6    FIRST RUN AND THE SECOND RUN WAFERS WERE ORDERED AND
7    MANUFACTURED BY CREE.  HE'S GOING TO TELL YOU, WE
8    DIDN'T DO ANY DESIGN WORK.  WE DIDN'T DO ANY TESTING
9    WORK, OR MICROEX OR KIET MAI.  WE SIMPLY RECEIVED A
10   BLUEPRINT FOR A CHIP THAT WE SHOULD MAKE, AND WE MADE
11   IT.  THE DESIGN WORK WAS DONE BY DR. SHIH.
12             YOU'LL VIEW CREE IN THIS CASE, THEY'RE
13   JUST A MACHINE SHOP.  IF YOU DESIGN A SPECIAL METAL
14   TOOL, AND YOU WANT TO SEE IF IT WORKS, AND IT'S GOOD,
15   YOU GO TO A MACHINE SHOP.  YOU SAY, MAKE IT.  AND THEN
16   YOU GET IT BACK.  AND YOU TEST IT FOR WHATEVER YOU
17   WANTED THE TOOL TO BE MADE FOR.  BUT THE MACHINE SHOP'S
18   JOB IS JUST TO MAKE THE TOOL ACCORDING TO THE
19   SPECIFICATIONS IT'S GIVEN.  THAT'S IT.  AND IN THIS
20   CASE, THAT'S ALL CREE DID.  THEY WERE DR. SHIH'S
21   MACHINE SHOP FOR SOME RESEARCH TO TEST TRANSISTORS AND
22   AMPLIFIERS.
23             MICROEX IS A COMPANY THAT -- IT'S A
24   CONSULTING COMPANY.  KIET MAI DOES ELECTRICAL
25   ENGINEERING CONSULTING WORK.  MICROEX IS HIS COMPANY.
```

```
1    HE WAS RETAINED BY DR. SHIH IN A WRITTEN CONTRACT.  I
2    MEAN, IT'S ALL VERY ABOVE BOARD, THE EVIDENCE WILL
3    ESTABLISH, TO DO THE FABRICATION PHASE OF DR. SHIH'S
4    RESEARCH.  AND KIET MAI WAS THE ONE WHO INTERFACED WITH
5    CREE FOR RUN ONE AND RUN TWO.
6              KIET MAI WILL TESTIFY IN THIS TRIAL.  AND
7    PROBABLY, I IMAGINE, HAVE ALL THE E-MAILS.  WHAT HE'S
8    GOING TO SAY IS, DR. SHIH DID THE DESIGN, EVERY STEP OF
9    THIS ORDERING PROCESS.  I DID WHAT DR. SHIH WANTED.  HE
10   PAID FOR THE MANUFACTURING.  I JUST WANTED TO HANDLE
11   THE MANUFACTURING PIECE.  THIS WAS DR. SHIH'S DESIGN,
12   HIS RESEARCH.  AND I WAS HIS -- BASICALLY THE GUY WHO
13   FOUND A GOOD MACHINE SHOP TO MAKE IT AND GET IT DONE.
14   THAT'S IT.
15             PULLMAN LANE PRODUCTIONS IS DR. SHIH'S
16   COMPANY.  YOU'RE GOING TO LEARN A LOT ABOUT IT.  OF
17   COURSE, IT'S NOT A BUILDING.  IT'S AN LLC.  IT'S THE
18   COMPANY THAT DR. SHIH USED BASICALLY TO COORDINATE HIS
19   RESEARCH.  WHEN HIS BROTHER WOULD SEND HIM FUNDING FOR
20   SOME CERTAIN TYPE OF PROJECT, DR. SHIH NEVER CO-MINGLED
21   HIS PERSONAL FUNDS WITH RESEARCH FUNDS.  AND SO PULLMAN
22   LANE IS THE COMPANY THAT RECEIVED ALL THE RESEARCH
23   FUNDS AND WAS HIS -- BASICALLY, HIS BUSINESS ACCOUNT,
24   IS THE WAY THAT YOU'LL QUICKLY GROW TO UNDERSTAND WHAT
25   PULLMAN LANE WAS.
```

63

