1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE JOHN A. KRONSTADT, US DISTRICT JUDGE

4                    - - -

5

6

7                                    )
   UNITED STATES OF AMERICA,         )
8                                    )
                     PLAINTIFF,      )
9                                    )
           vs.                       ) No. CR18-50-JAK
10                                   )
   (1) YI-CHI SHIH, ET AL.,          )
11                                   )
                     DEFENDANT.      )
12 _____)

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL

16            DAY 2, VOLUME II

17         THURSDAY, MAY 16, 2019

18              2:15 P.M.

19         LOS ANGELES, CALIFORNIA

20

21

22    _____

23       CINDY L. NIRENBERG, CSR 5059, FCRR
         U.S. Official Court Reporter
24         350 W. 1st Street, #4455
           Los Angeles, CA 90012
25            *www.msfedreporter.com*

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:
                        UNITED STATES ATTORNEY'S OFFICE
 4                      BY: JUDITH HEINZ,
                            ASSISTANT US ATTORNEY
 5                          JAMES HUGHES,
                            ASSISTANT US ATTORNEY
 6                          WILLIAM ROLLINS,
                            ASSISTANT US ATTORNEY
 7                          MELANIE SARTORIS,
                            ASSISTANT US ATTORNEY
 8                          KHALDOUN SHOBAKI,
                            ASSISTANT US ATTORNEY
 9                      312 NORTH SPRING STREET
                        13TH FLOOR
10                      LOS ANGELES, CA 90012
                        213-894-2434
11

12

13

14

15    FOR THE DEFENDANT:
                        SPERTUS LANDES & UMHOFER
16                      BY: JOHN HANUSZ, ATTORNEY AT LAW
                            JAMES W. SPERTUS, ATTORNEY AT LAW
17                          CHRISTA L. CULVER WASSERMAN,
                            ATTORNEY AT LAW
18                      1990 SOUTH BUNDY DRIVE
                        SUITE 705
19                      LOS ANGELES, CA 90025
                        310-826-4700
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1                        I N D E X

2

3    GOVERNMENT'S WITNESSES:                    PAGE

4    BRIAN BURKE

5        DIRECT BY MR. ROLLINS               7

6        CROSS BY MR. SPERTUS               11

7        REDIRECT BY MR. ROLLINS           24

8        RECROSS BY MR. SPERTUS            25

9

10   JOSEPH JUN

11       DIRECT BY MR. SHOBAKI             26

12

13   THOMAS ANDRUKONIS

14       DIRECT BY MR. SHOBAKI             46

15       CROSS BY MR. SPERTUS              51

16

17

18   FURTHER PROCEEDINGS

19   DISCUSSION HELD OUTSIDE PRESENCE OF JURY    5

20   DISCUSSION HELD AT SIDEBAR                 20

21   DISCUSSION HELD AT SIDEBAR                 42

22   DISCUSSION HELD OUTSIDE PRESENCE OF JURY   53

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    E X H I B I T S

 2   TRIAL EXHIBITS                    MARKED   ADMITTED

 3   1645                                         41

 4   2790                               37        38

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 16, 2019

 2                           2:15 P.M.

 3                           - - - - -

 4         (The following was heard outside the presence of the

 5         jury.)

 6              THE COURT:  All right.  We're back on the record.

 7    There are no jurors present.

 8              Is the government prepared to proceed?

 9              MR. ROLLINS:  Yes, we are, Your Honor.

10              THE COURT:  Okay.  Any other issues we need to

11    address?

12              MR. SPERTUS:  No, Your Honor.

13              THE COURT:  Thank you.

14              Before you start, I'm going to remind the jury that

15    what counsel have said in your opening statements isn't

16    evidence and that I will -- that will come later, or now, and

17    that as to the law, I will instruct on the law.

18              Who is the first witness, please?

19              MR. ROLLINS:  It's Brian Burke, Your Honor.

20              MR. SHOBAKI:  Your Honor, just for purposes of the

21    timing, what is the time we are aiming to be done at?  Is it

22    3:15?  3:30?

23              THE COURT:  I think 3:15.  One of the jurors has a

24    graduation family event.

25              MR. SHOBAKI:  Okay.  We will try to be as expeditious
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   as possible.

2          THE COURT:  Thanks.  I mean, I know we got started a

3   little late because we didn't have all of our jurors.

4          MR. ROLLINS:  May I place Exhibit 1 up at the witness

5   box?

6          THE COURT:  Yes.

7      *(Jury in at 2:17 p.m.)*

8          THE COURT:  All right.  Please be seated.

9          All jurors and alternates are present.

10         Ladies and gentlemen, we are now going to proceed to

11  the next phase of the trial where witnesses will testify.

12  Witnesses will be examined by both counsel, both sides.  The

13  party that calls a witness may also ask further questions after

14  the witness is cross-examined.

15         And then, secondly, I wanted to remind you that what

16  counsel said during the opening statements is not evidence, and

17  with respect to legal issues, I will be instructing you on the

18  law.

19         So, Mr. Rollins, would the government please call the

20  first witness.

21         MR. ROLLINS:  Yes, Your Honor.  The United States

22  calls Brian Burke to the stand.

