UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

```
USA,                               )
                                   )
               PLAINTIFF,          )
                                   )
VS.                                ) CR18-00050-JAK
                                   )
SHIH, ET AL.,                      )
               DEFENDANTS.         )
_____)
```

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY 4, VOLUME 1 OF 2**

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 21, 2019; 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF:        MELANIE ANN HANSON SARTORIS
                      AUSA - OFFICE OF US ATTORNEY
                      UNITED STATES DISTRICT COURTHOUSE
                      312 NORTH SPRING STREET
                      12TH FLOOR
                      LOS ANGELES, CA 90012


                      JUDITH A. HEINZ
                      AUSA - OFFICE OF US ATTORNEY
                      CRIMINAL DIVISION - US COURTHOUSE
                      312 NORTH SPRING STREET
                      15TH FLOOR
                      LOS ANGELES, CA 90012-4700


                      KHALDOUN SHOBAKI
                      AUSA - OFFICE OF US ATTORNEY
                      CYBER AND INTELLECTUAL
                      PROPERTY CRIMES SECTION
                      312 NORTH SPRING STREET
                      SUITE 1500
                      LOS ANGELES, CA 90012


                      JAMES C. HUGHES
                      AUSA - OFFICE OF US ATTORNEY
                      TAX DIVISION
                      300 NORTH LOS ANGELES STREET
                      ROOM 7211
                      LOS ANGELES, CA 90012


                      WILLIAM ROLLINS
                      AUSA - OFFICE OF US ATTORNEY
                      GENERAL CRIMES SECTION
                      312 NORTH SPRING STREET
                      SUITE 1200
                      LOS ANGELES, CA 90012

**APPEARANCES  (CONTINUED)**

FOR DEFENDANT SHIH:

JAMES W. SPERTUS
SPERTUS LANDES AND UMHOFER LLP
1990 SOUTH BUNDY DRIVE
SUITE 705
LOS ANGELES, CA 90025


JOHN HANUSZ
SPERTUS LANDES AND UMHOFER LLP
1990 SOUTH BUNDY DRIVE
SUITE 705
LOS ANGELES, CA 90025


CHRISTA L. WASSERMAN
SPERTUS LANDES AND UMHOFER LLP
1990 SOUTH BUNDY DRIVE
SUITE 705
LOS ANGELES, CA 90025

# I N D E X

**PAGE**

**CARLOS MONROY**

REDIRECT EXAMINATION BY MR. SHOBAKI............... 11


**ERIN ROBINSON**

DIRECT EXAMINATION BY MS. SARTORIS................ 13

CROSS-EXAMINATION BY MS. WASSERMAN................ 40


**JAMAAL JEREMY WESTBY**

DIRECT EXAMINATION BY MR. ROLLINS................. 63

DIRECT EXAMINATION BY MR. HANUSZ.................. 82


**PETER LAWRENCE MATTIS**

EXAMINATION BY MR. SHOBAKI........................ 85

EXAMINATION BY MR. HANUSZ........................ 89

EXAMINATION BY MR. SHOBAKI....................... 105

| EXHIBIT | MARKED | RECEIVED |
|---|---|---|
| 4042 THROUGH 4047 | | 10 |
| 4050 THROUGH 4059 | | 10 |
| 4285 | | 10 |
| 4289 THROUGH 4291 | | 10 |
| 4293-4294 | | 10 |
| 1650 THROUGH 1655 | | 21 |
| 4091 | | 46 |
| 4105 | | 48 |
| 1201 AND 1203 | | 66 |
| 1202 | | 67 |
| 226 | | 77 |
| 239 | | 81 |

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 6 of 131   Page ID #:9031

8:30 AM

- - - - -

**(THE FOLLOWING PROCEEDINGS WERE HELD IN**

**OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)**

THE COURT:  CR18-00050, USA VERSUS YI-CHI

SHIH.

WOULD YOU STATE YOUR APPEARANCES, PLEASE.

MS. HEINZ:  GOOD MORNING, YOUR HONOR.  JUDITH

HEINZ ON BEHALF OF THE UNITED STATES.

WITH US AT COUNSEL TABLE IS SPECIAL AGENT

ALEX STORINO OF THE FBI.

MR. ROLLINS:  GOOD MORNING, YOUR HONOR.  WILL

ROLLINS ON BEHALF OF THE UNITED STATES.

MR. SHOBAKI:  GOOD MORNING, YOUR HONOR.  KHAL

SHOBAKI ON BEHALF OF THE UNITED STATES.

MR. HUGHES:  GOOD MORNING, YOUR HONOR.  JAMES

HUGHES ON BEHALF OF THE UNITED STATES.

MS. SARTORIS:  GOOD MORNING, YOUR HONOR.

MELANIE SARTORIS ON BEHALF OF THE UNITED STATES.

MR. SPERTUS:  GOOD MORNING, YOUR HONOR.  JAMES

SPERTUS, JOHN HANUSZ, CHRISTA WASSERMAN ON BEHALF OF

DR. SHIH WHO IS PRESENT BEFORE THE COURT.

I HAVE THE GOVERNMENT'S BRIEF FROM THIS

MORNING.

HAVE YOU RECEIVED A COPY OF THAT?

MR. HANUSZ:  WE RECEIVED A COPY ABOUT 10

MINUTES AGO, YOUR HONOR.

THE COURT:  WELL, I THINK THE GOVERNMENT HAS

PRESENTED CONSISTENT WITH WHAT MR. ROLLINS SAID

YESTERDAY, SUBSTANTIAL -- A POTENTIAL BASIS FOR LINKING

THESE ENTITIES TO THE DEFENDANT.  I HAVEN'T REVIEWED

ALL OF THE EXHIBITS YET.

THE ISSUE REMAINS, IN TERMS OF TESTIMONY,

ABOUT IDENTIFYING THESE ENTITIES BY THE WITNESS, BY

MR. MATTIS.

SO THE ISSUE THERE BEING, WHETHER THERE

WAS AN ADEQUATE DISCLOSURE OF THE BASIS FOR HIS

OPINIONS OR HIS ABILITY TO IDENTIFY THESE PARTICULAR

ENTITIES THAT HAVE BEEN IDENTIFIED HERE.

MR. HANUSZ:  SO, YOUR HONOR, THERE'S BEEN NO

ADDITIONAL -- THERE'S BEEN ADDITIONAL DISCLOSURES IN

THAT DISCLOSURES WERE MADE AT 11:00 O'CLOCK LAST NIGHT

OF NOTES FROM A MEETING THAT PROSECUTORS AND AGENTS HAD

WITH MR. MATTIS BACK ON MAY 13TH, WHICH TRACKS THE 302,

WHICH WAS DISCLOSED LAST FRIDAY, MAY 20TH, A WEEK AFTER

THAT MEETING.

```
 1              CERTAINLY, TO THE EXTENT THAT THE COURT
 2    IS GOING TO ALLOW MR. MATTIS TO TESTIFY, WE THINK IT'S
 3    APPROPRIATE TO HAVE A DAUBERT HEARING.
 4              BASED ON HIS WRITINGS, THERE'S
 5    SIGNIFICANT QUESTIONS ABOUT HIS SOURCING, WHICH I WOULD
 6    LIKE TO ADDRESS WITH THE WITNESS.
 7              AND I THINK THE COURT HAS TO VIEW, AS
 8    PART OF THE -- ITS GATEKEEPER FUNCTION UNDER 702,
 9    PUTTING ASIDE THE LACK OF DISCLOSURES, THE WHOLESALE
10    LACK OF DISCLOSURES IN THIS CASE.
11              SO I RECEIVED THE GOVERNMENT'S BRIEFING
12    10 MINUTES AGO, BUT I THINK THE GOVERNMENT -- THE
13    GOVERNMENT CONFLATES A COUPLE OF ISSUES.
14              WHAT MR. MATTIS WOULD TESTIFY REGARDING
15    THESE ENTITIES -- AND, AGAIN, WE'RE ENTITLED TO KNOW
16    HIS BASIS OF KNOWLEDGE FOR THAT.  BUT THE MORE
17    PERTINENT ISSUE IS, DR. SHIH'S KNOWLEDGE OF WHATEVER
18    MR. MATTIS WOULD TESTIFY TO AND ITS RELEVANCE TO THE
19    LICENSING COUNTS, WHICH ARE COUNTS 1 AND 2, WHICH ARE
20    THE ONLY COUNTS THAT THIS TESTIMONY IS, ARGUABLY,
21    RELEVANT TO.
22              BUT TO THE EXTENT THAT THE COURT IS GOING
23    TO ALLOW THIS WITNESS, WHERE NO DISCLOSURES HAVE BEEN
24    MADE, WE WOULD ASK FOR A HEARING OUTSIDE THE PRESENCE
25    OF THE JURY ON BASICALLY RELATING TO DAUBERT ISSUES.
```

3

1   WE HAVE A LOT OF QUESTIONS FOR MR. MATTIS.  AND I THINK

2   THE COURT WILL SEE, UPON IN ITS GATEKEEPER ROLE, THAT

3   HE SHOULD NOT TESTIFY UNDER 702.

4           THE COURT:  ALL RIGHT.

5           MR. ROLLINS:  WE HAVE NO OBJECTION TO A

6   DAUBERT HEARING FOR THIS WITNESS.

7               WITH RESPECT TO THE DISCLOSURE ISSUE, IN

8   FOOTNOTE 2 OF OUR BRIEF, I POINTED OUT -- AND I THINK

9   AS IS CLEAR FROM THE DEFENDANT'S OWN FILINGS, THE

10  GOVERNMENT'S, IN ITS MARCH LETTER, ATTACHED A LENGTHY

11  LIST OF PUBLICATIONS AUTHORED BY MR. MATTIS, ALL OF

12  WHICH ARE WIDELY AVAILABLE.

13              SO TO THE EXTENT THE COURT IS CONCERNED

14  ABOUT THAT, I THINK THAT --

15          THE COURT:  THAT CAME UP YESTERDAY, BUT ARE

16  THOSE THE -- WILL THOSE FORM THE BASIS FOR HIS

17  OPINIONS, IF HE'S ALLOWED TO OPINE?

18          MR. ROLLINS:  YES, THAT IS A PORTION OF WHAT

19  WILL FORM THE BASIS FOR HIS OPINIONS.

20              AND THEN --

21          THE COURT:  WHAT ELSE?

22          MR. ROLLINS:  SO AFTER THE DEFENSE OPENING IN

23  THIS CASE, IT'S TRUE THAT WE DID APPROACH MR. MATTIS

24  AGAIN ABOUT SPECIFIC ENTITIES.

25              I'M GOING TO LET MR. SHOBAKI ADDRESS THIS

MR. SHOBAKI:  YOUR HONOR, THERE'S A COUPLE OF

THINGS WITH TIMING TO CLEAR UP.

FIRST OF ALL, WITH RESPECT TO WHAT HE

RELIED ON, IT'S THE SAME THING THAT I SAID YESTERDAY.

THERE WAS RELIANCE ON OPEN SOURCE RESEARCH.  THAT IS,

RESEARCH WITH PUBLICLY-AVAILABLE SOURCES, WHICH THE

WITNESS CAN TALK ABOUT OUTSIDE THE PRESENCE OF THE

JURY.  AND HE'S HERE AND PREPARED TO DO THAT.

WITH RESPECT TO THE TIMING OF THE

DISCLOSURES, JUST TO CLARIFY A COUPLE OF THINGS THAT

MR. HANUSZ SAID.  FIRST OF ALL, THE 302 WAS DISCLOSED

LAST FRIDAY, THE 17TH, THE SAME WEEK THAT FBI AGENTS,

AND NOT THE PROSECUTORS, HAD SPOKEN WITH MR. MATTIS.

AND THE NOTES THAT WERE PRODUCED

YESTERDAY WERE REQUESTED FROM THE FBI.  THEY'RE FROM

THE PEOPLE WHO PARTICIPATED IN THAT INTERVIEW.  AND

THEY DO NOT DIFFER MATERIALLY IN ANY WAY FROM THE

DISCLOSURE OF THE INFORMATION IN THE 302.

SO TO THE EXTENT THAT THERE'S ALLEGATIONS

OR ASPERSIONS CAST ABOUT THE GOVERNMENT NOT PROVIDING

THAT INFORMATION, THEY'RE REALLY BASELESS.

THE COURT:  I THINK WHAT I SAID YESTERDAY AND

THE CONCERN THAT I EXPRESSED YESTERDAY WAS WHETHER

THERE WAS AN ADEQUATE DISCLOSURE OF THE INFORMATION ON

1

2     DEFENDANT WOULD HAVE BEEN IN A POSITION TO EVALUATE

3     THAT INFORMATION AND, POTENTIALLY, LOOK FOR COMPETING

4     INFORMATION.  THAT WAS WHERE I WANTED TO FOCUS.

5               NOW, IF YOU'RE NOW SAYING THAT THE BASIS

6     FOR THE OPINIONS WOULD BE THE -- HIS PUBLISHED

7     ARTICLES, THOSE -- THOSE WERE DISCLOSED.

8               WHAT ELSE IS THE BASIS FOR HIS OPINION?

9          MR. SHOBAKI:  MY UNDERSTANDING - AND

10    MR. MATTIS IS BETTER QUALIFIED TO SPEAK TO THIS - IS

11    THAT HIS BASE OF KNOWLEDGE -- WHICH INCLUDES HIS

12    PUBLISHED ARTICLES AND HIS WORK, HIS RESEARCH, HIS

13    EXPERIENCE, EVIDENCE FROM THIS CASE AND

14    PUBLICLY-AVAILABLE INFORMATION, WHICH IS THE SAME THING

15    THAT WE TALKED ABOUT YESTERDAY, YOUR HONOR.  AND I

16    BELIEVE THAT THE COURT'S VIEW, IF I'M REMEMBERING IT

17    CORRECTLY, WAS THAT WE SHOULD BRING MR. MATTIS.  AND HE

18    CAN EXPLAIN WHAT THOSE ADDITIONAL THINGS WERE THAT HE

19    RELIED UPON.  AND HE'S HERE TO DO THAT.

20         THE COURT:  WHAT I ALSO SAID WAS, IT'S A

21    TIMING PROBLEM BECAUSE WE HAVE JURORS WAITING.

22         MR. HANUSZ:  YOUR HONOR, THIS IS A PRETTY

23    CRITICAL ISSUE.  I WOULD LIKE TO BE HEARD.

24         THE COURT:  IS THERE SOMETHING NEW?

25         MR. HANUSZ:  YES, YOUR HONOR.

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 12 of 131   Page ID #:9037

1    RELIANCE ON OPEN-SOURCE INFORMATION.  I'D LIKE TO READ

2    TO THE COURT WHAT MR. MATTIS HIMSELF HAS -- HIMSELF HAS

3    SAID ABOUT OPEN-SOURCE INFORMATION.

4              "I DON'T THINK YOU CAN PUT A CLEAR

5    JUDGMENT ON THE BASIS OF OPEN SOURCES.  IF YOU'RE NOT

6    IN THE COMMUNITY AND NOT ACTIVE IN IT, AND YOU DON'T

7    HAVE A BROAD VIEW ACROSS WHAT THE COMMUNITY IS DOING,

8    IT'S VERY DIFFICULT TO SAY.  SUFFICE IT TO SAY, THERE'S

9    SIMPLY ISN'T ENOUGH KNOWLEDGE PUBLICLY TO HAVE A ROBUST

10   AND ONGOING DISCUSSION OF CHINESE INTELLIGENCE AND ITS

11   THREAT TO U.S. INTERESTS.  I'LL LEAVE IT AT THERE."

12             WHAT THE GOVERNMENT DOESN'T MENTION IS

13   THE FACT THAT MR. MATTIS WAS A CIA OPERATIVE FOR FOUR

14   YEARS.

15             THE COURT:  THIS ISN'T NEW.  WE HAVE JURORS

16   WAITING.  I WENT OVER THIS YESTERDAY.  YOU MADE THESE

17   ARGUMENTS YESTERDAY.

18             WHAT YOU JUST READ, I HADN'T HEARD

19   BEFORE.  BUT THE CIA ISSUE IS NOT NEW.

20             SO LET'S NOT SPEND TIME ON THINGS THAT

21   AREN'T NEW.

22             WHERE IS MR. MATTIS?

23             MR. SHOBAKI:  YOUR HONOR, HE'S EITHER OUTSIDE

24   OR ON THE SECOND FLOOR.  WE ANTICIPATED DOING THIS

```
 1        MAYBE DURING A BREAK, BUT I CAN GET HIM UP HERE IF THE
 2   COURT WANTS TO DO IT NOW.
 3             THE COURT:  MR. MONROY WILL BE TESTIFYING.
 4   AND THEN WHEN HE IS FINISHED, WHO IS THE NEXT WITNESS?
 5             MR. SHOBAKI:  WE HAVE MS. ROBINSON AND SPECIAL
 6   AGENT WESTBY CUED UP.
 7             THE COURT:  HOW LONG DO YOU THINK THE
 8   TESTIMONY OF THOSE THREE WITNESSES WILL TAKE?
 9             MR. SHOBAKI:  DEPENDING ON CROSS, MAYBE AN
10   HOUR TO TWO HOURS, SOMEWHERE IN BETWEEN THERE.
11             THE COURT:  ALL RIGHT.  I'D LIKE TO GET GOING
12   WITH THE JURORS BECAUSE THEY'RE ALL HERE ON TIME.
13             AND WE'LL ADDRESS THE ISSUE OF WHETHER
14   THERE WILL BE A HEARING INVOLVING MR. MATTIS WHEN WE'RE
15   FARTHER ALONG IN THE DAY.
16             I THINK I'VE IDENTIFIED -- I DON'T WANT
17   TO REPEAT MYSELF HAVING TOLD YOU NOT TO DO SAME.  I
18   THINK I'VE IDENTIFIED THE ISSUES I WOULD LIKE TO
19   ADDRESS.
20             AND I UNDERSTAND YOU HAVE ISSUES.
21             IF THERE IS AN EXAMINATION OF MR. MATTIS,
22   I EXPECT IT TO BE BRIEF AND EFFICIENT.  AND I MAY START
23   IT.
24             MR. SHOBAKI:  THANK YOU, YOUR HONOR.
25             MR. HANUSZ:  VERY WELL, YOUR HONOR.
```

1
2   I HAVE AN AGREEMENT WITH THE GOVERNMENT.  I'M SIMPLY

3   GOING TO READ A LIST OF EXHIBITS, WITHDRAW TWO BECAUSE

4   WE REPLACED THEM PER THE COURT'S REQUEST.  AND THEN

5   THERE WILL BE NO FURTHER QUESTIONS.

6            THE COURT:  IS MR. MONROY HERE?

7            WOULD YOU COME FORWARD, PLEASE.

8            **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

9            **OPEN COURT IN THE PRESENCE OF THE JURY:)**

10           THE CLERK:  ALL RISE.

11           THE COURT:  PLEASE BE SEATED.

12           ALL 15 OF OUR JURORS AND ALTERNATES ARE

13  BACK.

14           THANK YOU FOR BEING ON TIME, LADIES AND

15  GENTLEMEN.  SORRY WE KEPT YOU WAITING.  WE WERE WORKING

16  ON SOME MATTERS.

17           MR. MONROY, WOULD YOU PLEASE RESTATE

18  YOUR NAME.

19           THE WITNESS:  MY NAME IS CARLOS MONROY.

20           THE COURT:  DO YOU UNDERSTAND, MR. MONROY,

21  THAT YOU REMAIN UNDER OATH?

22           THE WITNESS:  YES, I DO.

23           THE COURT:  MR. SPERTUS, PLEASE PROCEED.

24           MR. SPERTUS:  WITH AGREEMENT FROM THE

25  GOVERNMENT, I'M GOING TO READ A LIST OF TRIAL EXHIBITS

THAT I WILL MOVE INTO EVIDENCE.  AND ONCE RECEIVED, I

HAVE NO FURTHER QUESTIONS.

THE EXHIBITS I AM MOVING INTO EVIDENCE

ARE EXHIBIT 4042, 4043, 4044, 4045, 4046, 4047, 4050,

4051, 4052, 4053, 4054, 4055, 4056, 4057, 4058, 4059,

4285, 4289, 4290, 4291, 4293 AND 4294.

AND, YOUR HONOR, FOR THE RECORD, I'VE

WITHDRAWN MY EXHIBITS 4048 AND 4049.  AND THOSE TWO

EXHIBITS HAVE BEEN REPLACED WITH 4293 AND 4294

RESPECTIVELY.

NO FURTHER QUESTIONS.

THE COURT:  THANK YOU.

**(EXHIBITS 4042, 4043, 4044, 4045,**

**4046, 4047, 4050, 4051, 4052, 4053, 4054, 4055,**

**4056, 4057, 4058, 4059, 4285, 4289, 4290, 4291,**

**4293 AND 4294 RECEIVED IN EVIDENCE)**

THE COURT:  ANY REDIRECT?

MR. SHOBAKI:  BRIEFLY, YOUR HONOR.

THE COURT:  BEFORE YOU DO THAT, LADIES AND

GENTLEMEN, YOU HAVE HEARD REFERENCE TO SOME EXHIBITS.

THESE HAVEN'T -- I DON'T BELIEVE ALL OF THESE HAVE BEEN

PUBLISHED.  PORTIONS OF SOME OF THEM WERE PREVIOUSLY

PUBLISHED.  THESE EXHIBITS ARE BEING ADMITTED FOR A

LIMITED PURPOSE.  AND THAT PURPOSE IS TO FACILITATE

YOUR CONSIDERATION OF THE NATURE OF THE EXPORT

1   

2   THE PROCESS INVOLVING THE EXPORT CONTROL -- EXPORT

3   ADMINISTRATION REGULATIONS.

4              THEY ARE NOT ADMITTED AS TO WHAT THE LAW

5   IS, INCLUDING AS TO ANY STATEMENTS OR LANGUAGE IN THESE

6   EXHIBITS.

7              I WILL INSTRUCT YOU ON THE LAW WITH

8   RESPECT TO ALL ISSUES YOU ARE TO ADDRESS IN THIS

9   MATTER, INCLUDING AS TO ANY MATTERS RELATED TO ANY OF

10  THESE EXHIBITS.

11                    **REDIRECT EXAMINATION**

12  BY MR. SHOBAKI:

13  Q    GOOD MORNING, MR. MONROY.

14  A    GOOD MORNING.

15  Q    DO YOU REMEMBER BEING ASKED SOME QUESTIONS ON

16  FRIDAY ABOUT EXPORT LICENSES, EXEMPTIONS AND THE ENTITY

17  LIST?

18  A    YES, I DO REMEMBER.

19  Q    CAN AN EXPORT LICENSE BE REQUIRED TO EXPORT AN ITEM

20  EVEN IF THE RECIPIENT ISN'T ON THE ENTITY LIST?

21  A    YES.

22  Q    SO IS THE ENTITY LIST ANOTHER REASON THAT AN EXPORT

23  LICENSE MIGHT BE REQUIRED, NOT THE ONLY REASON?

24  A    THAT'S CORRECT.

25  Q    DID ANY OF YOUR DISCUSSION ON FRIDAY CHANGE YOUR

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 17 of 131   Page ID #:9042

IN THIS CASE?

A    NO, IT DID NOT.

Q    AND DID ANY OF YOUR DISCUSSION ON FRIDAY CHANGE

YOUR CONCLUSIONS ABOUT THE FACT THAT NONE OF THE

EXCEPTIONS OR EXEMPTIONS TO THE LICENSE REQUIREMENT

APPLIED?

A    IT DID NOT CHANGE.

Q    ARE MMIC POWER AMPLIFIERS COMMODITIES, TECHNOLOGY

OR SOFTWARE?

A    THEY ARE COMMODITIES.

          MR. SHOBAKI:  NO FURTHER QUESTIONS, YOUR

HONOR.

          MR. SPERTUS:  NO FURTHER QUESTIONS, YOUR

HONOR.

          THE COURT:  OKAY.  MR. MONROY, THANK YOU FOR

YOUR TESTIMONY.  YOU ARE EXCUSED.

              HAVE A SAFE TRIP HOME.

              GOVERNMENT, PLEASE CALL THE NEXT WITNESS.

          MS. SARTORIS:  THANK YOU, YOUR HONOR.

              THE GOVERNMENT CALLS ERIN ROBINSON.

          THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE CLERK:  PLEASE STATE YOUR FULL NAME AND

SPELL YOUR LAST NAME.

THE WITNESS:  ERIN ELIZABETH ROBINSON,

E-R-I-N, E-L-I-Z-A-B-E-T-H, R-O-B-I-N-S-O-N.

THE COURT:  GOOD MORNING, MS. ROBINSON.

THE WITNESS:  GOOD MORNING.

PLEASE PROCEED.

**DIRECT EXAMINATION**

BY MS. SARTORIS:

Q   GOOD MORNING, MS. ROBINSON.

A   GOOD MORNING.

Q   WHAT AGENCY DO YOU WORK FOR?

A   FOR THE U.S. DEPARTMENT OF STATE.

Q   HOW LONG HAVE YOU WORKED FOR THE U.S. DEPARTMENT OF

STATE?

A   SINCE MARCH 2012.

Q   WHAT IS YOUR CURRENT POSITION?

A   I'M CURRENTLY WORKING AS A VISA POLICY ANALYST IN

THE BUREAU OF CONSULAR AFFAIRS, OFFICE OF VISA

SERVICES.

Q   WHERE IS THAT LOCATED?

A   WASHINGTON DC.

Q   WHAT DO YOU DO IN THAT POSITION?

A   I AM RESPONSIBLE FOR RESPONDING TO POLICY-RELATED

1
2        FIELD ABOUT VISA ISSUES.