```
 1                    AND THE LAST CONCEPT I WANT TO SPECIALLY

 2      CARVE OUT FOR THIS SECOND BUCKET IN THE TRIAL IS THIS

 3      PDK PORTAL.  ALL OF THESE CREE FRAUD COUNTS ARE CREE

 4      WITNESSES SAYING, WE KEEP A VERY SECURE PORTAL.  THAT

 5      WE WOULD NEVER GIVE ACCESS TO SOMEBODY -- TO DR. SHIH.

 6      WE ONLY WANTED KIET MAI TO USE IT.  FIRST OF ALL, LET'S

 7      DEFINE WHAT IT IS.

 8                    IT IS THE WAY THAT DESIGNS FOR COMPUTER

 9      CHIPS ARE COMMUNICATED TO THE FOUNDRY SO THAT THEY CAN

10      MAKE SURE THEY UNDERSTAND THE DESIGN.  AND THEY

11      COORDINATE WITH THE DESIGNERS AND RUN MODELING TO MAKE

12      SURE THAT DESIGNS ARE COMPATIBLE WITH WHATEVER THE

13      NEEDS OF MANUFACTURING ARE.  IT'S A WORKSPACE.  IT'S ON

14      A COMPUTER, TRUE.  IT'S A WORKSPACE.

15                    BUT JUST LIKE A WRITER -- YOU'LL HEAR

16      THROUGH GOVERNMENT EXPERTS AND CREE WITNESSES, A WRITER

17      CAN COMPILE A NOVEL.  AND HE CAN USE MICROSOFT WORD TO

18      DO IT.  THE NOVEL, THE DESIGN OF THE WORK, THE WRITING

19      IS THE AUTHOR'S.  THEY OWN IT.  IT'S THEIR INTELLECTUAL

20      PROPERTY.  IT'S THEIRS.  THEY DON'T OWN MICROSOFT WORD,

21      THE CONDUIT FOR COMMUNICATING THEIR WRITING TO THE

22      WORLD.  THEY JUST USE WORD TO CREATE -- I MEAN, TO TYPE

23      OUT THEIR OWN IDEAS.  THAT'S THE PDK PORTAL.  THERE'S

24      NOTHING SECRET ABOUT IT.

25                    WHAT'S IMPORTANT ABOUT THE PORTAL IS THAT
```

```
1    ALL COMPANIES THAT ARE USING CREE, FOR EXAMPLE, INTEL,
2    MICROSOFT, DR. SHIH, ANYBODY, THEY WANT THEIR IDEAS
3    SECRET.  SO CREE DOES LIMIT ACCESS.  FOR EXAMPLE, THE
4    PORTAL WHERE ALL THE DESIGN WORK RESIDES, EACH CUSTOMER
5    DEPOSITS THEIR DESIGNS IN A SPECIFIC AREA IN CREE WHERE
6    NO OTHER CREE CUSTOMER CAN SEE IT.  OF COURSE.  I MEAN,
7    THIS IS ALL WORK THAT HOPEFULLY WILL BE FOR PATENTS AND
8    ORIGINAL RESEARCH AND PUBLICATION.  SO IT'S MAINTAINED
9    SECURELY.  BUT YOU LEARN NOTHING ABOUT THE CREE
10   CREATION PROCESS BY USING ITS PORTAL.  JUST LIKE YOU
11   DON'T LEARN ANYTHING ABOUT AN AUTHOR'S IDEAS BY, YOU
12   KNOW, USING MICROSOFT WORD WHERE THEY REPOSIT THEIR
13   OUTLINES.  IT'S A TOOL.  IT'S COMPILED.  THERE'S NO
14   MACHINE CODE OR CREE SECRETS WHATSOEVER CONNECTED WITH
15   THE PORTAL.
16              SO THE GOVERNMENT JUST DESCRIBED IN THEIR
17   OPENING THAT THE CREE WITNESSES WILL SAY THAT THEY
18   NEVER WOULD HAVE GIVEN PERMISSION TO MICROEX TO USE THE
19   PORTAL.  THEY GAVE PERMISSION IN WRITING.  YOU'LL SEE
20   THE CONTRACT.  IT'S IN WRITING.  AND YOU'LL SEE THAT
21   KIET MAI COMPLIED FULLY WITH THE CONTRACT, THE
22   INSTRUCTIONS FROM CREE ON USE OF ITS PORTAL.
23              BASICALLY, YOU'RE ALLOWED TO USE IT FOR
24   ALL THE PEOPLE YOU'RE WORKING WITH ON YOUR TEAM.  IT'S