23         THE COURT:  Agent Burke.

24         THE CLERK:  Can you step forward.

25         Please raise your right hand.

```
 1              Do you solemnly swear that the testimony you're about

 2    to give in the cause now before this Court shall be the truth,

 3    the whole truth, and nothing but the truth, so help you God?

 4              THE WITNESS:  I do.

 5              THE CLERK:  Can you please be seated.

 6              Can you please state your full name and spell it for

 7    the record.

 8              THE WITNESS:  Brian Robert Burke, B-r-i-a-n,

 9    R-o-b-e-r-t, B-u-r-k-e.

10              THE COURT:  All right.  Good afternoon, Mr. Burke.

11              THE WITNESS:  Good afternoon, Your Honor.

12              THE COURT:  Please proceed, Mr. Rollins.

13                          BRIAN BURKE,

14                  having been first duly sworn,

15                     testified as follows:

16                      DIRECT EXAMINATION

17    BY MR. ROLLINS:

18    Q.   Good afternoon, Mr. Burke.

19              What do you do for a living?

20    A.   Currently, I am self-employed as a contract investigator.

21    Q.   And what did you do before that?

22    A.   I am a retired FBI agent.

23    Q.   And when did you retire from the FBI?

24    A.   June of 2017.

25    Q.   Are you familiar with a man named Yi-Chi Shih?
```

```
 1    A.    I am.

 2    Q.    Would you take a look around the courtroom for a moment

 3    and see if you can identify him in this room.

 4    A.    I do.

 5    Q.    And would you describe something that he is wearing,

 6    please.

 7    A.    He is wearing a gray suit.

 8              MR. ROLLINS:  Okay.  Would the record reflect that

 9    the witness has identified the defendant.

10              THE COURT:  Yes.

11              Any objection?

12              MR. SPERTUS:  No objection.

13              THE COURT:  Yes, the witness has identified the

14    defendant.

15    BY MR. ROLLINS:

16    Q.    Agent Burke, would you please take a look at the item in

17    front of you marked Government's Exhibit 1.

18              Do you recognize that item?

19    A.    I do.

20    Q.    What is that?

21    A.    It's a Cree wafer.

22    Q.    And how do you know that?

23    A.    I know it because it's marked as such.  The production

24    number is a Cree production number.  The lot number of the

25    wafer ID number matched the numbers of a Cree wafer that I
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   received.

2   Q.   And who gave you that wafer?

3   A.   Ethan Huang.

4   Q.   And who is Ethan Huang?

5   A.   He is a professor in the engineering -- electrical

6   engineering department at UCLA.

7   Q.   So you did not receive that wafer during a search warrant?

8   A.   No.

9   Q.   Okay.  Just to be clear.

10          And is that in substantially the same condition that

11   when you received it from Mr. Huang?

12   A.   Yes.

13          MR. ROLLINS:  Your Honor, at this time the government

14   moves to admit Exhibit 1 into evidence.

15          THE COURT:  Any objection?

16          MR. SPERTUS:  No objection.

17          THE COURT:  To the extent that there are exhibits

18   that need to be admitted, as they're identified, to facilitate

19   the process, we should do that.  Otherwise, you may want to

20   wait and do them all at once.  We will consider that as we

21   proceed.

22          MR. ROLLINS:  Understood, Your Honor.

23   BY MR. ROLLINS:

24   Q.   Who is Ethan Huang?

25   A.   He is a professor in the electrical engineering department

1    at UCLA.

2    Q.    And what did Mr. Huang say to you about where he got that

3    wafer when you received it?

4    A.    He stated that he had received it from one of his graduate

5    students, who had received it from Yi-Chi Shih.

6    Q.    Thank you.

7            MR. ROLLINS:  Your Honor, with the Court's

8    permission, I would like to pass the wafer out to the jury.

9            THE COURT:  Any objection?

10           MR. SPERTUS:  Can we just use the Elmo, Your Honor?

11   Can we just use the Elmo so we can all see it?

12           THE COURT:  Is this -- is the exhibit different than

13   what's in the government's exhibit book?  Is it the physical?

14           MR. ROLLINS:  It is the physical, Your Honor.

15           THE COURT:  Can it be published with the camera?

16           MR. ROLLINS:  I suppose it could, Your Honor.  It's

17   just so -- the benefit of the jury seeing the size and shape of

18   these things.  If there is an objection, we don't have to do

19   that.

20           THE COURT:  All right.  Just a minute.

21           I think it should just be published.  I don't want to

22   have to stop each time we potentially have an exhibit to pass

23   it among the jurors.  If there is some specific reason why a

24   specific exhibit --

25           MR. ROLLINS:  It is actually only this exhibit, Your

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Honor, that we had planned for the entire trial to hand out.
 2              THE COURT:  Do you have any views on --
 3              MR. SPERTUS:  No objection.
 4              THE COURT:  All right.  You may pass the exhibit.
 5              MR. ROLLINS:  Thank you.  No further questions.
 6              THE COURT:  Just a moment.  Wait.  Let's let the jury
 7    finish examining the exhibit before you cross-examine.
 8              Thank you, Mr. V.
 9              Cross-examination, please, Mr. Spertus.
10                        CROSS-EXAMINATION
11    BY MR. SPERTUS:
12    Q.   Agent Burke, when were you first assigned to the
13    investigation that led you to recover the wafer you described
14    as Exhibit 1?
15    A.   I can't give you an exact date, but it was sometime in
16    late 2013 or early 2014, I believe.
17    Q.   And so were you assigned to the investigation for
18    approximately four years before you retired out of the FBI?
19    A.   No.  I retired in June of 2017, so it would have been less
20    than that.
21    Q.   Three years, approximately, ballpark?
22    A.   Ballpark, yes, it would be about that, I think.
23    Q.   How did you come to know that the wafer marked as
24    Exhibit 1 would be with Ethan Huang at UCLA?
25    A.   I don't think originally we did.  I think originally we
```

1   were speaking to Ethan Huang generally about his knowledge of

2   the defendant's activities in China.  And I think at some point

3   he volunteered that he had this.

4   Q.   He told you he was doing research with Dr. Shih, correct?

5   A.   I believe so, yes.

6   Q.   And the wafer was at UCLA for research purposes, correct?

7   A.   It was, yes.

8   Q.   Now, your investigation was not secret from Dr. Shih at

9   the time you recovered the wafer, was it?

10  A.   I assume -- I can't be certain what Dr. Shih knew and

11  didn't know, but I would assume that he would have been aware

12  of the investigation at that time.  We had spoken to a number

13  of his colleagues.

14  Q.   And speaking to the colleagues of someone you are

15  investigating as an FBI agent, you assume the colleagues will

16  tell the person you're investigating, right?

17  A.   It can happen, sure.  We ask them not to, obviously, but

18  it can happen.

19  Q.   When did your investigation -- you said you believe your

20  investigation began in 2013?

21  A.   Either late 2013 or early 2014.

22  Q.   And what caused your investigation to begin?

23       MR. ROLLINS:  Your Honor, I'm sorry.  I'm just going

24  to object that this is way beyond the scope of his direct exam.

25       THE COURT:  That's all right.  Overruled.

```
 1              Go ahead.
 2   BY MR. SPERTUS:
 3   Q.   In summary, what caused your investigation to begin?
 4   A.   The Los Angeles division of the FBI received information
 5   from headquarters regarding the potential loss of technology to
 6   China.  The information that was provided by our headquarters
 7   identified the defendant as a person who was a US person, an
 8   American, who was the president of a company in China that was
 9   being placed on the entity list.  I think that was the general
10   nature of the information received from our headquarters.
11   Q.   Did the FBI materials that you are describing reveal that
12   Dr. Shih had been removed as president of CGTC before it was
13   placed on the entity list?
14   A.   I don't believe it did, no.  I don't recall that, no.
15   Q.   Were you a case agent assigned to this case?
16   A.   I was, yes.
17   Q.   And what is a case agent?
18   A.   A case agent has principal responsibility for the
19   investigation of the violation.
20   Q.   And so the principal responsibility for the investigation
21   of this case resided with you when the case was first opened,
22   right?
23   A.   Initially, yes.  I had a co-case agent with another
24   agency, as well.
25   Q.   And as part of your investigation, did you think it was
```

1    important to determine whether or not Dr. Shih was president of

2    CGTC when CGTC was placed on the entity list?

3    A.    Not necessarily.  I'm sorry?

4    Q.    I --

5    A.    Okay.  Not necessarily.  We were conducting the

6    investigation based on information that had been acquired prior

7    to -- and, again, I don't recall the date that he was no longer

8    the president of CGTC.  We learned that some time later.  But

9    it was based on the information concerning the activities of

10   the defendant and CGTC and related companies during the period

11   that the information had been acquired.  It doesn't have to

12   be -- it didn't necessarily have to be an active --

13   Q.    Well, did you -- when you confirmed from Dr. Ethan Huang

14   that the wafer was the subject of research at UCLA, did you

15   tell anyone at the FBI that it was a research project?

16   A.    Well, this was one of multiple wafers.  We could not

17   account for what happened -- at that time, we could not account

18   for what had happened to the other wafers.

19          We had this wafer.  At that time, we weren't certain

20   whether it was export controlled or restricted.  We weren't

21   certain what happened to the other wafers.  So I'm not sure

22   what I would have told the FBI.

23   Q.    Well, just to unpack that answer a little bit, you didn't

24   know the performance of the wafer when you received it, right?

25   A.    Not at that time, no.

1    Q.    Which meant, by definition, that you didn't know whether

2    it fell within any ECCN under the export regulations, correct?

3    A.    Not at that time.

4    Q.    And you are aware from your training and experience that

5    the only way to determine whether a MMIC is subject to the

6    export laws is to test it, correct?