3                    I ALSO WORK WITH OTHER AGENCIES RELATED TO

4        VISA POLICY ON VISA POLICY MATTERS AND CREATING VISA

5        POLICY.

6        Q    SO YOU HAVE MENTIONED "VISA POLICY."  WHAT IS A

7        VISA?

8        A    A VISA IS A DOCUMENT GRANTED TO A FOREIGN CITIZEN

9        WHICH ALLOWS THEM TO COME TO A PORT OF ENTRY AND ASK

10       FOR PERMISSION TO ENTER THE UNITED STATES.

11       Q    SO THESE ARE VISAS THAT ARE ISSUED BY THE

12       UNITED STATES DEPARTMENT OF STATE?

13       A    YES.

14       Q    SO THAT FOREIGN PERSONS CAN ENTER THE

15       UNITED STATES?

16       A    YES, THAT'S CORRECT.

17       Q    PRIOR TO YOUR CURRENT POSITION, WHAT DID YOU DO?

18       A    PREVIOUSLY, I SERVED AS A CONSULAR OFFICER IN THE

19       U.S. CONSULATE GENERAL IN SHANGHAI, CHINA.

20       Q    WHAT IS A "U.S. CONSULAR GENERAL"?

21       A    SO OUR MISSIONS ABROAD ARE -- IT DEPENDS ON HOW

22       LARGE IT IS.  IN MOST COUNTRIES, WE HAVE AN EMBASSY,

23       WHICH IS WHERE THE AMBASSADOR WORKS.  AND IT IS THE

24       PRIMARY LOCATION WHERE WE DO OUR DIPLOMATIC WORK AND

25       ANY OTHER WORK THAT THE DEPARTMENT OF STATE DOES.

1   HAVE SUBSIDIARY POSTS, SO OTHER LOCATIONS.  AND THOSE

2   ARE GENERALLY CALLED "U.S. CONSULATES."

3   Q    SO IS THAT THE CASE IN PEOPLE'S REPUBLIC OF CHINA?

4   A    YES.

5        THERE IS AN EMBASSY AND FIVE CONSULATES AT THE

6   MOMENT.

7   Q    AND I BELIEVE YOU MENTIONED THAT YOU WERE A

8   VICE COUNSEL.

9        WHAT DOES THAT MEAN?

10  A    VICE COUNSEL IS THE DIPLOMATIC TITLE THAT I HOLD,

11  THAT YOU WOULD HOLD ABROAD IN THE POSITION THAT I DO.

12  MY FUNCTIONAL TITLE OR WHAT I ACTUALLY DID WAS A

13  CONSULAR OFFICER.

14  Q    SO WHAT DID YOU DO AS A CONSULAR OFFICER?

15  A    FOR MOST OF THE TIME THAT I WAS IN SHANGHAI, I

16  SERVED AS A VISA ADJUDICATOR, WHICH MEANS THAT I

17  INTERVIEWED FOREIGN CITIZENS WHO WANTED TO TRAVEL TO

18  THE UNITED STATES, AND DETERMINED WHETHER OR NOT THEY

19  WERE ELIGIBLE FOR THE VISA FOR WHICH THEY WERE

20  APPLYING.

21       I ALSO DID -- SERVED FOR ABOUT SIX MONTHS IN

22  OUR FRAUD PREVENTION UNIT.

23  Q    DID YOU TRAIN NEW OFFICERS AND MANAGERS?

24  A    YES.

```
 1    Q    WHAT TYPE OF VISAS DID YOU WORK ON?
 2    A    NON-IMMIGRANT VISAS, WHICH ARE VISAS FOR
 3   INDIVIDUALS WHO DO NOT INTEND TO IMMIGRATE TO THE
 4   UNITED STATES.  SO SHORT-TERM VISAS FOR TRAVEL OR WORK.
 5            THERE A LARGE NUMBER OF VISA CATEGORIES.  SO
 6   ANY TYPE OF VISA THAT THE INDIVIDUAL APPLIED FOR.
 7    Q    BUT NOT PEOPLE WHO WERE PLANNING TO IMMIGRATE TO
 8   THE UNITED STATES?
 9    A    NO.
10    Q    DID YOU HOLD ANY OTHER POSITIONS WITH THE
11   DEPARTMENT OF STATE?
12    A    YES.
13            MY FIRST POST WAS IN HYDERABAD, INDIA WHERE I
14   WAS ALSO A CONSULAR OFFICER.
15    Q    DID YOU ALSO ADJUDICATE VISAS IN THAT POSITION?
16    A    YES.
17    Q    DID YOU RECEIVE ANY TRAINING FOR THESE POSITIONS?
18    A    YES.
19            WHEN I JOINED THE DEPARTMENT IN 2012, I FIRST
20   DID A SIX-WEEK ORIENTATION ON HOW TO BE A FOREIGN
21   SERVICE OFFICER AND HOW TO WORK AT THE DEPARTMENT OF
22   STATE.
23            SUBSEQUENT TO THAT, I RECEIVED APPROXIMATELY
24   EIGHT MONTHS OF TRAINING IN LANGUAGE THAT WAS RELEVANT
25   TO MY FIRST POST.
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 22 of 131   Page ID #:9047

WEEKS OF TRAINING ON BASIC CONSULAR WORK, WHICH IS

MANDATED BY CONGRESS.

Q    WHAT IS YOUR EDUCATION?

A    I HAVE A BACHELOR'S DEGREE IN POLITICAL SCIENCE,

WITH A MINOR IN EAST ASIAN STUDIES, AND A MASTERS

DEGREE IN ASIAN STUDIES FROM THE ELLIOTT SCHOOL FOR

INTERNATIONAL AFFAIRS AT THE GEORGE WASHINGTON

UNIVERSITY IN DC.

Q    COULD YOU DESCRIBE BRIEFLY FOR THE JURY THE

PROCEDURES AND REQUIREMENTS A PERSON WANTING TO GET A

NON-IMMIGRANT VISA FROM THE PEOPLE'S REPUBLIC OF CHINA

MUST GO THROUGH?

A    YES.

THE FIRST STEP IS TO FILL OUT AN ONLINE

APPLICATION.  IT HAS A NUMBER OF QUESTIONS, NAME,

EDUCATION, HISTORY, WORK HISTORY, ASKS ABOUT YOUR

TRAVEL PLANS.  AND IT ASKS A NUMBER OF SECURITY

QUESTIONS.

AND THEN YOU WOULD -- WHEN YOU GO TO SIGN

THE -- THEN YOU WOULD SIGN THE APPLICATION.  YOU ALSO

SUBMIT A PHOTOGRAPH AT THAT TIME THROUGH THE ONLINE

SYSTEM.

YOU SIGN THE APPLICATION CERTIFYING THAT

EVERYTHING IS GOING TO BE TRUE AND CORRECT.

THE VISA APPLICATION PAYMENT, WHICH WOULD THEN ALLOW

YOU TO SCHEDULE AN APPOINTMENT FOR YOUR INTERVIEW.

ON THE DAY OF YOUR INTERVIEW, YOU WOULD ARRIVE

AT THE EMBASSY OR CONSULATE THAT YOU HAD CHOSEN TO

APPLY AT.  AT WHICH POINT, YOU WOULD STOP AT -- THE

FIRST STOP WOULD BE AN INDIVIDUAL WHO WOULD CHECK OVER

YOUR RECORDS AND MAKE SURE THAT ALL OF THE INFORMATION

IN YOUR PASSPORT MATCHED THE INFORMATION IN THE

APPLICATION THAT YOU FILLED OUT.  SO YOU SPELLED YOUR

NAME CORRECTLY.  YOU HAD NOT WRITTEN YOUR DATE OF BIRTH

WRONG.  AND THAT THE PHOTOGRAPH MET OUR REQUIREMENTS

FOR WHAT A PHOTOGRAPH HAS TO LOOK LIKE.

THEY WOULD THEN SEND YOU TO EITHER TO A U.S.

CITIZEN WHO WOULD TAKE YOUR FINGERPRINTS AND WOULD

BIOMETRICALLY COMPLETE THE APPLICATION.

AT THAT TIME, YOU WOULD ALSO BE INFORMED

THAT -- YOU WOULD BE REMINDED AGAIN THAT YOUR

APPLICATION HAD TO BE TRUE AND CORRECT AND THAT

EVERYTHING IT WOULD SAY IN THE SUBSEQUENT INTERVIEW IS

ALSO REQUIRED TO BE TRUE AND CORRECT UNDER THE PENALTY

OF PERJURY.

AND THEN YOU WOULD GO AND DO YOUR INTERVIEW

WITH AN OFFICER, SOMEONE LIKE ME, WHO WOULD BE

GENERALLY A FOREIGN SERVICE OFFICER WORKING FOR THE

DEPARTMENT OF STATE.  AT WHICH POINT, THE OFFICER WOULD

INTERVIEW THE APPLICANT, ASK THEM A NUMBER OF QUESTIONS

TO DETERMINE WHETHER OR NOT THEY QUALIFIED FOR THE VISA

THAT THEY HAD APPLIED FOR.

THIS MEANS BOTH THAT THE INDIVIDUAL IS

APPLYING FOR THE RIGHT KIND OF VISA.  THE TYPE OF VISA

THAT YOU NEED IS DETERMINED BY WHAT YOUR PURPOSE OF

TRAVEL IS.  SO WHY ARE YOU GOING TO THE UNITED STATES,

THAT REALLY DICTATES THE TYPE OF VISA THAT YOU NEED.

AND THEN ALSO FROM MOST NON-IMMIGRANT VISAS,

THE APPLICANTS ARE SUBJECT TO A SECTION OF LAW, THE

IMMIGRATION NATIONALITY ACT CALLED "SECTION 214(B),"

WHICH REQUIRES THE ADJUDICATOR, SO AN OFFICER LIKE ME,

ASSUME THAT THE INDIVIDUAL INTENDS TO IMMIGRATE TO THE

UNITED STATES.  SO IT'S -- THE APPLICANT HAS TO

CONVINCE THE INTERVIEWING OFFICER THAT THEY DO NOT

INTEND TO IMMIGRATE, THAT THEY DO WANT TO COME

TEMPORARILY AND THEN RETURN TO THEIR HOME COUNTRY.

Q    THANK YOU.

SO YOU COVERED A LOT OF GROUND, AND THANK YOU

FOR DOING THAT.

SO THE INFORMATION THAT IS IN THE APPLICATION

THAT THE DEPARTMENT OF STATE HAS, IS THAT INFORMATION

THAT WAS PROVIDED SOLELY BY THE APPLICANT?

A    YES.

1    Q    AND IF THERE'S OTHER INFORMATION PROVIDED SUCH AS A

2    RESUME OR ADDITIONAL DOCUMENTS, WHERE DO THOSE

3    DOCUMENTS COME FROM?

4    A    THEY WOULD ALSO BE PROVIDED BY THE APPLICANT.

5    Q    AND THE PHOTOGRAPH IS ALSO PROVIDED BY THE

6    APPLICANT?

7    A    THAT'S CORRECT.

8    Q    DO YOU -- ARE YOU FAMILIAR IF UNITED STATES

9    CITIZENS GO THROUGH A SIMILAR PROCESS IF THEY WANT TO

10   TRAVEL FROM THE UNITED STATES TO THE PEOPLE'S REPUBLIC

11   OF CHINA?

12   A    YES.  THEY'RE ALSO REQUIRED TO APPLY FOR VISAS.

13   Q    AND WHO DO THEY APPLY TO FOR A VISA?

14   A    IT WOULD DEPEND ON WHERE THEY ARE.  BUT, GENERALLY,

15   WHICHEVER CHINESE EMBASSY OR CONSULATE IS CLOSEST TO

16   THEM.

17   Q    SO THOSE VISAS ARE NOT ISSUED BY THE DEPARTMENT OF

18   STATE?

19   A    NO.

20   Q    THEY WOULD BE ISSUED BY THE PEOPLE'S REPUBLIC OF

21   CHINA?

22   A    YES.  THAT'S CORRECT.

23            MS. SARTORIS:  THANK YOU.

24               YOUR HONOR, THE UNITED STATES WOULD LIKE

25   TO INTRODUCE EXHIBITS 1650, 1651, 1652, 1653, 1654 AND

1   1655, WHICH ARE CERTIFIED VISA RECORDS FOR SIX PEOPLE

2   FROM THE PEOPLE'S REPUBLIC OF CHINA WHO SAT AND

3   OBTAINED VISAS TO TRAVEL FROM THE PEOPLE'S REPUBLIC OF

4   CHINA TO THE UNITED STATES.

5            MS. WASSERMAN:  NO OBJECTION, YOUR HONOR.

6            THE COURT:  THOSE EXHIBITS ARE ADMITTED.

7            **(EXHIBITS 1650 THROUGH 1655 RECEIVED IN**

8        **EVIDENCE)**

9   BY MS. SARTORIS:

10  Q    IF I COULD ASK YOU TO TURN TO VOLUME 20, EXHIBIT

11  1650.

12            I'M GOING TO PUT ON THE SCREEN A PAGE OF THAT

13  EXHIBIT MARKED "11463."

14            DO YOU HAVE THIS EXHIBIT, EXHIBIT 1650, IN

15  FRONT OF YOU?

16  A    YES.

17  Q    AND LOOKING AT THIS DOCUMENT ON THE SCREEN, DO

18  RECOGNIZE WHAT THIS IS?

19  A    YES.  THIS IS THE APPLICATION FOR A VISA FOR AN

20  APPLICANT FAMILY NAME "CHEN," PERSONAL NAME "YAPING."

21  Q    SO YOU MENTIONED THE FAMILY NAME "CHEN" AND THE

22  PERSONAL NAME "YAPING."

23            CAN YOU DESCRIBE HOW AN INDIVIDUAL IN THE

24  PEOPLE'S REPUBLIC OF CHINA WOULD STATE THEIR NAME AND

25  HOW THAT MIGHT BE DIFFERENT IN THE UNITED STATES?

```
 1         A    IN CHINA, GENERALLY, STANDARD CONVENTION IS THAT 22
 2    THE FAMILY NAME COMES FIRST AND THEN A PERSONAL NAME
 3    WOULD COME SUBSEQUENT.  SO IN CHINA, HE WOULD BE
 4    REFERRED TO AS "CHEN YAPING."
 5              IF INDIVIDUALS FREQUENTLY INTERACT WITH
 6    AMERICANS OR OTHER WESTERN PEOPLE, THEY WILL OFTEN
 7    REVERSE THEIR NAME WHEN THEY ARE PREPARING FOR THOSE
 8    INTERACTIONS BECAUSE THEY KNOW THAT, IN MOST WESTERN
 9    CULTURES, THE PERSONAL NAME COMES FIRST AND THEN THE
10    FAMILY NAME COMES SECOND.  SO THEY WILL SOMETIMES FLIP
11    THE NAME BACK AND FORTH.
12              BUT IN CHINESE CONVENTION, IT WOULD BE "CHEN
13    YAPING."
14    Q    AND THEN SO CONTRAST THAT IN THE WESTERN
15    CONVENTION, IT WOULD BE "YAPING CHEN"?
16    A    YES.
17    Q    SO IF I COULD, I'M GOING TO SWITCH NOW TO PAGE --
18    ANOTHER PAGE OF THIS EXHIBIT, WHICH SAYS "'465" ON THE
19    BOTTOM.
20    A    OKAY.
21    Q    DO YOU SEE THAT?
22    A    YES.
23              THE COURT:  YOU'RE REFERRING TO "11465"?
24              MS. SARTORIS:  YES, YOUR HONOR.
25    BY MS. SARTORIS:
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 28 of 131   Page ID #:9053

```
 1        Q    SO WHAT IS THIS DOCUMENT?

 2        A    THIS IS A COPY OF THE AFOREMENTIONED APPLICANT'S

 3   RESUME, WHICH WOULD HAVE BEEN PROVIDED BY THE APPLICANT

 4   AT THE TIME OF INTERVIEW.

 5        Q    AND LOOKING AT THIS RESUME, DO YOU SEE -- BRINGING

 6   YOUR ATTENTION TO THE WORK EXPERIENCE -- WORKING

 7   EXPERIENCE SECTION.

 8        A    YES.

 9        Q    WHAT DOES IT SAY THIS INDIVIDUAL'S POSITION WAS

10   FROM OCTOBER 2007 TO APRIL 2014?

11        A    IT STATES THAT HE WAS GENERAL MANAGER AND CHIEF

12   TECHNICAL SUPERVISOR OF CHENGDU RM TECHNOLOGY COMPANY

13   LIMITED.

14        Q    AND I'D ASK YOU TO TURN TO ANOTHER PAGE OF THIS

15   SAME DOCUMENT.  AT THE BOTTOM IT SAYS, "11467."

16             DO YOU HAVE THAT PAGE IN FRONT OF YOU?

17        A    YES.

18        Q    BRINGING YOUR ATTENTION THE SECTION THAT SAYS

19   "BUSINESS TOUR."

20             DO YOU SEE THIS INDIVIDUAL REPRESENTING HAVING

21   TRAVELED TO THE UNITED STATES ON SEVERAL OCCASIONS?

22        A    YES.

23        Q    AND ALSO TO CANADA?

24        A    YES.  IN JANUARY OF 2012 TO CANADA.

25        Q    NOW, GOING FURTHER INTO THE EXHIBIT, IF YOU CAN
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 29 of 131   Page ID #:9054

SAYS "11516."

THE COURT:  EXCUSE ME, DOES THAT SAY "JANUARY"

OR "JUNE"?

MS. SARTORIS:  THE RESUME?  I BELIEVE IT SAYS

"JUNE."

THE COURT:  THE MEETING IN CANADA?

THE WITNESS:  IT APPEARS TO SAY "JANUARY."

BY MS. SARTORIS:

Q    YOU READ IT AS "JANUARY"?

A    YEAH, IT LOOKS CLOSED ON THE TOP.

Q    SO LOOKING AT A DOCUMENT THAT SAYS "11516" AT THE

BOTTOM.

DO YOU RECOGNIZE WHAT THIS IS?

A    THIS IS AN EARLIER APPLICATION FOR THE SAME

APPLICANT, CHEN YAPING.

Q    WHAT ARE THE DATES?

A    THE VISA WAS ISSUED ON JUNE 25TH, 2013, AND EXPIRED

ON MAY 30TH, 2014.

Q    AND LOOKING AT THIS DOCUMENT -- I'M GOING TO SLIDE

IT UP.

CAN YOU TELL WHERE -- IN WHAT CITY THIS

APPLICANT APPLIED FOR A VISA?

A    YES.  HE APPLIED IN CHENGDU.

Q    AND FROM THIS DOCUMENT, CAN YOU TELL WHO HE

1   REPRESENTED HIS EMPLOYER TO BE?

2   A    HE STATED HIS EMPLOYER WAS CHENGDU RML TECHNOLOGY

3   COMPANY LIMITED.

4   Q    JUMPING AHEAD TO A PAGE OF THIS DOCUMENT THAT'S

5   MARKED "11510" AT THE BOTTOM.

6   A    "11519"?

7   Q    SORRY, YOU'RE RIGHT, "11519."

8         DO YOU HAVE THAT IN FRONT OF YOU?

9   A    YES.

10  Q    DO YOU SEE WHAT -- WHO HE REPRESENTED HIS -- WHAT

11  IS THIS DOCUMENT?

12  A    THIS IS THE APPLICATION WHICH THE APPLICANT WOULD

13  HAVE FILLED OUT AND SUBMITTED ONLINE.

14  Q    AND DO YOU SEE WHO HE REPRESENTED HIS EMPLOYER TO

15  BE?

16  A    CHENGDU RML TECHNOLOGY COMPANY LIMITED.

17  Q    HOW DID HE DESCRIBE HIS DUTIES?

18  A    HE SAID THAT HE OVERSEES ALL THE OPERATIONS AND

19  PRACTICES OF THE COMPANY.

20  Q    BRINGING YOU TO TWO PAGES FORWARD TO A DOCUMENT

21  THAT SAYS "11521" AT THE BOTTOM.

22  A    YES.

23  Q    WHAT IS THIS DOCUMENT?

24  A    THIS IS FURTHER DOWN ON THE SAME APPLICATION THAT

25  THE APPLICANT WOULD HAVE FILLED OUT AND SUBMITTED.

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 31 of 131   Page ID #:9056

```
 1      Q     DO YOU SEE THE ADDRESS AND PHONE?

 2      A     YES.

 3      Q     AT THE BOTTOM, DO YOU SEE THE E-MAIL ADDRESS THAT'S

 4   REPRESENTED?

 5      A     YES.  IT IS "YPC@RML138.COM."

 6      Q     AND YOU MENTIONED AN APPLICANT IS REQUIRED TO SIGN

 7   THE APPLICATION TRUTHFULLY?

 8      A     YES.

 9      Q     AND IF I BRING YOUR ATTENTION TO THE NEXT PAGE, AND

10   YOU SEE THIS "SIGN AND SUBMIT" LANGUAGE?

11      A     YES.

12      Q     IS THAT THE LANGUAGE YOU WERE REFERRING TO?

13      A     YES, IT IS.

14      Q     AND IS THAT THE SAME ON ALL OF THE VISA

15   APPLICATIONS?

16      A     YES, IT IS.

17      Q     IF I COULD ASK YOU TO LOOK AT THE NEXT PAGE, I

18   BELIEVE, "11524" AT THE BOTTOM.

19      A     YES.

20      Q     WHAT IS THIS?

21      A     THIS IS THE RESUME OF THE SAME APPLICANT.  WOULD

22   HAVE SUBMITTED IT AT THE TIME OF INTERVIEW.

23      Q     AND WHAT -- UNDER "WORK EXPERIENCE," WHAT -- WHO

24   DOES HE SAY HIS EMPLOYER IS?

25      A     HE STATES HIS EMPLOYER IS "RML TECHNOLOGY COMPANY
```

Q    AND HIS POSITION?

A    GENERAL MANAGER AND CHIEF TECHNICAL SUPERVISOR.

Q    AND IS THAT FROM OCTOBER 2007 TO PRESENT?

A    YES, THAT'S CORRECT.

Q    THE PRESENT TIME OF THIS APPLICATION?

A    YES, AT THE TIME OF THE APPLICATION, WHICH WAS IN

2013.

Q    SO IF I COULD BRING YOUR ATTENTION TO A PAGE LATER

IN THAT EXHIBIT.  IT SAYS "11533" AT THE BOTTOM.

        WHAT IS THIS?

A    THIS IS AN EARLIER APPLICATION OF THE SAME

APPLICANT, CHEN YAPING.

Q    AND WHAT ARE THE DATES OF THIS APPLICATION?

A    HE WAS INTERVIEWED ON APRIL 16, 2012.  THE VISA WAS

ISSUED ON APRIL 25TH, 2012 WITH AN EXPIRATION DATE OF

APRIL 23RD, 2013.

Q    WE'LL GO THROUGH ALL OF THE SAME INFORMATION AS

BEFORE.  BUT IF YOU COULD GO FORWARD TO A PAGE THAT

SAYS "11541" AT THE BOTTOM.

        DO YOU HAVE THAT IN FRONT OF YOU?

A    YES.

Q    AND, AGAIN, WHAT IS THIS?

A    THIS IS THE RESUME THAT THE APPLICANT WOULD HAVE

SUBMITTED AT THE TIME OF THE VISA APPLICATION.

1    Q   AND WHO DOES HE SAY HIS EMPLOYER IS?

2    A   HE STATES HIS EMPLOYER IS CHENGDU RM TECHNOLOGY

3    COMPANY LIMITED.

4           MR. HANUSZ:  IF I MAY, WHAT EXHIBIT ARE WE

5    WORKING OFF OF NOW?  IS IT STILL 1650?

6           MS. SARTORIS:  YES.

7           MR. HANUSZ:  MAY WE HAVE A SIDEBAR?

8           THE COURT:  OKAY.  BRIEFLY.

9                    **(SIDEBAR)**

10          MR. HANUSZ:  THANK YOU.  THIS IS JOHN HANUSZ.

11          THE REASON WE'RE CONFUSED IS THAT THE

12   EXHIBITS THAT ARE BEING LOOKED AT BY THE WITNESS DO NOT

13   MATCH THE ELECTRONIC EXHIBITS THAT WERE PROVIDED BY THE

14   GOVERNMENT.

15          THEY MAY MATCH THE ONES IN THE BINDER.

16   BUT AS I'M GOING THROUGH THE ELECTRONIC EXHIBITS, NONE

17   OF THESE DOCUMENTS -- THERE'S ABOUT 10 PAGES THERE.

18          MS. SARTORIS:  I -- I'M NOT SURE WHY THAT IS

19   BECAUSE THEY HAVE SWITCHED AROUND SOMETIMES.  BUT IF

20   IT'S HELPFUL, I CAN GIVE YOU THE PAPER COPY.

21          THE COURT:  WELL, I'VE NOTICED IN THE BINDER

22   COPY THAT I HAVE, THE PAGES ARE NOT IN NUMERICAL ORDER,

23   I DON'T THINK.

24          MS. SARTORIS:  I THINK THAT'S RIGHT.

25          THE COURT:  THAT MAY EXPLAIN WHY YOU'RE --

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 34 of 131   Page ID #:9059

```
 1                                                         29
 2   VERSION AT ALL.

 3              THEY ALSO INDICATE THEY THEY'RE SUBJECT

 4   TO A PROTECTIVE ORDER.

 5              MS. SARTORIS:  NOT ON THE COPY THAT I'M USING.

 6   THAT'S WHY I'M USING THE ELMO.  THIS IS AN ISSUE YOU

 7   RAISED YESTERDAY.  SO I REDACTED THOSE BECAUSE OUR

 8   TRIAL DIRECTOR VERSION HAD THE PROTECTIVE ORDER.

 9              MR. HANUSZ:  THERE'S MANY COMPETING VERSIONS.

10   I CAN'T KEEP TRACK.

11              THE COURT:  DO YOU HAVE A COPY OF THE

12   EXHIBIT -- A PAPER COPY?

13              MS. SARTORIS:  I HAVE MIGHT HAVE ONE WITH MY

14   NOTES ON IT, IF YOU WANT TO BORROW IT.

15              MR. HANUSZ:  NO.

16              I'LL LOOK IN THE BINDER, YOUR HONOR.

17              THE COURT:  I'VE BEEN ABLE TO FIND IN THE

18   BINDER MOST -- WITH THE EXCEPTION OF THE LAST PAGE YOU

19   REFERENCED, I DIDN'T -- BECAUSE AS I SAID, THESE ARE

20   NOT IN ORDER NUMERICAL ORDER, AND I HAVEN'T FOUND THAT

21   YET.

22              MR. HANUSZ:  THE ELECTRONIC VERSION OF 1650 IS

23   13 PAGES.  THIS IS MUCH LENGTHIER.