25   NOT LIKE THEY NEED TO KNOW ALL THE MEMBERS OF YOUR
```

1   TEAM.  CREE FULLY UNDERSTOOD THAT KIET MAI IS NOT A

2   CHIP DESIGNER.  THEY WILL ADMIT THAT DURING THIS TRIAL.

3   KIET MAI CAN'T DESIGN A COMPUTER CHIP.  DR. SHIH

4   DESIGNS AMPLIFIERS AND TRANSISTORS.  BUT KIET MAI WAS

5   THE ONE COMMUNICATING WITH CREE.  HE SIGNED THE

6   CONTRACT, AND THE CONTRACT PERMITS IT.  IT'S CALLED THE

7   "PDK AGREEMENT," AND YOU'LL SEE IT.

8                KIET MAI -- CREE KNEW THAT KIET MAI WAS

9   NOT THE CHIP DESIGNER ON THE MICROEX PROJECTS.  KIET

10  MAI HAD A CONTRACT WITH DR. SHIH.  THAT'S ONLY

11  IMPORTANT BECAUSE YOU HAVE TO BE IN CONTRACT WITH

12  SOMEONE.  KIET MAI WOULD HAVE TO BE IN CONTRACT WITH

13  THE OTHER PEOPLE ON HIS DESIGN TEAM BEFORE HE CAN GIVE

14  THEM ACCESS TO THE PORTAL.

15                AND THE WHOLE THEORY IS, THAT YOU CAN USE

16  THE PORTAL TO COMMUNICATE YOUR DESIGNS FROM YOU AND

17  YOUR TEAM, BUT THEY DON'T GIVE CREDENTIALS TO ANYBODY

18  WHO IS NOT BUYING CREE PRODUCTS.  THAT'S THE POINT.

19                MOST IMPORTANTLY, CREE WAS PAID IN FULL.

20  TYPICALLY, IN A FRAUD CASE, SOMEBODY IS DEFRAUDED OF

21  MONEY OR PROPERTY.  YOU WON'T HEAR OF ANYTHING LOST BY

22  CREE IN THIS TRIAL.  HOW THEY COULD BE A FRAUD VICTIM

23  WILL PROBABLY BE AS MUCH A MYSTERY TO YOU WHEN YOU

24  BEGIN YOUR DELIBERATIONS AS IT IS TODAY.  THEY WERE

25  PAID IN FULL FOR THEIR FABRICATION SERVICES.

1          AND THERE WAS NOTHING SECRET ABOUT THE

2    CREE PDK PORTAL.  CREE ADVERTISES ITS PORTAL ON THE

3    INTERNET.  IF YOU WANT TO SEE ALL THE FEATURES OF THE

4    CREE PORTAL -- NOT DURING THIS TRIAL.  THE COURT SAID

5    DON'T DO ANY OUTSIDE RESEARCH.  BUT WITNESSES WILL TELL

6    YOU, DURING THIS TRIAL, THAT YOU CAN JUST TYPE IT INTO

7    YOUTUBE.  AND THEY ADVERTISE IT BECAUSE THEY WANT

8    CUSTOMERS.  THEY WANT PEOPLE TO SAY, WOW, THERE'S A

9    GREAT TOOL TO COMMUNICATE WITH THE FOUNDRY THAT'S

10   CONVENIENT FOR US, AND HERE ARE ALL THE FEATURES,

11   DESIGNERS OF THE WORLD.  SO COME BUY YOUR CHIPS FROM

12   US.

13          YOU WILL LIKELY -- MANY CREE WITNESSES

14   WILL DESCRIBE THAT ADVERTISING.  AND WE WILL LIKELY

15   WATCH A VIDEO DURING THIS TRIAL WITH A CREE WITNESS ON

16   THE STAND DESCRIBING ALL OF THE FEATURES OF THE PDK

17   BECAUSE THEY WANT PEOPLE TO USE IT.  THAT'S ONE OF THE

18   WAYS CREE GETS CUSTOMERS.  WE HAVE A GOOD PORTAL, COME

19   LOOK AT ALL IT CAN DO.  BUY YOUR CHIPS FROM US.

20          AND THERE'S NO SECRET CREE INFORMATION

21   THAT CAN POSSIBLY BE OBTAINED FROM THE CREE PDK PORTAL.

22   ALL IT DOES IS STORE DR. SHIH'S DESIGNS IN HIS PORTION

23   OF THE CREE SYSTEM.  THAT'S IT.  NO ONE ELSE IS THERE.

24          SO, IN SUMMARY, FOR THIS SECOND BUCKET OF

25   THE CREE TRIAL, THE EVIDENCE WILL SHOW THAT DR. SHIH