7    A.    Yes.

8    Q.    Correct?

9    A.    Correct.  I am not an engineer, but that's my

10   understanding.

11           THE COURT:  Mr. Burke, if you could talk a little

12   more slowly, it would be easier for the reporter.  Thank you.

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Thank you.

15   BY MR. SPERTUS:

16   Q.    But even an engineer couldn't tell how a MMIC performs

17   until they test it, right?

18   A.    That's my understanding, yes.  You can't tell by looking

19   at it.

20   Q.    Correct.  There's no way that, when you look at Exhibit 1,

21   you can tell whether it falls within the export regulations or

22   not, right?

23           MR. ROLLINS:  Objection, Your Honor.

24           THE WITNESS:  I certainly -- excuse me.

25           MR. ROLLINS:  That calls for speculation.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sustained.

 2   BY MR. SPERTUS:

 3   Q.   Well, your training and experience and investigation of

 4   this case, I believe I heard you just testify that you can't

 5   determine the output of a chip until you test it.

 6              MR. ROLLINS:  Same objection, Your Honor.

 7              THE COURT:  It's asked and answered.  Let's move on,

 8   please.

 9   BY MR. SPERTUS:

10   Q.   What did you do with the wafer after you recovered it from

11   UCLA?

12   A.   At that point, we would have started reaching out to our

13   headquarters, to private entities, to Cree, in an attempt to

14   get the wafer tested.

15   Q.   Why would you want the wafer tested?

16   A.   To determine if it was -- if it was export restricted.

17   Q.   And the test results would give you that answer?

18   A.   They should.

19   Q.   And how would the results of a test give you the answer on

20   your question about whether the wafer is export restricted?

21   A.   I'm not an engineer, but it would fall within -- I assume

22   it would fall within certain parameters that would qualify it

23   for different levels of export restriction and/or no

24   restrictions at all.