24              I WILL SAY THAT OUR OBJECTIONS WERE BASED

25   ON ELECTRONIC.
```

1       THE COURT:  I UNDERSTAND.                    30

2                MR. HANUSZ:  IF I MAY HAVE A MOMENT TO LOOK?

3                THE COURT:  SURE.

4                MR. HANUSZ:  THANK YOU, YOUR HONOR.

5                     **(PAUSE IN THE PROCEEDINGS)**

6                MR. HANUSZ:  THANK YOU, YOUR HONOR.

7                     THE VERSION APPEARS TO MATCH THE BINDER.

8                THE COURT:  THANK YOU.

9       BY MS. SARTORIS:

10      Q    MS. ROBINSON, IF I MAY DRAW YOUR ATTENTION TO A

11      COUPLE OF PAGES FURTHER IN THE EXHIBIT TO A DOCUMENT

12      THAT HAS THE NUMBERS "11547" AT THE BOTTOM.

13      A    YES.

14      Q    DO YOU SEE WHAT THIS IS?

15      A    THIS IS AN APPLICATION FOR THE SAME INDIVIDUAL,

16      CHEN YAPING, FROM 2011.

17      Q    AND WHAT ARE THE DATES OF THE ISSUANCE, EXPIRATION

18      OF THIS VISA?

19      A    IT WAS ISSUED ON APRIL 8TH, 2011.  AND IT EXPIRED

20      APRIL 1ST, 2012.

21      Q    AND GOING AHEAD A FEW MORE PAGES TO A PAGE AT THE

22      BOTTOM WHERE IT SAYS "11550."

23                DO YOU HAVE THAT IN FRONT OF YOU?

24      A    I DO.

25      Q    AND IS THIS ANOTHER COPY OF AN APPLICATION THAT HE

1

2   A    YES.

3   Q    WHO DOES IT SAY HIS EMPLOYER IS?

4   A    CHENGDU RML TECHNOLOGY COMPANY LIMITED.

5   Q    WHAT'S HIS JOB DUTY?

6   A    GENERAL MANAGER.

7   Q    GOING TO THE NEXT PAGE THAT SAYS "11551" AT THE

8   BOTTOM.

9   A    YES.

10   Q    DO YOU SEE THE E-MAIL ADDRESS THERE?

11   A    YES.

12   Q    AND WHAT IS IT?

13   A    YPC@RML138.COM.

14   Q    THANK YOU, MS. ROBINSON.

15        CAN I ASK YOU TO TURN TO EXHIBIT 1651.

16   A    YES.

17   Q    IF YOU TURN TO A PAGE AT THE BOTTOM OF THE EXHIBIT

18   THAT SAYS "11442."

19   A    YES.

20   Q    DO YOU HAVE THAT IN FRONT OF YOU?

21   A    I DO.

22   Q    WHAT IS THIS?

23   A    THIS IS THE APPLICATION FOR AN INDIVIDUAL NAMED

24   YUAN YE WHO APPLIED IN CHENGDU IN 2012.

25   Q    WHAT ARE THE ISSUE DATES AND EXPIRATION DATE FOR

A    THIS VISA WAS ISSUED NOVEMBER 20TH, 2012.  AND

EXPIRED NOVEMBER 14TH, 2013.

Q    IN THE MIDDLE OF THE EXHIBIT, DO YOU SEE THE

PORTION THAT SAYS "MEMO"?

A    YES.

Q    WHAT DOES IT -- HOW DOES THAT INFORMATION GET THERE

IN THE MEMO SECTION?

A    THIS PART IS TYPED BY THE ADJUDICATING OFFICER

DURING THE INTERVIEW.

Q    BASED ON WHAT?

A    BASED ON THE RESPONSES PROVIDED BY THE APPLICANT

DURING THE INTERVIEW, THE ANSWERS THEY GIVE TO THE

QUESTIONS, AND INFORMATION PROVIDED BY THE APPLICANT IN

BOTH THE APPLICATION AND ANY SUPPLEMENTARY

DOCUMENTATION THEY WOULD HAVE PROVIDED.

Q    AND CAN YOU READ WHAT THE FIRST SENTENCE SAYS IN

THAT SECTION?

A    "FOR RESEARCH PROGRAM AT UCLA."

Q    AND THE SECOND SENTENCE?

A    "APPLICANT IS A CHIP DESIGNER FOR A COMPANY WHICH

MAKES ALL TYPES OF PRODUCTS THAT HE CLAIMS ARE FOR

COMMERCIAL USE."

Q    IF I COULD ASK YOU TO LOOK AT THE PAGE THAT SAYS

"11445" ON IT.

1    A    YES.

2    Q    WHAT DOES THIS SAY HIS OCCUPATION IS?

3    A    IT SAYS HE WORKS FOR RML TECHNOLOGY COMPANY LIMITED

4    AND IS IN CHARGE OF CHIP DESIGNING WORK.

5    Q    DOES IT SAY THAT HE'S AN ENGINEER?

6    A    YES, "PRIMARY OCCUPATION, ENGINEERING."

7    Q    IF YOU GO TO THE NEXT PAGE THAT SAYS "11446" AT THE

8    BOTTOM.

9    A    YES.

10   Q    I'M SORRY, GOING BACK TO THE PAGE WE WERE JUST ON,

11   THE "11445."

12   A    YES.

13   Q    DOES IT SAY -- ASK -- DO YOU SEE WHERE IT SAYS,

14   "WERE YOU PREVIOUSLY EMPLOYED?"

15   A    YES.

16   Q    AND HOW DOES HE ANSWER THAT QUESTION?

17   A    HE SAYS, YES, HE WAS PREVIOUSLY EMPLOYED BY CHINA

18   ELECTRONICS GROUP CORPORATION, ALSO IN CHENGDU, AS A

19   CIRCUIT DESIGNER.

20   Q    IF WE CAN GO AHEAD TO THE PAGE BEFORE THAT THAT

21   SAYS "11444" AT THE BOTTOM.

22   A    YES.

23   Q    DO YOU HAVE THAT IN FRONT OF YOU?

24   A    YES.

25   Q    WHERE DOES IT SAY HIS ADDRESS WILL BE WHEN HE'S IN

1

2     A    HE STATES THAT HIS ADDRESS WILL BE UCLA ELECTRICAL

3     ENGINEERING, 420 WESTWOOD PLAZA IN L.A.

4     Q    AND LOOKING AT PAGE 11445 -- I'M SORRY.

5          LOOKING AT PAGE 11447.

6     A    YES.

7     Q    DO YOU SEE THE SECTION WHERE IT SAYS, "ADDRESS AND

8     PHONE"?

9     A    YES.

10    Q    WHAT DOES HE LIST HIS E-MAIL ADDRESS TO BE?

11    A    XDUN@RML138.COM.

12    Q    AND IF YOU GO FORWARD INTO THIS DOCUMENT TO A PAGE

13    THAT SAYS, AT THE BOTTOM, "11450."

14    A    YES.

15    Q    WHAT IS THIS?

16    A    THIS IS THE RESUME THAT THE APPLICANT PROVIDED TO

17    THE ADJUDICATOR AT THE TIME OF INTERVIEW.

18    Q    AND, AGAIN, DOES IT HAVE THE SAME E-MAIL ADDRESS

19    THAT WE JUST TALKED ABOUT?

20    A    YES, XDUN@RML138.COM.

21    Q    AND COULD YOU -- WHAT DOES IT SAY FOR WORK

22    EXPERIENCE?

23    A    IT LISTS HIS EMPLOYMENT AS FROM 2005 TO 2011 AT THE

24    NUMBER 10 RESEARCH INSTITUTE OF CHINA ELECTRONICS

25    TECHNOLOGY GROUP CORPORATION AS AN RF CIRCUITS ENGINEER

THEN FROM 2012 TO THE TIME OF INTERVIEW, AT

RML TECHNOLOGY COMPANY LIMITED AS A CHIP DESIGNER TO BE

ENGAGED IN RF CHIP DESIGN AND RF ID DESIGN.

Q    AGAIN, 11451, IF YOU TURN TO THAT PAGE.

A    YES.

Q    WHAT IS THIS?

A    THIS IS THE ENGLISH SIDE OF A BUSINESS CARD LISTING

HIS EMPLOYMENT AS RML AS A CHIEF ENGINEER.

Q    IF YOU GO FURTHER IN THIS DOCUMENT, YOU SEE

INFORMATION ABOUT AN INDIVIDUAL ON PAGE 11454.

A    YES.

Q    DO YOU SEE THAT?

A    YES.

Q    AND WHY WOULD THIS INFORMATION BE IN HERE?

A    THE APPLICANT WOULD HAVE PROVIDED IT TO THE

ADJUDICATOR AT THE TIME OF INTERVIEW.

Q    CAN I ASK YOU TO LOOK AT WHAT'S BEEN MARKED AND

ENTERED AS GOVERNMENT'S EXHIBIT 1652, PLEASE?

A    YES.

Q    MS. ROBINSON, CAN I ASK YOU TO LOOK AT A PAGE THAT

SAYS "11433" AT THE BOTTOM?

A    YES.

Q    AND WHAT IS THIS?

A    THIS IS AN APPLICATION IN 2011 FROM AN APPLICANT

2  Q    WHAT ARE THE DATES OF THIS VISA?

3  A    THE VISA WAS ISSUED SEPTEMBER 6TH, 2011, AND

4  EXPIRED SEPTEMBER 1ST, 2012.

5  Q    IF YOU GO TO TWO PAGES AHEAD TO 11435 AT THE

6  BOTTOM.

7  A    YES.

8  Q    DO YOU HAVE THAT IN FRONT OF YOU?

9  A    I DO.

10 Q    SO WHO DOES IT -- WHAT DOES IT LIST THIS PERSON'S

11 EMPLOYMENT TO BE?

12 A    TIAN HANG YANG PU LIMITED COMPANY IN BEIJING.

13 Q    AND WHAT'S HER POSITION?

14 A    SHE STATES SHE'S THE VICE PRESIDENT OF THE COMPANY,

15 RESPONSIBLE FOR THE MANAGEMENT OF THE COMPANY.

16 Q    AND IF YOU LOOK DOWN TO THE SECTION WHERE IT ASKS

17 ABOUT PREVIOUS EMPLOYMENT --

18 A    YES.

19 Q    -- DID SHE INDICATE THAT SHE WAS PREVIOUSLY

20 EMPLOYED?

21 A    YES.  AT CHINA QING'AN INTERNATIONAL TRADE LIMITED

22 COMPANY, ALSO IN BEIJING, AS THE DEPARTMENT GENERAL

23 MANAGER.

24 Q    IF YOU LOOK AT THE NEXT PAGE --

25 A    YES.

1  Q  -- 11436.

2  A  YES.

3  Q  THIS DESCRIBES -- YOU'LL SEE THERE'S A "2" AND IT

4  DESCRIBES ANOTHER PRIOR EMPLOYER.

5  A  YES.

6  Q  AND WHO DOES IT SAY HER SUPERVISOR WAS AT THAT

7  TIME?

8  A  IT LISTS HER SUPERVISOR AS CHEN YAPING, YAPING

9  CHEN.

10  Q  FROM WHEN TO WHEN?

11  A  FROM 2009 UNTIL 2010.

12  Q  AND GOING TO THE PAGE THAT'S MARKED "11437."

13  A  YES.

14  Q  WHAT DOES IT LIST HER E-MAIL ADDRESS TO BE?

15  A  "DJRU@163.COM."

16  Q  NOW, IF I COULD ASK YOU TO LOOK AT THE DOCUMENT

17  THAT'S MARKED "11493."

18      DO YOU HAVE THAT IN FRONT OF YOU?

19  A  YES.

20  Q  WHAT IS THIS?

21  A  THIS IS AN APPLICATION FROM THE SAME INDIVIDUAL,

22  DENG JIERU, FROM 2013.

23  Q  AND WHAT ARE THE DATES OF THIS VISA?

24  A  THE VISA WAS ISSUED MAY 8TH, 2013, AND EXPIRED MAY

25  6TH, 2014.

```
 1        Q    IF YOU COULD LOOK AHEAD TWO PAGES --

 2        A    YES.

 3        Q    -- WHERE IT SAYS, "PRESENT WORK, EDUCATION,

 4   TRAINING."  AND THEN BELOW THAT, IT DESCRIBES PRIOR

 5   EMPLOYER.

 6             WHAT DOES IT SAY THERE?

 7        A    IT SAYS, "CHINA QING'AN INTERNATIONAL TRADE GROUP

 8   LIMITED COMPANY IN BEIJING."

 9        Q    AND FROM WHEN TO WHEN?

10        A    FROM MARCH 1999 TO DECEMBER 2010.

11        Q    AND ON PAGE 11497, DO YOU SEE THE E-MAIL ADDRESS

12   THAT'S LISTED?

13        A    YES.  IT IS DJRU@163.COM.

14        Q    TURN YOUR ATTENTION TO WHAT'S BEEN MARKED AS

15   GOVERNMENT'S EXHIBIT 1653.

16        A    YES.

17        Q    IF YOU TURN TO THE PAGE THAT SAYS "23082" AT THE

18   BOTTOM.

19        A    YES.

20        Q    WHAT IS THIS DOCUMENT?

21        A    THIS IS AN APPLICATION FOR AN INDIVIDUAL NAMED

22   "CHENG KAI" FROM 2008.

23        Q    WHAT ARE THE ISSUE AND EXPIRATION DATES OF THIS

24   VISA?

25        A    IT WAS ISSUED FEBRUARY 25TH 2008, AND EXPIRED
```

1     FEBRUARY 19, 2010.

2     Q    AND WHAT DOES IT SAY IN THE MEMO PORTION OF THIS

3     DOCUMENT?

4     A    AIR CHINA PILOT.

5     Q    AND WHAT DOES THAT MEAN?

6     A    IT MEANS THAT THE INDIVIDUAL IS EMPLOYED AS A PILOT

7     FOR AIR CHINA AT THE TIME OF APPLICATION.

8     Q    CAN I ASK YOU TO TURN YOUR ATTENTION TO WHAT'S BEEN

9     MARKED AS "1654."

10    A    YES.

11    Q    IF YOU LOOK AT THE PAGE THAT SAYS "23093" AT THE

12    BOTTOM.

13         DO YOU HAVE THAT?

14    A    I DO.

15    Q    AND WHAT IS THIS?

16    A    THIS IS THE APPLICATION FOR A VISA FOR AN

17    INDIVIDUAL NAMED TIAN JONG.

18    Q    WHEN WAS IT ISSUED AND WHEN DID IT EXPIRE?

19    A    IT WAS ISSUED SEPTEMBER 28, 2007, AND EXPIRED

20    SEPTEMBER 17TH, 2009.

21    Q    AND LOOKING AT THE APPLICATION DATA, WHO DOES --

22    WHAT DO YOU KNOW ABOUT HIS EMPLOYMENT?

23    A    HE IS A CAPTAIN OR A PILOT FOR AIR CHINA.

24    Q    IF YOU COULD LOOK AT GOVERNMENT'S EXHIBIT 1655.

25    A    YES.

40

1    Q    TURN TO THE PAGE WHERE AT THE BOTTOM IT SAYS,

2    "23111."

3              DO YOU HAVE THAT IN FRONT OF YOU?

4    A    YES.

5    Q    WHAT IS THIS?

6    A    THIS IS AN APPLICATION FOR AN INDIVIDUAL NAMED

7    "CHEN YUAN DONG" FROM 2008.

8    Q    WHAT ARE THE ISSUE AND EXPIRATION DATES FOR THIS?

9    A    IT WAS ISSUED JUNE 4, 2008, AND EXPIRED MAY 21ST,

10   2010.

11   Q    AND WHAT DOES IT -- WHAT DO YOU LEARN FROM THE MEMO

12   THERE?

13   A    THE INDIVIDUAL WAS AN AIR CHINA PILOT AND HAD BEEN

14   WORKING THERE FOR ONE YEAR.

15             MS. SARTORIS:  THANK YOU, YOUR HONOR.  NO

16   FURTHER QUESTIONS.

17             THE COURT:  CROSS-EXAMINATION?

18             MS. WASSERMAN:  THANK YOU, YOUR HONOR.

19                      **CROSS-EXAMINATION**

20   BY MS. WASSERMAN:

21   Q    GOOD MORNING.

22   A    GOOD MORNING.

23   Q    THE INFORMATION IN THE VARIOUS VISA APPLICATIONS

24   YOU WERE JUST DISCUSSING, IF TRUE, THAT WOULD ALLOW A

25   PERSON TO TRAVEL TO THE UNITED STATES PERFECTLY

LAWFULLY; CORRECT?

A     A VISA -- YES, IF THEY WERE APPROVED FOR A VISA,

THEY ARE ALLOWED TO TRAVEL TO THE PORT OF ENTRY AND ASK

FOR PERMISSION TO ENTER.  A VISA DOES NOT GUARANTY YOU

ENTRY TO THE UNITED STATES.

Q     YOU HAVE NO REASON TO BELIEVE THAT ANY OF THE

STATEMENTS IN THESE EXHIBITS ARE UNTRUE; CORRECT?

A     I HAVE NO REASON TO BELIEVE THAT.

Q     I'D LIKE TO TURN YOUR ATTENTION BACK TO

GOVERNMENT'S EXHIBIT 1650, PLEASE.

A     YES.

Q     IF YOU COULD TURN TO THE PAGE ENDING IN BATES

"11553."

A     OKAY.

Q     I BELIEVE YOU PREVIOUSLY IDENTIFIED THIS DOCUMENT

AS THE RESUME ATTACHED TO A VISA APPLICATION FOR YAPING

CHEN?

A     YES.

Q     DO YOU SEE, UNDER "EDUCATION," A NUMBER OF BULLETS

LISTED?

A     YES.

Q     THOSE BULLETS INDICATE THAT MR. CHEN WAS STUDYING

AS A DOCTOR OF BUSINESS ADMINISTRATION AT PRESTON

UNIVERSITY IN 2011; CORRECT?

A     YES.

```
 1    Q    AND THAT HE ALSO STUDIED AT A DOCTORAL CLASS OF    42

 2    BUSINESS ADMINISTRATION IN CHINA IN 2010; CORRECT?

 3    A    YES.

 4    Q    IT ALSO INDICATES OTHER POST-GRADUATE STUDY,

 5    INCLUDING IN ELECTRONICS; CORRECT?

 6    A    YES.

 7    Q    WOULD YOU PLEASE TURN TO THE NEXT PAGE.

 8    A    YES.

 9    Q    DO YOU SEE A HEADING TITLED "PUBLICATION"?

10    A    YES.

11    Q    THERE'S A BULLET UNDERNEATH THAT THAT READS

12    "MULTIMEDIA COMMUNICATION AND VOD SYSTEM PRESENT

13    ELECTRONICS"?

14    A    YES.

15    Q    THIS IS A PUBLICATION THAT MR. CHEN AUTHORED?

16    A    THIS IS A PUBLICATION HE INCLUDED ON HIS RESUME.

17    Q    OKAY.  I'D LIKE TO TURN NOW TO EXHIBIT 1651,

18    PLEASE.

19    A    OKAY.

20    Q    IF YOU TURN TO THE PAGE ENDING IN "11442."

21    A    YES.

22    Q    THIS WAS PREVIOUSLY IDENTIFIED AS A VISA

23    APPLICATION FOR MR. YUAN YE; CORRECT?

24    A    YES.

25    Q    I'D LIKE TO DIRECT YOUR ATTENTION BACK TO THE
```

1

2     A    UH-HUH.   YES.

3     Q    YOU PREVIOUSLY INDICATED THAT THAT PORTION OF THE

4     VISA APPLICATION READS, "FOR RESEARCH PROGRAM AT UCLA";

5     CORRECT?

6     A    YES.

7     Q    THIS CONTINUES ON IN THE SECOND SENTENCE TO SAY,

8     "APPLICANT HAS A MASTERS DEGREE UESTC AND HAS PUBLISHED

9     A FEW PAPERS ON MICROWAVE TECHNOLOGY."

10          IS THAT CORRECT?

11    A    THE THIRD SENTENCE, YES.

12    Q    THANK YOU.

13    A    UH-HUH.

14    Q    IN THAT SAME DOCUMENT, I'D LIKE TO DIRECT YOU NOW

15    TO THE PAGE ENDING IN "11450," PLEASE.

16    A    YES.

17    Q    THIS IS MR. YUAN'S RESUME ATTACHED TO THE VISA

18    APPLICATION; CORRECT?

19    A    YES, THAT HE WOULD HAVE SUBMITTED.

20    Q    UNDER "EDUCATION," IT INDICATES THAT HE HAS A

21    BACHELOR'S DEGREE IN ELECTROMAGNETIC AND MICROWAVE

22    TECHNOLOGY; CORRECT?

23    A    YES.

24    Q    AND IT ALSO INDICATES THAT HE HAS A MASTERS DEGREE

25    IN ELECTRONIC -- EXCUSE ME, ELECTROMAGNETIC AND

1

2        A    YES.

3        Q    UNDER THE HEADING "PUBLICATIONS," THERE ARE ALSO

4   SEVERAL PAPERS LISTED; CORRECT?

5        A    THERE APPEAR TO BE THREE, YES.

6        Q    AND THOSE APPEAR TO BE PUBLICATIONS FROM HIS

7   RESEARCH?

8        A    ONE IS LISTED AS HIS MASTERS DEGREE THESIS.  ONE IS

9   LISTED AS A PAPER -- IT APPEARS TO BE A PAPER PRESENTED

10  AT A CONFERENCE.  AND THE THIRD ONE, YES.

11       Q    IF YOU COULD TURN NOW TO PAGE 11455, PLEASE.

12       A    YES.

13       Q    THIS IS A DOCUMENT ENTITLED "RESEARCH PLAN."

14       A    YES.

15       Q    IS THAT CORRECT?

16       A    YEAH.

17       Q    AND THE HOSTING UNIVERSITY IS IDENTIFIED AS "UCLA";

18  CORRECT?

19       A    THAT'S CORRECT.

20            MS. WASSERMAN:  MAY I HAVE JUST A MOMENT, YOUR

21  HONOR?

22            THE COURT:  YES.

23            MS. WASSERMAN:  THANK YOU, YOUR HONOR.

24  BY MS. WASSERMAN:

25       Q    IF I COULD DIRECT YOUR ATTENTION NOW -- I'LL PLACE

1
2      THIS IS THE PAGE ENDING IN "11456."

3      A     YES.

4      Q     IS THIS ONE OF THE RESEARCH PAPERS THAT'S LISTED IN

5      THE RESUME ATTACHED TO THE VISA APPLICATION?

6      A     YES.  IT APPEARS TO BE NUMBER THREE ON THE LIST.

7      Q     I'D LIKE TO DIRECT YOU TO GOVERNMENT'S EXHIBIT --

8      ACTUALLY, STRIKE THAT.

9             I'M GOING TO DIRECT YOU TO A DIFFERENT

10     EXHIBIT.

11            I'D LIKE TO DIRECT YOU TO EXHIBIT 4091.  I'LL

12     TELL YOU THE VOLUME IN WHICH THIS EXHIBIT APPEARS.

13            IT SHOULD APPEAR IN THE BINDER LABELED "VOLUME

14     19," EXHIBIT 4091.

15     A     OKAY.

16     Q     I'D LIKE TO DIRECT YOU TO PAGE 1150 OF THAT

17     EXHIBIT.

18     A     OKAY.

19     Q     DO YOU RECOGNIZE THIS DOCUMENT?

20     A     THIS IS THE APPLICATION FOR YUAN YE FROM 2016.

21            MS. WASSERMAN:  WE'D LIKE TO MOVE THIS INTO

22     EVIDENCE, YOUR HONOR.

23            THE COURT:  ANY OBJECTION?

24            MS. SARTORIS:  NO, YOUR HONOR.

25            THE COURT:  EXHIBIT 4091 IS ADMITTED.

BY MS. WASSERMAN:

Q    UNDER THE HEADING "MEMO," DO YOU SEE WHAT MR. YUAN

HAS WRITTEN THERE?

A    THIS SECTION IS ENTERED BY THE ADJUDICATOR, NOT BY

MR. YUAN.

Q    UNDERSTOOD.

          AND WHAT DID THE ADJUDICATOR ENTER THERE?

A    "ONE-WEEK TRIP TO PRESENT A PAPER ON TRANSMITTERS,

SLASH, SIGNAL PROCESSING AT IEEE, INTERNATIONAL

MICROWAVE SYMPOSIUM.  PH.D. CANDIDATE, EXTENSIVE

EDUCATION, SLASH, RESEARCH IN MICROWAVE TECHNOLOGY."

Q    THAT'S SUFFICIENT.  THANK YOU.

          I'D LIKE TO STAY ON THIS SAME EXHIBIT, BUT

DIRECT YOU TO ANOTHER PAGE.  IF YOU COULD TURN TO PAGE

11510.

A    YES.

Q    IS THIS AN INVITATION LETTER FROM THE INTERNATIONAL

MICROWAVE SYMPOSIUM TO VISIT THE UNITED STATES?

A    YES.  IT APPEARS TO BE AN INVITATION LETTER TO YUAN

YE.

Q    AND THE PURPOSE OF THE INVITATION IS TO PERMIT

MR. YUAN YE TO PRESENT A RESEARCH PAPER AT THIS

SYMPOSIUM?

A    YES, THAT APPEARS TO BE WHAT IT STATES.