```
1    NEVER DEFRAUDED CREE IN ANY MANNER.  THAT DR. SHIH DID

2    NOT USE THE CREE DESIGN PORTAL WITHOUT AUTHORIZATION.

3    HE WAS GIVEN AUTHORIZATION, HE AND KIET MAI.  THE

4    CONTRACT SAYS, "MICROEX," BUT THEN IT'S MICROEX AND HIS

5    TEAM, WERE GIVEN AUTHORIZATION IN WRITING.  AND YOU'LL

6    SEE THE CONTRACT.

7              DR. SHIH IS NOT GUILTY OF ANY OF THE

8    CREE-RELATED COUNTS CHARGED IN COUNTS 3 THROUGH 9.

9              NOW, THE THIRD BUCKET - AGAIN, WE KEEP

10   TURNING CHAPTERS.  THIS IS NOW ALMOST AN UNRELATED

11   CHAPTER OF THIS TRIAL - ARE THESE FALSE STATEMENT

12   COUNTS.

13             COUNT 1, AS THE PROSECUTOR DESCRIBED,

14   INVOLVES FBI AGENTS SEARCHING -- FIRST OF ALL, THIS

15   INVESTIGATION WAS NEVER SECRET.  I MEAN, THE --

16   KIET MAI WILL DESCRIBE HOW HE AND DR. SHIH WERE GIVING

17   INFORMATION TO THE FBI FOR A YEAR OR TWO BEFORE THIS

18   CASE WAS EVER CHARGED, TRYING TO EXPLAIN THEIR

19   RESEARCH, IF THE FBI HAD ANY INTEREST IN LEARNING IT,

20   AND ANSWERING ALL OF THEIR QUESTIONS.

21             THE CASE AGENT, ALEX STORINO, HE WILL

22   TESTIFY IN THIS TRIAL, WAS THE ONE CONSTANTLY

23   INTERVIEWING SHIH -- KIET MAI, SENDING HIM AN E-MAIL.

24   WHAT DID YOU MEAN BY THIS E-MAIL OR THAT E-MAIL?  AND

25   KIET MAI WAS ANSWERING.  AND THERE'S NO SECRETS.  AND
```

1    THEN KIET MAI WAS TELLING DR. SHIH, "SO I ANSWERED

2    THEIR QUESTIONS.  I DON'T KNOW WHAT THEY THINK WE HAVE

3    DONE WRONG."  SO THAT'S GOING ON FOR YEARS.

4            BUT THEN THE FBI EXECUTED A SEARCH

5    WARRANT AT UCLA TO RECOVER A WAFER MONTHS BEFORE THEY

6    CHARGED THIS CASE.  SO THE -- A SEARCH WARRANT ISN'T A

7    CHARGE.  IT'S A RIGHT TO GO RECOVER PROPERTY.  AND

8    YOU'LL SEE THAT TWO AGENTS -- RIGHT AT THE BEGINNING OF

9    THE CASE, I THINK THE FIRST TRIAL WITNESS WILL BE A GUY

10   WHO SAYS, "I WENT TO UCLA.  I EXECUTED A SEARCH

11   WARRANT.  THEY GAVE ME THE WAFER.  I TOOK IT AWAY."  SO

12   EVERYBODY KNEW ABOUT THE FBI INVESTIGATION.

13           AND THEN, IN 2018, THE AGENTS KNOCK ON