25   Q.   So when you just testified that the wafers were not all
```

1    accounted for, what did you mean by that?

2    A.    The Cree shipment -- we had received information that the

3    Cree shipment, there were a number of wafers in that shipment.

4    This was one of those wafers.  There were other wafers that we

5    did not have in our possession.

6    Q.    Where were they?

7    A.    At that time, we did not know.

8    Q.    During the time you were the case agent for this

9    investigation, did you ever determine where the wafers were?

10   A.    We had -- we collected quite a bit of evidence that

11   indicated that the wafers were in China.

12   Q.    Did you ever ask Dr. Shih?

13   A.    We did not, no.

14   Q.    Why not?

15   A.    Generally, we don't approach a defendant until we're

16   comfortable that we -- when we speak to a defendant, we want to

17   understand completely the nature of the offense and collect as

18   much evidence as we can so we can assess the defendant's

19   statements to us for their veracity.

20   Q.    And what happens if you assess them and conclude that they

21   lack veracity?

22   A.    We would -- I think we would attempt to collect additional

23   evidence that would establish that and can lead to charges.

24   And if the defendant has lied to you, it can lead to charges,

25   as well.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.    And you said you retired in 2017?

2    A.    I did.

3    Q.    So you never once interviewed Dr. Shih during the entire

4    three or so years that you were a case agent for this case?

5    A.    I did not.

6    Q.    Now, I believe during the time when you were the case

7    agent for this case, Kiet Mai was answering all of your

8    questions, correct?

9    A.    We did interview Kiet Mai a number of times, yes.

10            MR. ROLLINS:  Your Honor, I am going to object again

11    about the scope of this.

12            MR. SPERTUS:  Your Honor, he was the case agent.

13            THE COURT:  This should be confined and let's move

14    on.  Complete this question and then -- but let's just keep

15    moving, please, so you can keep your cross-examination focused

16    on the direct examination.

17            MR. SPERTUS:  Should we re-call him in my case, then?

18            THE COURT:  Well, no, I don't think that's necessary.

19    But I think we'd like -- I don't know the basis upon which

20    these questions are being posed or how many questions you have.

21    So let's just get the next question.

22            Read the question, please.

23        (The record was read.)

24    BY MR. SPERTUS:

25    Q.    Kiet Mai told you that he was informing Dr. Shih of his

1    interviews with you, right?

2              MR. ROLLINS:  Your Honor, that also calls for hearsay

3    and it's beyond the scope of this same direct.

4              MR. SPERTUS:  Your Honor, I can proffer the relevance

5    at sidebar or I can state it.

6              THE COURT:  What's the hearsay exception?

7              MR. SPERTUS:  It's for a non-hearsay purpose of

8    showing that Dr. Shih and Kiet had nothing to hide from the FBI

9    and cooperated and answered every question.

10             THE COURT:  I think you've already addressed that

11   with your prior question.  What's the next question, please?

12   BY MR. SPERTUS:

13   Q.   Okay.  Did you ever believe that the answers that Kiet Mai

14   was giving you was evasive in any manner?

15   A.   I believe early on, we had to conduct some clarification

16   with Kiet Mai concerning his answers.

17             But I wasn't involved in later interviews with Kiet

18   Mai, so I can't -- I don't really know the full timeline of

19   Kiet Mai's statements.

20             I was involved in some early interviews of Kiet Mai

21   where -- I would say probably three interviews of Kiet Mai.

22   Again, that's based on my memory.  I haven't gone back and

23   looked at the file.  So I believe there's maybe three

24   interviews of Kiet Mai, but I am sure Kiet Mai was talked to

25   extensively after my retirement.

1   Q.    Right.   And you requested information and e-mails from

2   Kiet Mai that he readily provided to you in response to your

3   request, correct?

4           MR. ROLLINS:  Your Honor, this is very far beyond the

5   scope of his direct exam.

6           THE COURT:  Let me talk to you briefly.

7       *(The following proceedings were held at sidebar.)*

8           THE COURT:  What's your estimated length of your

9   cross-examination?

10          MR. SPERTUS:  I'll call him in my case.

11          MR. ROLLINS:  No objection.

12          MR. SPERTUS:  Okay.  So what I'll do --

13          THE COURT:  I don't mind doing it all at once; I just

14  want to understand -- could you answer my question, please.

15          MR. SPERTUS:  I think 15 minutes max.  I did not know

16  he was the case agent, so -- it's 15 minutes.

17          THE COURT:  Why wouldn't it be more efficient for his

18  examination to be all at once?

19          MR. ROLLINS:  So if he does want to proceed beyond

20  the scope of his direct, we'd ask that he be instructed to

21  proceed in a nonleading fashion, which is --

22          THE COURT:  That's fine.

23          MR. ROLLINS:  -- under the rules.  And --

24          MR. SPERTUS:  I'll do that.

25          THE COURT:  That's fine.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. ROLLINS:  -- the other -- I would just point out,

2    Your Honor, that the only thing that he testified to on his

3    direct exam was the identification of the defendant and then

4    the introduction of the wafer, and we're now talking about Kiet

5    Mai, so --

6        THE COURT:  No, I understand, but if it's going into

7    the -- I think it would be more efficient, and I'll instruct

8    the jury on this, to have him appear once, not twice.

9        MR. ROLLINS:  I understand.

10       MR. SPERTUS:  My goal -- first of all, he is a

11   hostile witness, but I will ask -- I will try with.  Open

12   questions.  My goal is to show that Dr. Shih and Kiet Mai

13   weren't hiding anything.  That's all.

14       THE COURT:  You can ask him questions, but I'm going

15   to explain to the jury -- I'll explain.

16       MR. SPERTUS:  Okay.  Understood.  Thank you.

17       *(The following proceedings were held in open court.)*

18       THE COURT:  Ladies and gentlemen, as I've said to

19   you, the way a trial proceeds is that each side has an

20   opportunity to call witnesses.  The way this trial proceeds is

21   that the government will first call its witnesses and they can

22   be cross-examined, and at the conclusion of the government's

23   case, if the defense wishes to present witnesses at that time,

24   it may do so.

25       In this circumstance, this witness is one that the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    defense would like to call, so I'm going to -- in terms of

 2    efficiency and saving time for everyone, rather than have

 3    Mr. Burke appear twice, we are just going to have him appear

 4    once today.  And I'm going to permit, therefore, the defense,

 5    through Mr. Spertus, to ask questions of Mr. Burke that went

 6    beyond the government's questioning.  And, again, it's for

 7    efficiency.  And I appreciate counsel's collaboration on this

 8    because it will save us all time.

 9              Please proceed, Mr. Spertus, and consistent with what

10    we said about the form of the questions.

11              MR. SPERTUS:  Thank you, Your Honor.

12    BY MR. SPERTUS:

13    Q.   Will you please list, just by general category of your own

14    creation, what types of questions were you asking Kiet Mai when

15    you were doing your investigation?

16    A.   We would have asked him about his work on behalf of the

17    defendant and why he was in contact with Cree, what the nature

18    of that business relationship was, what the nature of the

19    companies that he established were, whether he was aware of

20    where the wafers were going.

21              We would have asked him some general questions about

22    his knowledge of export control.  Just basic initial standard

23    investigative questions.

24    Q.   And did Kiet Mai offer to discuss your questions with

25    Dr. Shih?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    I honestly don't recall.

2    Q.    Why didn't you ask Dr. Shih where the wafers were if that

3    was the focus of your investigation?

4    A.    As I said earlier, we want to be completely prepared when

5    we initially meet with the subject of the case.

6            And part of the process, too, in our organization is

7    to interview the subject of the case, you actually need

8    relatively high-level authority from our headquarters, and we

9    would have to justify to our headquarters that we've taken

10   every investigative step possible prior to conducting that

11   interview.

12           So we weren't in a position, at that point, to meet

13   those standards or to -- to be comfortable that we were

14   completely prepared for an interview of Yi-Chi Shih.

15   Q.    So based on the policies and procedures of the FBI, you

16   weren't allowed to ask Dr. Shih where the wafers were?

17   A.    No, not necessarily.  We made -- we could have asked our

18   headquarters for authority to conduct that interview, but based

19   on my experience, we wouldn't have gotten it at this point.

20           Additionally, we weren't comfortable, at that time,

21   that we knew everything that we needed to know prior to

22   conducting that interview.

23   Q.    Okay.  So, certainly, based on Kiet Mai's statements to

24   you and Dr. Huang's statements to you, you were aware that they

25   were conferring with Dr. Shih about your investigation, right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    I -- I don't remember Dr. Huang ever saying that to us,

2    and I believe we had directed both of those individuals to not

3    discuss it with the defendant.  But the timeline of that, I'd

4    have to look at the file, honestly.

5    Q.    All right.  But your testimony is you did not execute a

6    search warrant to recover Exhibit 1, the wafer, correct?

7    A.    No.

8    Q.    You just asked for it and they gave it to you.

9    A.    Yes.

10   Q.    And you made the investigative decision not to ask

11   Dr. Shih where the other three were, right?

12   A.    That's correct, yes.

13            MR. SPERTUS:  No further questions, Your Honor.

14            THE COURT:  Thank you.

15            MR. ROLLINS:  Just two questions, Your Honor.

16            THE COURT:  Redirect.

17            MR. ROLLINS:  Very briefly, Your Honor.

18            THE COURT:  Thank you.

19                       REDIRECT EXAMINATION

20   BY MR. ROLLINS:

21   Q.    Agent Burke, do you know if other agents from the FBI

22   later interviewed the defendant?

23   A.    Yes, they did.

24   Q.    And is part of the reason that the FBI doesn't interview

25   the target of an investigation the fear that that individual

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   might flee the country?

 2   A.   That is one of the possibilities.

 3            MR. ROLLINS:  No further questions, Your Honor.

 4            MR. SPERTUS:  One question, Your Honor.

 5                      RECROSS-EXAMINATION

 6   BY MR. SPERTUS:

 7   Q.   Kiet Mai was a target of your investigation when you

 8   interviewed him, correct?

 9   A.   He was one of the target -- one of multiple targets, yes.

10   He wasn't the main -- what we would consider the main subject

11   of the investigation.  He wasn't the named subject of our

12   investigation.

13   Q.   But he was a target?

14   A.   We don't use the term "target," really.  He was not the

15   main subject of our investigation.

16            MR. SPERTUS:  No further questions, Your Honor.

17            THE COURT:  Anything further?  Any further questions?

18            MR. ROLLINS:  No, Your Honor.

19            THE COURT:  Mr. Burke, thank you for your testimony.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  You are excused.

22            Would the government call the next witness, please.

23            MR. SHOBAKI:  Yes, Your Honor.  The United States

24   calls Joseph Jun.

25            THE CLERK:  Can you please step forward.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Can you please raise your right hand.

 2              Do you solemnly swear that the testimony you're about

 3   to give in the cause now before this Court shall be the truth,

 4   the whole truth, and nothing but the truth, so help you God?

 5              THE WITNESS:  Yes.

 6              THE CLERK:  You may be seated.

 7              THE WITNESS:  Thank you.

 8              THE CLERK:  Can you state your full name and spell it

 9   for the record.

10              THE WITNESS:  Sure.  My full name is Joseph,

11   J-o-s-e-p-h, Jun, J-U-N.

12              THE COURT:  Good afternoon, Mr. Jun.

13              THE WITNESS:  Good afternoon, sir.

14              THE COURT:  Please proceed, Mr. Shobaki.

15                        JOSEPH JUN,

16                 having been first duly sworn,

17                    testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. SHOBAKI:

20   Q.   Good afternoon, Mr. Jun.

21              Where do you work?

22   A.   I currently work for the Irvine Police Department, but I'm

23   assigned to the Orange County Regional Computer Forensics Lab.

24   Q.   And what's your position there?

25   A.   I am a forensic examiner.
```

1   Q.   And what's your position with the Irvine Police

2   Department?

3   A.   I am a detective with the Irvine Police Department.

4   Q.   How long have you been a computer forensics examiner?

5   A.   It's been approximately five years.

6   Q.   And can you just briefly explain for the jury what a

7   computer forensics examiner does.

8   A.   Sure.  So computer forensic examiners analyze/process

9   digital devices.  Those are typically computers, laptops, cell

10  phones, smart phones.  All of these digital devices we process

11  for different agencies, different investigators.

12           So at that point, we typically -- getting into

13  what -- specifically, some of the things we do is we image

14  these devices or copy these devices, and we work off of these

15  copies and ultimately analyze the data that we've copied.

16  Q.   And approximately how many examinations of digital devices

17  have you conducted?

18  A.   Approximately -- it's in the hundreds.

19  Q.   And have you received training as a computer forensics

20  examiner?

21  A.   Yes.  I am certified by the FBI as a computer forensic

22  examiner, which included approximately three hours of just FBI

23  certification to be called a forensic examiner and then

24  advanced training, as well.