```
 1        Q    I'D LIKE NOW TO DIRECT YOU TO THE VERY NEXT PAGE, 47

 2   THIS IS THE PAGE ENDING IN "1511."

 3             DO YOU SEE THAT?

 4   A    YES.

 5   Q    AND THIS IS A CERTIFICATION FROM THE UNIVERSITY OF

 6   ELECTRONIC SCIENCE AND TECHNOLOGY OF CHINA CERTIFYING

 7   THAT MR. YE YUAN IS A PH.D. CANDIDATE THERE?

 8   A    YES, THAT APPEARS TO BE WHAT IT SAYS.

 9   Q    TURNING NOW TO THE NEXT PAGE ENDING IN "11512."

10   A    YES.

11   Q    THIS IS THE RESEARCH PAPER REFERENCED IN THE

12   INVITATION LETTER FROM THE MICROWAVE SYMPOSIUM;

13   CORRECT?

14   A    YES, IT DOES APPEAR TO BE SO.

15   Q    I'D LIKE NOW FOR YOU TO TURN YOUR ATTENTION TO

16   EXHIBIT 4105.  I BELIEVE IT'S IN THE SAME VOLUME, BUT

17   PLEASE LET ME KNOW IF THAT IS NOT THE CASE.

18   A    IT IS.

19   Q    AND DO YOU RECOGNIZE THIS DOCUMENT?

20   A    THIS IS AN APPLICATION FOR AN INDIVIDUAL NAMED XU

21   QIANG IN -- SUBMITTED IN 2010.

22             MS. WASSERMAN:  WE'D LIKE TO MOVE THIS INTO

23   EVIDENCE, YOUR HONOR.

24             THE COURT:  ANY OBJECTION?

25             MS. SARTORIS:  NO, YOUR HONOR.
```

**(EXHIBIT 4105 RECEIVED IN EVIDENCE)**

BY MS. WASSERMAN:

Q    IF YOU COULD TURN TO PAGE 11654, PLEASE.

A    YES.

Q    I KNOW THE PRINT IS A LITTLE FAINT, BUT IS THIS AN

INVITATION LETTER FROM UCLA?

A    IT APPEARS TO BE, YES.

Q    AND THE INVITATION LETTER PROVIDES THAT MR. XU IS

BEING INVITED TO JOIN THE ELECTRICAL ENGINEERING

DEPARTMENT AT UCLA?

A    YES, THAT'S WHAT IT STATES.

Q    TURNING NOW TO THE FOLLOWING PAGE, DOES THIS APPEAR

TO BE MR. XU'S RESUME ATTACHED TO THE VISA APPLICATION?

A    YES, THAT HE WOULD HAVE SUBMITTED AT TIME OF

APPLICATION.

Q    IT STATES HIS EDUCATIONAL BACKGROUND IS -- THAT HE

HAS A PH.D. IN ELECTROMAGNETIC FIELD AND MICROWAVE

TECHNOLOGY?

A    YES.

Q    AND A BS IN INFORMATION ENGINEERING?

A    YES.

Q    UNDER THE NEXT HEADING, IT ALSO STATES A NUMBER OF

RESEARCH INTERESTS; CORRECT?

A    YES.

```
 1      Q    THOSE INCLUDE MICROWAVE SYSTEMS AND INTEGRATED RF

 2   MODULES?

 3   A    YES, THOSE ARE BOTH LISTED.

 4   Q    A LITTLE FURTHER DOWN, THERE ARE ALSO A NUMBER OF

 5   HONORS AND AWARDS LISTED?

 6   A    YES.

 7   Q    AND THEN BELOW THAT, THERE ARE SEVERAL PUBLICATIONS

 8   LISTED; CORRECT?

 9   A    YES.  THERE ARE FOUR JOURNAL AND MAGAZINE PAPERS

10   LISTED ON THIS PAGE.

11   Q    AND THOSE APPEAR TO BE PUBLISHED IN

12   ELECTRONICS-RELATED AND MICROWAVE-RELATED JOURNALS?

13   A    YES.  THEY APPEAR TO HAVE TITLES RELEVANT TO

14   ELECTRONICS.

15   Q    I'D LIKE NOW TO DIRECT YOUR ATTENTION TO THE VERY

16   NEXT PAGE.  THERE'S A HEADING AT THE TOP THAT SAYS

17   "CONFERENCE PAPERS."

18   A    YES.

19   Q    DO YOU SEE THAT?

20   A    I DO.

21   Q    THERE ARE FOUR CONFERENCE PAPERS LISTED BELOW THAT?

22   A    FIVE.

23   Q    YOU'RE CORRECT, FIVE.

24        AND THOSE ALSO APPEAR TO BE MICROWAVE AND

25   ELECTRICAL-ENGINEERING-RELATED CONFERENCES?
```

THE COURT: TO WHICH -- WELL --

MS. WASSERMAN: I JUST HAVE A FEW MORE

QUESTIONS, YOUR HONOR.

THE COURT: DO YOU HAVE ANY UNDERSTANDING OF

THIS -- OF THE STATEMENTS IN THE DOCUMENT OTHER THAN

THE WORDS THAT ARE WRITTEN HERE?

THE WITNESS: NO, SIR.

THE COURT: OKAY. NEXT QUESTION, PLEASE.

BY MS. WASSERMAN:

Q    BELOW THAT HEADING APPEARS ANOTHER HEADING TITLED

"PATENTS"; CORRECT?

A    YES.

Q    AND TWO PATENTS ARE LISTED BELOW THAT?

A    THEY APPEAR TO BE, YES.

Q    AND THERE'S ALSO A HEADING FOR DOCTORAL

DISSERTATION; CORRECT?

A    CORRECT.

Q    ON THE VERY NEXT PAGE, THERE'S ALSO A DOCUMENT

ENTITLED "RESEARCH PROPOSAL"; CORRECT?

A    THAT'S CORRECT.

Q    AND YOU HAVE NO REASON TO BELIEVE THAT ANY OF THE

STATEMENTS DISCUSSED IN THESE DOCUMENTS THAT WE COVERED

ARE UNTRUE; CORRECT?

A    I HAVE NO REASON TO BELIEVE SO AT THIS TIME.

1  BUT THIS IS THE FIRST TIME I'VE SEEN ANY OF

2  THESE DOCUMENTS, SO --

3  Q    YOU WEREN'T INVOLVED IN REVIEWING ANY OF THE

4  APPLICATIONS DISCUSSED EITHER WITH ME OR WITH THE

5  GOVERNMENT; CORRECT?

6  A    YOU MEAN REVIEWING THEM AT THE TIME THEY WERE

7  ADJUDICATED?  NO.

8  Q    SO HAVE YOU NO BASIS FOR CONCLUDING ONE WAY OR THE

9  OTHER THAT THESE STATEMENTS ARE UNTRUE; CORRECT?

10 A    NO.

11           MS. WASSERMAN:  THANK YOU.

12               NO FURTHER QUESTIONS, YOUR HONOR.

13           THE COURT:  THANK YOU, MS. WASSERMAN.

14               MS. SARTORIS, ANY REDIRECT?

15           MS. SARTORIS:  NO, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  MS. ROBINSON, THANK

17 YOU FOR YOUR TESTIMONY.  YOU ARE EXCUSED.  HAVE A SAFE

18 TRIP HOME.

19               WOULD THE GOVERNMENT CALL THE NEXT

20 WITNESS, PLEASE?

21           MR. ROLLINS:  YOUR HONOR, JAMAAL WESTBY.  I

22 BELIEVE THAT THE DEFENSE HAS SOME ISSUES THEY WOULD

23 LIKE TO RESOLVE BEFORE THIS WITNESS TESTIFIES.

24           THE COURT:  OKAY.

25               LET ME TALK TO YOU AT THE SIDE.

MR. HANUSZ:  THANK YOU, YOUR HONOR.

SO THE INITIAL ISSUE RELATES TO THE

VISUAL AIDS THAT THE GOVERNMENT WOULD LIKE TO USE WITH

THESE WITNESS -- WITH THIS WITNESS.  THERE ARE FOUR,

ESSENTIALLY, POWER POINT SLIDES.  THEY DON'T SUMMARIZE

A GREAT DEAL OF THE INFORMATION.  CERTAINLY, AGENT

WESTBY CAN TALK ABOUT -- I THINK THERE ARE ISSUES WITH

HIS TESTIMONY MORE GENERALLY.  THEY'RE TEXT RECORDS.

THE RECORDS SPEAK FOR THEMSELVES.

BUT IN TERMS OF THESE DEMONSTRATIVE

SLIDES, THEY DON'T ADD ANYTHING.  THEY'RE JUST -- I

DON'T THINK THEY HAVE ANY PLACE HERE.

MR. ROLLINS:  YOUR HONOR, WE'RE NOT SEEKING TO

INTRODUCE THESE INTO EVIDENCE AS AN EXHIBIT.

WHAT WE'RE SEEKING TO DO, BECAUSE THE

TEXT RECORDS ARE FAIRLY VOLUMINOUS, AND WE'RE GOING TO

BE FLIPPING BACK AND FORTH BETWEEN VISA RECORDS,

E-MAILS AND TEXT RECORDS, IS ESSENTIALLY PROVIDE A

DEMONSTRATIVE AID TO SUMMARIZE WHAT THESE E-MAILS AND

TEXT RECORDS SHOW.

THE COURT:  OKAY.  WHAT'S THE OTHER ISSUE?

MR. HANUSZ:  AGENT WESTBY CAN SPEAK TO THE

E-MAILS.  HE HAS NO KNOWLEDGE OF THE E-MAILS.

SO TO THE EXTENT THAT THE GOVERNMENT

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 58 of 131   Page ID
#:9083

THAT.

              BUT TO THE EXTENT THAT THIS EVIDENCE

COMES IN THROUGH THIS WITNESS WHO HAS NO KNOWLEDGE,

OTHER THAN HE'S HERE TO CERTIFY THE TEXT RECORDS WHICH

ARE ALREADY CERTIFIED.

              MR. ROLLINS:  AGENT WESTBY HAS REVIEWED THE

E-MAILS.  I BELIEVE THE DEFENSE HAS STIPULATED TO THIS

ACCOUNT AS BELONGING AND HAVING BEEN USED BY DEFENDANT.

              MR. HANUSZ:  THE E-MAILS WERE NO PART OF THE

EXPERT DISCLOSURE, NOT MENTIONED IN THE EXPERT

DISCLOSURE.

              THE COURT:  WHAT IS THE TESTIMONY HE'S -- WHAT

IS THE OFFERED TESTIMONY AS TO THE CONTENTS OF E-MAILS?

              MR. ROLLINS:  SO THE DEFENDANT RECEIVED

E-MAILS BEING INSTRUCTED TO MEET AIR CHINA PILOTS IN

HOTEL ROOMS AND HAND THEM PACKAGES.  ONE OF THOSE

ATTACHMENTS TO THE E-MAILS INSTRUCTS DEFENDANT NOT TO

TELL THE PILOT ABOUT THE MMIC'S.  AND AGENT WESTBY HAS

REVIEWED ALL OF THESE E-MAILS, AND THEY WERE OBTAINED

BY THE GOVERNMENT IN THIS CASE.

              THE COURT:  OKAY.  JUST A MINUTE.

               THIS IS AN E-MAIL SENT TO THE DEFENDANT?

              MR. ROLLINS:  CORRECT, YOUR HONOR.

              THE COURT:  AND DO YOU OBJECT TO THE ADMISSION

MR. HANUSZ:  CERTAINLY, WE HAVE NOT OBJECTED

TO MANY E-MAILS.

HERE'S THE ISSUE, YOUR HONOR:  THIS IS

NOT PART OF THE EXPERT -- AGENT WESTBY'S EXPERT

DISCLOSURE.  THIS IS ALL BEING DISCLOSED FOR THE FIRST

TIME RIGHT NOW.

THE COURT:  NO, BUT THE E-MAIL -- HERE'S WHAT

I DON'T QUITE UNDERSTAND:

IF THERE ARE E-MAILS THAT ARE

AUTHENTICATED AND THEIR AUTHENTICITY ISN'T DISPUTED,

AND IF THEY ARE NOT SUBJECT TO A HEARSAY OBJECTION, AND

I THINK THEY'RE NOT, THEN THEY CAN BE ADMITTED INTO

EVIDENCE, IF THEY HAVE RELEVANT INFORMATION.

SO WHAT IS HIS TESTIMONY GOING TO ADD TO

WHAT THE DOCUMENTS SAY?

MR. ROLLINS:  SO THE TEXT RECORDS ESTABLISH

THAT, AT THE TIME DEFENDANT WAS INSTRUCTED TO MEET THE

PILOTS, THE PILOTS IN FACT FLEW FROM BEIJING, AS

REFLECTED BY THESE RECORDS AND LANDED AT L.A.X.

THE COURT:  WHICH RECORDS, I'M SORRY?

MR. ROLLINS:  THE TEXT RECORDS, YOUR HONOR.

THOSE ARE THE CBP'S VERSION OF BORDER RECORDS VERIFYING

WHEN SOMEONE ENTERS THE UNITED STATES.

THE COURT:  OKAY.  I THINK --

```
 1              MR. HANUSZ:  YOUR HONOR, IF THE GOVERNMENT IS
 2    INTENDING TO CALL AGENT WESTBY TO TALK ABOUT E-MAILS,
 3    WHICH WAS NOT --
 4              THE COURT:  NO, I DON'T THINK THAT'S
 5    NECESSARY.
 6              THE E-MAILS SPEAK FOR THEMSELVES.
 7              THE ISSUE IS, THIS OTHER DOCUMENT THAT
 8    TALKS ABOUT WHEN A FLIGHT TAKES OFF AND/OR LANDS IN THE
 9    UNITED STATES.
10              MR. ROLLINS:  THE COURT RULED YESTERDAY THAT
11    ALL OF THOSE RECORDS WERE ADMISSIBLE.
12              SO I THINK WHAT MR. HANUSZ IS OBJECTING
13    TO IS OUR PRESENTATION OF THE E-MAILS SIMULTANEOUS WITH
14    AGENT WESTBY'S TESTIMONY, WHICH, IN OUR VIEW, WE'RE
15    ENTITLED TO PRESENT BECAUSE IT'S CRUCIAL FOR THE JURY'S
16    UNDERSTANDING OF THE CASE.  THEY NEED TO UNDERSTAND
17    THAT PILOTS WERE FLYING IN AT THE SAME TIME DEFENDANT
18    WAS BEING TOLD TO MEET THESE PEOPLE IN HOTELS.
19              THE COURT:  WHAT OPINIONS ARE YOU OFFERING
20    FROM HIM?
21              MR. ROLLINS:  THE ONLY EXPERT -- QUOTE,
22    UNQUOTE, "EXPERT," WHICH WE DON'T EVEN KNOW THAT THIS
23    NECESSARILY QUALIFIES, IS RELATED TO THE TEXT RECORDS.
24    SO BASED ON HIS TRAINING AND EXPERIENCE AS A FORMER CBP
25    OFFICER, HE REVIEWED TEXT RECORDS ALL THE TIME.
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 61 of 131   Page ID
#:9086

PARALLEL TO WHAT WE JUST HEARD FROM MS. ROBINSON.

SHE'S EXPLAINED SOME VISA RECORDS AND HOW THEY WORK.  I

THINK THAT THERE COULD BE EXPLANATION BY THE WITNESS AS

TO THESE RECORDS ABOUT FLIGHTS IN AND OUT OF THE UNITED

STATES BECAUSE I THINK THAT'S NOT SOMETHING THAT A

LAYPERSON -- WITH WHICH A LAYPERSON WOULD HAVE

FAMILIARITY.

          AS TO THE CONTENTS OF THE E-MAILS, I

DON'T SEE WHY THE WITNESS HAS TO TESTIFY ABOUT THE

CONTENTS OF THE E-MAILS AS OPPOSED TO ADMITTING THE

E-MAILS.

          MR. ROLLINS:  THAT WOULD BE FINE, YOUR HONOR.

IN FACT, I'M NOT EXPECTING HIM TO TESTIFY ABOUT THE

ENTIRETY OF THESE E-MAILS.  JUST VERY SMALL PORTIONS OF

THEM WHICH RELATE DIRECTLY TO THE TEXT RECORDS AT

ISSUE.

          SO WITHOUT INTRODUCING THE CONTENT OF THE

E-MAILS, THE JURY IS JUST GOING TO BE EVALUATING TEXT

RECORDS IN A COMPLETE VACUUM.

          THE COURT:  NO.  THE E-MAILS CAN BE ADMITTED

INTO EVIDENCE.  AND YOU CAN PRESENT THEM AS EXHIBITS TO

THE JURY AND EXPLAIN HOW YOU CONTEND THEY ARE LINKED

UP.

          I'M NOT QUITE SURE WHAT THE EXPERT IS

1

2            MR. ROLLINS:  HE'S NOT, YOUR HONOR.  HE'S

3    NOT -- THAT'S NOT PART OF HIS EXPERT TESTIMONY.  HE

4    WOULD JUST BE LITERALLY RECITING PASSAGE OF THOSE

5    E-MAILS IN WHICH --

6            THE COURT:  OKAY.  BUT IF THE EXHIBITS ARE

7    ADMITTED INTO EVIDENCE --

8            MR. HANUSZ:  HERE'S THE ISSUE, YOUR HONOR:  WE

9    IDENTIFIED, FOR THE COURT YESTERDAY, THE EXHIBITS THAT

10   WE ASSUMED WOULD BE USED WITH AGENT WESTBY.  THE

11   GOVERNMENT DID NOT OFFER, DID NOT TALK ABOUT ANY

12   E-MAILS.  WE HAVE NOT PREPARED FOR ANY

13   CROSS-EXAMINATION RELATING TO E-MAILS.  WE HAVE NO IDEA

14   WHAT HE WILL BE SHOWN, WHETHER ADMITTED OR NOT.

15           THE COURT:  BUT I JUST SAID, I THINK THE ISSUE

16   IS -- I DON'T THINK THIS IS THAT COMPLICATED.

17               WE JUST HAD A WITNESS TESTIFY ABOUT THE

18   CONTENTS OF EXHIBITS.  AND SHE WAS EXPLAINING CERTAIN

19   ELEMENTS OF THE EXHIBITS, TO WHICH THERE WERE NO

20   OBJECTIONS.

21               THESE EXHIBITS, IF HE'S GOING TO BE THE

22   PERSON THAT AUTHENTICATES -- IN EFFECT, AUTHENTICATES

23   OR EXPLAINS THESE ARE E-MAILS THAT WERE OBTAINED IN A

24   CERTAIN FASHION, THAT'S -- I DON'T HAVE A PROBLEM WITH

25   THAT.

1    I DON'T, HOWEVER, UNDERSTAND YET WHY HE 58

2    NEEDS TO TESTIFY AS TO WHAT IS STATED IN AN E-MAIL.

3    MR. ROLLINS:  BECAUSE, YOUR HONOR, WHEN

4    DEFENDANT WAS E-MAILED AND INSTRUCTED TO MEET THE AIR

5    CHINA PILOTS IN THE VISA RECORDS, THE TEXT RECORDS

6    CONFIRM THAT IN FACT THOSE INDIVIDUALS AT THE EXACT

7    SAME DATE THAT DEFENDANT WAS INSTRUCTED TO MEET THEM

8    FLEW INTO OR OUT OF THE UNITED STATES.  AND SO WHEN HE

9    WAS INSTRUCTED TO MEET THEM TO HAND OFF A PACKAGE, HE

10   WAS -- THE TEXT RECORDS THEN CONFIRMED THAT --

11   THE COURT:  I -- WHAT I'M SAYING IS, I DON'T

12   UNDERSTAND WHY A WITNESS IS NEEDED TO TESTIFY AS TO

13   WHAT AN ADMITTED EXHIBIT SAYS.

14   MR. ROLLINS:  HE DOESN'T NEED TO SUMMARIZE THE

15   WHOLE THING.  IT'S JUST GOING TO BE THE RELEVANT

16   PORTIONS REFLECTING WHEN THOSE INDIVIDUALS MET WITH THE

17   DEFENDANT BASED ON THE E-MAILS.

18   FOR THE RECORD, YOUR HONOR, WE DID IN OUR

19   FILING YESTERDAY THAT SUPPLEMENTED, IN FACT

20   SPECIFICALLY IDENTIFIED THESE E-MAILS IN A COURT PUBLIC

21   FILING.  SO MR. HANUSZ IS MISTAKEN ABOUT THAT.

22   MR. HANUSZ:  YOUR HONOR --

23   THE COURT:  I THINK -- I DON'T THINK THIS IS

24   THAT COMPLICATED.  I THINK THERE ARE -- I'VE ALREADY

25   RULED.  THERE CAN BE EXPERT TESTIMONY AS TO THE FLIGHTS

```
 1        IN AND OUT.  THE WITNESS CAN IDENTIFY -- YOU KNOW, HE
 2   CAN EXPLAIN WHERE THESE -- THAT THERE WERE E-MAILS THAT
 3   WERE GATHERED IN SOME FASHION.
 4                 BUT I THINK YOU CAN ARGUE BASED ON THE
 5   E-MAILS, IF YOU MOVE THEM IN AS EXHIBITS.  THEN IT'S UP
 6   TO YOU LATER TO EXPLAIN HOW THE E-MAILS RELATE TO THE
 7   OTHER MATTERS YOU'RE SAYING.
 8             MR. HANUSZ:  THIS AGENT DIDN'T SEIZE THE
 9   E-MAILS OR GATHER THEM.
10                 THIS IS AN EXPERT.  THIS IS A SEPARATE
11   AGENT WHO HAD NO INVOLVEMENT WITH THE INVESTIGATION.
12             THE COURT:  I DON'T THINK YOU'RE HEARING WHAT
13   I'M SAYING.
14                 WHAT I'M SAYING IS, THE EXHIBITS CAN COME
15   IN.  AND COUNSEL CAN LATER ARGUE ABOUT WHETHER THEY
16   COME IN.
17                 AND, FRANKLY, DOES IT REALLY MATTER
18   THROUGH WHOM THE EXHIBITS ARE IDENTIFIED?
19             MR. HANUSZ:  NO, IT'S THE DOTS THAT THE
20   GOVERNMENT WANTS THE WITNESS TO CONNECT.
21             THE COURT:  BUT I SAID I'M NOT DOING THAT.
22             MR. HANUSZ:  I APPRECIATE THAT.
23             THE COURT:  I DON'T THINK THE WITNESS HAS TO
24   DESCRIBE THE E-MAILS.  I THINK YOU CAN DO THAT.
25                 I THINK IF YOU WANT THIS WITNESS TO
```

59

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 65 of 131   Page ID #:9090

```
 1    EXPLAIN, WE HAVE GATHERED E-MAILS AS PART OF THIS
 2    INVESTIGATION, THAT'S FINE.  AND HE HAS PERCIPIENT
 3    KNOWLEDGE ON THAT.  AND HE CAN EXPLAIN THE FLIGHT AND
 4    IN AND OUT ON THE OTHER DATA.
 5             MR. ROLLINS:  SO I'M UNDERSTANDING THE COURT,
 6    MAY I ZOOM IN ON PORTIONS OF THOSE E-MAILS WHILE
 7    THEY'RE BEING ADMITTED INTO EVIDENCE?
 8             MR. HANUSZ:  WITH THIS WITNESS?
 9             THE COURT:  WHAT'S THE -- WHAT WOULD BE THE
10    PURPOSE?
11             I GUESS -- I DON'T SEE WHY YOU COULDN'T
12    DO THAT.  IT'S AN EXHIBIT.
13             MR. HANUSZ:  BUT NOT WITH THIS WITNESS, YOUR
14    HONOR.  THAT'S THE PROBLEM.
15             THE COURT:  BUT THE WITNESS ISN'T GOING TO BE
16    ASKED ANY QUESTIONS, OTHER THAN, WERE E-MAILS GATHERED?
17    AND YOU WANT TO PUBLISH AN E-MAIL.
18             I THINK IT'S A WASTE OF TIME HERE.  THE
19    EXHIBIT IS COMING IN.  WHY DOES IT MATTER WHEN IT'S
20    PUBLISHED?
21             MR. HANUSZ:  BECAUSE IT ADDS NOTHING TO THIS
22    WITNESS' TESTIMONY.
23             THE COURT:  ALL RIGHT.  IF THIS IS GOING TO BE
24    THE WITNESS WHO SAYS THE E-MAILS WERE GATHERED AND
25    PRESENTED, THEN ONE CAN BE PUBLISHED, BUT WITHOUT
```

                    IS THERE ANOTHER WITNESS WHO IS MORE

INFORMED ABOUT THE GATHERING OF THE E-MAILS?

          MR. ROLLINS:  YES.  THERE ARE TWO OTHER FBI

AGENTS WHO ARE MORE FAMILIAR WITH THE INVESTIGATION.

BUT FBI AGENT WAS ALSO ASKED, SPECIFICALLY AS PART OF

HIS ROLE IN THIS INVESTIGATION, TO REVIEW THIS SET OF

E-MAILS.

          MR. HANUSZ:  HE DIDN'T GATHER THE E-MAILS;

RIGHT?

          MR. ROLLINS:  CORRECT.

               BUT THEY'RE ADMISSIBLE --

          THE COURT:  I DON'T THINK IT MATTERS WHEN YOU

PUBLISH THEM, WHETHER IT'S NOW OR WITH THE OTHER

WITNESSES.  IT DOESN'T MATTER.

               BUT IF THERE'S AN OBJECTION THAT THE

OTHER WITNESSES ARE THE ONES WHO GATHERED THE E-MAILS,

THEN THEY CAN TALK ABOUT IT.

               HAVE THIS WITNESS TALK ABOUT THE FLIGHT

INFORMATION.  THAT'S WHAT HE'S HERE FOR.

          MR. ROLLINS:  CORRECT.

          MR. HANUSZ:  IF THE GOVERNMENT WANTS TO ARGUE

IN ITS CLOSING, THEY'RE FREE TO.