14   DR. SHIH'S DOOR FIRST THING IN THE MORNING, EXECUTE

15   SEARCH WARRANTS IN HIS HOUSE EARLY IN THE MORNING AND

16   INTERVIEWS HIM FOR TWO HOURS.  HE ANSWERS ALL OF THEIR

17   QUESTIONS.

18           AND WHEN I SAID THE COMPETENCE OF THE

19   AGENTS WILL FACTOR INTO THIS TRIAL BECAUSE THE -- YOU

20   HAVE TO EVALUATE WHETHER THEY KNOW WHAT THEY'RE DOING.

21   I THINK THE INTERVIEW WILL BE THE SINGLE MOST IMPORTANT

22   EVIDENCE THAT THEY HAD NO IDEA WHAT THEY WERE DOING.

23   DR. SHIH TOLD THEM, NO CREE WAFERS WENT TO CHINA, NO

24   CREE WAFERS WENT TO HONG KONG.  HE WAS NOT WORKING ON

25   GALLIUM NITRADE IN CHINA.  AND YOU KNOW WHAT THE

1    GOVERNMENT DID?  THEY CHARGED HIM IN COUNT 11 WITH

2    THOSE THREE LIES.  SO THAT'S WHAT COUNT 11 IS.

3                YOU'LL REMEMBER COUNT 11 WHEN YOU

4    DELIBERATE BECAUSE THOSE ARE THE STATEMENTS DR. SHIH

5    MADE DURING HIS INTERVIEW.  ALL OF THEM ARE TRUE.  NO

6    CREE WAFERS WENT TO CHINA.  NO CREE WAFERS WENT TO

7    HONG KONG.  DR. SHIH WAS NOT WORKING ON GALLIUM NITRADE

8    IN CHINA.  AND NOW HE STANDS ACCUSED IN COUNT 11 OF

9    TELLING THOSE THREE LIES.

10                COUNTS 12 TO 14 ALLEGE FALSE STATEMENTS

11   TO THE IRS.  THEY'RE BASICALLY TAX RELATED.  THE

12   PROSECUTOR TALKED ABOUT HOW DR. SHIH DECLARED

13   TRUTHFULLY ALL OF HIS INCOME THAT HE EARNED WHEN HE WAS

14   ACTING BEFORE ENTITY LISTING AS PRESIDENT OF CGTC.

15                WELL, DR. SHIH ALLEGEDLY, ACCORDING TO

16   THE GOVERNMENT, UNDERPAID HIS TAXES IN 2011, UNDERPAID

17   HIS TAXES IN 2012 AND UNDERPAID HIS TAXES IN 2013.

18   THAT'S WHAT COUNTS 12 THROUGH 14 ARE.  BUT THAT

19   DR. SHIH PAID ALL OF HIS TAXES.

20                WHAT THE GOVERNMENT IS DOING IN THIS

21   TRIAL IS SAYING, BECAUSE THERE WERE RESEARCH FUNDS THAT

22   WENT TO DR. SHIH ESSENTIALLY IN TRUST.  IT WASN'T HIS

23   MONEY.  HE USED IT TO BUY THE CREE WAFERS TO FURTHER

24   RESEARCH.  RESEARCH GETS FUNDED.  BUT DR. SHIH IS --

25   WHATEVER.  HE DOESN'T LABEL HIS ACCOUNT, "MY RESEARCH