25  Q.   And have you had extensive professional training over the

1  last few years as a forensic examiner?

2  A.   Yes, I have.

3  Q.   Are you a member of any professional organizations in

4  connection with your work as a computer forensics examiner?

5  A.   Yes.  I am part of the High Technology Criminal

6  Investigations Association.

7  Q.   And what kinds of devices do you conduct -- well, I'm

8  sorry, you actually answered this already.

9       But in this case, what kinds of devices did you

10  conduct computer forensics examinations on?

11  A.   In this case, I examined, basically, personal computers,

12  tower computers and laptops, and hard drives, as well.

13  Q.   Can you describe, generally, the process that you use for

14  conducting a computer forensics examination?

15  A.   Sure.  I can explain it where -- say I am looking at a

16  laptop.  Typically, what we do with a laptop is we take

17  photographs, identify the laptop, and then we open up the

18  laptop and take the hard drive out of the laptop.

19       Based on the data that's contained on that hard

20  drive, we typically use our forensic software to copy -- make

21  an exact copy of that hard drive.

22       Once we have that copy, that copy is authenticated by

23  a system called hashing.  So, basically, it's a digital

24  fingerprint, so we make sure that what we've copied is the

25  exact same as what -- the original hard drive we copied from.

1        And then from then on, we go ahead and analyze and

2   process the data off of that copy.  So we're only touching the

3   original evidence once.

4   Q.   So what software tools or hardware tools do you use to

5   make those copies?

6   A.   So we use hardware tools such as write blockers so that

7   when we do make copies, it's only one way.  It's kind of like

8   a -- how would we describe? -- a one-way mask maybe on a CPR.

9   So you can only blow in and it can't come out.  So, basically,

10  it protects the data from corrupting.

11       I'm sorry.  I forgot the full question again.

12  Q.   Well, you answered the hardware.  I was also asking --

13  A.   Oh, software.

14       There are miscellaneous forensic tools --

15       THE COURT:  One second, please.

16       Would you restate the question.

17       MR. SHOBAKI:  Yes, Your Honor.

18  BY MR. SHOBAKI:

19  Q.   What software did you use -- do you use for conducting

20  computer forensics examinations?

21  A.   There are multiple softwares, but in this particular case,

22  we used a software called FTK Imager, which images and copies

23  hard drive data, as well as a computer software called

24  AccessData Lab, which ultimately processes all of those copies

25  of hard drives and data.

1    Q.   Now, you mentioned making a copy of each digital device as

2    part of your examination.

3            Is that an exact copy?

4    A.   It is an exact copy.

5    Q.   And how do you confirm that it's an exact copy?

6    A.   So when we initially make that copy, there is a system

7    called hashing.  And we use -- it's a mathematical algorithm

8    that lays out a string of numbers that has gone through every

9    single piece of information on that original hard drive and

10   identifies it with that number and letters.

11           The software ultimately -- as it's copying, it does a

12   verification of that data, and we match up those -- it's called

13   MD5 -- those numbers so they are exactly the same.  And that's

14   how we identify that as a digital fingerprint match.

15   Q.   So on the copy of a digital device that you make, would

16   the hash values be the same as they were on the original?

17   A.   Yes, they would.

18   Q.   And what if the hash value was different?

19   A.   Then we would -- if the hash value is different we would

20   have to triage what happened during that process, because then

21   it would not be an exact match.

22   Q.   And in your work on this case duplicating digital devices,

23   did the hashes from the originals and the copies all match?

24   A.   Yes, they did.

25   Q.   And can you also do that same kind of hashing thing for an

1    entire device-by-device basis?

2    A.    Yes, we can.

3    Q.    Now, after that forensic image of a device is made, what

4    do you do with the original?

5    A.    The original goes back -- typically, back into the

6    container or bag that it was taken out from.  And my process

7    that I typically do is check it back into evidence.

8    Q.    And did you check back all of the originals into evidence

9    for this case?

10   A.    Yes, I did.

11   Q.    Now, after you've created an image and determined hash

12   values, how is the device further examined?

13   A.    So those images or those copies that we -- that are

14   created are ultimately brought into a forensic software for

15   processing.

16          That data is ultimately processed using a forensic

17   tool which identifies and lays out what is on that drive.

18          Typically, if we think of a Windows computer, it

19   shows what the file systems are; it shows you the different

20   users identified in the folders and different files that are

21   contained on the actual hard drive.

22   Q.    And are those files then -- in the course of your work,

23   normally, how do you select which files to take off the

24   computer?

25   A.    So because we've copied it, made an exact copy of that

1  hard drive, we've taken all of the files out of that hard

2  drive.

3          So, basically, whatever has been on that hard drive,

4  we have a copy of.  And that software ultimately analyzes that

5  and makes it viewable for our investigators.

6  Q.  And so in terms of this investigation, after you made

7  these forensic copies and loaded up the files into the

8  software, did you pick which files to -- did you -- what did

9  you do next?

10 A.  So at that point, the files are identified by this

11 software, such as documents or photos or videos.  Those files

12 are all identified, and the software is then -- well, the

13 investigator comes in and views the actual files.

14 Q.  So that would be investigating agents?

15 A.  Correct.

16 Q.  And they can view the files that existed on each digital

17 device that way?

18 A.  Correct.

19 Q.  And then is there some way for them to indicate which

20 files are of interest?

21 A.  Yes.  There is a way in the software to what we call

22 bookmark or tag specific files that are relevant to an

23 investigation.

24 Q.  And once the bookmarking or tagging has been completed,

25 what do you do?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   So after an investigation or review -- what we call a

2   review is done, I go ahead and generate a report based upon

3   those items that were tagged or bookmarked.

4   Q.   And what does that report contain?

5   A.   So that report contains the file, as well as where that

6   file was on that hard drive or on that file system.

7   Q.   And is there a common term for that location?

8   A.   Yes.  Typically, we would call that -- where the file

9   resides as a file path.  So it leads to the path of where that

10  file is in a folder and, ultimately, on that hard drive.

11  Q.   So this report, is that generated out of the software

12  where the files have been loaded from the image?

13  A.   Yes, they are.

14  Q.   And is there any additional checking you do when

15  generating that report to make sure the files are still the

16  same?

17  A.   Yes.  So I -- once that report is generated, I cross-check

18  to make sure that those files that were exported are still

19  matching the original where the software is, where the

20  bookmarks are contained on that software.

21  Q.   So what process is used to do that?

22  A.   I manually do that.

23  Q.   And is there also hashing used at that point?

24  A.   The hashing is done after the case is -- after the

25  reporting is done, then we hash the image or we fingerprint

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    that image to make sure that nothing has changed during that

 2    review or during that process.

 3    Q.    So what does that mean with respect to the files that are

 4    contained in your report?

 5    A.    That they are still the same files that originally were

 6    copied.

 7    Q.    And does that mean they are the same as the files that

 8    were on the original device?

 9    A.    Yes, they -- yes, it does.

10    Q.    Now, were you asked to perform a forensic examination of

11    digital devices in connection with this case?

12    A.    Yes, I was.

13    Q.    And do you use codes or numbers or some way of naming

14    devices?

15    A.    Yes.

16    Q.    And how does that work?

17    A.    So every device that comes into our laboratory gets an

18    identifying sticker, as we call a bar code, and that bar code

19    is referenced for that specific digital device.

20    Q.    And what's the format of those numbers?

21    A.    It's "ORC" and then a six-digit number.

22    Q.    And in connection with this case, did you perform a

23    forensic analysis on a number of devices?