          THE COURT:  I THINK THEY CAN ALSO PUBLISH THE

EXHIBITS DURING THE TRIAL, JUST AS YOU CAN, AND JUST AS

WE JUST DID WITH THIS OTHER WITNESS.  I DON'T THINK

2      THAT'S MUCH OF AN ISSUE.  YOU'RE NOT RESTRICTED WHEN

3      YOU CAN -- ABOUT PUBLISHING AN EXHIBIT --

4               MR. HANUSZ:  I THINK THE INFERENCE IS WHAT A

5      WITNESS IS BEING ASKED TO DRAW BASED ON THOSE E-MAILS.

6      THAT'S WHAT THE PROBLEM IS.

7               THE COURT:  THE E-MAIL --

8               MR. ROLLINS:  THANK YOU, YOUR HONOR.

9               **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

10              **OPEN COURT IN THE PRESENCE OF THE JURY:)**

11              THE COURT:  LADIES AND GENTLEMEN, WHEN WE'RE

12     AT THE SIDE, YOU ARE FREE TO STAND AND STRETCH.  OKAY.

13              MR. ROLLINS, WOULD YOU CALL THE NEXT

14     WITNESS, PLEASE?

15              MR. ROLLINS:  YES, YOUR HONOR.

16              THE UNITED STATES CALLS JAMAAL WESTBY TO

17     THE STAND.

18              THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

19     TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

20     PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

21     TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

22              THE WITNESS:  I DO.

23              THE CLERK:  PLEASE STATE AND SPELL YOUR FIRST

24     AND LAST NAME FOR THE RECORD.

25              THE WITNESS:  JAMAAL JEREMY WESTBY,

1

2          THE COURT:  GOOD MORNING, MR. WESTBY.

3          THE WITNESS:  GOOD MORNING, SIR.

4          THE COURT:  PLEASE PROCEED, MR. ROLLINS.

5                    **DIRECT EXAMINATION**

6    BY MR. ROLLINS:

7    Q    GOOD MORNING, AGENT WESTBY.

8    A    GOOD MORNING, SIR.

9    Q    AND WHAT DO YOU DO FOR A LIVING?

10   A    I AM AN FBI AGENT, SIR.

11   Q    AND HOW LONG HAVE YOU BEEN AN FBI AGENT?

12   A    ABOUT A YEAR-AND-A-HALF.

13   Q    WHAT DID YOU DO BEFORE THAT?

14   A    CUSTOMS AND BORDER PROTECTION.  I WAS A CUSTOMS AND

15   BORDER PROTECTION OFFICER.

16   Q    AND CAN YOU GENERALLY DESCRIBE THE TRAINING THAT

17   YOU RECEIVED AS A CBP OFFICER?

18   A    YES.  I ATTENDED THE FEDERAL LAW ENFORCEMENT

19   TRAINING CENTER FOR APPROXIMATELY FOUR MONTHS.  AND WE

20   RECEIVED TRAINING IN IMMIGRATION AND CUSTOMS LAWS, HOW

21   TO PROCESS PASSENGERS COMING IN AND OUT OF THE COUNTRY.

22   Q    AND ARE YOU ASSIGNED TO A PARTICULAR SQUAD WITH THE

23   FBI RIGHT NOW?

24   A    I AM.

25   Q    WHAT SQUAD IS THAT?

1

2  Q    AND AS PART OF YOUR WORK AS AN FBI AGENT, WERE YOU

3  INVOLVED IN AN INVESTIGATION INTO A MAN NAMED "YI-CHI

4  SHIH"?

5  A    YES, SIR.

6  Q    AND DID YOU REVIEW SOMETHING CALLED "TEXT RECORDS"

7  DURING YOUR INVESTIGATION?

8  A    I DID.

9  Q    WHAT ARE THOSE?

10 A    TEXT RECORDS -- TEXT IS A DATABASE THAT CBP USES TO

11 TRACK PEOPLE COMING IN AND OUT OF THE COUNTRY.  THEY

12 GET MANIFESTS FROM THE AIRLINES SUBMITTED TO THEM.  AND

13 THEY HOUSE THAT INFORMATION IN TEXT.  AND THAT'S WHERE

14 THEY HOUSE ALL THE CROSSING AND HISTORY FOR PEOPLE

15 COMING IN AND OUT OF THE COUNTRY.

16 Q    AND HOW DID YOU BECOME WITH TEXT RECORDS?

17 A    WHEN I WORKED AS A CBP OFFICER.

18 Q    AND WOULD YOU GENERALLY DESCRIBE HOW THAT SYSTEM

19 OPERATES FOR THE JURY?

20 A    YES, ABSOLUTELY.

21      SO THE AIRLINE IS REQUIRED TO SUBMIT MANIFESTS

22 FOR PASSENGERS THAT ARE FLYING IN AND OUT ON THEIR

23 CARRIERS.  THAT INFORMATION GETS SENT TO CBP.  THAT

24 INFORMATION IS PLACED IN THE TEXT SYSTEM.  AND THAT IS

25 WHAT CBP USES WHEN A PASSENGER COMES INTO THE COUNTRY

Case 2:18-cr-00050-JAK    Document 581    Filed 07/03/19    Page 70 of 131    Page ID #:9095

THEIR NAME, THEIR DOCUMENT NUMBERS, DATE OF BIRTH,

THINGS LIKE THAT.  AND CBP VERIFIES THAT INFORMATION

WHEN THE PERSON COMES IN.

Q   AND WHAT STEPS DOES CBP TAKE TO VERIFY THAT

INFORMATION?

A   SO CBP WILL VERIFY THEIR TRAVELING DOCUMENTS, SO

THEIR PASSPORTS OR VISA OR WHATEVER THEIR TRACKING

DOCUMENTS ARE.

        THEY WILL VERIFY THEIR PHOTO.  THEY TAKE

PICTURES OF THEM.  AND THEN DEPENDING ON WHAT THEIR

STATUS IS, THEY'LL TAKE FINGERPRINTS OF THAT PERSON.

Q   AND DID YOU OBTAIN TEXT RECORDS FOR YI-CHI SHIH AND

OTHER INDIVIDUALS, INCLUDING CHEN YAPING, DENG JIERU

AND YU-MO CHIEN DURING YOUR INVESTIGATION?

A   I DID.

Q   AND WHAT WAS THE DATE RANGE FOR ALL THOSE RECORDS?

A   APPROXIMATELY JANUARY OF 2006 UP UNTIL JANUARY

1ST -- OR JANUARY 31ST OF 2018.

Q   AND WOULD YOU PLEASE TAKE A LOOK AT EXHIBITS 1201

AND 1203 IN THE BINDERS TO YOUR LEFT?

A   YES.  WOULD THAT BE VOLUME 12?

Q   I BELIEVE SO.

        THE COURT:  I THINK IT'S VOLUME 14.

        MR. ROLLINS:  THANK YOU.

BY MR. ROLLINS:

1

2    Q    DO YOU RECOGNIZE THOSE?

3    A    I DO.

4    Q    WHAT ARE THEY?

5    A    THESE ARE CERTIFIED TEXT RECORDS FOR THE DEFENDANT

6    AND SOME ASSOCIATES.

7         MR. ROLLINS:  YOUR HONOR, AT THIS TIME THE

8    GOVERNMENT MOVES TO ADMIT EXHIBITS 1201 AND 1203 INTO

9    EVIDENCE.

10        THE COURT:  ANY OBJECTION?

11        MR. HANUSZ:  NO OBJECTION, YOUR HONOR.

12        THE COURT:  EXHIBITS 1201 AND 1203 ARE

13   ADMITTED.

14        **(EXHIBITS 1201 AND 1203 RECEIVED IN**

15        **EVIDENCE)**

16   BY MR. ROLLINS:

17   Q    IN ADDITION TO THE DEFENDANT AND THE OTHER

18   INDIVIDUALS WE JUST DISCUSSED, DID YOU OBTAIN AND

19   REVIEW TEXT RECORDS FOR THREE INDIVIDUALS NAMED KAI

20   CHANG, YONG TIAN AND YUAN DONG CHEN?

21   A    YES, SIR.

22   Q    WOULD YOU PLEASE TAKE A LOOK AT EXHIBIT 1202.

23   A    I DID.  THANK YOU.

24   Q    DO YOU RECOGNIZE THAT DOCUMENT?

25   A    I DO.

67

1    Q    WHAT IS IT?

2    A    THESE ARE TEXT RECORDS CROSSING HISTORIES FOR THESE

3    INDIVIDUALS.

4         MR. ROLLINS:  YOUR HONOR, AT THIS TIME THE

5    GOVERNMENT MOVES TO ADMIT EXHIBIT 1202 INTO EVIDENCE.

6         THE COURT:  ANY OBJECTION?

7         MR. HANUSZ:  WE HAVE NO OBJECTION BEYOND OUR

8    PRIOR OBJECTION.

9         THE COURT:  EXHIBIT 1202 IS ADMITTED.

10        THE OBJECTION IS OVERRULED.

11        **(EXHIBIT 1202 RECEIVED IN EVIDENCE)**

12        MR. ROLLINS:  I'D LIKE TO PUBLISH EXHIBIT

13   1201-3.

14        MR. HANUSZ:  YOUR HONOR, MAY WE HAVE A SIDEBAR

15   REGARDING THIS EXHIBIT?

16        THE COURT:  BRIEFLY.

17        MR. HANUSZ:  IF IT COULD BE TAKEN OFF THE

18   MONITOR, WE WOULD APPRECIATE IT.

19        **(SIDEBAR)**

20        MR. HANUSZ:  WE HAD SPOKEN TO THE GOVERNMENT

21   PREVIOUSLY ABOUT REDACTING THE EXHIBITS.  THEY SAY,

22   "FOR OFFICIAL LAW ENFORCEMENT USE ONLY, SENSITIVE."  MY

23   RECOLLECTION IS, THE GOVERNMENT AGREED TO REDACT IT.

24   THE VERSION THAT IS BEING SHOWN TO THE WITNESS AND THE

25   JURY IS NOT REDACTED.

 1

 2      THAT MUST HAVE BEEN A GLITCH BECAUSE IT WAS SUPPOSED TO

 3      BE REDACTED.

 4                THE COURT:  CAN YOU JUST REDACT IT BEFORE

 5      YOU --

 6                MR. ROLLINS:  IT'S ONLY AN ELECTRONIC VERSION

 7      ON TRIAL DIRECTOR.  BUT THE GOVERNMENT WOULD HAVE NO

 8      OBJECTION TO THE COURT INSTRUCTING THE JURY TO

 9      DISREGARD --

10                THE COURT:  I DON'T WANT TO CALL ATTENTION TO

11      IT.  YOU'RE -- JUST A MINUTE.

12                YOU DON'T THINK YOU COULD PLACE THE

13      EXHIBIT ON THE ELMO IN A FASHION THAT THIS ISN'T SHOWN?

14                MR. ROLLINS:  I CAN DO THAT, YOUR HONOR.

15                IT WOULD BE MORE CHALLENGING TO ZOOM IN

16      ON SOME OF THE COLUMNS, BUT -- AND I AM NOT SURE THAT I

17      HAVE THE REDACTED HARD COPY WITH ME.  I APOLOGIZE.

18                MR. HANUSZ:  YOUR HONOR, I WOULD BE HAPPY TO

19      CHECK MY BINDER TO SEE IF I HAVE A REDACTED COPY.

20                THE COURT:  WOULD YOU?  THANK YOU.

21                      **(PAUSE IN THE PROCEEDINGS)**

22                MR. HANUSZ:  I DO NOT.

23                THE COURT:  HOW MANY PAGES ARE YOU GOING TO

24      SHOW THE WITNESS?

25                MR. ROLLINS:  THERE ARE PROBABLY ABOUT EIGHT

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 74 of 131   Page ID
#:9099

1

2     EIGHT TO TEN.

3              MR. HANUSZ:  I THINK THE WITNESS CAN JUST

4     DESCRIBE THE ENTRIES, YOUR HONOR.

5              THE COURT:  I THINK WHAT YOU CAN DO IS THIS, I

6     THINK WHAT YOU SHOULD DO IS TAKE THE FIRST DOCUMENT

7     YOU'RE GOING TO USE WITH THE WITNESS AND GO OVER WITH

8     HIM WHAT IT IS YOU'RE GOING TO COVER AND DO IT IN A WAY

9     THAT CORRESPONDS TO WHAT YOU WOULD BE DOING WITH THE

10    OTHER PAGES.  AND THEN THE QUESTION BECOMES, IS THERE A

11    NEED TO PUBLISH ALL OF THE PAGES?

12             MR. ROLLINS:  I JUST CONFERRED WITH MY

13    COLLEAGUES.  AND HE CAN PULL UP THE EXHIBITS IN A WAY

14    SUCH THAT "FOR OFFICIAL USE" AND "LAW ENFORCEMENT

15    SENSITIVE" IS NOT DISPLAYED TO THE JURY.

16             THE COURT:  THANK YOU.

17                 **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

18             **OPEN COURT IN THE PRESENCE OF THE JURY:)**

19             THE COURT:  THANK YOU, LADIES AND GENTLEMEN,

20    FOR WAITING FOR US.

21             MR. ROLLINS, WHEN YOU SAID PAGE 3, ARE

22    YOU REFERRING TO -- WHAT'S THE BATES NUMBER, PLEASE, IF

23    YOU HAVE IT?

24             IS THAT "12049"?

25             MR. ROLLINS:  2047, YOUR HONOR.

BY MR. ROLLINS:

Q    SO WE WERE TALKING ABOUT EXHIBIT 1201-3.

             AND IF WE'RE READY, I'LL PUT IT BACK UP.

             THE COURT:  YOU'RE TALKING ABOUT PAGE 3 OF

EXHIBIT 1201?

             MR. ROLLINS:  YES, YOUR HONOR.  AND I'M JUST

USING THE DASH FOR THE CONVENIENCE OF THE AGENT WHO IS

HELPING WITH TRIAL DIRECTOR.

             THE COURT:  I JUST WANT IT CLEAR THAT THE

EXHIBIT NUMBER IS NOT WITH A DASH.

             MR. ROLLINS:  CORRECT.

             THE COURT:  THANK YOU.

BY MR. ROLLINS:

Q    AGENT WESTBY, WOULD YOU JUST DESCRIBE WHAT EACH OF

THOSE ROWS ON THIS CHART MEAN?

A    YES, SIR.

             SO ON THE FIRST COLUMN IS THE NAME -- FIRST

AND LAST NAMES.

             THIRD COLUMN IS THE DATE OF BIRTH.

             THEN BEYOND THAT IS THE DOCUMENT TYPE.  "P"

WOULD MEAN PASSPORT.

             NEXT TO THAT IS THE DOCUMENT NUMBER.

             FOLLOWING THAT IS THE DATE AND TIME THE

INDIVIDUAL CAME IN.

2    IDENTIFICATION FOR THE AIRLINE.  "I&O" REPRESENTS

3    INBOUND AND OUTBOUND.  "I" WOULD BE AN INBOUND.  "O"

4    WOULD BE AN OUTBOUND.

5              THE "SITE" IS THE CBP LOCATION WHERE THE

6    PERSON WAS PROCESSED.

7              "INSPECTOR" IS GENERALLY THE CBP OFFICER THAT

8    PROCESSED THAT PERSON.

9              "TYPE" IS -- "APIS" IS FOR AIRLINE

10   INFORMATION.

11             "STATUS" TELLS YOU WHETHER OR NOT THE PERSON

12   BOARDED THAT FLIGHT.

13             "REF" MEANS REFERRED.  IT MEANS IF CBP

14   SELECTED THAT PERSON FOR AN ADDITIONAL SCREENING.

15             "ARR LOCATION," THAT'S ARRIVAL LOCATION, WHERE

16   THE FLIGHT CAME INTO.

17             "DEP LOCATION" IS THE DEPARTURE LOCATION,

18   WHERE THE FLIGHT LEFT FROM.  THOSE SYMBOLS ARE AIRPORT

19   CODES.

20             SO, FOR EXAMPLE, "L.A.X." IS LOS ANGELES

21   INTERNATIONAL AIRPORT.

22   Q    OKAY.  AND IF WE COULD GO TO EXHIBIT 1203, PAGE 12.

23             THE COURT:  DID YOU MEAN "1203" OR "1201"?

24             MR. ROLLINS:  APOLOGIES.

25                  1201, PAGE 12.

72

1    2056, YOUR HONOR.

2         THE COURT:  THANK YOU.

3    BY MR. ROLLINS:

4    Q    WOULD YOU DESCRIBE WHAT SOME OF THESE CODES HERE

5    MEAN?

6    A    YES, SIR.

7         SO ON THE VERY TOP ONE ON THE LEFT, THOSE

8    CODES ARE AIRPORT CODES.

9         FOR EXAMPLE, "PEK" IS FOR BEIJING CAPITAL

10   INTERNATIONAL AIRPORT.

11        BELOW THAT IS THE DOCUMENT CODES.  SO "P"

12   BEING "PASSPORT," SO ON SO FORTH.

13        THEN BELOW THAT ARE THE CODES FOR THE CBP

14   INSPECTION SITE.  AND THOSE IDENTIFY WHICH LOCATION THE

15   PERSON WAS PROCESSED AT.

16   Q    SO A MOMENT AGO, YOU MENTIONED YOU REVIEWED TEXT

17   RECORDS FOR THREE INDIVIDUALS NAMED KAI CHENG, YONG

18   TIAN AND YUAN DONG CHEN?

19   A    YES, SIR.  I DID.

20   Q    AND DID YOU ALSO REVIEW CERTIFIED VISA RECORDS FOR

21   THOSE INDIVIDUALS?

22   A    I DID.

23   Q    AT THIS POINT, I WOULD LIKE TO PUBLISH EXHIBIT 1653

24   AT PAGE 2.

25        WHAT IS THIS INDIVIDUAL'S OCCUPATION?

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 78 of 131   Page ID #:9103

```
 1        A    BASED ON THE RECORD, IT SHOWS THAT HE LISTS HIS
 2   OCCUPATION AS AN AIRLINE PILOT CAPTAIN.
 3   Q    AND CAN WE NOW PUBLISH EXHIBIT 1654, PAGE 2.
 4             AND WHAT IS THIS INDIVIDUAL'S OCCUPATION?
 5   A    HE'S ALSO AN AIRLINE CAPTAIN.
 6   Q    FOR WHICH AIRLINE?
 7   A    AIR CHINA.
 8   Q    AND IF WE COULD PUBLISH EXHIBIT 1655 AT PAGE 2.
 9             AND WHAT IS THIS INDIVIDUAL'S OCCUPATION?
10   A    ALSO A PILOT, A CAPTAIN.
11   Q    DURING YOUR INVESTIGATION, DID YOU ALSO REVIEW ANY
12   E-MAILS RECEIVED BY THE DEFENDANT?
13   A    I DID.
14   Q    AND WHAT TYPES OF E-MAILS DID YOU REVIEW?
15   A    PRIMARILY E-MAILS BETWEEN THE DEFENDANT AND AN
16   INDIVIDUAL KNOWN AS "MICHAEL JACKSON."
17   Q    OKAY.  AND DID ANY OF THOSE E-MAILS MENTION THE
18   THREE AIR CHINA PILOTS WE JUST DISCUSSED?
19             MR. HANUSZ:  OBJECTION, YOUR HONOR.
20   RELEVANCE.  403.  HEARSAY.  RULE 16.
21             THE COURT:  IT'S HEARSAY.
22             MR. ROLLINS:  YOUR HONOR, AT THIS POINT, THE
23   GOVERNMENT WOULD MOVE TO ADMIT AND PUBLISH EXHIBIT --
24   MOVE TO ADMIT EXHIBIT 226 INTO EVIDENCE.
25             THE COURT:  JUST A MOMENT.
```

MR. HANUSZ:  I'LL RESTATE THE OBJECTION.  SO

403, RELEVANCE AND RULE 16.

THE COURT:  OKAY.

MR. ROLLINS:  YOUR HONOR, MAY WE HAVE A BRIEF

SIDEBAR ON THIS?  I APOLOGIZE, BUT I THINK THIS IS A

SIGNIFICANT ENOUGH ISSUE TO --

THE COURT:  ALL RIGHT.

**(SIDEBAR)**

THE COURT:  GO AHEAD, MR. HANUSZ.

MR. HANUSZ:  AGAIN, I'LL GO THROUGH THE

OBJECTIONS.

FIRST IS, RULE 16 AND 702.  WE NEVER

RECEIVED ANY EXPERT NOTICE REGARDING THESE E-MAILS.

THE COURT:  WE WENT THROUGH THIS BEFORE.  I'M

NOT TALKING ABOUT AN EXPERT.  THE ISSUE IS WHETHER THE

E-MAIL CAN BE ADMITTED INTO EVIDENCE.

MR. HANUSZ:  WE DON'T HAVE A FOUNDATIONAL

OBJECTION TO THIS.

THE COURT:  I THINK I'VE ALREADY ADDRESSED THE

OTHER OBJECTIONS.

SO THE ISSUE -- AT THE LAST SIDEBAR,

EXHIBITS -- I'M GOING TO ADMIT THE EXHIBIT.

SO THE ISSUE IS, WHAT THE EXPERT IS

ADDING TO THE EXHIBIT.  SO I DON'T THINK -- OTHER THAN

1   PUBLISHING THE EXHIBIT, WHICH I SAID YOU COULD DO, IF

2   IT'S ADMITTED, THEN I DON'T KNOW WHAT QUESTION YOU HAVE

3   FOR THE WITNESS.

4           MR. ROLLINS:  THAT'S ALL I WAS PLANNING TO DO

5   CONSISTENT WITH THE COURT'S PRIOR ORDER.

6           THE COURT:  OKAY.

7           MR. HANUSZ:  I WANT TO KNOW WHAT THE

8   GOVERNMENT PLANS TO DO BECAUSE IT WASN'T ENTIRELY CLEAR

9   WHEN WE WERE UP HERE BEFORE.

10              SO TO PREVENT US FROM HAVING TO COME BACK

11  UP HERE AGAIN, PLEASE GIVE US SOME IDEA OF WHAT YOU

12  PLAN TO DO?

13          MR. ROLLINS:  SO, YOUR HONOR, THE GOVERNMENT

14  INTENDS TO INTRODUCE THESE E-MAILS SO THAT THE JURY

15  UNDERSTANDS THAT ON THE DATES THE DEFENDANT WAS

16  INSTRUCTED TO MEET AIR CHINA PILOTS, THEY IN FACT FLEW

17  TO L.A.X. AND IN FACT AFTER RECEIVING THE --

18          THE COURT:  I UNDERSTAND.  YOU JUST HAD THE

19  WITNESS TESTIFY -- WE WENT OVER THIS.

20              THE WITNESS HAS EXPLAINED THE FLIGHT DATA

21  GATHERING, WHICH WOULD -- ACCORDING TO THE WITNESS,

22  REFLECTS WHEN CERTAIN INDIVIDUALS LANDED AT L.A.X. AND

23  WHAT AIRLINES AND SO ON.  AND THAT'S BEEN ADMITTED.

24  THAT EXHIBIT IS ADMITTED.  AND THIS E-MAIL WILL BE

25  ADMITTED.  AND YOU CAN LATER ARGUE BASED ON -- TO

75

1

2    DON'T THINK WE NEED A WITNESS TO SAY, "I LOOKED AT THIS

3    DOCUMENT.  I LOOKED AT THAT DOCUMENT."  THAT'S YOUR JOB

4    WITH THE JURY.

5              MR. ROLLINS:  SO THEN I'LL JUST PUBLISH THESE

6    E-MAILS?

7              THE COURT:  YOU CAN PUBLISH E-MAILS.

8              MR. ROLLINS:  UNDERSTOOD.

9              THE COURT:  I DON'T HAVE A PROBLEM WITH THAT,

10   THE ONES THAT ARE ADMITTED.

11             MR. HANUSZ:  I WILL OBJECT IF ANY QUESTIONS

12   ARE ASKED --

13             THE COURT:  I UNDERSTAND.

14             MR. HANUSZ:  THANK YOU, YOUR HONOR.

15             THE COURT:  THE E-MAILS CAN BE PUBLISHED WITH

16   SOME -- I THINK THERE WAS AN EXPLANATION ALREADY.  AND

17   SO I'M ADMITTING E-MAILS THAT WERE GATHERED IN

18   CONNECTION WITH THIS MATTER.  AND I JUST THINK THIS

19   IS -- WE'RE -- WE'RE KIND OF WASTING A LITTLE TIME HERE

20   BECAUSE IT DOESN'T MATTER WHO THE WITNESS IS WHO IS

21   GOING TO SAY, "WE GATHERED E-MAIL," DOES IT?

22             MR. HANUSZ:  THE POINT IS, IT'S ARGUMENT, YOUR

23   HONOR.  AND THIS IS THE GOVERNMENT WANTING TO PUT ON A

24   PORTION OF ITS CLOSING ARGUMENT THROUGH THIS WITNESS.

25             THE COURT:  I UNDERSTAND.  THANK YOU.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT IN THE PRESENCE OF THE JURY:)

THE COURT:  THANK YOU, LADIES AND GENTLEMEN, FOR WAITING FOR US.

ALL RIGHT EXHIBIT 226 IS ADMITTED.

**(EXHIBIT 226 RECEIVED IN EVIDENCE)**

THE COURT:  YOU MAY PUBLISH IT.

MR. ROLLINS:  THANK YOU, YOUR HONOR.

IF YOU COULD ZOOM IN ON THE AUGUST 15TH, 2009 E-MAIL AT 8:25 A.M.

THE COURT:  WHAT PAGE OF THE EXHIBIT ARE YOU PUBLISHING?

MR. ROLLINS:  4325, BATES NUMBER.

THE COURT:  THANK YOU.

OKAY.  ANY FURTHER QUESTIONS OF THE WITNESS?

MR. ROLLINS:  NOT ON THIS E-MAIL, YOUR HONOR.

THE COURT:  GO AHEAD.

MR. ROLLINS:  IF WE CAN PUBLISH EXHIBIT 1202 AT PAGE 2.

BY MR. ROLLINS:

Q    AGENT WESTBY, DID YOU REVIEW TIAN YONG'S TEXT RECORDS FOR DATES NEAR AUGUST 16TH, 2009?

A    YES, SIR.