1    FUNDS FOR CANADIAN SPACE AGENCY BIDS."  SO SOMEHOW --

2    HE SEGREGATES THEM INTO PULLMAN LANE, BUT IT'S NOT HIS

3    MONEY.  DR. SHIH HELD FUNDS THAT DID NOT BELONG TO HIM.

4    IT HAPPENS ALL THE TIME.  AND NO TAXES ARE DUE UNLESS

5    THE MONEY IS YOURS.  THAT'S A BASIC PREMISE OF OUR TAX

6    LAW.

7                IF SOMEBODY GIVES MONEY TO YOU TO GO GET

8    THEM A T-SHIRT AT THE STORE, YOU DON'T -- IT'S NOT YOUR

9    MONEY.  YOU'RE DOING THINGS WITH THE MONEY THAT YOU'RE

10   INSTRUCTED TO DO.  THAT DOESN'T MEAN IT'S YOURS.

11                COUNTS 15 THROUGH 18 ARE THESE ALLEGED

12   FALSE STATEMENTS TO THE IRS WITH THESE FBAR STATEMENTS.

13   BASICALLY, FBAR SAYS, IF YOU OWN FOREIGN BANK ACCOUNTS,

14   YOU HAVE TO DECLARE THEM IF YOU'RE -- WHEN YOU FILE

15   YOUR TAXES.  YOU HAVE TO PAY TAX ON ALL MONEY THAT'S

16   YOURS.  IF YOU HAVE MONEY THAT'S EARNING INTEREST IN A

17   BANK ACCOUNT IN SWITZERLAND, THAT INTEREST IS INCOME TO

18   YOU, SO IT HAS TO BE DECLARED AND PAID.

19                BUT DR. SHIH, THE GOVERNMENT ALLEGES,

20   THAT HE DIDN'T DISCLOSE ACCOUNTS IN 2013, 2014 AND

21   2015.  BUT HE DID DISCLOSE ALL OF HIS ACCOUNTS.  HE

22   DIDN'T DISCLOSE THE RESEARCH ACCOUNTS BECAUSE IT'S NOT

23   HIS MONEY.

24                IT DOESN'T MATTER IF IT'S TITLED IN HIS

25   NAME.  HE'S THE RESEARCHER.  HE'S THE HEAD RESEARCHER.

1   BUT IT'S NOT HIS.  HE CAN'T GO BY NIKE SHOES WITH IT.

2   HE HAS TO BUY CREE WAFERS WITH IT, AS HE'S PLEDGED TO

3   DO.  THERE ARE NO DISCLOSURES OF ACCOUNTS THAT AREN'T

4   YOURS.  THAT'S A BASIC TENANT OF THE TAX LAW.  RESEARCH

5   FUNDS ARE NOT DR. SHIH'S.

6              DR. SHIH DID FILE -- THE BEST EVIDENCE

7   THAT DR. SHIH IS TRYING TO FOLLOW THE LAW IS HE FILED

8   FBAR'S ON THE CHINESE ACCOUNTS WHERE HE RECEIVED HIS

9   SALARY.  BECAUSE THEY WERE FOREIGN ACCOUNTS, THE

10  GOVERNMENT WOULDN'T KNOW ABOUT THEM, UNLESS HE TOLD THE

11  GOVERNMENT ABOUT THEM.  AND HE DID.  AND THE PROSECUTOR

12  TOLD YOU IN OPENING, THAT THAT MONEY, THAT DR. SHIH DID