24    A.    Yes, I did.

25    Q.    Specifically, did you conduct a forensic examination of a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   device with the number ORC028239?

2   A.   Yes, I did.

3   Q.   And ORC028240?

4   A.   Yes.

5   Q.   And ORC028241?

6   A.   Yes.

7   Q.   ORC028242?

8   A.   Yes.

9   Q.   ORC028246?

10   A.   Yes.

11   Q.   ORC028247?

12   A.   Yes.

13   Q.   ORC028248?

14   A.   Yes.

15   Q.   ORC028250?

16   A.   Yes.

17   Q.   And ORC028251?

18   A.   Yes.

19   Q.   And that's a total of nine devices?

20   A.   Correct.

21   Q.   And for each of the nine digital devices that you just

22   identified, did you take the same steps we just discussed to

23   create a forensic image?

24   A.   Yes, I did.

25   Q.   And did you check the hash values on each image to make

1   sure that they were the same as the original?

2   A.    Yes, I did.

3   Q.    And with respect to the examination of the files using the

4   software tools, was that done in the same manner?

5   A.    Yes, it was.

6   Q.    And did you generate reports for each of those nine

7   devices?

8   A.    Yes, I did.

9   Q.    And for each of those reports, did you match the hash

10  values for the files seized against the originals?

11  A.    Yes.

12  Q.    So do you have an opinion as to whether the files you

13  seized for each of those nine devices were the same as those on

14  the original devices?

15  A.    Yes.  They were the same.

16  Q.    And for each of those, you mentioned generating your

17  report with file paths.

18          Did you do that, too?

19  A.    Yes, I did.

20  Q.    Okay.  And can you -- would you say that there were

21  thousands of files seized off these devices or --

22  A.    Yes, there were thousands of files.

23  Q.    Okay.  And can you please take a look, in the binder over

24  to your left, at Exhibit 2790.

25  A.    Can you repeat that number?

1    Q.    2790.

2            THE COURT:  Exhibit 2790 will be marked for

3    identification consistent with the exhibit list.

4        *(Exhibit 2790 marked for identification.)*

5            THE COURT:  Did counsel stipulate that all exhibits

6    will be marked for identification consistent with the exhibit

7    lists?

8            MR. SHOBAKI:  Yes, Your Honor.

9            MR. SPERTUS:  Yes, Your Honor.

10            THE COURT:  Thank you.

11            THE WITNESS:  Yes, I have it.

12   BY MR. SHOBAKI:

13   Q.    And do you recognize that?

14   A.    Yes, I do.

15   Q.    And what is that?

16   A.    This is a copy of the software report that I generated

17   that shows file paths of files that were bookmarked or tagged.

18   Q.    And is this for one of the nine devices on which you

19   conducted forensic analysis that we just talked about?

20   A.    Yes, it is.

21   Q.    And which device is that?

22   A.    It is ORC028250.

23   Q.    And what does this -- what does Exhibit 2790 show?

24   A.    It shows the file path -- I'm sorry.  Are you asking for

25   what kind of device it was or what this paper shows?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q.   No, what -- just what does the exhibit show in terms of

2   the piece of paper in front of you.

3   A.   It shows file paths of different files that were

4   bookmarked and where they were located on this particular

5   device.

6        MR. SHOBAKI:  Your Honor, I move to admit

7   Exhibit 2790.

8        THE COURT:  Any objection?

9        MR. SPERTUS:  No objection.

10       THE COURT:  All right.  It's admitted.

11       *(Exhibit 2790 admitted into evidence.)*

12       MR. SHOBAKI:  Permission to publish, Your Honor.

13       THE COURT:  You may publish.

14       What page are you publishing?

15       MR. SHOBAKI:  I am publishing the first page,

16   Your Honor.

17       THE COURT:  Bates page -22553?

18       MR. SHOBAKI:  Yes, Your Honor.

19   BY MR. SHOBAKI:

20   Q.   Detective Jun, can you just briefly explain what you see

21   in this -- what this document shows.

22   A.   Sure.  If you look at the top where it says "File Category

23   Documents," right under that is the identifying device number

24   or bar code that we use, ORC028250, which is named an "ASUS

25   tower."  So that's an ASUS computer tower.

```
 1              If you go down, this is, basically, what is contained
 2    in the recycle bin, and this shows the path of where that is on
 3    that hard drive.  And it's in a Partition 2.
 4    Q.   And without going through the rest of the document,
 5    does -- this document shows the results of one of your forensic
 6    examination, and the files that you pulled off this computer,
 7    right?
 8    A.   Yes, it does.
 9    Q.   And the way that they existed on that computer?
10    A.   Yes.
11    Q.   Now, these forensic reports you created with respect to
12    the nine digital devices, were those sizable?
13    A.   Yes, they were.
14    Q.   And did they contain -- would you say they contain, like,
15    a large amount of information?
16    A.   Yes, they did.
17    Q.   And can you please take a look at Exhibit 1645.
18    A.   Yes.  I have it here.
19    Q.   Have you reviewed that document before?
20    A.   Yes.
21    Q.   And what is it?
22    A.   These are file paths that ultimately identify where those
23    files are on each particular device that notates on this page.
24    Q.   So are these file paths listed in Exhibit 1645 a fair
25    summary of the locations of files seized from the nine digital
```

1   devices as reflected in your forensic reports?

2   A.   Yes, they are.

3   Q.   So just looking through this really quickly, can you look

4   through and identify the page on which each of the various

5   devices is listed?

6   A.   Sure.  So on the very first page is a Toshiba laptop,

7   identified as our bar code as ORC028239.

8          The next page is a -- I believe it's a Western

9   Digital hard drive called FreeAgent -- I'm sorry, it's a

10  Seagate.  That's identified as ORC028240.

11         The third page is a Kingston thumb drive, and that is

12  identified as ORC028241.

13         The following page is another thumb drive.  That's

14  generic, and that is identified as ORC028242.

15         Moving forward, there's a Sony, a Vaio.  That's a

16  tower computer.  That is identified as ORC028246.

17         And the next, _7, would be a Dell Inspiron tower,

18  which is identified with our bar code as ORC028247.

19         And then _8 would be a Compaq tower computer,

20  identified as ORC028248.

21         And then _10 would be an ASUS Ultra tower computer,

22  which would be ORC028250.

23         And that continues until -- the very last page is

24  _11, which is ORC028251, which identifies it as an Iomega hard

25  drive.

1   Q.   And, again, the file paths listed on each of those pages

2   for those devices, are those consistent with the file paths

3   contained in your FTK reports?

4   A.   Yes, they are.

5            MR. SHOBAKI:  Your Honor, move to admit Exhibit 1645

6   as a summary of voluminous records.

7            THE COURT:  Any objection?

8            MR. SPERTUS:  No objection, Your Honor.

9            THE COURT:  It's admitted.

10      (Exhibit 1645 admitted into evidence.)

11           MR. SHOBAKI:  I have no further questions,

12   Your Honor.

13           THE COURT:  Okay.  Cross-examination.

14           MR. SPERTUS:  No cross-examination, Your Honor.

15           THE COURT:  Mr. Jun, thank you for your testimony.

16   You are excused.

17           THE WITNESS:  Thank you.

18           THE COURT:  We're going to break.  Well, you --

19           MR. SHOBAKI:  Your Honor, we have a very short

20   witness.