Q    WOULD YOU PLEASE EXPLAIN THE ENTRIES ON AUGUST 14TH

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 83 of 131   Page ID #:9108

1

2    A    IT SHOWS, ON AUGUST 14TH, OF 2009, MR. YONG TIAN

3    CAME INBOUND INTO THE UNITED STATES FROM BEIJING,

4    CHINA.

5         AND THEN ON AUGUST 17TH, 2009, HE WENT

6    OUTBOUND FROM THE UNITED STATES, LEFT LOS ANGELES

7    INTERNATIONAL AIRPORT TO BEIJING, CHINA.

8    Q    THANK YOU.

9         MR. ROLLINS:  YOUR HONOR, AT THIS TIME, THE

10   GOVERNMENT WOULD MOVE TO ADMIT EXHIBIT -- AND PUBLISH

11   EXHIBIT 234?

12        THE COURT:  ONE MOMENT.

13        ANY OBJECTION TO -- DO YOU WANT TO RENEW

14   ANY OBJECTIONS TO --

15        MR. HANUSZ:  RULE 16, RELEVANCE, 702, YOUR

16   HONOR.

17        THE COURT:  OVERRULED FOR THE REASONS STATED.

18        YOU MAY PUBLISH EXHIBIT 234.

19        MR. ROLLINS:  IF YOU CAN ZOOM IN ON THAT SO

20   THE JURY CAN READ IT.

21                **(PAUSE IN THE PROCEEDINGS)**

22        THE COURT:  OKAY.  NEXT QUESTION, PLEASE.

23   BY MR. ROLLINS:

24   Q    AGENT WESTBY, DID YOU REVIEW CHENG KAI'S TEXT

25   RECORDS FOR DATES SURROUNDING THIS E-MAIL?

1    A    YES, I DID.

2    Q    CAN YOU PLEASE PUBLISH EXHIBIT 1202 AT PAGE 7,

3    BATES 132.

4              WOULD YOU PLEASE DESCRIBE THE TWO ROWS, ONE UP

5    FROM THE BOTTOM ON THIS PAGE OF THE TEXT RECORDS?

6    A    ONE UP FROM THE BOTTOM, MR. KAI CHENG CAME INBOUND

7    INTO THE UNITED STATES FROM BEIJING, CHINA.  CAME INTO

8    LOS ANGELES INTERNATIONAL AIRPORT.

9    Q    DID YOU REVIEW ANY E-MAILS DURING THIS TIME FRAME

10   IN WHICH THE DEFENDANT STATED HE WOULD ALSO TRAVEL TO

11   CHINA?

12             MR. HANUSZ:  OBJECTION, YOUR HONOR.

13             THE COURT:  SUSTAINED.

14             MR. ROLLINS:  YOUR HONOR, I'D LIKE TO PUBLISH

15   EXHIBIT 239 AT PAGE 2.

16             THE COURT:  OKAY.  YOU MAY PUBLISH -- ANY

17   OBJECTION?  SAME OBJECTIONS?

18             MR. HANUSZ:  YES, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  OVERRULED.

20              YOU MAY PUBLISH.

21             MR. ROLLINS:  AGENT STORINO, IF WE CAN ZOOM IN

22   ON THE NOVEMBER 6TH E-MAIL FIRST AND THEN MOVE TO THE

23   BOTTOM.

24              AND IF WE CAN ZOOM IN ON THE E-MAIL AT

25   THE BOTTOM OF THAT.

1

2     BY MR. ROLLINS:

3     Q    AGENT WESTBY, DID YOU REVIEW DEFENDANT'S TEXT

4     RECORDS FOR NOVEMBER 2009?

5     A    I DID.

6     Q    AND COULD WE PUBLISH EXHIBIT 1201-8.

7          AND IF WE COULD ZOOM IN ON THE ENTRIES FOR

8     NOVEMBER 20TH, 2009 AND NOVEMBER 26TH, 2009.

9          THE COURT:  WHAT'S THE BATES PAGE, PLEASE?

10         MR. ROLLINS:  ENDS IN "12052."

11         THE COURT:  THANK YOU.

12    BY MR. ROLLINS:

13    Q    WOULD YOU EXPLAIN THOSE ENTRIES, PLEASE?

14    A    YES, SIR.

15         IT SHOWS YI-CHI SHIH WENT OUTBOUND FROM THE

16    UNITED STATES TO BEIJING, CHINA ON NOVEMBER 20 OF 2009.

17         IT SHOWS ON NOVEMBER 26 OF 2009, MR. SHIH CAME

18    INBOUND INTO THE UNITED STATES FROM BEIJING, CHINA TO

19    L.A.X.

20    Q    THANK YOU.

21         MR. ROLLINS:  AT THIS POINT, THE GOVERNMENT

22    WOULD MOVE TO ADMIT AND PUBLISH EXHIBIT 239.

23         THE COURT:  MR. HANUSZ, SAME OBJECTIONS?

24         MR. HANUSZ:  I BELIEVE 239 HAS ALREADY BEEN

25    PUBLISHED.

1      THE COURT:  239 IS ADMITTED.

2      MR. HANUSZ:  SAME OBJECTION, YOUR HONOR.

3      THE COURT:  OKAY.  OVERRULED.

4          THANK YOU.

5      **(EXHIBIT 239 RECEIVED IN EVIDENCE)**

6      MR. ROLLINS:  AND IF WE COULD ZOOM IN ON THE

7  VERY TOP E-MAIL.

8          AND IF WE COULD GO TO PAGE 2 OF THIS

9  EXHIBIT.

10          APOLOGIES, PAGE 3, IF WE CAN ZOOM IN ON

11 THAT TEXT.

12 BY MR. ROLLINS:

13 Q   DID YOU REVIEW YUAN DONG CHEN'S TEXT RECORDS FOR

14 DECEMBER 2ND AND 5TH OF 2009?

15 A   I DID.

16 Q   I'D LIKE TO PUBLISH EXHIBIT 1202 AT PAGE 12, BATES

17 137.

18          IF WE COULD ZOOM IN ON THE ENTRIES FOR

19 DECEMBER 2ND AND 5TH, 2009.

20          WOULD YOU EXPLAIN THOSE ENTRIES, PLEASE?

21 A   YES.

22          ENTRIES SHOWS MR. CHEN COMING INBOUND TO THE

23 UNITED STATES ON DECEMBER 2ND FROM BEIJING, CHINA.  AND

24 ON DECEMBER 5TH, MR. CHEN EXITED THE UNITED STATES AND

WENT TO BEIJING, CHINA.

MR. ROLLINS:  NO FURTHER QUESTIONS, YOUR

HONOR.

THE COURT:  THANK YOU.

CROSS-EXAMINATION?

**CROSS-EXAMINATION**

BY MR. HANUSZ:

Q    GOOD MORNING, AGENT WESTBY.

A    GOOD MORNING, SIR.

Q    SO YOU WOULD AGREE THAT AIR CHINA PILOTS ARE LIKE

ANYONE ELSE WITH A VISA, RIGHT, THEY HAVE TO HAVE A

VISA OR THEY HAVE TO HAVE PERMISSION TO COME INTO THE

UNITED STATES?

A    YES, THEY HAVE TO HAVE A VISA TO COME IN.

Q    OKAY.  SO JUST LIKE ANYONE ELSE COMING FROM ABROAD

WHO IS NOT A CITIZEN, YOU NEED SOME SORT OF VISA?

A    CORRECT.

Q    AND INDIVIDUALS WHO COME HERE TO THE U.S. WITH A

VISA ARE ALLOWED TO TAKE THINGS, TO LEAVE THE COUNTRY

WITH ITEMS SO LONG AS IT'S LAWFUL; RIGHT?

A    THEY'RE ALLOWED TO LEAVE WITH ITEMS YOU'RE SAYING?

Q    RIGHT.  SO LONG AS IT'S LAWFUL.

A    YES, SIR.

Q    SO IF I HAVE -- OR IF THERE'S A PILOT AND SOMEONE

HAS A FRIEND ABROAD, AND THEY REALLY -- THE FRIEND

1  ABROAD REALLY LIKES FRENCH BUTTER, AND THEY CAN'T GET

2  THE FRENCH BUTTER IN THE COUNTRY WHERE THAT PILOT IS

3  GOING, CERTAINLY THE PILOT COULD TAKE FRENCH BUTTER

4  FROM THE UNITED STATES AND TAKE IT WITH HIM OR HER TO

5  THEIR DESTINATION SO LONG AS IT'S LAWFUL; RIGHT?

6          MR. ROLLINS:  I'M GOING TO OBJECT.  THIS CALLS

7  FOR SPECULATION AND IRRELEVANT.

8          THE COURT:  SUSTAINED AS FRAMED BECAUSE IT'S

9  ASSUMING LEGAL ISSUES ABOUT THE FOREIGN -- THE COUNTRY

10  TO WHICH THIS WOULD BE BROUGHT.

11  BY MR. HANUSZ:

12  Q    AS LONG AS IT'S LAWFUL, AN INDIVIDUAL MAY TAKE

13  ITEMS FROM THE UNITED STATES; CORRECT?

14  A    THE ITEMS ARE LAWFUL?  YES, SIR.

15  Q    THANK YOU VERY MUCH.

16          MR. HANUSZ:  NO FURTHER QUESTIONS.

17          THE COURT:  ANY REDIRECT?

18          MR. ROLLINS:  NO, YOUR HONOR.

19          THE COURT:  MR. WESTBY, THANK YOU FOR YOUR

20  TESTIMONY.  YOU ARE EXCUSED.

21              LADIES AND GENTLEMEN, ONE MOMENT, PLEASE.

22              WE'LL TAKE OUR FIRST BREAK AT THIS TIME

23  FOR ABOUT 20 MINUTES.

24              IF IT'S LONGER THAN THAT, WE'LL LET YOU

25  KNOW.

1

2   BREAK.  THANK YOU.

3            THE CLERK:  ALL RISE.

4                **(THE FOLLOWING PROCEEDINGS WERE HELD IN**

5            **OPEN COURT OUTSIDE THE PRESENCE OF THE JURY:)**

6            THE COURT:  PLEASE BE SEATED.

7                 WHO IS THE NEXT WITNESS?

8            MS. SARTORIS:  YOUR HONOR, I DO SUGGEST THAT

9   THIS WOULD BE A GOOD TIME TO EXPLORE THE MR. MATTIS

10  MATTERS BECAUSE OF HIS UNAVAILABILITY AFTER TODAY.

11           THE COURT:  IS HE HERE?

12           MS. SARTORIS:  YES.

13           THE COURT:  IS HE IN THE COURTROOM OR OUTSIDE?

14           MS. HEINZ:  OUTSIDE.

15           THE COURT:  WOULD YOU HAVE HIM COME IN,

16  PLEASE?

17           THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

18  TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

19  PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

20  TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

21           THE WITNESS:  I DO.

22           THE CLERK:  WOULD YOU PLEASE STATE YOUR FULL

23  NAME AND SPELL IT FOR THE RECORD.

24           THE WITNESS:  PETER LAWRENCE MATTIS,

25  P-E-T-E-R, L-A-W-R-E-N-C-E, M-A-T-T-I-S.

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 90 of 131   Page ID #:9115

1     THE COURT:  GOOD MORNING, MR. MATTIS.

2          THE WITNESS:  GOOD MORNING.

3          THE COURT:  LET'S PROCEED IN THIS FASHION.

4               WHO WILL BE EXAMINING MR. MATTIS FOR THE

5     GOVERNMENT?

6          MR. SHOBAKI:  I WILL, YOUR HONOR.

7          THE COURT:  WOULD YOU IDENTIFY -- WITH RESPECT

8     TO THE ISSUE OF THE NATURE OF CERTAIN ENTITIES, WOULD

9     YOU PLEASE IDENTIFY THE ENTITIES ABOUT WHICH THE

10    WITNESS WILL -- YOU WILL BE ASKING THE WITNESS TO

11    TESTIFY?  START THERE.

12         MR. SHOBAKI:  YES, YOUR HONOR.

13                        **EXAMINATION**

14    BY MR. SHOBAKI:

15    Q    GOOD MORNING, MR. MATTIS.

16    A    GOOD MORNING.

17    Q    IN CONNECTION WITH THIS CASE, WERE YOU ASKED TO

18    PROVIDE OPINIONS AS TO THE NATURE AND IDENTITY OF

19    CERTAIN ENTITIES IN THE PEOPLE'S REPUBLIC OF CHINA?

20    A    YES.

21    Q    AND I'M GOING TO READ A LIST OF ENTITIES AND ASK IF

22    THOSE ARE THE ONES THAT YOU WERE ASKED TO IDENTIFY.

23         CHINA ELECTRONIC TECHNOLOGY GROUP CORPORATION

24    29 RESEARCH INSTITUTE, ALSO KNOWN AS CETC 29, A.K.A.

25    CHINA SOUTHWEST ELECTRONIC EQUIPMENT RESEARCH

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 91 of 131   Page ID #:9116

CHENGDU SIWEI ELECTRONICS COMPANY?

A    YES.

Q    CHENGDU RML TECHNOLOGY COMPANY LIMITED?

A    YES.

Q    QING'AN INTERNATIONAL TRADING CO. LIMITED, A.K.A.

QING'AN INTERNATIONAL TRADING GROUP, QTC?

A    QING'AN TRADING CORPORATION, YES.

Q    CHINA AVIONICS SYSTEMS CO. LIMITED?

A    YES.

Q    NUMBER 607 INSTITUTE?

A    YES.

Q    AND BEIJING TIAN HANG SUNNYBUY TECHNOLOGY

INVESTMENT CO. LIMITED?

A    YES.

Q    ARE THOSE THE CHINESE ENTITIES ON WHICH YOU WERE

PREPARED TO PROVIDE TESTIMONY AS TO THE IDENTITY AND

NATURE?

A    YES.

          THE COURT:  THEN I'D LIKE -- WOULD YOU INQUIRE

AS TO THE BASIS FOR THE OPINIONS THAT HE WOULD BE

OFFERING?

BY MR. SHOBAKI:

Q    MR. MATTIS, DID YOU PREVIOUSLY, IN AN INTERVIEW

WITH THE FBI, PROVIDE SOME OPINIONS AS TO THE NATURE OF

A    YES.

Q    AND WITH RESPECT TO THE OPINIONS THAT YOU EXPRESSED

TO THE FBI, CAN YOU PLEASE EXPLAIN FOR THE COURT, WITH

RESPECT TO EACH OF THE ENTITIES, THE BASIS FOR YOUR

OPINION?

          THAT IS, WHAT YOU CONSULTED AND HOW YOU

REACHED THAT OPINION?

A    THE BASIS FOR MY OPINION WAS BASED ON OPEN-SOURCE

RESEARCH, LOOKING AT COMPANY WEBSITES, FOLLOWING

INDIVIDUALS ASSOCIATED WITH THAT COMPANY TO LOOK AT

WHAT KIND OF EVENTS THEY SHOWED UP AT, LOOKING THROUGH

THE FILES AND BOOKS THAT I'VE COLLECTED RELATED TO THE

ISSUES OF CHINA'S TECH TRANSFER -- OR CHINA RELATED

TECH TRANSFER, CHINESE MILITARY MODERNIZATION, AS WELL

AS CONVERSATIONS OR QUESTIONS TO FRIENDS WHO HAVE

FOLLOWED THESE SAME ORGANIZATIONS OR THE SAME GENERAL

AREA OF ORGANIZATION.

Q    SO IN THAT LAST SECTION, IS THAT -- WERE YOU

SPEAKING WITH OTHER PEOPLE WHO ARE CONSIDERED

SUBJECT-MATTER EXPERTS IN THE AREA?

A    YES.

Q    AND WE HAVEN'T REALLY ADDRESSED YOUR BACKGROUND

HERE WITH THE COURT.  BUT WITH RESPECT TO CHINA AND THE

TOPIC AREAS THAT YOU JUST IDENTIFIED, IS THAT THE AREA

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 93 of 131   Page ID #:9118

A    YES.

THE COURT:  MR. MATTIS, YOU MENTIONED -- I

BELIEVE, ONE OF THE ITEMS YOU MENTIONED WAS FILES YOU

HAVE ON CHINA CONCERNING TECH TRANSFER.

IS THAT WHAT YOU SAID?

THE WITNESS:  YES.

THE COURT:  CAN YOU TELL ME WHAT THAT MEANS?

THE WITNESS:  I HAVE A BOOK THAT IS COMING

THAT'S GOING TO BE PUBLISHED THIS FALL THROUGH THE

NAVAL INSTITUTE PRESS.

AND ONE OF THE CHAPTERS IN THERE INCLUDES

CASES OF WHERE U.S. INDIVIDUALS OR INDIVIDUALS WHO WERE

CONVICTED IN A U.S. COURT RELATED TO EXPORT CONTROL

VIOLATIONS OR OTHER FORMS OF ECONOMIC ESPIONAGE THAT

WERE -- THAT WERE RELATED TO THE MOVEMENT OF TECHNOLOGY

TO CHINA.

THE COURT:  ARE THE -- ARE THE MATERIALS THAT

YOU USED -- WHEN YOU REFER TO FILES YOU HAVE ON CHINA,

ARE YOU REFERRING TO THE FILES THAT YOU USED IN

CONNECTION WITH WRITING YOUR BOOK?

THE WITNESS:  MOSTLY, YES.

SO A COLLECTION OF NEWS ARTICLES THAT I

FOUND USING RESEARCH DATABASES LIKE LEXIS NEXIS AND

GOVERNMENT DOCUMENTS IDENTIFYING EXPORT CONTROL

1

2                    THE COURT:  WHEN YOU SAY "GOVERNMENT

3      DOCUMENTS," WHAT ARE -- TO WHAT ARE YOU REFERRING?

4                    THE WITNESS:  THE DEPARTMENT OF COMMERCE, AS

5      WELL AS THE DEPARTMENT OF JUSTICE.

6                    THE COURT:  ARE YOU REFERRING TO DOCUMENTS

7      THAT ARE PUBLISHED?

8                    THE WITNESS:  THAT ARE PUBLIC RECORD, YES.

9                    THE COURT:  OKAY.  DO YOU HAVE ANY OTHER

10     QUESTIONS AT THIS POINT?

11                   MR. SHOBAKI:  YOUR HONOR, NOT WITH RESPECT TO

12     THE MATERIALS THAT MR. MATTIS CONSULTED.

13                        IN THE INTEREST OF TIME, I HAVE FOREGONE

14     GOING THROUGH HIS EDUCATION, HIS PUBLICATIONS BECAUSE I

15     DIDN'T UNDERSTAND THAT TO BE THE POINT OF THIS HEARING.

16                   THE COURT:  WELL -- ALL RIGHT.

17                   MR. HANUSZ, ARE YOU GOING -- DO YOU HAVE

18     QUESTIONS, BRIEFLY?

19                   MR. HANUSZ:  I DO, YOUR HONOR.

20                   THE COURT:  FOCUSED?

21                   MR. HANUSZ:  YES, YOUR HONOR.

22                   THE COURT:  THANK YOU.

23                              **EXAMINATION**

24     BY MR. HANUSZ:

25     Q    GOOD MORNING, MR. MATTIS.

A   GOOD MORNING.

Q   WHO DID YOU TALK TO IN PREPARATION FOR THE -- FOR

THE CONCLUSIONS AND THE OPINIONS THAT YOU GAVE IN THIS

CASE?  WHO DID YOU SPEAK TO?

A   THE PRIMARY PERSON I SPOKE TO WAS JAMES MULVENON,

M-U-L-V-E-N-O-N.  AND IT WAS AN EFFORT TO CONFIRM

WHETHER OR NOT I HAD MISSED SOMETHING, PARTICULARLY

RELATED TO THE QING'AN TRADING CORPORATION.

Q   WHO IS THAT PERSON?

A   HE WORKS -- HE PREVIOUSLY WORKED FOR RAND.  HE NOW

WORKS FOR A COMPANY CALLED "SOSI."  AND HE WROTE A BOOK

ON THE PEOPLE'S LIBERATION'S ARMY'S CORPORATE EMPIRE.

Q   DID YOU EVER WORK WITH HIM?

A   NO.

Q   HOW DO YOU KNOW HIM?

A   PERSONAL ACQUAINTANCE IN THE CHINA FIELD.

Q   DOES HE HAVE A SECURITY CLEARANCE?

A   HE -- YES, I BELIEVE HE DOES.

Q   DOES HE MAINTAIN A SECURITY CLEARANCE?

A   YES.

Q   DID HE PROVIDE YOU INFORMATION THAT IS SUBJECT TO A

SECURITY CLEARANCE?

A   NO.

Q   DO YOU HAVE A SECURITY CLEARANCE?

A   NO.

1    Q   HAVE YOU EVER HAD A SECURITY CLEARANCE?

2    A   I DID HOLD A SECURITY CLEARANCE BETWEEN 2006 AND

3    2010.

4    Q   WHERE DID YOU HOLD A SECURITY CLEARANCE?

5    A   CENTRAL INTELLIGENCE AGENCY.

6    Q   AND WHAT WAS YOUR JOB WITH THE CENTRAL INTELLIGENCE

7    AGENCY?

8    A   I WAS A COUNTER-INTELLIGENCE ANALYST.

9    Q   SPECIALIZING IN WHAT?

10   A   THE FUNCTIONING OF INTELLIGENCE SERVICES AND HOW

11   THEY WOULD AFFECT THE U.S. GOVERNMENT.

12   Q   DOES THAT INCLUDE CHINESE INTELLIGENCE SERVICES?

13   A   YES.

14   Q   DID THE RESEARCH THAT YOU DID AS A CIA OPERATIVE

15   INFORM YOUR OPINIONS IN THIS CASE?

16   A   IT -- THAT'S A DIFFICULT QUESTION TO GIVE A

17   STRAIGHT ANSWER TO IN THE SENSE THAT, I FOCUSED ON THE

18   INTELLIGENCE SERVICES.  AND THERE'S NOTHING THAT'S ON

19   THE RECORD HERE RELATED TO THE INTELLIGENCE SERVICES.

20        BUT IN TRYING TO UNDERSTAND WHAT THEY DID, YOU

21   HAVE TO SEPARATE OUT WHAT HAPPENS IN THE WORLD THAT

22   DOESN'T INVOLVE THEM, WHAT OTHER KINDS OF EXPORT

23   CONTROL VIOLATIONS TAKE PLACE, WHAT KIND OF OTHER PARTS

24   OF THE CHINESE SYSTEM ARE INVOLVED IN OUTREACH TO

25   FOREIGN ENTITIES AND INDIVIDUALS.

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 97 of 131   Page ID #:9122

1    Q    SO IS THAT A "YES" OR IS THAT A "NO"?

2    A    THAT'S A "YES."

3    Q    SO YOU DID RELY ON YOUR EXPERIENCE AND THE

4    KNOWLEDGE YOU LEARNED WHILE YOU WERE WITH THE CIA TO

5    INFORM YOUR CONCLUSIONS IN THIS CASE?

6    A    YES.

7    Q    AND WHAT DID YOU LEARN WHEN YOU WERE WORKING AT THE

8    CIA?

9    A    THAT NOT EVERYTHING INVOLVING THE MOVEMENT OF

10   MONEY, PEOPLE, MATERIAL, WHAT WE WOULD CALL "COLLECTION

11   ACTIVITIES" NECESSARILY INVOLVES THE INTELLIGENCE

12   SERVICES.

13   Q    WHAT DID YOU LEARN INVOLVING THESE ENTITIES WHEN

14   YOU WERE AT THE CIA?

15   A    NOTHING.

16   Q    WHAT ARTICLES HAVE YOU WRITTEN ABOUT THESE ENTITIES

17   WHERE THESE ENTITIES HAVE BEEN MENTIONED?

18   A    THEY ARE -- AT LEAST ONE OR TWO OF THOSE ENTITIES

19   IS MENTIONED IN THE FORTHCOMING BOOK.

20   Q    SO IT'S NOT IN ANYTHING YOU HAVE PUBLISHED?

21   A    NO, IT'S NOT IN MY PUBLICATIONS.

22   Q    DID YOU RECEIVE THAT INFORMATION FOR YOUR BOOK FROM

23   THE GOVERNMENT IN THIS CASE?

24   A    NO.

25   Q    YOU RECEIVED IT SEPARATELY?

1       A    YES.

2       Q    HAVE YOU PROVIDED THE GOVERNMENT YOUR MANUSCRIPT

3    FOR YOUR UPCOMING BOOK?

4       A    NO.

5       Q    DID THEY ASK YOU FOR IT?

6       A    NO.

7       Q    SO YOU HAVE WRITTEN A LOT OF ARTICLES; RIGHT?

8       A    I'VE -- I SUPPOSE IT'S OVER A HUNDRED NOW.

9       Q    YOU'RE A RESEARCHER; RIGHT?

10      A    YES.

11      Q    AND NONE OF THESE ENTITIES OF WHICH YOU CLAIM

12   EXPERTISE WERE THE SUBJECT OF ANY OF THESE ARTICLES?

13      A    NO, NONE OF THESE ENTITIES SPECIFICALLY WERE THE

14   SUBJECT OF ARTICLES.

15      Q    AND SO THE INFORMATION THAT YOU RECEIVED, YOU

16   RECEIVED FROM OTHER INDIVIDUALS?

17      A    NO.

18           I RESEARCHED THESE ENTITIES, AND HAVE COME TO

19   MY OPINION ON THE BASIS OF THE ENTITIES THAT I WAS

20   LOOKING AT, THOSE ENTITIES THAT I WAS ASKED TO

21   RESEARCH.

22      Q    THROUGH OPEN-SOURCE MATERIALS?

23      A    YES.

24      Q    NOW, OPEN-SOURCE MATERIALS ARE MATERIALS THAT ARE

25   AVAILABLE TO ANYONE; RIGHT?

A    YES.

Q    OKAY.  DID ANYONE TALK TO YOU ABOUT YOUR TESTIMONY

HERE AT ANY TIME THIS MORNING?  ANYONE FROM THE

GOVERNMENT TALK TO YOU ABOUT THE TESTIMONY AND ABOUT

OPEN SOURCE -- YOUR RELIANCE ON OPEN-SOURCE MATERIALS

THIS MORNING?

A    NO.

Q    DO YOU REMEMBER TESTIFYING ON JUNE 9, 2016?

A    IN -- I'M -- BEFORE THE U.S.-CHINA SECURITY AND

ECONOMIC REVIEW COMMISSION?

Q    THAT'S THE ONE.

A    YES.

Q    DO YOU REMEMBER TALKING TO THAT COMMISSION ABOUT

RELIANCE ON OPEN-SOURCE MATERIALS?

A    YES.

Q    DO YOU RECALL WHAT YOU SAID?

A    I RECALL SAYING THAT THERE WERE SEVERE LIMITATIONS

IN DEALING WITH THE CHINESE INTELLIGENCE SERVICES.

THAT YOU COULD SEE WHAT WAS AVAILABLE PUBLICLY, BUT

THAT DIDN'T HELP YOU UNDERSTAND THE MACHINERY BEHIND

IT.

Q    THAT'S NOT ACTUALLY WHAT YOU SAID, RIGHT?

        I'M GOING TO TELL YOU WHAT YOU SAID.

        THE COURT:  EXCUSE ME, IF YOU WOULD SPEAK IN A

COURTEOUS MANNER, PLEASE, AND JUST POSE QUESTIONS.

95

BY MR. HANUSZ:

Q    ON THAT DATE, YOU SAID, "AS FAR AS HOW EFFECTIVE

THE UNITED STATES HAS BEEN AT DEALING WITH THEM, I

DON'T THINK YOU CAN PUT A CLEAR JUDGMENT ON THE BASIS

OF OPEN SOURCES.  IF YOU'RE NOT IN THE COMMUNITY AND

YOU'RE NOT ACTIVE IN IT, AND YOU DON'T HAVE A BROAD

VIEW ACROSS WHAT THE COMMUNITY IS DOING, IT'S VERY

DIFFICULT TO SAY.  SUFFICE IT TO SAY, THERE'S SIMPLY

ISN'T ENOUGH KNOWLEDGE PUBLICLY TO HAVE A ROBUST AND

ONGOING DISCUSSION OF CHINESE INTELLIGENCE AND ITS

THREATS TO U.S. INTERESTS.  I'LL LEAVE IT THERE."

DO YOU RECALL SAYING THAT?

A    YES.