13  FILE FBAR'S.  IF YOU FILE FBAR'S, YOU'RE TRYING TO

14  COMPLY WITH THE LAW.

15             AND THE PROSECUTOR QUOTED DR. SHIH FROM

16  HIS INTERVIEW.  HE WILL TELL YOU HE WAS AWARE OF THE

17  FBAR LAW.  OF COURSE HE WAS BECAUSE HE FILED THE FBAR'S

18  BECAUSE HIS ACCOUNTANT TOLD HIM.

19             NO WITNESS DURING THIS TRIAL WILL TELL

20  YOU THAT YOU HAVE TO FILE AN FBAR FOR AN ACCOUNT THAT'S

21  NOT YOURS.  IT'S THE RULE.  IF IT'S YOUR MONEY, YOU

22  HAVE TO FILE.  IF IT'S NOT YOURS, YOU DON'T.

23             WHEN THIS TRIAL IS OVER, I'M GOING TO

24  COME BACK TO YOU, SUMMARIZE THE EVIDENCE AND NEXT TIME

25  WITH REFERENCE TO SPECIFIC EXHIBITS AND SPECIFIC

1    TESTIMONY THAT YOU HAVE HEARD.  AND I'M GOING TO ASK

2    YOU TO FIND DR. SHIH GUILTY OF COUNT -- NOT GUILTY.

3    THAT WAS A BIG ERROR.  I WANT TO REPEAT IT.

4              BECAUSE DR. SHIH IS NOT GUILTY OF COUNTS

5    1 AND 2 AND 10.  10, I KIND OF SKIPPED OVER BECAUSE

6    IT'S BASICALLY, IF YOU ENGAGE IN ANY FINANCIAL

7    TRANSACTION TO PROMOTE UNLAWFUL ACTIVITY, THAT'S A

8    SEPARATE CRIME.  AND WHAT'S CHARGED IS THAT, DR. SHIH'S

9    BROTHER SENT $120,000 TO GET THE WAFERS MADE OR

10   SOMETHING LIKE THAT.  THERE WAS SOME -- MAYBE FOR

11   FUNDING RESEARCH AT UCLA.  BUT THAT TRANSFER REQUIRES

12   THAT DR. SHIH BE GUILTY OF EXPORT VIOLATION CRIMES OR

13   CREE FRAUD CRIMES.  IF IT'S FOR RESEARCH, IT'S LAWFUL.

14   PEOPLE ARE ALLOWED TO SEND MONEY FOR RESEARCH OR FOR

15   ANY PURPOSE THAT'S NOT TO PROMOTE UNLAWFUL ACTIVITY.

16   SO I HAVE LUMPED IT INTO TRYING TO REDUCE THE NUMBER OF

17   BUCKETS TO EXPLAIN.

18             DR. SHIH IS ALSO NOT GUILTY OF COUNTS 3

19   THROUGH 9, THE CREE FRAUD COUNTS, AND 10, AGAIN, HE'S

20   ALLOWED TO BUY THE WAFERS WITH MONEY IF THERE'S NO

21   FRAUD INVOLVED.

22             HE'S NOT GUILTY OF COUNT 11 BECAUSE HE

23   TOLD THE FBI THE TRUTH, NO WAFERS WENT TO CHINA.

24             AND JUST AN ASIDE, HERE'S AN EXAMPLE

25   WHERE IT WOULD HAVE BEEN PERFECTLY LAWFUL TO SEND A