21           THE COURT:  That's fine.

22           MR. SHOBAKI:  Should we approach or --

23           Bring him in.

24           Your Honor, the United States would call Thomas

25   Andrukonis.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  What's your time estimate on your direct?

 2              MR. SHOBAKI:  Five minutes.

 3              THE COURT:  Do you know whether -- all right.

 4              All right.  We'll start the witness, but we have a

 5    graduation.

 6              MR. SPERTUS:  Can we have a quick sidebar on this

 7    witness?

 8         (The following proceedings were held at sidebar.)

 9              MR. SPERTUS:  The --

10              THE COURT:  Keep your voice up, because the --

11              MR. SPERTUS:  Okay.  I'm sorry.  So --

12              THE COURT:  And say your name so that the reporter

13    knows who's talking.

14              MR. SPERTUS:  I'm sorry.  James Spertus.

15              We just have a Rule 16 objection.  This was a report

16    prepared two years ago that was produced very recently, and --

17              Oh, I'm sorry.  Mr. Hanusz.

18              MR. HANUSZ:  Mr. Andrukonis wrote a report in 2018

19    which was disclosed to the defense about a week ago, which was

20    after the Court's standing -- the standing order, the discovery

21    cutoff.  He was not on the government's initial witness list.

22              MR. SHOBAKI:  Your Honor, may I be heard briefly?

23              This is Khal Shobaki for the United States.

24              The letters that he wrote are actually just

25    certifications of no record.  They were written in 2018.  They
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   were produced, depending on when you construe the Court's trial

2   date as the original trial date or this trial date, within or

3   without the time period.  I don't disagree.

4          However, those documents need not even be admitted.

5   I was going to seek to admit them, Your Honor, but I can also

6   just elicit the testimony from him as the person who conducted

7   those searches, which is not subject to any -- and it's not

8   expert testimony.  He's just a person who works for BIS.

9          THE COURT:  All right.  Well -- excuse me.  Go ahead.

10         MR. HANUSZ:  No.

11         THE COURT:  See, to the extent that the testimony is

12   to provide the foundational basis for an exhibit you wish to --

13         MR. SHOBAKI:  It is not.

14         THE COURT:  It is not.  So you wish to elicit

15   testimony from him about what he did?

16         MR. SHOBAKI:  About what he -- things that --

17   searches he did, and establish that he did a search and he

18   found no license, for example.

19         MR. HANUSZ:  This search was done.  The report was

20   prepared on November 16, 2018.  It was not disclosed to the

21   defense.  We had no knowledge of who this person was until

22   about a week ago, Your Honor.

23         THE COURT:  What about that?

24         MR. SHOBAKI:  I think it was more than a week ago

25   that they knew who he was.  They got the report.

1        THE COURT:  All right.  At this point, we're -- we

2   have a -- what is it you're going to elicit on the direct exam?

3        MR. SHOBAKI:  The direct exam is going to be that he

4   works for the Bureau of Industry Security, that he was asked to

5   conduct searches for a variety of entities and individuals as

6   to whether they had any export licenses, and that he conducted

7   that search and there were no such licenses.

8        And that does not need the document to come in.  He

9   is a person who can testify about that.

10       THE COURT:  I think you can effectively cross-examine

11  him on this, because it's about whether a license exists.  Is

12  that really a disputed point?

13       MR. HANUSZ:  I don't think -- no, Your Honor, it's

14  not a disputed point.  So it was a report -- the report comes

15  in and massive discovery done -- I'm sorry, this is John

16  Hanusz -- and massive discovery done.  He is not on the

17  government's witness list.

18       I understand the Court's point and certainly accept

19  the Court's ruling, but it's emblematic of what's been going on

20  in this case.

21       THE COURT:  Well, I'm not getting into the details --

22       MR. HANUSZ:  Understood.

23       THE COURT:  -- I'm just saying it sounds like the

24  testimony is limited to whether there was a license.  It's a

25  point on which you might even stipulate.  I don't know.

```
1              MR. SHOBAKI:  It's very limited testimony,

2    Your Honor, and that's why I said he's a few minutes, from D.C.

3              THE COURT:  Okay.

4              MR. SPERTUS:  Testimony without an exhibit is fine.

5              THE COURT:  Right.  Okay.  Thank you.

6              MR. SHOBAKI:  Thank you.

7              MR. HANUSZ:  Thank you, Your Honor.

8              THE COURT:  Be mindful of this, please.  We have a

9    juror who wants to get to a family graduation, so please be

10   efficient.

11             MR. HANUSZ:  Thank you.

12             MR. SHOBAKI:  Thank you, Your Honor.

13        (The following proceedings were held in open court.)

14             THE COURT:  All right.  Would you come forward,

15   please, sir.

16             THE CLERK:  Please raise your right hand.

17             Do you solemnly swear that the testimony you're about

18   to give in the cause now before this Court shall be the truth,

19   the whole truth, and nothing but the truth, so help you God?

20             THE WITNESS:  I do.

21             THE CLERK:  Please have a seat.

22             Can you please state your full name and spell it for

23   the record.

24             THE WITNESS:  Sure.  Thomas Walter Andrukonis,

25   T-h-o-m-a-s, W-a-l-t-e-r, A-n-d-r-u-k-o-n-i-s.
```

```
 1              THE COURT:  All right.  Good afternoon,
 2   Mr. Andrukonis.
 3              Please proceed, Mr. Shobaki.
 4                   THOMAS ANDRUKONIS,
 5              having been first duly sworn,
 6                   testified as follows:
 7                   DIRECT EXAMINATION
 8   BY MR. SHOBAKI:
 9   Q.   Good afternoon.  Where do you work?
10   A.   The Department of Commerce, Bureau of Industry and
11   Security.
12   Q.   How long have you worked there?
13   A.   A little over 39 years.
14   Q.   And what's your current job?
15   A.   I'm the director of the Export Management and Compliance
16   Division.
17   Q.   Can you very briefly for the jury explain your job duties.
18   A.   Yeah.  I am responsible for a variety of compliance and
19   licensing activities to support the Bureau of Industry and
20   Security.
21   Q.   Are you involved with the recordkeeping for export
22   licenses?
23   A.   Yes, I am.
24   Q.   And do you conduct searches for licenses as part of that
25   job?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A.    Yes.

2    Q.    And does that include providing certified license

3    histories related to export licenses?

4    A.    Yes, it does.

5    Q.    Now, does BIS -- I'm sorry.  Are you familiar with the

6    acronym BIS?

7    A.    Yes.  Bureau of Industry and Security, yes.

8    Q.    So does the BIS keep records of export license histories

9    for individuals and entities?

10   A.    Yes.

11   Q.    And are those records that are regularly made and

12   preserved as part of the business of BIS?

13   A.    That is correct.

14   Q.    And what form do those records take?

15   A.    They are kept in an electronic format.

16   Q.    Is that like a database?

17   A.    That is correct, a database.

18   Q.    And who maintains that database?

19   A.    Well, our office, as well with our Office of Chief

20   Information Officer.

21   Q.    And what kind of information does BIS keep in the export

22   license database?

23   A.    Pretty much everything.  Every action the applicant

24   submits to the Bureau of Industry and Security, as well as all

25   of the actions by internal licensing officers and others that

1  would have a recommendation on that, other agencies, as well as

2  the Commerce Department.

3  Q.   And so would that include whether a person or entity

4  applied for an export license?

5  A.   Absolutely, yes.

6  Q.   And how far back does that database go?

7  A.   Actively, back to 1997 for active access.  We can go back

8  further than that into an archive record, but active, 1997.

9  Q.   And does the BIS and the United States Government rely on

10 that database in the ordinary course of enforcing export

11 control laws?

12 A.   Yes, it does.

13 Q.   Now, in connection with this case, did you conduct

14 searches for license histories for individuals and entities?

15 A.   Yes.

16 Q.   And were you personally involved with that?

17 A.   An individual directly in my supervision conducted the

18 search, but I also reviewed all of their work and redid the

19 search myself.

20 Q.   And did you report the results of those searches in

21 certified license history letters?

22 A.   That is correct, yes.

23 Q.   Now, to your knowledge, did defendant Yi-Chi Shih have any

24 record of applying for or receiving an export license from BIS?

25 A.   No records at all.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Now, did any of the following people have a record of
 2   applying for or receiving an export license to export Cree
 3   wafers or Monolithic Microwave Integrated Circuit amplifiers
 4   from the United States to China?  I'll read you a list.
 5            Yi-Chi Shih?
 6   A.   No.
 7   Q.   Kiet Anh Mai?
 8   A.   No.
 9   Q.   Jeiru Deng?
10   A.   No.
11   Q.   Yaping Chen?
12   A.   No.
13   Q.   Fei Yeh?
14   A.   No.
15   Q.   Ye Yaun?
16   A.   No.
17   Q.   Now, did you also search for entities, in addition to
18   individuals?
19   A.   Yes, I did.
20   Q.   Now, did any of the entities that you searched for have a
21   record of applying for or receiving an export license to export
22   Cree wafers or Monolithic Microwave Integrated amplifiers from
23   the United States to China?
24   A.   Not to receive a license, no.
25   Q.   So if I give you some names of entities, can you confirm
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that you searched for those entities and found no such record?

2    A.    Yes.

3    Q.    China Electronics Technology Group Corp. 29 Research

4    Institute aka Chengdu SIWEI Electronics Company or CETC 29?

5    A.    That entity did not receive any license.

6    Q.    And we're specifically talking about licenses --

7              THE COURT:  Would you slow down and would you make

8    sure to provide these names to the reporter.

9              MR. SHOBAKI:  Absolutely, Your Honor.

10             THE COURT:  Thank you.

11   BY MR. SHOBAKI:

12   Q.    Now, we're speaking specifically with respect to --

13             THE COURT:  And slow down, please.

14   BY MR. SHOBAKI:

15   Q.    We're speaking specifically with respect to an export

16   license or application to export Cree wafers or Monolithic

17   Microwave Integrated Circuits here, right?

18   A.    That is correct.

19   Q.    Okay.  Again, Chengdu Gastone Technology Company?

20   A.    No.

21   Q.    Tian Hang Yang Pu Technology Investment Limited?

22   A.    No.

23   Q.    Chengdu Dingtian Micro-Electronics Company?

24   A.    No.

25   Q.    Chengdu Jiashi Technology Company?