I WAS REFERRING SPECIFICALLY TO THE CHINESE

INTELLIGENCE SERVICES.

Q    SO YOU WEREN'T REFERRING TO RELIANCE ON OPEN-SOURCE

INFORMATION?

A    I THINK IT'S CLEAR FROM THE TRANSCRIPT THAT YOU

READ FROM THAT I'M REFERRING TO HOW EFFECTIVE THE U.S.

GOVERNMENT HAS BEEN AT ADDRESSING CHINESE INTELLIGENCE

SERVICES ACTIVITY AGAINST THE UNITED STATES.

Q    I'M ASKING WHAT YOU SAID ABOUT OPEN-SOURCE

INFORMATION AND RELYING ON IT.

A    I SAID YOU CAN'T RELY ON OPEN-SOURCE INFORMATION TO

DESCRIBE CLASSIFIED GOVERNMENT ACTIVITY.

1    Q    SO YOU WOULD AGREE THAT OPEN-SOURCE INFORMATION HAS

2    SIGNIFICANT LIMITATIONS?

3    A    YES.

4    Q    AND YOU FILL IN THOSE LIMITATIONS FROM THE

5    CLASSIFIED INFORMATION THAT YOU RECEIVED WHEN YOU

6    WORKED FOR THE CENTRAL INTELLIGENCE AGENCY?

7    A    I'M NOT QUITE SURE THAT I UNDERSTAND THE QUESTION.

8    Q    THE QUESTION IS, YOU HAVE A KNOWLEDGE BASE SEPARATE

9    AND APART FROM OPEN-SOURCE INFORMATION; RIGHT?

10   A    RELATED TO THE CHINESE INTELLIGENCE SERVICES.

11   Q    THAT'S ALL WE'RE TALKING ABOUT.  WE'RE TALKING

12   ABOUT CHINA; RIGHT?

13   A    WELL, YES, WE'RE TALKING ABOUT CHINA WITH 1.3

14   BILLION PEOPLE, A MASSIVE GOVERNMENT, HUNDREDS OF

15   THOUSANDS OF GOVERNMENT OFFICIALS.

16        SO, YES, I HAVE SOME KNOWLEDGE OF THE CHINESE

17   INTELLIGENCE SERVICES.  BUT NOT A SINGLE ONE OF THE

18   ENTITIES THAT I WAS ASKED TO TESTIFY ABOUT IS RELATED

19   TO THE CHINESE INTELLIGENCE SERVICES.

20   Q    ARE THEY RELATED TO THE CHINESE GOVERNMENT?

21   A    YES.

22   Q    AND THE BASIS OF YOUR KNOWLEDGE IS WHAT?

23   A    FOR EXAMPLE, IN THE CASE OF THE CHINA ELECTRONICS

24   TECHNOLOGY GROUP CORPORATION AND ITS SUBSIDIARIES, THEY

25   STATED VERY CLEARLY ON THEIR WEBSITE THAT THEY ARE A

 1
 2     PARTY CENTER, THE CENTRAL MILITARY COMMISSION AND THE

 3     STATE COUNSEL.

 4     Q    SO LET'S TALK ABOUT WEBSITES CAUSE YOU REVIEWED

 5     SOME; RIGHT?

 6     A    YES.

 7     Q    NOW, YOU NOTED THAT CHENGDU RML DOES NOT HAVE A

 8     WEBSITE; RIGHT?

 9     A    RIGHT.

10     Q    SO YOU CAN'T --

11          THE COURT:  ONE MOMENT, PLEASE.

12               GO AHEAD.  PLEASE PROCEED, MR. HANUSZ.

13     BY MR. HANUSZ:

14     Q    SO YOU COULDN'T GO TO CHENGDU RML'S WEBSITE TO GET

15     INFORMATION; RIGHT?

16     A    NO.  YOU WOULD HAVE TO LOOK FOR PEOPLE WHO ARE

17     IDENTIFIED AS WORKING FOR CHENGDU RML.

18     Q    OKAY.  AND YOU LOOKED FOR THOSE PEOPLE?

19     A    YES.

20     Q    AND WHO GAVE YOU THE NAMES OF THOSE PEOPLE?

21     A    THE DEPARTMENT OF JUSTICE.

22     Q    THE PROSECUTION TEAM IN THIS CASE?

23     A    YES.

24     Q    WHAT DID THEY PROVIDE YOU IN THE COURSE OF YOUR

25     REVIEW?

```
 1        A    THEY PROVIDED ME WITH THE SUPERSEDING INDICTMENT 98

 2   AND THE CRIMINAL COMPLAINT.

 3   Q    THAT'S ALL YOU -- YOU INDICATED IN YOUR 302 THAT

 4   YOU WERE FAMILIAR WITH THE EVIDENCE IN THIS CASE, THAT

 5   YOU REVIEWED THE EVIDENCE IN THIS CASE.

 6             WHAT'S "THE EVIDENCE" YOU REVIEWED?

 7   A    I WAS GIVEN AND REVIEWED A POWER POINT PRESENTATION

 8   RELATED TO ONE OF THE COMPANIES.  AND I RECEIVED A FEW

 9   CORPORATE DOCUMENTS.

10             BUT THEY DID NOT PROVIDE A JUDGMENT ON -- THEY

11   DIDN'T DO ANYTHING FOR ME OTHER THAN IDENTIFY A NAME TO

12   FOLLOW.

13   Q    SO, BASICALLY, WHAT YOU DO IS BASICALLY INTERNET

14   RESEARCH, ESSENTIALLY IS WHAT YOUR DESCRIBING FOR US?

15   A    IN THIS CASE, FOR -- FOR MOST OF THE ENTITIES, LIKE

16   CHENGDU RML, THEN, YES.

17   Q    SO IT'S REALLY NO DIFFERENT IF I WANTED TO LOOK UP

18   A FRIEND FROM COLLEGE TO SEE WHAT HE OR SHE WAS DOING

19   THESE DAYS, RIGHT, IS BASICALLY WHAT YOU WERE DOING?

20   A    YES, IN ENGLISH AND CHINESE.

21   Q    SO THE WEBSITES THAT YOU REVIEWED, SOME OF THEM ARE

22   IN MANDARIN?

23   A    THEY'RE WRITTEN IN CHINESE CHARACTERS.

24   Q    IS THAT NOT MANDARIN?

25   A    MANDARIN IS A SPOKEN TONGUE.
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 104 of 131   Page ID #:9129

```
 1    Q    SO WHAT LANGUAGE ARE THEY WRITTEN IN?

 2    A    CHINESE CHARACTERS.

 3    Q    AND YOU CAN READ THOSE?

 4    A    YES.

 5    Q    DID YOU PROVIDE THOSE TO THE GOVERNMENT?

 6    A    NO.

 7    Q    BUT YOU'RE BASING YOUR REVIEW AND YOUR OPINIONS OFF

 8    CHINESE LANGUAGE CHARACTERS; RIGHT?

 9    A    IN LARGE PART, YES.

10    Q    DID YOU HAVE THEM TRANSLATED?

11    A    NO.

12    Q    ARE YOU A CERTIFIED TRANSLATOR?

13    A    NO.

14    Q    WHO ELSE DID YOU SPEAK TO IN PREPARATION OF YOUR

15    TESTIMONY BESIDES THE INDIVIDUAL YOU DESCRIBED EARLIER?

16    A    MY RESEARCH ASSISTANT, CHERYL YU.

17    Q    CAN YOU SPELL HER NAME?

18    A    C-H-E-R-Y-L.  LAST NAME IS, Y-U.

19    Q    DOES SHE HAVE A SECURITY CLEARANCE?

20    A    NO.

21    Q    DID THE INDIVIDUAL YOU DESCRIBED EARLIER WORK FOR

22    THE CENTRAL INTELLIGENCE AGENCY?

23    A    NO.

24    Q    DID HE HAVE A CONTRACT WITH THE CENTRAL

25    INTELLIGENCE AGENCY?
```

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 105 of 131   Page ID
#:9130
REFERRING?

Q    THE INDIVIDUAL THAT YOU REFERRED THAT BASICALLY YOU

GOT ALL YOUR INFORMATION FROM.

          MR. SHOBAKI:  OBJECTION.  ARGUMENTATIVE AND

CALLS FOR SPECULATION.

          THE COURT:  SUSTAINED.

BY MR. HANUSZ:

Q    THE INDIVIDUAL, I BELIEVE HIS NAME WAS MR. MULVENON

OR SOMETHING LIKE THAT?

A    YOU'RE SAYING DR. MULVENON?

Q    SURE.  YES.  I GOT THE NAME WRONG.

A    I ASKED HIM A QUESTION OF WHETHER OR NOT I HAD

MISSED SOMETHING RELATED TO QING'AN TRADING

CORPORATION.

Q    AND WHAT DID HE TELL YOU?  HAD YOU MISSED ANYTHING?

A    HE SAID THE INFORMATION THAT HE HAD ON QING'AN

TRADING CORPORATION WAS MOSTLY HISTORICAL AND THAT, AT

THAT TIME, IT WAS RELATED TO THE PEOPLE'S LIBERATION

ARMY.

Q    DID HE TELL YOU YOU HAD MISSED ANYTHING?

A    NO.

Q    YOU DON'T HAVE A DOCTORATE; RIGHT?

A    NO.

Q    YOU'RE A RESEARCH FELLOW?

1    A    YES.

2    Q    AND WHAT VARIABLES DO YOU USE IN YOUR RESEARCH, IN

3    YOUR ANALYSIS?

4    A    IN MY ANALYSIS OF WHAT?

5    Q    YOU'RE A RESEARCHER; RIGHT?  YOU DO RESEARCH.

6    YOU'RE A SOCIAL SCIENTIST.

7    A    I WOULDN'T SAY THAT I'M A SOCIAL SCIENTIST.

8    Q    THEN WHAT SPECIALTY DO YOU BRING HERE?

9    A    I BRING MORE THAN A DECADE OF LOOKING AT CHINA'S

10   GOVERNMENT, MILITARY AND GENERAL SECURITY AFFAIRS, AND

11   PARTICULARLY LOOKING AT THE WAY THAT THE GOVERNMENT AND

12   THE PARTY OPERATE, IF YOU WILL, SOMETIMES OPENLY,

13   SOMETIMES SORT OF IN THE SHADOWS TO BUILD POLITICAL

14   INFLUENCE AND NETWORKS THAT CAN BE USEFUL TO BEIJING.

15   Q    NOW, WHAT THEY DO IN THE SHADOWS, BY DEFINITION,

16   WOULDN'T BE DESCRIBED IN OPEN-SOURCE INFORMATION, WOULD

17   IT?

18   A    IT DEPENDS ON THE NATURE OF THAT ACTIVITY.

19   Q    WELL, IF IT'S OPEN-SOURCE INFORMATION, IS IT IN THE

20   SHADOWS?

21   A    YES, BECAUSE THE PURPOSE BEHIND THAT ACTIVITY IS

22   NOT NECESSARILY CLEARLY KNOWN.

23   Q    SO HOW DO YOU CONFIRM IT?

24   A    WELL, THE FIRST IS, I TEND TO START WITH WHAT THE

25   PARTY SAYS ABOUT HIS OBJECTIVES, WHAT IT DOES, THE

THE CORE ORGANIZATIONS ARE AND THE PARTY AND WITH

RELATED TO THE QUESTION THAT I'M LOOKING, FOLLOWING

THOSE ORGANIZATIONS OUTWARD.

Q    AND YOU CAN DO THAT BY INTERNET RESEARCH,

ESSENTIALLY?

A    AND THROUGH LOOKING THROUGH CHINESE PUBLICATIONS

FROM THE PEOPLE'S REPUBLIC OF CHINA, LOOKING THROUGH

BOOKS PUBLISHED BY, PARTICULARLY, ELEMENTS OF THE

CHINESE COMMUNIST PARTY.

Q    ARE YOU SAYING ALL OF THIS MATERIAL THAT YOU LOOK

AT IS REALLY IN THE PUBLIC DOMAIN?

A    YES.

Q    AND ALL OF THE MATERIALS THAT YOU RELIED ON HERE

ARE IN THE PUBLIC DOMAIN?

A    YES.

Q    THERE'S NO CLASSIFIED INFORMATION?

A    THERE'S NO CLASSIFIED INFORMATION.

Q    THERE'S NO NON-PUBLIC INFORMATION?

A    THERE'S NO NON-PUBLIC INFORMATION.

Q    SO ANYONE COULD GO AND KIND OF FIND WHAT YOU HAVE

BEEN ABLE TO FIND, ESSENTIALLY?

A    YES.

Q    OKAY.  COULD I FIND THE MATERIALS, DO YOU THINK,

THAT YOU -- YOU DON'T KNOW ME; RIGHT?

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 108 of 131   Page ID #:9133

RELIED ON?

MR. SHOBAKI:  OBJECTION.  SPECULATION AND

ARGUMENTATIVE.

THE COURT:  IS THERE ANOTHER FOCUSED AREA YOU

WANT TO ADDRESS, PLEASE?

BY MR. HANUSZ:

Q   ARE YOU REQUIRED TO SPEAK CHINESE OR TO SPEAK

MANDARIN TO OBTAIN THIS INFORMATION?

A   NO.

Q   ARE YOU REQUIRED TO READ IT?

A   IF I'M REQUIRED TO READ CHINESE CHARACTERS TO FIND

THIS INFORMATION.

Q   IS THAT A, "YES"?

THE COURT:  I THINK THAT HAS BEEN ASKED AND

ANSWERED.

WHAT IS THE NEXT QUESTION?

BY MR. HANUSZ:

Q   WHICH WEBSITES DID YOU CONSULT TO -- WHICH SPECIFIC

WEBSITES DID YOU CONSULT TO PREPARE YOUR CONCLUSIONS

AND YOUR OPINIONS IN THIS CASE?

A   I WOULD HAVE TO GO BACK TO MY NOTES TO LOOK FOR THE

SPECIFIC ONES.  THE ONES THAT I CAN NAME OFF THE TOP OF

MY HEAD ARE THE CORPORATE WEBSITES OF THE CHINA

ELECTRONICS TECHNOLOGY GROUP CORPORATION AND ITS

Q    DO YOU HAVE YOUR NOTES HERE?

A    I HAVE SOME NOTES THAT I WROTE DOWN TO KEEP -- TO

GUIDE ME IN TERMS OF WHAT I WOULD SAY ABOUT THESE

ORGANIZATIONS.

Q    DO YOU HAVE A PROBLEM PRODUCING THOSE NOTES TO ME?

A    NO.

          MR. HANUSZ:  YOUR HONOR, I WOULD MOVE FOR

PRODUCTION OF THOSE NOTES?

          THE COURT:  WE'LL GET TO THAT LATER.

BY MR. HANUSZ:

Q    WHAT OTHER WEBSITES?

A    THEY WERE SUBJECT OF SEARCHES BASED ON THE CHINESE

NAMES OF THE COMPANIES AND RELEVANT INDIVIDUALS TO THE

CASE.

Q    WHAT WEBSITES?

A    I'VE GIVEN YOU THE ONES THAT I CAN NAME

SPECIFICALLY.

Q    YOU'VE GIVEN ME ONE.

A    IN SOME CASES, THESE WERE CHINESE LANGUAGE NEWS

PORTALS CARRYING ARTICLES ABOUT THE INDIVIDUAL AND

MEETINGS THAT THEY ATTENDED OR AGREEMENTS THAT WERE

SIGNED.

Q    WHICH WEBSITES?

          MR. SHOBAKI:  OBJECTION.  ASKED AND ANSWERED.

```
 1                 THE COURT:  YES, ASKED AND ANSWERED.
 2              IS THERE ANY NEW AREA?

 3                 MR. HANUSZ:  I WOULD LIKE TO ADDRESS ALL OF

 4      THE AREAS THAT HE'S REVIEWED.  AND I'D LIKE TO --

 5                 THE COURT:  IS THERE ANYTHING ELSE YOU WANT TO

 6      ADDRESS BESIDES THAT?

 7                 I'M HERE FOR A FOCUSED PURPOSE.

 8                 MR. HANUSZ:  MAY I HAVE A MOMENT, YOUR HONOR?

 9                 THE COURT:  SURE.

10                 MR. HANUSZ:  THANK YOU.

11                 NO ADDITIONAL QUESTIONS.  THE ONES I HAVE

12      ARE ALONG THE SAME LINE.

13                 THE COURT:  THANK YOU.

14                 MR. HANUSZ:  THANK YOU, YOUR HONOR.

15                 THE COURT:  DO YOU HAVE ANY FURTHER -- WELL,

16      MR. SHOBAKI, DO YOU HAVE ANY FURTHER QUESTIONS IN TERMS

17      OF BACKGROUND THAT YOU MENTIONED EARLIER YOU WANTED TO

18      ASK?

19                 MR. SHOBAKI:  JUST A COUPLE, YOUR HONOR.

20                 THE COURT:  GO AHEAD.

21                              EXAMINATION

22      BY MR. SHOBAKI:

23      Q    MR. MATTIS, DID YOU EVER LIVE IN CHINA?

24      A    YES.

25      Q    FOR HOW LONG?
```

1    A    FOR ROUGHLY ONE YEAR.

2    Q    AND YOU SAID THAT YOU CAN READ CHINESE CHARACTERS?

3    A    YES.

4    Q    OKAY.  AND IS IT IN YOUR LINE OF WORK AS A

5    RESEARCHER AND AUTHOR, IS IT NORMAL TO RELY ON

6    PUBLICATIONS AND WRITTEN WORKS TO HELP GUIDE YOUR

7    OPINIONS AND VIEWS?

8    A    YES.

9    Q    AND JUST TO BE CLEAR, IN REACHING THE OPINIONS THAT

10   YOU HAVE -- ARE PREPARED TO TESTIFY ABOUT, DID YOU RELY

11   ON ANY CLASSIFIED INFORMATION OR YOUR EXPERIENCE AT THE

12   CIA?

13   A    I DIDN'T RELY ON ANY CLASSIFIED INFORMATION.  BUT

14   TO SAY THAT MY EXPERIENCE AS A RESEARCHER DIDN'T INFORM

15   HOW I HAVE LEARNED HOW TO DO RESEARCH WOULD BE

16   DISINGENUOUS AT BEST.

17   Q    SO ARE YOU SPEAKING ABOUT THE GENERAL FACT THAT

18   YOUR LIFE EXPERIENCE AS SOMEONE WORKING ON CHINA ISSUES

19   CARRY THROUGH VARIOUS JOBS?

20   A    YES.

21   Q    OKAY.  BUT NO SPECIFIC KNOWLEDGE TIED TO THAT

22   INFORMED YOUR VIEWS IN THIS CASE?

23   A    NO.

24            MR. SHOBAKI:  NOTHING FURTHER.

25                 I WOULD JUST NOTE THAT THERE IS NO LEGAL

Case 2:18-cr-00050-JAK   Document 581   Filed 07/03/19   Page 112 of 131   Page ID #:9137

1    BASIS TO REQUIRE AN EXPERT TO PROVIDE ALL INFORMATION

2    UPON WHICH THEY HAVE GENERATED AN OPINION.  IN FACT,

3    THAT'S THE VERY POINT OF HAVING AN EXPERT, IS THAT

4    SOMEONE WHO ACTUALLY KNOWS WHAT THEY'RE TALKING ABOUT.

5              THE COURT:  OKAY.  JUST A MINUTE.

6              MR. HANUSZ, LET ME HEAR FROM YOU BRIEFLY.

7              MR. HANUSZ:  YOUR HONOR, ANY ARGUMENT WE MAKE,

8    WE WOULD ASK FOR MR. MATTIS TO BE EXCUSED.

9              THE COURT:   THAT'S FINE.

10             MR. MATTIS YOU ARE EXCUSED.  THANK YOU.

11             MR. HANUSZ:  THANK YOU, YOUR HONOR.

12             I GUESS THE STARTING POINT IS RULE 16 AND

13   THE DISCLOSURES THAT WERE MADE LAST FRIDAY.

14             WE FILED NUMEROUS -- THE DEFENSE FILED

15   NUMEROUS MOTIONS ON THIS ISSUE.

16             THE GOVERNMENT DOES NOT SEE FIT TO

17   SUPPLEMENT ANY OF THOSE DISCLOSURES UNTIL AFTER TRIAL

18   HAD BEGUN.  SO THAT'S THE STARTING POINT.

19             WE STILL DON'T HAVE A SENSE OF WHAT THE

20   BASES, OTHER THAN INTERNET RESEARCH AND

21   PUBLICLY-AVAILABLE INFORMATION, THAT MR. MATTIS RELIED

22   ON EXCEPT FOR POSSIBLY HIS EXPERIENCE AT THE CIA, WHICH

23   CLEARLY INFORMS HIS OPINION.

24             BUT THE BIGGER ISSUE IS THE COURT'S

25   GATE-KEEPING FUNCTION UNDER RULE 702 AND THE

THE TESTIMONY THIS MORNING MAKES CLEAR

THAT THERE ARE RELIABILITY ISSUES.  CERTAINLY,

MR. MATTIS TESTIFIED TO THAT FACT WHEN HE TESTIFIED IN

FRONT OF CONGRESS REGARDING OPEN-SOURCE INFORMATION.

AND THAT'S BEEN THE MANTRA, THAT EVERYTHING HERE IS

BASED ON OPEN-SOURCE INFORMATION.

BUT THE DEFENSE -- IT'S NEARLY IMPOSSIBLE

FOR THE DEFENSE TO TEST HIS CONCLUSIONS, WHICH WE HAVE

NO SENSE OF WHAT THE BASES ARE.

SO I THINK THIS IS A SIMPLE -- FROM THE

DEFENSE'S PERSPECTIVE, IT'S A SIMPLE 702 ANALYSIS.  THE

TESTIMONY HAS NOT SHOWN TO BE RELIABLE.

CERTAINLY, ALTHOUGH HE'S GOT SOME

EXPERTISE ON CHINA, THAT'S CLEAR.

WHAT MR. MATTIS INDICATED IS, HE GOT ON

THE INTERNET AND SEARCHED DATABASES.  HE'S WRITTEN A

LOT OF ARTICLES.  NONE OF THOSE ARTICLES HAVE BEEN

ABOUT ANY OF THESE ENTITIES.  THE ONLY THING THAT HE'S

WRITTEN IS APPARENTLY NOT EVEN PUBLISHED YET THAT

RELATES TO ANY OF THESE ENTITIES.

SO 403 ISSUES AS WELL, THE PREJUDICE.

HAPPY TO DEAL WITH WHY THIS ISN'T

RELEVANT TO ANY EXPORT VIOLATION COUNTS, BUT I DON'T

WANT TO -- I UNDERSTAND -- I DON'T WANT TO --

BRIEFING, WHICH YOU REVIEWED, THE GOVERNMENT IDENTIFIED

SEVERAL ENTITIES AND STATED THAT IT BELIEVES THERE'S

EVIDENCE FROM E-MAILS SENT TO OR BY THE DEFENDANT THAT

CONNECTS THE DEFENDANT TO THESE ENTITIES.

              DO YOU RECALL THAT?

          MR. HANUSZ:  I DO.

          THE COURT:  I'M NOT SAYING YOU HAVE TO AGREE

WITH IT.  I'M JUST SAYING THAT'S ITS POSITION.

          MR. HANUSZ:  YES, YOUR HONOR.

          THE COURT:  TO THE EXTENT THAT THE OPINIONS

ARE OFFERED TO PROVIDE INFORMATION -- JUST CERTAIN

INFORMATION ABOUT WHAT THE -- WHAT HIS OPINION -- WHAT

HIS OPINIONS ARE AS TO WHAT THESE -- THE FUNCTION OF

THESE ENTITIES, WHY IS THAT IRRELEVANT, AS YOU JUST

SAID?

          MR. HANUSZ:  WELL, IT'S NOT RELEVANT TO -- IF

THE GOVERNMENT WANTS TO ARGUE THROUGH E-MAIL THAT

DR. SHIH HAS KNOWLEDGE OF SOMETHING, WELL, CERTAINLY

THE GOVERNMENT CAN MAKE THAT ARGUMENT THROUGH E-MAILS.

              WHAT THE GOVERNMENT WANTS TO DO IS TO

ESSENTIALLY WALK THE JURY AND CONNECT THE DOTS BASED ON

INTERNET RESEARCH THAT WE DO NOT HAVE ABILITY TO TEST.

              BUT IT'S -- ITS RELEVANCE TO EXPORT

LICENSING COUNTS, WHICH ARE COUNTS 1 AND 2, IS TENUOUS

AT BEST.

I'LL USE THE ANALOGY OF A BANK. IF I

HAVE AN ACCOUNT WITH BANK OF AMERICA, CERTAINLY I DON'T

KNOW OR MAY HAVE NO KNOWLEDGE OF WHAT BANK OF AMERICA

IS DOING WITH SUBPRIME LOANS OR WHAT HAVE YOU. SO THAT

THAT IN AND OF ITSELF, THE RELATIONSHIP SHOWS NOTHING.

THE COURT: THANK YOU, MR. HANUSZ. I

APPRECIATE YOUR BEING BRIEF.

MR. HANUSZ: I'M TRYING, YOUR HONOR.

THE COURT: YOU'RE DOING FINE.

MR. SHOBAKI, LET ME HEAR FROM YOU ON THE

FOLLOWING:

WE DIDN'T SPEND A LOT OF TIME TO FOCUS ON

THE EXPERTISE OF THE WITNESS, MR. MATTIS, THAT HE

WORKED AT THE CIA AS AN ANALYST.

I HEARD THAT HE HAS WRITTEN A BOOK THAT

MAY SOON BE PUBLISHED, BUT WE DIDN'T SPEND A LOT OF

TIME ON WHAT QUALIFIES HIM AS AN EXPERT ON THE NATURE

OF THE OPERATIONS OF THESE CHINESE ENTERPRISES OR HIS

ABILITY TO ANALYZE INFORMATION THAT HE RECEIVES ABOUT

THEM.

CAN YOU ADDRESS THAT FIRST?

MR. SHOBAKI: YES, YOUR HONOR.

MR. MATTIS DID SPEND SIX YEARS AT THE

CIA. BUT, SUBSEQUENTLY TO THAT, HE HAS WORKED AT THE

MEMORIAL FOUNDATION, WHICH ARE BOTH WASHINGTON DC

FOUNDATIONS WHERE HE'S A RESEARCH FELLOW.

AND IN THAT TIME FRAME, WHICH IS THE LAST

EIGHT YEARS, REALLY, HE WAS THE EDITOR AND EDITED AND

PUBLISHED CHINA BRIEF, A BIWEEKLY JOURNAL COVERING

GREATER CHINA.  HE WROTE BIWEEKLY COLUMNS.  HE HAS A

LOT OF PUBLICATIONS ABOUT CHINA.

HE ORGANIZED THE ANNUAL CHINA DEFENSE AND

SECURITY CONFERENCE.

HE BRIEFED CORPORATE AUDIENCES ON

MANAGING SECURITY PROGRAMS.

HE'S BRIEFED GOVERNMENT AUDIENCES ON

CHINA ISSUES.

HE HAS EXTENSIVE EXPERIENCE WITH CHINA.

AND, QUITE FRANKLY, YOUR HONOR,

NOTWITHSTANDING THE SORT OF DERISIVE COMMENTS ABOUT

JUST DOING INTERNET RESEARCH, THIS IS A PERSON WHO IS

DEEPLY ENSCONCED IN AFFAIRS INVOLVING CHINA, WHICH ARE,

BY THEIR NATURE, DEEPLY INTERTWINED WITH THE CHINESE

GOVERNMENT.

HE'S ALREADY INDICATED HE DOESN'T -- THIS

ISN'T AN INTELLIGENCE-BASED CASE, AT LEAST AS FAR AS

WHAT HE'S TALKED ABOUT.

AND HE'S SOMEONE WHO IS QUALIFIED TO GIVE

TESTIMONY TO HELP THE JURY UNDERSTAND.

YOUR AVERAGE JUROR OR PERSON IN THIS

COURTROOM ISN'T GOING TO KNOW, WHEN YOU TALK ABOUT A

CHINESE ENTITY, WHETHER IT'S THE 607 INSTITUTE, FOR

EXAMPLE, WHETHER THAT'S A CHINESE MCDONALD'S OR CHINESE

RATHEON.  AND TO GIVE SOME CONTEXT TO THE JURORS TO

UNDERSTAND WHAT THESE ENTITIES ARE, THE GOVERNMENT

BELIEVES THIS TESTIMONY IS EXTREMELY VALUABLE.

TO THE RELEVANCE ISSUE, I DON'T KNOW IF

THE COURT WANTS TO GO THERE.  OBVIOUSLY, THE DEFENDANT

HAS PUT FORTH, IN THIS CASE, CLAIMS TO BE JUST, YOU

KNOW, AN INNOCENT RESEARCHER CAUGHT UP IN SOME KIND OF

GOVERNMENT WITCH HUNT.  AND IF HE'S CLAIMING NOT TO

KNOW WHO HE'S DEALING WITH OR WHAT THESE ENTITIES ARE

INVOLVED WITH, AS AN INITIAL MATTER, THE GOVERNMENT

BELIEVES THE EVIDENCE AND DOCUMENTS WILL SHOW THAT

THAT'S JUST NOT REALLY PLAUSIBLE.

BUT THE GOVERNMENT IS ENTITLED TO ALSO

SHOW THE NATURE OF THE ENTITIES WITH WHOM DEFENDANT WAS

DEALING BECAUSE THAT NATURE DIRECTLY REBUTS THE IDEA

THAT THIS IS JUST SOME ACADEMIC WORK, YOU KNOW, INSOFAR

AS THESE ARE SOME OF THE COMMERCIAL ENTITIES AND ALSO

INVOLVED IN THE DEFENSE SPACE.

AND ACKNOWLEDGING, YOUR HONOR, THAT THERE

```
 1        ARE -- THE COURT HAS EXPRESSED THIS BEFORE -- CONCERNS13
 2   ABOUT DRAWING IN TOO MUCH DISCUSSION ABOUT THE PEOPLE'S
 3   LIBERATION ARMY, THE GOVERNMENT BELIEVES THAT THAT CAN
 4   BE -- FIRST OF ALL, THAT CAN BE NARROWED BY SOME SORT
 5   OF DISCUSSION ABOUT WHAT EXACTLY HE'S ALLOWED TO SAY
 6   WITH RESPECT TO HIS OPINIONS ABOUT THESE ENTITIES.
 7              AND, YOU KNOW, THE DEFENSE IS WELCOME --
 8   TO THE EXTENT THAT THEY HAVE A PROBLEM WITH THIS
 9   EXPERT, THERE IS -- THE REMEDY IS NOT EXCLUDING THE
10   EXPERT.  IF THEY WANT TO HAVE A REBUTTAL EXPERT ON
11   THESE ISSUES AS -- THE NARROW ISSUES, AGAIN, YOUR
12   HONOR, AND THE GOVERNMENT WOULD HEW TO THAT, AS TO THE
13   IDENTITIES OF THESE ENTITIES, THEN CERTAINLY THAT'S
14   SOMETHING THAT CAN BE DONE.
15              UNLESS THE COURT HAS OTHER QUESTIONS --
16         THE COURT:  NO, I DON'T.  THANK YOU.
17         MR. HANUSZ, ANYTHING NEW?
18         MR. HANUSZ:  GIVEN THE LACK OF RELEVANCE AND
19   THE HIGHLY PREJUDICIAL NATURE OF THIS EXPERT, I DON'T
20   THINK IT'S HYPERBOLE TO SAY THAT HIS TESTIMONY WILL
21   INSERT ERROR INTO THIS TRIAL.
22              THIS IS A PROBLEM -- AND THE TIMING OF
23   MR. MATTIS IS A PROBLEM OF THE GOVERNMENT'S CREATION.
24   WE RECEIVED A 302 LAST FRIDAY, MAY 20TH, WHICH WAS FROM
25   AN INTERVIEW THE WEEK PRIOR, MAY 13TH.
```

Case 2:18-cr-00050-JAK    Document 581    Filed 07/03/19    Page 119 of 131   Page ID #:9144

PROBLEMS; BUT THE DEFENSE, GIVEN HIS TESTIMONY AND

GIVEN THE LACK OF DISCLOSURE BY THE GOVERNMENT, IS NOT

IN A POSITION TO EFFECTIVELY CROSS MR. MATTIS.

SO IF THE --

THE COURT:  GO AHEAD.

MR. HANUSZ:  IF THE GOVERNMENT WANTS TO

PROVIDE SOME DISCLOSURES AND MOVE HIM TO THE END OF

TRIAL, WE'LL -- THE COURT SEES WE'RE ABLE TO TURN

AROUND A LOT OF DOCUMENTS VERY QUICKLY.  WE'LL DO THAT.

BUT WE HAVE NOTHING AT THIS POINT.

THE COURT:  OKAY.  JUST A MINUTE.

WHAT ABOUT THE TIMING ISSUE, BRIEFLY?

TIMING OF DISCLOSURE?

MR. SHOBAKI:  WELL, YOUR HONOR, FIRST OF ALL,

THE GOVERNMENT, BACK IN MARCH, DISCLOSED MR. MATTIS;

DISCLOSED THAT HE WOULD BE TALKING ABOUT THE NATURE,

AND SPECIFICALLY THEN, OF QTC AND OF OTHER ENTITIES

INVOLVED IN THE CASE.

AGAIN, THE TIMING OF THE 302 WITH THE

FURTHER DISCLOSURES ABOUT HIS VIEWS ON SOME OF THESE

OTHER ENTITIES, IT WAS -- THAT DOCUMENT WAS DISCLOSED

ON FRIDAY, THE 17TH, NOT THE 20TH, AS MR. HANUSZ

REPEATEDLY SAYS.  SO -- YOU KNOW, WHICH WAS A FEW DAYS

AFTER HE HAD BEEN INTERVIEWED BY FBI AGENTS AND WAS

1   TURNED OVER AS SOON AS I RECEIVED A COMPLETED 302.   115

2   WELL, I WAS IN TRIAL WHEN I RECEIVED A COMPLETED 302;

3   BUT I SENT IT DIRECTLY THEREAFTER.  AND, YOU KNOW -- I

4   MEAN, THAT'S BASICALLY IT WITH RESPECT TO TIMING.

5                THE GOVERNMENT BELIEVES THAT THE RULE 16

6   NOTICES ARE SUFFICIENT.

7                WE ALSO MADE A SIMILAR DISCLOSURE ABOUT

8   WHAT THE SUBSTANCE OF HIS TESTIMONY WOULD BE IN A

9   SUPPLEMENTAL FILING WITH THE COURT ABOUT EXPERTS.

10               I BELIEVE WE'VE ARGUED THESE ISSUES WITH

11  THE COURT --

12          THE COURT:  YOU HAVE.

13          THANK YOU.

14          MR. SHOBAKI:  THANK YOU, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  HERE'S MY VIEWS:  I'M

16  NOT PERSUADED THAT MR. MATTIS LACKS EXPERTISE IN TERMS

17  OF THE 702 ISSUE.

18               I THINK THAT THERE'S A -- ALTHOUGH WE'VE

19  HAD A BRIEF HEARING ON THIS, I THINK THERE'S A

20  SUFFICIENT BASIS THAT HE WOULD HAVE KNOWLEDGE AND

21  EXPERTISE ASSOCIATED WITH CERTAIN CHINA-RELATED ISSUES,

22  INCLUDING ENTITIES THERE, AND THAT HE HAS AN ABILITY,

23  THROUGH HIS PRIOR WORK, TO ANALYZE INFORMATION THAT HE

24  CAN GATHER FROM OPEN SOURCES IN A MANNER THAT IS BEYOND

25  WHAT A TYPICAL LAYPERSON COULD DO.

1   THEREFORE, I THINK THAT -- SO I'M NOT

2   PERSUADED THAT, IN THE GATEKEEPING FUNCTION, THAT HE

3   LACKS SUFFICIENT EXPERTISE TO WARRANT HIS ABILITY TO

4   OPINE ON MATTERS.

5                I THINK IT HAS ALSO BEEN ESTABLISHED THAT

6   THE OPINIONS HE WOULD BE OFFERING ARE NOT BASED ON

7   CLASSIFIED INFORMATION OR COMMUNICATION WITH OTHERS WHO

8   HAD CLASSIFIED INFORMATION TO PROVIDE TO HIM.  BUT,

9   INSTEAD, AS WAS POINTED OUT DURING MR. HANUSZ'S

10  CROSS-EXAMINATION, A LOT OF THE -- A LOT OF INFORMATION

11  WAS GATHERED FROM LOOKING AT WEBSITES AND

12  PUBLICLY-AVAILABLE INFORMATION.

13               HE DID SAY HE -- I'LL USE THE WORD

14  "VETTING."  HE TALKED TO OTHERS OR AT LEAST ONE OTHER

15  PERSON ABOUT HIS -- ABOUT THE WORK HE WAS DOING,

16  MR. MULVENON, CONCERNING -- JUST TO GET ANOTHER INPUT

17  ON HIS TENTATIVE VIEWS.

18               IN TERMS OF THE TIMING, HIS NAME HAS BEEN

19  HERE FOR SOME TIME.  AND THE AREAS HAVE BEEN HERE FOR

20  SOME TIME.  SO I'M -- AND GIVEN THAT HE'S RELYING ON

21  THIS PUBLIC INFORMATION ABOUT ENTITIES WHOSE -- AGAIN,

22  THESE ARE NOT MYSTERIOUS ENTITIES.  THE NAMES HAVE BEEN

23  KNOWN THROUGHOUT.  SO ON THOSE LEVELS, I WOULD BE --

24  I'M NOT YET PERSUADED THAT I WOULD EXCLUDE HIS

25  TESTIMONY.

116

BEFORE.  AND THERE WAS A REFERENCE TO IT A MOMENT AGO

BY MR. SHOBAKI, WHAT -- WHICH IS ABOUT THE MILITARY --

THE CHINESE MILITARY.  WE'VE DISCUSSED THIS AT LENGTH.

I'M NOT GOING TO REPEAT ALL THOSE DISCUSSIONS,

MILITARY, NATIONAL SECURITY AND SO ON.

BUT I THINK THAT THE -- I THINK IT'S

CORRECT THAT A LAYPERSON HERE IN THE COURTROOM WOULD

NOT HAVE FAMILIARITY WITH SOME OF THE NAMES OF THESE

ENTITIES IN THE SAME FASHION THAT A LAYPERSON IN A

MATTER MIGHT HAVE FAMILIARITY WITH BUSINESS OR OTHER

ENTITIES THAT ARE MORE -- THAT OPERATE WITHIN THE

UNITED STATES.  SO I THINK THAT SOME EXPERTISE WITH

RESPECT TO THE ENTITIES IS UNDERSTANDABLE.  BUT I DON'T

THINK THAT IT'S NECESSARY TO BE OPINING ABOUT THESE

ENTITIES BEING LINKED IN ANY FASHION TO THE CHINESE

MILITARY.

I THINK IT'S A PRETTY NARROW ISSUE.  AND

THAT IS, THE DEFENSE HAS MADE THE ARGUMENT, AMONG OTHER

THINGS, THAT THIS WAS ACADEMIC WORK.  AND DEFENSE HAS

OTHER ARGUMENTS AS WELL.

THE GOVERNMENT -- THERE IS EVIDENCE

THAT'S BEING PROFFERED AS TO CONTACTS BETWEEN DR. SHIH

AND SOME OF THESE ENTITIES, INCLUDING -- WHICH WE'VE

DISCUSSED.  AND I THINK, THEREFORE, HAVING AN

BE -- WOULD BE APPROPRIATE.

SO I THINK THE -- AND WITH AN OPPORTUNITY

TO CROSS-EXAMINATION, AS YOU HAVE JUST DONE, TO SHOW

THAT YOU DISAGREE WITH THE QUALITY OF THE WORK AND THE

NATURE OF THE WORK.

BUT THERE SHOULDN'T BE A REFERENCE TO THE

CHINESE MILITARY.

THERE CAN BE A REFERENCE TO THE CHINESE

GOVERNMENT, BUT IT SHOULDN'T BE THE MILITARY BECAUSE I

DON'T THINK THAT IS -- I DON'T -- ON A 403 SIDE, SAME

THING WE'VE DISCUSSED EARLIER.  I DON'T THINK THAT'S A

NECESSARY ELEMENT OF ESTABLISHING THE ISSUE OF KNOWING

AND -- WILLFULLY AND KNOWINGLY -- ALLEGEDLY WILLFULLY

AND KNOWINGLY DOING SOMETHING.  I DON'T THINK WE NEED

TO GET THERE.  I THINK IT'S A MATTER OF UNDERSTANDING

WHO THESE -- WHAT THESE ENTITIES ARE IN TERMS OF THE

COMMUNICATIONS THEY HAD WITH DR. SHIH ONLY.

MR. SPERTUS:  YOUR HONOR, JUST A MECHANICAL

QUESTION?  THE RECORD HAS BEEN MADE.

IS THE COURT INSTRUCTING THE GOVERNMENT

TO TELL MR. MATTIS THAT HE MAY NOT SPEAK ABOUT CHINESE

MILITARY OR WEAPONS BECAUSE THEY TALK A LOT ABOUT

WEAPONS?

THE COURT:  YES, THAT'S CORRECT.

THAT MR. MATTIS IS NOT AVAILABLE AFTER TODAY.

WHEN HE IS NEXT AVAILABLE?

MR. SHOBAKI:  I CAN INQUIRE, YOUR HONOR.

BUT WHEN I LAST SPOKE WITH AGENTS ABOUT

HIS SCHEDULE, HE WAS BOOKED UP FOR THE NEXT FEW WEEKS.

I CAN INQUIRE.

THE COURT:  I'D LIKE TO KNOW -- HERE'S THE

OTHER REASON I WANT TO KNOW:

THIS TRIAL IS NOT -- THE TIME

ESTIMATES -- WE DON'T KNOW FOR SURE, BUT WE MAY BE

GOING ON FOR SEVERAL WEEKS.

I WOULD ALSO SAY THAT I'M WILLING TO HAVE

MR. MATTIS -- POTENTIALLY HAVE MR. MATTIS RETURN FOR

FURTHER CROSS-EXAMINATION AT A LATER DATE AFTER THE

DEFENSE HAS HAD AN OPPORTUNITY TO CONDUCT FURTHER

RESEARCH.

MR. SHOBAKI:  YOUR HONOR, IF THAT'S THE CASE,

I THINK, HIS SCHEDULE ALLOWING, THAT IT WOULD BE BETTER

TO DO IT ALL AT ONCE.  SO I CAN INQUIRE ABOUT HIS

SCHEDULE.

THE COURT:  WHY DON'T YOU FIND OUT.

MR. SHOBAKI:  OKAY.  CAN I HAVE A BREAK HERE

TO DO THAT?

THE COURT:  YES.

```
 1              HE'S HERE.  WE'VE KEPT -- AND I THINK WE
 2   SHOULD GET AS MUCH DONE AS WE CAN.  AND I DON'T KNOW
 3   THAT THE DEFENSE WILL WISH TO HAVE FURTHER
 4   CROSS-EXAMINATION AFTER TODAY.
 5              MR. SPERTUS:  WE'RE NOT PREPARED TO CROSS
 6   TODAY.
 7              AND WHAT WE DO DO, IT SHOULD BE DONE
 8   TOGETHER.  I THINK THE KIND OF RACE TO HAVE HIM ON
 9   TODAY IS --
10              THE COURT:  OKAY.  FIND OUT HIS AVAILABILITY.
11   BUT I DON'T THINK I QUITE AGREE YOU CAN'T DO ANY
12   CROSS-EXAMINATION TODAY.  MR. HANUSZ JUST DID IT.
13              I DON'T MEAN -- I'M NOT -- WOULD YOU
14   PLEASE FIND OUT HIS AVAILABILITY?
15              MR. SHOBAKI:  YES, YOUR HONOR.
16              THE COURT:  THANK YOU.
17              WHEN I SAY "MR. HANUSZ JUST DID IT," WHAT
18   I MEAN IS, MR. HANUSZ DID PART OF THE
19   CROSS-EXAMINATION.  AND WHAT I WAS REFERRING TO WHEN I
20   SAID "POTENTIALLY HAVE HIM RETURN" WAS, IF THE DEFENSE
21   SHOWS THAT, BASED ON FURTHER RESEARCH THAT IT HAS DONE,
22   IT HAS FURTHER QUESTIONS THAT IT THINKS WOULD BE
23   IMPORTANT, I WOULD WORK TO HAVE THAT HAPPEN.
24              MR. SPERTUS:  IN ADDITION, YOUR HONOR, WE
25   WOULD HAVE REBUTTAL EXPERTS NOW THAT WE'VE PUT THOSE
```

1

2              MR. ROLLINS:  YOUR HONOR, PAGES 6 TO 10 OF THE

3    GOVERNMENT'S SUPPLEMENTAL BRIEF THIS MORNING ADDRESSED

4    SOME OF THE COURT'S CONCERNS ABOUT THE USE OF THOSE

5    PHRASES.

6              AND, OBVIOUSLY, I DON'T WANT TO WASTE'S

7    THE COURT'S TIME OR REPEAT ARGUMENTS.  BUT I WOULD

8    STRONGLY ENCOURAGE THE COURT TO REVIEW THOSE PAGES IN

9    PARTICULAR WITH RESPECT TO THE 403 ISSUE BECAUSE I

10   THINK IT LAYS OUT WHY THOSE TERMS AND PHRASES AND

11   REFERENCE TO WEAPONS IS CRUCIAL TO WILLFULNESS IN LIGHT

12   OF THE RESEARCH-BASED ARGUMENTS THAT HAVE BEEN MADE BY

13   THE DEFENSE.

14             MR. SPERTUS:  YOUR HONOR, I HAVEN'T READ THE

15   BRIEF.  IT WAS HANDED TO ME IN COURT TODAY.

16             MR. SHOBAKI:  I LEARNED THAT HIS SCHEDULE IS

17   BOOKED UP PRETTY MUCH THROUGH JUNE 6TH.  HE HAD SOME

18   OTHER THINGS THAT HE WAS SHIFTING AROUND.  BUT HE COULD

19   BE AVAILABLE BETWEEN JUNE 6TH AND JUNE 21.

20             THE COURT:  WHAT DO YOU PROPOSE?

21             MR. SHOBAKI:  YOUR HONOR, THE GOVERNMENT JUST

22   WOULD PREFER, I GUESS, TO GO ON TODAY, IF POSSIBLE,

23   WITH THE OPPORTUNITY FOR FUTURE CROSS-EXAMINATION --

24   ADDITIONAL CROSS-EXAMINATION AS THE COURT PROPOSED.

25             I THINK THAT WITH RESPECT TO MR. SPERTUS'

THE COURT INSTRUCT THE WITNESS AS TO WHAT HE'S NOT

SUPPOSED TO TALK ABOUT RATHER THAN THE GOVERNMENT

SAYING DON'T TALK ABOUT IT.  I THINK THAT WOULD BE A

BETTER WAY TO DO SUCH AN ADMONITION.

MR. SPERTUS:  YOUR HONOR, THE BRIEF THAT WAS

HANDED TO US IN COURT THAT WILL ROLLINS JUST ASKED THE

COURT TO REVIEW IS CITING TO MISTRANSLATED DOCUMENTS.

SO, FACTUALLY, WE DO DISPUTE THOSE DOCUMENTS.

IF THEY INTEND TO BE SHOWN TO THE

WITNESS - OBVIOUSLY, THEY WON'T BE - BUT WE WOULD

OBJECT TO THAT.

WITH REGARD TO INSTRUCTIONS ON WHAT NOT

TO TESTIFY, THE WORD "MILITARY," THE WORD "WEAPONS

SYSTEMS," THE THINGS THAT SUGGEST A COMBAT-RELATED GOAL

CANNOT BE DISCUSSED BY THIS WITNESS.

MR. SHOBAKI:  YOUR HONOR, I'D JUST LIKE TO

NOTE FOR THE COURT THAT THE NUMBER 607 INSTITUTE IS

IDENTIFIED AS A STATE-OWNED ENTERPRISE, WHICH WAS A

SUBSIDIARY TO CHINA AVIONICS AND DEVELOPED MISSILE

GUIDANCE SYSTEMS, AIR-TO-AIR MISSILES AND OTHER WEAPONS

AND ARMAMENTS.  THIS LED BY ONE OF THE TWO MAIN

CONTRACTORS FOR THE PEOPLE'S LIBERATION ARMY AIR FORCE.

SO THE DEGREE TO WHICH THAT CAN BE

SANITIZED --

```
 1              THE COURT:  WELL, I THINK YOU CAN SAY IT'S AN 123
 2    ENTITY THAT'S RELATED TO THE CHINESE GOVERNMENT.  I
 3    THINK YOU CAN DO THAT IN A STRAIGHTFORWARD FASHION.
 4              THE MATTER -- THE ALLEGATIONS IN THE
 5    INDICTMENT DO NOT CONCERN SERVING THE CHINESE MILITARY,
 6    DO THEY?
 7              THEY CONCERN EXPORTING ITEMS FOR WHICH A
 8    LICENSE IS REQUIRED WITHOUT A LICENSE.
 9              MR. SHOBAKI:  I'M GOING TO LET MR. ROLLINS
10    ADDRESS THIS SINCE HE BRIEFED IT.
11              THE COURT:  OKAY.  BUT WE'VE KEPT THE JURY FOR
12    ALMOST AN HOUR.
13              MR. ROLLINS:  I THINK THAT THE KEY ISSUE NOW
14    IS, THE COURT'S DECISION TO INSTRUCT ON THE LICENSING
15    REQUIREMENT IN WILLFULNESS AT THE END OF THE CASE AND
16    DEFENSE'S THEORY.  SO AS I HAD MENTIONED YESTERDAY,
17    THOSE TWO THINGS NOW HAVE SQUARELY PLACED THOSE
18    EXCEPTIONS AT ISSUE.
19              AND WHEN THE EVIDENCE IN THE CASE
20    INDICATES THAT DEFENDANT WAS INVOLVED, FOR EXAMPLE, OR
21    PITCHING MISSILE GUIDANCE TECHNOLOGY TO CHINESE
22    COMPANIES, WHEN HE'S MAKING A BUSINESS PITCH FOR THAT,
23    THEN THAT'S OBVIOUSLY -- WE CAN'T SANITIZE THE EVIDENCE
24    DOWN TO THE POINT WHERE -- WE CAN'T SAY THE WORD
25    "MISSILE" IF DEFENDANT HIMSELF IS USING THE PHRASE
```

THE COURT:  NO, I DON'T THINK THAT'S WHAT I'M

SAYING

I THINK THAT -- I THINK THAT THERE'S --

THERE COULD BE A GENERIC STATEMENT ABOUT MISSILE

GUIDANCE, POTENTIALLY; BUT IT DOESN'T HAVE TO -- IT CAN

BE GENERIC AND BRIEF AND NOT LINKED TO THE MILITARY.

MR. ROLLINS:  YOUR HONOR --

THE COURT:  OKAY.

MR. SHOBAKI:  YOUR HONOR, WITH RESPECT TO THIS

ISSUE, IN LIGHT OF THE COURT'S -- THE VIEWS I'VE JUST

HEARD EXPRESSED BY THE COURT, I BELIEVE THE COURT WILL

BE BETTER SITUATED TO MAKE A DECISION AS TO WHETHER AND

WHAT PORTIONS OF TESTIMONY THAT IMPLICATE THE MILITARY

ARE AFTER SEEING SOME MORE EVIDENCE IN THIS CASE.  AND

FOR THAT REASON, IT MAY MAKE MORE SENSE TO DELAY

MR. MATTIS' TESTIMONY.

THE COURT:  OKAY.  AND YOU DON'T OBJECT TO

THAT?

MR. SPERTUS:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE'RE GOING TO TAKE A

SHORT BREAK TO GIVE THE REPORTER AND --

MR. HANUSZ:  I'M SORRY, YOUR HONOR.

BUT WE WOULD ASK THE COURT TO ORDER A

FULSOME RULE 16 DISCLOSURE, WHICH INCLUDES THE BASIS --

1          THE COURT:  I'M NOT HERE TO -- THIS IS NOT ~~125~~

2     OKAY.

3                    **(RECESS)**

COUNTY OF LOS ANGELES        )
                             )
STATE OF CALIFORNIA          )

            I, ALEXANDER T. JOKO, FEDERAL OFFICIAL COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATE:  JUNE 29, 2019.


                    /S/ ALEXANDER T. JOKO
                    _____
                    ALEXANDER T. JOKO, CSR NO. 12272
                    FEDERAL OFFICIAL COURT REPORTER