```
 1   WAFER TO CHINA ANYWAY.  THIS COUNT 11 DEALS WITH

 2   WHETHER DR. SHIH TOLD A MATERIAL FALSE STATEMENT TO AN

 3   FBI AGENT BECAUSE THAT'S A CRIME.  SO IF IT WAS LAWFUL

 4   TO SEND A WAFER TO CHINA, BUT DR. SHIH TOLD AN FBI

 5   AGENT, "I DIDN'T SEND A WAFER TO CHINA," THE LIE WOULD

 6   BE A CRIME.  BUT NO WAFERS WENT TO CHINA.  AND THE

 7   STATEMENTS WERE TRUE.

 8                 I'M GOING TO ASK YOU TO FIND DR. SHIH NOT

 9   GUILTY OF COUNTS 12 THROUGH 14.  THOSE ARE THE TAX

10   COUNTS.  I'M GOING TO ASK YOU TO FIND DR. SHIH NOT

11   GUILTY OF THE FBAR COUNTS IN COUNTS 15 THROUGH 18.

12                 A GREAT DEAL OF THE FACTUAL MATERIAL THAT

13   WILL BE PRESENTED TO YOU IN THIS CASE IS UNDISPUTED.

14   DR. SHIH RECEIVED MONEY FROM HIS BROTHER.  WHAT'S

15   DISPUTED IS, WHETHER DR. SHIH AND HIS BROTHER WERE

16   COMMITTING ANY CRIME BY DOING THE THINGS THAT THEY WERE

17   DOING.

18                 SAME THING WITH THE CHINESE COLLEAGUES.

19   THEY'RE DOING RESEARCH.  THAT'S PERFECTLY LAWFUL,

20   UNLESS AN ITEM WAS SENT TO CHINA THAT REQUIRED AN

21   EXPORT LICENSE AND YOU DIDN'T GET IT.  SO NO ONE IS

22   GOING TO BE DISPUTING THE E-MAIL TRAFFIC THAT WILL BE

23   PRESENTED TO YOU TIME AFTER TIME AFTER TIME.

24                 ALL THAT'S DISPUTED IS WHETHER A LICENSE

25   WAS REQUIRED AND WHETHER DR. SHIH INTENDED TO AVOID THE
```

1    LICENSING REQUIREMENTS.

2              YOU'LL LEARN HE DID KNOW A LITTLE BIT

3    ABOUT EXPORT LAW, TRIED TO LEARN A LOT CAUSE HE WANTED

4    TO COMPLY.  AND THE COURT WILL INSTRUCT YOU, AT THE END

5    OF THIS CASE, THAT MISTAKES ARE NOT CRIMES.  YOU COULD

6    BE WRONG, BUT NOT -- YOU HAVE TO WILLFULLY VIOLATE

7    THESE EXPORT LAWS.  THEY ARE SO COMPLICATED, THEY HAVE

8    A WILLFULNESS REQUIREMENT.  AND THERE WILL BE ZERO

9    EVIDENCE OF THAT AT THIS TRIAL.

10             AT THE CONCLUSION OF THIS CASE, WE WILL

11   ASK YOU TO ACQUIT DR. SHIH OF ALL COUNTS CHARGED.

12             THANK YOU.

13        THE COURT:  THANK YOU, MR. SPERTUS.

14             OKAY.  WE'RE GOING TO TAKE A SHORT BREAK

15   AND THEN PROCEED WITH THE FIRST WITNESS.

16             SO WE WILL BREAK FOR ABOUT 10 MINUTES.

17   WE'LL RECESS FOR ABOUT 10 MINUTES.

18             PLEASE, AGAIN, LADIES AND GENTLEMEN OF

19   THE JURY, DO NOT DISCUSS THIS CASE IN ANY FASHION WITH

20   ANYONE DURING THE BREAK.

21             THANK YOU.

22        THE CLERK:  ALL RISE.

23        **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

24   **OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)**

25        THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

1              ARE THERE ANY ISSUES THAT WE NEED TO

2     ADDRESS?

3              MR. SHOBAKI:  NO, YOUR HONOR.

4                 WE HAVE THREE SHORT WITNESSES TO

5     ACCOMMODATE THE JURY SCHEDULE.

6              THE COURT:  THANK YOU.

7                 WE'LL RESUME IN ABOUT 10 MINUTES.

8                 **(RECESS)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES          )
                                    )
4    STATE OF CALIFORNIA            )

5                    I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

7    COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

8    CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

9    STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

10   TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

11   HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

12   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

14   STATES.

15   DATE:  JUNE 6, 2019

16

17

18                    /S/ ALEXANDER T. JOKO
                      _____
19                    ALEXANDER T. JOKO, CSR NO. 12272
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25