```
 1    A.    No.

 2    Q.    Qiang'an International Trading Company?

 3    A.    No.

 4    Q.    Chengdu RML Technology Company aka China Southwest

 5    Electronic Equipment Research Institute aka 29 Institute?

 6    A.    No.

 7    Q.    Chengdu Ganide Technology Company aka Chengdu Jiana Haiwei

 8    S&T Technology?

 9    A.    No.

10    Q.    Pullman Lane Productions, LLC?

11    A.    No.

12    Q.    JYS Technologies, Inc?

13    A.    No.

14    Q.    MicroEx Engineering aka L2Kontemporary?

15    A.    No.

16          MR. SHOBAKI:  Thank you.  No further questions.

17          THE COURT:  Cross-examination?

18          MR. SPERTUS:  Just a few, Your Honor.

19          THE COURT:  Please proceed.

20                    CROSS-EXAMINATION

21    BY MR. SPERTUS:

22    Q.    So you did a search and confirmed that no license was

23    issued to any of the individuals or entities listed by the

24    prosecutor, correct?

25    A.    Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q.   But you are offering no opinion one way or the other about

2    whether any license for anything was ever required for anything

3    those individuals or entities ever did, right?

4    A.   Can you restate the question?

5    Q.   You don't -- you're just confirming no license.

6    A.   That's correct.

7    Q.   That's all you're doing.

8    A.   Yes, sir.

9    Q.   You're not speaking to the issue of whether a license was

10   ever required for anything.

11   A.   That's correct.

12          MR. SPERTUS:  No further questions.

13          THE COURT:  Any redirect?

14          MR. SHOBAKI:  No, Your Honor.

15          THE COURT:  Mr. Andrukonis, thank you for your

16   testimony.  You are excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  Ladies and gentlemen, we are going to

19   stop here as promised so the graduation can be -- you can get

20   to the graduation in time.

21          Enjoy the graduation.

22          We're going to start tomorrow -- we're going to -- is

23   there anyone who has a problem getting here by 8:30 tomorrow?

24   No?  Good.  We will plan to start at 8:30, so if you can get

25   here somewhat prior to 8:30, it would be helpful.  And have a

```
 1   nice evening.

 2            As I have said each time, do not discuss the case

 3   with anyone or do any research about the case during the break.

 4            In terms of tomorrow, we will probably take two short

 5   breaks and then try to conclude by about 2:30.  We could go a

 6   little later than that if we're in the middle of a witness, but

 7   that would be the plan for tomorrow.

 8            Does that present any timing issues to any of you?

 9   No.  Okay.  Have a nice evening.

10            Thank you again for your help today.

11            THE CLERK:  All rise.

12       (Jury out at 3:19 p.m.)

13       (The following was heard outside the presence of the

14       jury.)

15            THE COURT:  All right.  Please be seated.

16            Any issues that you want to -- anything we need to

17   discuss?

18            MR. SPERTUS:  If we can just have confirmation of the

19   witnesses for tomorrow.

20            MR. SHOBAKI:  Your Honor, I sent them last night, but

21   they are going to be Nordquist and Monroy.

22            And then --

23       (Counsel confer off the record.)

24            MR. SHOBAKI:  I'm sorry, Your Honor.

25            -- and Jamaal Westby, time allowing, although from
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    speaking with Mr. Spertus yesterday, it sounds like he is going

2    to have a lot of cross, so we may not get to Mr. Westby.

3            MR. SPERTUS:  And, Your Honor, just to advise the

4    Court, Mr. Monroy will be an extensive cross.

5            THE COURT:  That's fine.

6            MR. SPERTUS:  Thank you.

7        *(The Court and clerk confer off the record.).*

8            THE COURT:  All right.  If you want to leave your

9    materials on the desk, you may do that.  We don't have any

10   other hearings between now and when you're back.  If you prefer

11   to take them with you, you may.  If you prefer to put them in

12   one of the attorney rooms, you may do that.  Thank you.

13           MR. SPERTUS:  Thank you, Your Honor.

14           MR. HANUSZ:  Thank you, Your Honor.

15           MR. SHOBAKI:  Thank you, Your Honor.

16       *(Evening recess taken 3:20 p.m.)*

17                        --oOo--

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1

2

3                          CERTIFICATE

4

5        I hereby certify that pursuant to Section 753,

6   Title 28, United States Code, the foregoing is a true and

7   correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12  Date: JUNE 5, 2019

13

14

15

16

17            /s/   Cindy L. Nirenberg, CSR No. 5059

18                          Official Court Reporter

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA